UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                                                      Chapter 11

LIVE PRIMARY LLC                                    Case No. 20-11612 (MG)

                                    Debtor.
------------------------------------------------------------X

# DECLARATION IN OPPOSITION TO
# MOTION TO RECLASSIFY AND/OR DISALLOW CLAIM

     Joel Schreiber declares the following under penalties of perjury pursuant to 28 U.S.C. §1746:

     1.     I am the Managing Member of Primary Member LLC ("PM"). I was directly involved in all aspects of the negotiations and implementation of the loans made by PM to the Debtor. As such, I have personal knowledge of this matter and I am competent to submit testimony in support of PM's claims in this Chapter 11 case.

## INTRODUCTION

     2.     I submit this Declaration in Opposition to the Debtor's motion, dated January 5, 2021 (ECF No. 97) (the "Objection"), seeking to reclassify or disallow Claim No. 8 filed by PM in the total sum of $6,436,184 (the "Claim"), a copy of which is annexed hereto as Exhibit "A". The Claim has its genesis in a series of pre-petition loans made to the Debtor which were always intended to be debt obligations and not capital contributions. The Objection is a paradigm of revisionist thinking, attempting to alter the original intent of the parties as reflected in the parties Limited Liability Company Agreement ("LLC Agreement") dated as of July 28, 2015, a copy of

which is annexed hereto as <u>Exhibit</u> "B".[1] Besides addressing issues of corporate governance, the LLC Agreement also provided a well-defined framework for the making and funding of loans to the Debtor.

3. Accordingly, I take strong exception with the Debtor's efforts to recharacterize the Claim as equity (years after the fact) as a means to effectively wipe out a $6 million debt obligation without affording PM or me the opportunity to have any meaningful say in the disposition of the Chapter 11 case.

4. While the terminology employed by the parties may not always be dispositive, the fact that the "Loans" were defined throughout the LLC Agreement certainly lends support to my view that they were real and not disguised capital. Indeed, the terms of the LLC Agreement recognize the existence of the "Loans" in multiple places, which are expressly delineated and defined in Section 9 thereof.

5. The LLC Agreement functionally served as the equivalent of a loan agreement containing provisions relating to the procedures for draws and disbursements to the Debtor, as well as establishing an interest rate, maturity events and even a penalty for late funding.

6. The fact that I was also a non-manager member of the Company should not and does not negate the fact that I made substantial loans with the legitimate expectation that I would be repaid. PM received an equity position as part of PM's agreement to lend $6,000,000 to the Debtor, not as a substitute or means to disguise capital.

7. To be clear, I never would have allowed PM to make a $6,000,000 capital investment in the Debtor. What I agreed to do was to have PM make a $6,000,000 loan with the

---

[1] None of the amendments to the LLC Agreement affect the terms and conditions of the loans. There are three iterations of the LLC Agreement - the original Agreement dated as of July 28, 2015, a First Amendment dated December 15, 2017 and a First Amended and Restated Limited Liability Agreement dated as of June 14, 2019.

expectation that it would be paid by the Debtor. The best way to characterize PM is that it functioned as the initial lending sponsor for the Debtor's start-up operations under credit line incentivized by an equity position.

8. Over a period of three (3) years, and at the specific requests of the Debtor, PM made over sixty (60) loan advances to the Debtor pursuant to the terms of the LLC Agreement. The specific loan advances are delineated in the schedule to the Claim filed with the Court. (*See,* Exhibit "A" herein)

9. If these loans were not extended, the Debtor would not have been able to, *inter alia,* start operating, including the payment of the security deposit to the landlord, build-out its facilities located on the 3rd and 8th floors of 26 Broadway, New York, New York, build-out its facility on West 30th Street or to meet its payroll and other operating expenses during its early years of its existence.

10. Separate and apart from the $6,000,000 of loans made under the LLC Agreement, the Debtor pleaded with PM to extend additional loans totaling more than $365,000 at ten (10%) percent per annum to help keep it afloat while it tried to expand and to reach profitability.

