LIMITED LIABILITY COMPANY AGREEMENT

of

**PRIMARY, LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

**Dated:  As of July 28, 2015**

**THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES
SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE
SECURITIES LAWS.   SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED,
PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN
COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND
ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE
OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.**

JS

LIMITED LIABILITY COMPANY AGREEMENT

OF

PRIMARY, LLC

This Limited Liability Company Agreement (this "Agreement") of Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of July 28, 2015 (the "Effective Date") by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual and Daniel Orenstein ("DO"), an individual, as members (individually, a "Member" and collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.     Formation. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.     Name. The name of the Company shall be "Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.     Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.     Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

5.     Principal Office. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.     Term. The term of the Company shall commence upon the Effective Date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

JS

7.    Members. The Company shall have initially three (3) Members. The names, mailing addresses and the number of ownership Units in the Company held by the Members are as set forth on Schedule 1. Notwithstanding the pro rata ownership of the Members, on any corporate action on which the Members are required to consent pursuant to this Agreement, the consent of PM shall be required for the approval of such corporate action.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized persons for all purposes of the Act is and shall be LSH and DO each as a member-manager (collectively the "Managers" and each individually a "Manager") of the Company. The Managers shall be the sole Persons with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by both Managers. The Managers shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company. In the event of a disagreement between the Managers, the majority vote of the Members shall determine the outcome of such disagreement.

8.2    Furthermore, notwithstanding the foregoing, the Managers shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the written consent or affirmative vote of all the Members, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)    liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(b)    amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(c)    create, or authorize the creation of, or issue or obligate itself to issue any additional Units or increase the authorized number of any Units, except pursuant to this Agreement;

(d)    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(e)    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Members;

JS  ◌
    ◌

(f)     guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000 except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(g)     make any investment inconsistent with any investment policy approved by the Members;

(h)     make any capital expenditure that is not already included in a budget approved by the Members greater than $10,000;

(i)     incur any aggregate indebtedness greater than $10,000 that is not already included in a budget approved by the Members, other than trade credit incurred in the ordinary course of business;

(j)     otherwise enter into or be a party to any transaction with any Member, officer, or employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Members;

(k)     hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment, which shall be determined pursuant to Schedule 8.6 ), including approving any option grants or Unit awards to executive officers or Members;

(l)     deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget; or

(m)     enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000.

8.3     Binding Authority.  Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

8.4     Liability for Certain Acts.  The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.5     Duty to Company.

-3-

JS    PTO
      LBR

        (a)     As Managing Members of the Company, LSH and DO shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

        (b)     The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

        (c)     Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH and DO may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

        8.6     Indemnification.

        (a)     The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorney's fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

        (b)     In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the

-4-

payment of the Indemnitee's reasonable attorney's fees in connection with any action or proceeding brought against the Indemnitee.

8.7 Expenses, Fees, and Compensation. Except as may be (a) approved by the Members in writing, (b) set forth in any budget approved by the Members related to a shared office facility or (c) pursuant to a Company reimbursement policy approved by the Members, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 8.6 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Members.

8.8 Officers. The Managers may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers. The Managers may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

8.9 Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.10 Meetings. All meetings of the Members or Managers shall be held at such time and place as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting.

9. Capital Contributions and Loans.

9.1 Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2 Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

-5-

 

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

9.3     Disbursement Process. The Managers shall deliver a written Disbursement Request to PM in accordance with and pursuant to the Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement request is not funded by PM within two (2) business days (the "Disbursement Date"), PM shall be in default hereunder (a "Disbursement Default"). PM shall have a period of sixty (60) days from the Disbursement Date to cure the Disbursement Default before the Disbursement Default penalty is triggered (the "Trigger Date").

(a)     Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

(b)     Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM' Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM' forty (40) Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

(c)     Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

(d)     In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

9.4     No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to

JS   

receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

          9.5    Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

          9.6    No Priority. Subject to Section 10.2, no Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

          9.7    Liability of Members and Their Affiliates for Capital and Debts. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

          10.    Capital Accounts, Profits, Losses and Distributions.

          10.1    Capital Accounts.

          (a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and its successors and permitted assigns.

          (b)    The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

          (c)    In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

          (d)    In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective

-7-



JS

gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(e)    For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

(g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.