11. All of the loans are, in fact, reflected as loans (not capital) on the Debtor's books and records, including specific references in the financial statements, and the Debtor's federal and state tax returns. For the Court's ready reference, annexed hereto as Exhibit "C" is a copy of the balance sheets included as part of the Debtor's income statements for the periods ending December 31, 2018 and December 31, 2019 reflecting and characterizing the PM loan as a Long-Term Liability[2]. The loans were also reflected on the balance sheets made a part of the Debtor's 2018 and 2019 tax

---

[2] Waterbridge is the parent investment company from which loans were funded to the Debtor.

returns. A redacted copy of excerpted portions of the 2018 and 2019 tax returns including the balance sheets is annexed hereto as Exhibit "D".

12. The loans were gratefully acknowledged by the Debtor during the pre-petition period and were fully disclosed and were known to the Noteholders before they extended their secured loans to the Debtor.

13. The current litigation position taken by the Debtor and the Noteholders runs counter to this financial reporting and is a brazen attempt to extinguish PM's valid Claim.

14. To make matters worse, the Debtor and the Noteholders have opposed PM's desire to protect its position by offering an alternative plan to creditors.

**BACKGROUND**

15. I met Lisa Hain in 2010. Ms. Hain was the first sales person for We Work. She impressed me as having very good skills and the ability to interface with the We Work community. I was the first Lender Investor in We Work. Ms. Hain left We Works' employ sometime in late 2011, and we remained in contact thereafter. After leaving We Works, Ms. Hain and I had conversations about opening another alternative office type business and she asked me to come aboard as a lender and investor.

16. I formed PM as the vehicle for the Live Primary project. In addition to putting together the first form of the LLC Agreement which was signed as of July 28 2015, the Debtor began to search out an acceptable location for what would be its flagship location. Ultimately the Debtor decided to take space at 26 Broadway, New York, New York. A lease was signed for part of the eighth floor which was later expanded to include the entire third floor.

17. The loans under the LLC Agreement required that PM lend $3.7 million for the first location. In the ordinary course of business, PM went back and forth with the Debtor's

4

representatives on the timing and the amount of the loan advances. PM loaned the $3.7 million for the development of the eighth floor at 26 Broadway. The first part of the loan is clearly shown on the loan schedule made a part of the Claim as <u>Exhibit</u> "A". The balance of the loan commitment was later extended to include the development of the eighth floor at 26 Broadway, along with the development of two floors at 251 West 30th Street, New York, New York.

18. All of the locations opened and conducted business pre-petition; however, I believe that the 30th Street location was closed by the Debtor and the space was given back to the landlord. While PM was required to provide total loans of $6,000,000, it actually advanced $6,131,522.77 on the project. The Loans were funded pursuant to a clearly delineated borrowing structure under the LLC Agreement pursuant to which the Debtor would provide PM with Disbursement Requests predicated upon a budget in accordance with the provisions of Section 9.3. The draws and budget are consistent with arm's length lending practices, and PM would independently check and verify many budget line items before issuing its loan advances.

19. Even after advancing the loans, PM would attempt to monitor the Debtor's payments to the parties who were supposed to receive same. Often, payment of the advances was held back because of construction delays which were commonplace. There were many emails back and forth with the Debtor concerning Disbursement Requests. Most Disbursement Requests were funded by wire transfers and all of the loan tranches are shown on the schedule appended to the Claim as <u>Exhibit</u> "A".

20. Additionally, under the LLC Agreement, the loans were required to be repaid before any distribution to its members in accordance with Section 10.2(c) further cementing the parties' actual intent that the loans are real debt obligations.

5

## ADDITIONAL LOANS

21. The original loans were not enough and in early 2018 Ms. Hain requested PM to extend additional loans. It was agreed that these additional loans would be made outside the scope of the LLC Agreement. These additional loans came in several tranches and were repayable on demand, bearing interest at ten (10%) percent per annum. This was done at Ms. Hain's suggestion. In fact, Ms. Hain indicated that a 10% interest rate was less than the interest rate she was paying for other loans obtained at that time.

## THE EQUITY POSITION

22. It was specifically understood that Ms. Hain and I would both have an equity interest, or membership, in the Debtor where I initially owned 3,600 units, Ms. Hain owned 2,700 units and Daniel Orenstein owned 2,700 units.