(a)    The Company shall distribute all or any portion of Available Cash to the Members pro rata in accordance with their respective Units.

(b)    Notwithstanding Section 10.2(a) above, in the event that the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have each received cash flow percentages therefrom equal to their Membership Interests. Any cash flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

-8-



          (c)     Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

          (d)     Notwithstanding Section 10.2(c) above, upon the Company achieving:

          (i)     Annual revenues of $500,000;

          (ii)     a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

          (iii)     Other milestones agreed upon by all the Members

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective Units.

          10.3     <u>Distributions in Kind</u>. In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

          10.4     <u>Profits and Losses</u>.

          (a)     <u>Generally</u>.

          (i)     The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

          (ii)     In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "<u>Effective Date</u>") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

          (b)     <u>Allocation of Profits and Losses</u>. Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise

JS

DfO
LfM

provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

        (c)    Special Allocation Provisions.

        (i)    Qualified Income Offset. In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

        (ii)    Member Nonrecourse Deductions. Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

        (iii)    Minimum Gain Chargeback.

        (A)    Company Minimum Gain. Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be

-10-



allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

        (B)    Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

        (iv)    Section 704(c) Allocation.

        (A)    Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax

purposes and its fair market value at the time such property was contributed to the Company.

(B)     In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

(C)     Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)     Members' Interest in Company Profits For Purposes of Section 752.  As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)     Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)     Regulatory Compliance.  The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)     Curative Allocations.  The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses).  In exercising

-12-



its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix) <u>Loss Allocation Limitation</u>. Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

10.5 <u>No Obligation to Restore Negative Balances in Capital Accounts</u>. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

10.6 <u>Tax Allocations</u>. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

10.7 <u>Member Tax Distributions</u>.

(a) Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

(b) A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

(i) his share of the Company's income for such Fiscal Year over

(ii) the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

-13-

(c)     The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

(d)     This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

(e)     Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

(f)     To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

10.8    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.     Books and Records.

11.1    Books of Account.

(a)     Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon reasonable advance request.

(b)     Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law,

-14-

provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

           11.2    Tax Elections. The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company. As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

           11.3    Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

           11.4    Tax Returns. The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

           11.5    Tax Matters Member. The Members shall designate the LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

        12.    Transfers of Interests of Members.

           12.1    General.

           (a)      Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided,

-15-

however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)     If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

(i)     The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)     the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)     the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)     the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)     if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)     the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)     the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring

-16-

JS

Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

(c) A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

(d) Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

(e) In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The

-17-

JS mo
VHN

terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

    12.2  Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

    12.3  Death or Permanent Disability of a Member.

      (a)  Death. Not later than ninety (90) days after the death of any Member (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their

-18-

economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)     Permanent Disability. Not later than ninety (90) days after the determination that any Member has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers. If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company. For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)     Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company.

-19-

Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

        12.4    Transfers by operation of Law. In the event that the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

        12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

        12.6    Purchase Price.

        (a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

        (b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity

-20-

JS

purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

(c)     Manner of Payment.     The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

(i)     An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

(ii)     The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

(iii)     in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

(iv)     the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall

-21-

be entitled to bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale. The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default. Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him. Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said Units. Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

(v)     The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

(1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

(2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

(3) the buyer is adjudicated a bankrupt, makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

13.     Withdrawal or Resignation. Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.     Admission of Additional Members. The Company may admit new Members, subject to Section 14.1.

14.1     Right of First Offer. Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

(a)     If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

-22-

       (b)     The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

     15.    Dissolution.

       15.1    Dissolution. The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

       15.2    Liquidation.

       (a)     Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

       (b)     Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

       15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

       15.4    Effect of Certain Events on the Company's Existence.

       (a)     General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

       (b)     Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law,

provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.     Participation in Sales.

16.1     Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

16.2     Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

16.3     Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

16.4     "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and the majority of the Members of the Company approves such transaction, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

-24-

17. Reserved.

18. Guaranty of Real Estate Obligations. PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

19. Miscellaneous.

19.1 Entire Agreement; Amendment. This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled. This Agreement may not be changed, modified, amended, discharged, abandoned or terminated orally, but only by an agreement in writing, signed by all of the Members.

19.2 Severability. If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3 Preparation and Review of Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4 Notices. Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5 Governing Law; Venue.