23. Had the loans been capital, obligations to extend such advances to the Debtor would have been equally required of Ms. Hain and Mr. Orenstein. However, when searching the four corners of the LLC Agreement, there is no contractual obligation placed upon them to extend loans. I note that Ms. Hain has asserted that she is owed approximately $230,000 on account of monies which she loaned to the Debtor. Her loans to the Debtor were voluntary advances made to help the struggling company through difficult times. PM's loans were contractual, subject to default provisions, and equity dilution provisions contained within Section 9.3 of the LLC Agreement.

24. I also wish to point out that many of the provisions within the LLC Agreement are typical of what one would expect to find under a conventional loan agreement. For example, PM and I had no control over the day-to-day operations of the company. Ms. Hain ran the Debtor. I was only consulted with respect to defined major actions. For example, my company's consent

was required and was given in connection with the loans made to the Debtor by the Noteholders. [*See,* Section 8.2 of the LLC Agreement].

25. I fully appreciate that PM made the loans without issuance of a note. However, execution of a note was contemplated by the LLC Agreement, although not signed, without fault of either party. Section 9.2 of the LLC Agreement states that the loans may (but not shall) be evidenced by execution of a Loan Agreement.

26. The LLC Agreement provides that the loans bear interest and are payable on the occurrence of a Liquidity Event as defined in Schedule 2 of the LLC Agreement. PM believes that the proposed recapitalization under the Plan involving a cancellation of the Debtor's equity and the transfer to new ownership constitutes the liquidity event triggering maturity. As such the PM claim should be recognized and addressed under the Plan. There is no accusation of wrongful conduct by PM.

27. I am told that the Court will look to the Company's ability to obtain outside financing when considering whether an advance should be considered loan or equity. While the Debtor did not obtain an institutional loan, it did receive $2.8 million loan from the Noteholders who were given a security interest on the Debtor's business assets. The records reviewed by the Noteholders reflected the long-term debt owed to PM when that loan was granted. PM was required to consent to the Noteholder loan. Clearly, a consent would not be required had the advances been equity rather than a loan.

28. Moreover, the legal recharacterization argument ignores economic reality, whereby entrepreneurs seek to be repaid for monies loaned to startup companies. Entrepreneurs would be hesitant to lend monies to "risky" business ventures where aside from the normal risks of a new venture, they would further risk having a Court at a later date reclassify their loans even though they

7

are not guilty of any wrongful or overreaching. All of the actions taken by PM were designed to try to help the Debtor establish itself. The legal position taken by the Debtor and the Noteholders undercuts all of these legitimate expectations. If PM's loans were equity contributions, why didn't Ms. Hain and Mr. Orenstein (the other original stockholder) make similar contributions?

## CONCLUSION

29. PM loaned $6,000,000 to the Debtor pursuant to the LLC Agreement, independent of its membership status. In the process, PM performed all its obligations under the LLC Agreement and there have been no claims of default, overreaching or other improprieties. While PM may have disagreed with the Debtor on the timing and the amounts needed for various expenditures, PM extended over 60 sets of disbursements totaling over $6 million. The loan enabled the Debtor to fund its leasehold commitments, construct its premises and operate its business. PM was not responsible for the decline in alternative office business or for the economic distress caused by COVID. The Debtor's books and records, financial statements and tax returns reflect the PM loans, and this is a critical factor which militates against reclassification. Any repayments of the 10% Loans were made in the ordinary course of business pursuant to the LLC Agreement, commensurate with the compensation paid to Ms. Hain during the one year period prior to the filing of the Chapter 11 case.

30. In view of all of the foregoing, the Court should deny the Debtor and the Noteholder's request to reclassify PM's loans.

Dated: New York, New York
      January 25, 2021

                              PRIMARY MEMBER LLC

                          By:    /s/ Joel Schreiber
                                  Joel Schreiber
                                  Managing Member

To:     Sanford Rosen, Esq.
        Rosen & Associates PC
        747 Third Avenue
        New York, NY 10017

        Daniel J. Weiner, Esq.
        Schaefer & Weiner
        40950 Woodward Avenue
        Suite 100
        Bloomfield Hills, MI 48304
        dweiner@schaeferandweiner.com