(a) This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b) Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such

-25-

action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

                19.6    <u>Counterparts; Signatures</u>. This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

                19.7    <u>No Third Party Beneficiaries</u>. None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of **NEW YORK**
The foregoing instrument was acknowledged before me this **28** of **JULY**, 2015, by Joel Schreiber, who personally appeared.

_____
Notary's Signature
My commission expires the **17** of **January**, 20 **16**

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01/17/16

_____
Lisa Skye Hain

_____
Daniel Orenstein

State of New York,
County of **NEW YORK**
The foregoing instrument was acknowledged before me this **28** of **JULY**, 2015, by Lisa Skye Hain and Daniel Orenstein who each personally appeared.

_____
Notary's Signature
My commission expires the **7** of **January**, 20 **16**

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01/17/16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01/17/16

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Units |
|--------|----------------|---------------------|-------|
| Primary Member, LLC | 7 Times Square 37th Floor New York, NY 10036 | $400.00 | 3,600.00 |
| Lisa Skye Hain | 110 Livingston St. Apt. 15H Brooklyn, NY 11201 | $300.00 | 2,700.00 |
| Daniel Orenstein | 52 Fort Greene Pl. Apt. 1 Brooklyn, NY 11217 | $300.00 | 2,700.00 |
| The 2015 Company Unit Option Plan | | TBD | 1,000.00 |
| Total: | | $1,000.00 | 10,000.00 |

JS    mo
      LO

Schedule 2

Definitions

"*Act*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Additional Capital Contributions*" means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

"*Affiliate(s)*" shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"*Agreement*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Approved Loan*" shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

"*Available Cash*" means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

"*Bankrupt*" shall have the meaning set forth in Section 15.4(b).

"*Bankruptcy*" shall have the meaning set forth in Section 15.4(b).

"*Business Day*" shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

"*Business Hours*" shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

Field Code Changed

"*Capital Account*" shall have the meaning set forth in Section 10.1(a).

"*Capital Contributions*" means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

"*Company*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Courts*" shall have the meaning set forth in Section 16.5.

"*Economic Risk of Loss*" shall have the meaning set forth in Section 10.4(c).

"*Effective Date*" shall have the meaning set forth in Section 10.4(a).

"*Fiscal Year*" or "*Fiscal Period*" means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

"*Gross Asset Value*" shall have the meaning set forth in Section 10.1(c).

"*Indemnitee*" shall have the meaning set forth in Section 8.5(b).

"*Liquidity Event*" Each of the following events shall be considered a "Liquity Event" unless the Members elect otherwise by written notice:

    (a)    a merger or consolidation in which

        (i)    the Company is a constituent party or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

    (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company

Field Code Changed

of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

"*Loan Documents*" shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

"*Member(s)*" shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

"*Member Nonrecourse Deductions*" shall have the meaning set forth in Section 10.4(c).

"*New Securities*" shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "*Exempted Securities*"):

(i)      Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)     Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Members;

(iv)     Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)      Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Members;

(vi)     Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

(vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Members; or

Field Code Changed

    (viii)   Units, Options or Convertible Securities issued in connection with strategic partnerships approved by the Members.

    *"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

    *"Profits"* or *"Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

    *"Property"* shall have the meaning set forth in Section 2.

    *"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

    *"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

    *"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

    *"TMP"* shall have the meaning set forth in Section 11.5.

    *"Transfer"* means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions. In the case of PM, the Transfer of any of the interests of PM to any


Field Code Changed

Sch. 2 – Page 4

Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

*"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Units shall be considered personal property. The initial Units of each Member are set forth on Schedule 1 annexed hereto.

Field Code Changed

Schedule 8.6

Fees, Expenses and Compensation

Effective on the Effective Date, the Company shall pay to LS on a monthly basis an amount equal to ten thousand dollars ($10,000.00) (the "LS Salary"), as may be amended pursuant the consent of the Members.

Effective on the Effective Date, the Company shall pay to DO on a monthly basis an amount equal to two thousand five hundred dollars ($2,500.00) until the six-month anniversary of the Effective Date, at which time the Company shall pay to DO on a monthly basis ten thousand dollars ($10,000.00) (the "DO Salary"), as may be amended pursuant the consent of the Members.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LSH Salary (the "PM Payment"). PM may waive the Company's obligation to pay the PM Payment, in its sole discretion.

Field Code Changed

JS