---

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor 1 | Live Primary, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of New York |
| Case number | 20-11612-MG |

## Official Form 410

# Proof of Claim

**04/19**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| | |
| --- | --- |
| 1. Who is the current creditor? | Primary Member LLC <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| 2. Has this claim been acquired from someone else? | ☑ No <br> ☐ Yes. From whom? |
| 3. Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br> c/o Kevin J. Nash, Esq./Goldberg Weprin Finkel <br> Name <br> 1501 Broadway, 22nd Floor <br> Number   Street <br> New York      NY      10036 <br> City         State    ZIP Code <br> Contact phone 212-301-6944 <br> Contact email knash@gwfglaw.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> **Where should payments to the creditor be sent? (if different)** <br> Name <br> Number   Street <br> City         State    ZIP Code <br> Contact phone <br> Contact email |
| 4. Does this claim amend one already filed? | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____   Filed on ___ MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No <br> ☐ Yes. Who made the earlier filing? |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | |
|---|---|
| 7. How much is the claim? | $_____6,436,184.00__. Does this amount include interest or other charges?<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Loans extended to Debtor as per operating agreement |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:                         $_____<br>Amount of the claim that is secured:    $_____<br><br>Amount of the claim that is unsecured: $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition:    $_____<br><br>Annual Interest Rate (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| | ☐ Yes. Check one: | Amount entitled to priority |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/02/2020
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Joel Schreiber | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Member | | |
| Company | Primary Member LLC c/o Waterbridge Capital | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 214 West 29th Street | | |
| | Number      Street | | |
| | New York | NY | 10001 |
| | City | State | ZIP Code |
| Contact phone | 212-607-8134 | Email | js@waterbridge.com |

| Establishment & Operation Loan | |
|---|---|
| Principal Due | 6,131,148 |
| Interest Due | 223,752 |
| Total Due | 6,354,900 |

| Other Loans | |
|---|---|
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

| Total Loans | |
|---|---|
| Principal Due | 6,194,041 |
| Interest Due | 242,143 |
| Total Due | 6,436,184 |

Live Primary LLC
Establishment & Operation Loan Detail

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 08/18/15 | Live Primary LLC | 50,000.00 | 50,000.00 | 1% | 1.37 | 58 | 79.45 |
| 10/15/15 | Live Primary LLC | 25,000.00 | 75,000.00 | 1% | 2.05 | 6 | 12.33 |
| 10/21/15 | Live Primary LLC | 84,087.49 | 159,087.49 | 1% | 4.36 | 7 | 30.51 |
| 10/28/15 | Live Primary LLC | 91,566.17 | 250,653.66 | 1% | 6.87 | 1 | 6.87 |
| 10/29/15 | Live Primary LLC | 549,397.00 | 800,050.66 | 1% | 21.92 | 18 | 394.55 |
| 11/16/15 | Live Primary LLC | 173,999.98 | 974,050.64 | 1% | 26.69 | 2 | 53.37 |
| 11/18/15 | Live Primary LLC | 137,000.00 | 1,111,050.64 | 1% | 30.44 | 6 | 182.64 |
| 11/24/15 | Live Primary LLC | 412,000.00 | 1,523,050.64 | 1% | 41.73 | 38 | 1,585.64 |
| 01/01/16 | YE 2015 Totals | 1,523,050.64 | 1,523,050.64 | | | | 2,345.36 |
| 01/01/16 | Live Primary LLC | - | 1,523,050.64 | 1% | 41.73 | 5 | 208.64 |
| 01/06/16 | Live Primary LLC | 5,000.00 | 1,528,050.64 | 1% | 41.86 | 2 | 83.73 |
| 01/08/16 | Live Primary LLC | 5,000.00 | 1,533,050.64 | 1% | 42.00 | 5 | 210.01 |
| 01/13/16 | Live Primary LLC | 50,000.00 | 1,583,050.64 | 1% | 43.37 | 2 | 86.74 |
| 01/15/16 | Live Primary LLC | 200,000.00 | 1,783,050.64 | 1% | 48.85 | 11 | 537.36 |
| 01/26/16 | Live Primary LLC | 50,000.00 | 1,833,050.64 | 1% | 50.22 | 1 | 50.22 |
| 01/27/16 | Live Primary LLC | 30,000.00 | 1,863,050.64 | 1% | 51.04 | 0 | - |
| 01/27/16 | Ylighting | 1,510.00 | 1,864,560.64 | 1% | 51.08 | 1 | 51.08 |
| 01/28/16 | Live Primary LLC | 20,000.00 | 1,884,560.64 | 1% | 51.63 | 1 | 51.63 |
| 01/29/16 | Live Primary LLC | 50,000.00 | 1,934,560.64 | 1% | 53.00 | 3 | 159.00 |
| 02/01/16 | Ferguson Enterprises | 7,449.77 | 1,942,010.41 | 1% | 53.21 | 0 | - |
| 02/01/16 | Ferguson Enterprises | 8,246.69 | 1,950,257.10 | 1% | 53.43 | 0 | - |
| 02/01/16 | Ylighting | 1,050.00 | 1,951,307.10 | 1% | 53.46 | 4 | 213.84 |
| 02/05/16 | Live Primary LLC | 190,000.00 | 2,141,307.10 | 1% | 58.67 | 0 | - |
| 02/05/16 | Live Primary LLC | 10,000.00 | 2,151,307.10 | 1% | 58.94 | 5 | 294.70 |
| 02/10/16 | Live Primary LLC | 50,000.00 | 2,201,307.10 | 1% | 60.31 | 2 | 120.62 |
| 02/12/16 | Live Primary LLC | 25,000.00 | 2,226,307.10 | 1% | 60.99 | 7 | 426.96 |
| 02/19/16 | Live Primary LLC | 25,000.00 | 2,251,307.10 | 1% | 61.68 | 3 | 185.04 |
| 02/22/16 | Live Primary LLC | 15,000.00 | 2,266,307.10 | 1% | 62.09 | 0 | - |
| 02/22/16 | Ylighting | 6,748.75 | 2,273,055.85 | 1% | 62.28 | 8 | 498.20 |
| 03/01/16 | Live Primary LLC | 25,000.00 | 2,298,055.85 | 1% | 62.96 | 3 | 188.88 |
| 03/04/16 | Live Primary LLC | 100,000.00 | 2,398,055.85 | 1% | 65.70 | 4 | 262.80 |
| 03/08/16 | Live Primary LLC | 103,185.19 | 2,501,241.04 | 1% | 68.53 | 1 | 68.53 |
| 03/09/16 | Live Primary LLC | 250,000.00 | 2,751,241.04 | 1% | 75.38 | 8 | 603.01 |
| 03/17/16 | Live Primary LLC | 10,000.00 | 2,761,241.04 | 1% | 75.65 | 8 | 605.20 |
| 03/25/16 | Live Primary LLC | 15,000.00 | 2,776,241.04 | 1% | 76.06 | 6 | 456.37 |
| 03/31/16 | Live Primary LLC | 225,000.00 | 3,001,241.04 | 1% | 82.23 | 15 | 1,233.39 |
| 04/15/16 | Live Primary LLC | 50,000.00 | 3,051,241.04 | 1% | 83.60 | 4 | 334.38 |
| 04/19/16 | Live Primary LLC | 10,000.00 | 3,061,241.04 | 1% | 83.87 | 1 | 83.87 |
| 04/20/16 | Leveldesk | 8,405.67 | 3,069,646.71 | 1% | 84.10 | 0 | - |
| 04/20/16 | Leveldesk | 2,900.87 | 3,072,547.58 | 1% | 84.18 | 2 | 168.36 |
| 04/22/16 | Live Primary LLC | 11,000.00 | 3,083,547.58 | 1% | 84.48 | 3 | 253.44 |
| 04/25/16 | Live Primary LLC | 10,000.00 | 3,093,547.58 | 1% | 84.75 | 0 | - |
| 04/25/16 | Directiview | 11,282.68 | 3,104,830.26 | 1% | 85.06 | 1 | 85.06 |
| 04/26/16 | Live Primary LLC | 10,000.00 | 3,114,830.26 | 1% | 85.34 | 6 | 512.03 |
| 05/02/16 | Live Primary LLC | 50,000.00 | 3,164,830.26 | 1% | 86.71 | 4 | 346.83 |
| 05/06/16 | Live Primary LLC | 100,000.00 | 3,264,830.26 | 1% | 89.45 | 4 | 357.79 |
| 05/10/16 | Live Primary LLC | 20,000.00 | 3,284,830.26 | 1% | 90.00 | 1 | 90.00 |
| 05/11/16 | Live Primary LLC | 10,000.00 | 3,294,830.26 | 1% | 90.27 | 2 | 180.54 |
| 05/13/16 | Live Primary LLC | 40,000.00 | 3,334,830.26 | 1% | 91.37 | 3 | 274.10 |
| 05/16/16 | Live Primary LLC | 50,000.00 | 3,384,830.26 | 1% | 92.74 | 2 | 185.47 |
| 05/18/16 | Live Primary LLC | 25,000.00 | 3,409,830.26 | 1% | 93.42 | 2 | 186.84 |
| 05/20/16 | Live Primary LLC | 25,000.00 | 3,434,830.26 | 1% | 94.10 | 21 | 1,976.20 |
| 06/10/16 | Live Primary LLC | 20,000.00 | 3,454,830.26 | 1% | 94.65 | 5 | 473.26 |
| 06/15/16 | Live Primary LLC | 245,000.00 | 3,699,830.26 | 1% | 101.37 | 199 | 20,171.68 |
| 12/31/16 | YE 2016 Totals | 2,176,779.62 | 3,699,830.26 | | | | 32,275.81 |

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 01/01/17 | Live Primary LLC | - | 3,699,830.26 | 1% | 101.37 | 348 | 35,275.09 |
| 12/15/17 | Live Primary LLC | 800,000.00 | 4,499,830.26 | 1% | 123.28 | 17 | 2,095.81 |
| 01/01/18 | YE 2017 | 800,000.00 | 4,499,830.26 | | | | 37,370.91 |
| 1/1/2018 | Live Primary LLC | - | 4,499,830.26 | 1% | 123.28 | 37 | 4,561.47 |
| 02/07/18 | Live Primary LLC | 945,674.08 | 5,445,504.34 | 1% | 149.19 | 0 | - |
| 02/07/18 | Live Primary LLC | 14,000.00 | 5,459,504.34 | 1% | 149.58 | 71 | 10,619.86 |
| 04/19/18 | Live Primary LLC | 100,000.00 | 5,559,504.34 | 1% | 152.32 | 5 | 761.58 |
| 04/24/18 | Live Primary LLC | 120,000.00 | 5,679,504.34 | 1% | 155.60 | 2 | 311.21 |
| 04/26/18 | Live Primary LLC | 75,000.00 | 5,754,504.34 | 1% | 157.66 | 12 | 1,891.89 |
| 05/08/18 | Live Primary LLC | 100,000.00 | 5,854,504.34 | 1% | 160.40 | 3 | 481.19 |
| 05/11/18 | Live Primary LLC | 25,000.00 | 5,879,504.34 | 1% | 161.08 | 6 | 966.49 |
| 05/17/18 | Live Primary LLC | 50,000.00 | 5,929,504.34 | 1% | 162.45 | 5 | 812.26 |
| 05/22/18 | Live Primary LLC | 70,121.08 | 5,999,625.42 | 1% | 164.37 | 1 | 164.37 |
| 05/23/18 | Live Primary LLC | 131,522.77 | 6,131,148.19 | 1% | 167.98 | 223 | 37,458.80 |
| 01/01/19 | YE 2018 | 1,631,317.93 | 6,131,148.19 | | | | 58,029.12 |
| 01/01/19 | Live Primary LLC | - | 6,131,148.19 | 1% | 167.98 | 365 | 61,311.48 |
| 01/01/20 | YE 2019 | - | 6,131,148.19 | | | | 61,311.48 |
| 01/01/20 | Live Primary LLC | - | 6,131,148.19 | 1% | 167.98 | 193 | 32,419.50 |
| 07/12/20 | YE 2020 | - | 6,131,148.19 | | | | 32,419.50 |

| Est. & Operation Loan Summary | |
|---|---|
| Loan Duration | 4.9 Years |
| Principal Due | 6,131,148.19 |
| Interest Due | 223,752.17 |
| Total | 6,354,900.36 |

Other Loans

| Period Start | Period End | Principal @ Start Period | Principal Adjustments | Principal @ End Period | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|---|
| 01/01/18 | 06/01/18 | - | 50,000.00 | 50,000.00 | 10% | 0 | 0 | 0 |
| 06/01/18 | 06/14/18 | 50,000.00 | (1,500.00) | 48,500.00 | 10% | 14 | 13 | 178 |
| 06/14/18 | 06/28/18 | 48,500.00 | (2,500.00) | 46,000.00 | 10% | 13 | 14 | 186 |
| 06/28/18 | 07/23/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 25 | 315 |
| 07/23/18 | 07/25/18 | (4,000.00) | 10,000.00 | 6,000.00 | 10% | (1) | 2 | (2) |
| 07/25/18 | 07/27/18 | 6,000.00 | 10,000.00 | 16,000.00 | 10% | 2 | 2 | 3 |
| 07/27/18 | 07/31/18 | 16,000.00 | 10,000.00 | 26,000.00 | 10% | 4 | 4 | 18 |
| 07/31/18 | 08/13/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 13 | 93 |
| 08/13/18 | 08/13/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 0 | 0 |
| 08/13/18 | 08/15/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 2 | (2) |
| 08/15/18 | 08/27/18 | 46,000.00 | (20,000.00) | 26,000.00 | 10% | 13 | 12 | 151 |
| 08/27/18 | 08/27/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 0 | 0 |
| 08/27/18 | 08/31/18 | 46,000.00 | (10,000.00) | 36,000.00 | 10% | 13 | 4 | 50 |
| 08/31/18 | 08/31/18 | 36,000.00 | (40,000.00) | (4,000.00) | 10% | 10 | 0 | 0 |
| 08/31/18 | 09/06/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 6 | (7) |
| 09/06/18 | 09/12/18 | 46,000.00 | (25,000.00) | 21,000.00 | 10% | 13 | 6 | 76 |
| 09/12/18 | 09/18/18 | 21,000.00 | 25,000.00 | 46,000.00 | 10% | 6 | 6 | 35 |
| 09/18/18 | 11/05/18 | 46,000.00 | (5,000.00) | 41,000.00 | 10% | 13 | 48 | 605 |
| 11/05/18 | 11/14/18 | 41,000.00 | (15,000.00) | 26,000.00 | 10% | 11 | 9 | 101 |
| 11/14/18 | 03/21/19 | 26,000.00 | 3,217.88 | 29,217.88 | 10% | 7 | 127 | 905 |
| 03/21/19 | 03/22/19 | 29,217.88 | 1,674.93 | 30,892.81 | 10% | 8 | 1 | 8 |
| 03/22/19 | 04/18/19 | 30,892.81 | 165,000.00 | 195,892.81 | 10% | 8 | 27 | 229 |
| 04/18/19 | 05/17/19 | 195,892.81 | 5,000.00 | 200,892.81 | 10% | 54 | 29 | 1,556 |
| 05/17/19 | 06/20/19 | 200,892.81 | (10,000.00) | 190,892.81 | 10% | 55 | 34 | 1,871 |
| 06/20/19 | 06/26/19 | 190,892.81 | (40,000.00) | 150,892.81 | 10% | 52 | 6 | 314 |
| 06/26/19 | 07/01/19 | 150,892.81 | (150,000.00) | 892.81 | 10% | 41 | 5 | 207 |
| 07/01/19 | 07/11/19 | 892.81 | 150,000.00 | 150,892.81 | 10% | 0 | 10 | 2 |
| 07/11/19 | 08/01/19 | 150,892.81 | (5,000.00) | 145,892.81 | 10% | 41 | 21 | 868 |
| 08/01/19 | 08/29/19 | 145,892.81 | (10,000.00) | 135,892.81 | 10% | 40 | 28 | 1,119 |
| 08/29/19 | 10/07/19 | 135,892.81 | (5,000.00) | 130,892.81 | 10% | 37 | 39 | 1,452 |
| 10/07/19 | 11/12/19 | 130,892.81 | (5,000.00) | 125,892.81 | 10% | 36 | 36 | 1,291 |
| 11/12/19 | 01/23/20 | 125,892.81 | (8,000.00) | 117,892.81 | 10% | 34 | 72 | 2,483 |
| 01/23/20 | 02/11/20 | 117,892.81 | (5,000.00) | 112,892.81 | 10% | 32 | 19 | 614 |
| 02/11/20 | 03/12/20 | 112,892.81 | (10,000.00) | 102,892.81 | 10% | 31 | 30 | 928 |
| 03/12/20 | 04/22/20 | 102,892.81 | (25,000.00) | 77,892.81 | 10% | 28 | 41 | 1,156 |
| 04/22/20 | 06/08/20 | 77,892.81 | (15,000.00) | 62,892.81 | 10% | 21 | 47 | 1,003 |
| 06/08/20 | 07/12/20 | 62,892.81 | - | 62,892.81 | 10% | 17 | 34 | 586 |
| | | | 62,893 | | | | 772 | 18,391 |

| Other Loans Summary | |
|---|---|
| Loan Duration | 2.1 Years |
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

9.   Capital Contributions and Loans.

9.1   Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2   Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement; the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

*Waterbridge Capital, LLC*
*website*

## About Us

Since 2000, Waterbridge Capital has established itself as a prominent real estate investment firm based in New York City. With strategic joint venture partners, Waterbridge has over 3.0 million square feet of assets under management valued at a market capitalization of over $2.0 billion.

Waterbridge targets investments in core-plus, value-added or opportunistic properties in the office, retail, hotel and multifamily sectors, which they acquire to be repositioned or redeveloped. Waterbridge's asset management team adds value to its investments through efficient property management, capital improvements and enhanced leasing that result in higher income earning investments.

Waterbridge's acquisition team identifies, acquires, and adds value to underperforming real estate assets in prime locations and generates significant returns for investors and partners. As a result of its relationships with the brokerage and investment communities, Waterbridge has a history of identifying off-market investment opportunities. The Waterbridge investment team collectively has more than thirty years of New York City real estate experience.

About Us        Team        Contact Us

## Joel Schreiber – Chief Executive Officer

Joel Schreiber founded Waterbridge Capital in 2006 and serves as the company's CEO. Mr. Schreiber was born & raised in London and currently resides in New York with his wife and children. Since 2000, his first real estate investments in the United States were residential properties in Brooklyn, upstate New York, and New Jersey. By the end of 2004, he sold off most of his residential portfolio and began to focus on commercial properties in Manhattan.

Mr. Schreiber and Waterbridge have been most active acquiring core plus, value-added and opportunistic assets in downtown Manhattan, with a focus on retail, office, and multifamily properties in Soho, Tribeca, the Meatpacking, Nolita, Chelsea, and the West Village.

## Avi Rosen - Chief Operating Officer

Avi Rosen joined Waterbridge Capital in 2013 as Chief Operating Officer. Prior to Waterbridge, Avi was Chief Operating Officer for Carnegie Hill Properties, a full-service real estate organization that owns and manages a cross section of asset classes throughout New York City and Los Angeles valued at over $500 million. In that capacity, Avi oversaw all aspects of the company's operations, including acquisitions, dispositions, asset management, property management, leasing and marketing. Before moving to New York, Avi worked at London & Newcastle, a joint venture company between Londonewcastle, Chelsfield Partners and the Bank of Scotland, in

About Us        Team        Contact Us

between LondonNewcastle, Chelsfield Partners and the Bank of Scotland, in acquisitions, sourcing and acquiring high specification mixed-use developments schemes in central London. During Avi's tenure at London & Newcastle, the pipeline development portfolio was expanded from a gross development value of £150 million to £800 million.

## Charles Valentino – Senior Vice President

Charles Valentino joined Waterbridge Capital in April, 2012 as Senior Vice President. He has nearly forty years of experience in the institutional real estate business with extensive experience in acquisitions, asset management, and portfolio management. Before joining Waterbridge, Mr. Valentino was a Senior Vice President for KBS Realty Advisors with asset management responsibilities for their Northeast Portfolio, which consisted over time of 12.2 million square feet of office, industrial, and residential properties. In this capacity, he was directly responsible for the management, leasing, and repositioning of these assets for disposition. During his tenure at KBS he oversaw the disposition of 6.3 million square feet of properties at a gross sales price of $1.1 billion. These sales generated profits in excess of $200 million. Mr. Valentino has also held a variety of senior level positions with several major firms, most notably, as Managing Director of Acquisitions at Copley Real Estate Advisors (now AEW Capital Management) and as Acquisition Investment Officer of the Real Estate Investment Group of CIGNA.

Mr. Valentino is a Certified Public Accountant and a graduate of the Wharton School of the University of Pennsylvania..

About Us          Team          Contact Us

## Contact Us

**Waterbridge Capital**
115 West 18th Street
2nd Floor
New York, New York 10011

**Phone:** 212-696-2400
**Fax:** 212-696-2401

info@waterbridge.com

About Us        Team        Contact Us

**LIMITED LIABILITY COMPANY AGREEMENT**

of

**PRIMARY, LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

Dated:  As of July 28, 2015

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.

JS

LIMITED LIABILITY COMPANY AGREEMENT

OF

PRIMARY, LLC

This Limited Liability Company Agreement (this "Agreement") of Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of July 28, 2015 (the "Effective Date") by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual and Daniel Orenstein ("DO"), an individual, as members (individually, a "Member" and collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.      Formation. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.      Name. The name of the Company shall be "Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.      Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.      Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

5.      Principal Office. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.      Term. The term of the Company shall commence upon the Effective Date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

JS

7.    Members.  The Company shall have initially three (3) Members.  The names, mailing addresses and the number of ownership Units in the Company held by the Members are as set forth on Schedule 1.  Notwithstanding the pro rata ownership of the Members, on any corporate action on which the Members are required to consent pursuant to this Agreement, the consent of PM shall be required for the approval of such corporate action.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized persons for all purposes of the Act is and shall be LSH and DO each as a member-manager (collectively the "Managers" and each individually a "Manager") of the Company. The Managers shall be the sole Persons with the power to bind the Company, except to the extent that such power is expressly delegated to any other Person by both Managers. The Managers shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company.  In the event of a disagreement between the Managers, the majority vote of the Members shall determine the outcome of such disagreement.

8.2    Furthermore, notwithstanding the foregoing, the Managers shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the written consent or affirmative vote of all the Members, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)    liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(b)    amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(c)    create, or authorize the creation of, or issue or obligate itself to issue any additional Units or increase the authorized number of any Units, except pursuant to this Agreement;

(d)    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(e)    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Members;

(f)    guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000 except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(g)    make any investment inconsistent with any investment policy approved by the Members;

(h)    make any capital expenditure that is not already included in a budget approved by the Members greater than $10,000;

(i)    incur any aggregate indebtedness greater than $10,000 that is not already included in a budget approved by the Members, other than trade credit incurred in the ordinary course of business;

(j)    otherwise enter into or be a party to any transaction with any Member, officer, or employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Members;

(k)    hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment, which shall be determined pursuant to Schedule 8.6 ), including approving any option grants or Unit awards to executive officers or Members;

(l)    deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget; or

(m)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000.

8.3    Binding Authority. Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

8.4    Liability for Certain Acts. The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.5    Duty to Company.

-3-

(a)    As Managing Members of the Company, LSH and DO shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

(b)    The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

(c)    Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH and DO may not engage in any business operating a "shared office" facility.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

8.6    Indemnification.

(a)    The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorney's fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct.  All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the

-4-

payment of the Indemnitee's reasonable attorney's fees in connection with any action or proceeding brought against the Indemnitee.

8.7    Expenses, Fees, and Compensation. Except as may be (a) approved by the Members in writing, (b) set forth in any budget approved by the Members related to a shared office facility or (c) pursuant to a Company reimbursement policy approved by the Members, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 8.6 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Members.

8.8    Officers. The Managers may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers. The Managers may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

8.9    Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.10    Meetings. All meetings of the Members or Managers shall be held at such time and place as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting.

9.    Capital Contributions and Loans.

9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2    Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

-5-

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

9.3    Disbursement Process. The Managers shall deliver a written Disbursement Request to PM in accordance with and pursuant to the Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement request is not funded by PM within two (2) business days (the "Disbursement Date"), PM shall be in default hereunder (a "Disbursement Default"). PM shall have a period of sixty (60) days from the Disbursement Date to cure the Disbursement Default before the Disbursement Default penalty is triggered (the "Trigger Date").

(a)    Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

(b)    Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM' Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM' forty (40) Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

(c)    Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

(d)    In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

9.4    No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to



receive property other than cash in connection with a distribution herein, or to receive property
other than cash in connection with a distribution or return of capital.

9.5    Return of Capital Contributions.  Except upon dissolution and
liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set,
for the return of any Capital Contribution of any Member.

9.6    No Priority.  Subject to Section 10.2, no Member shall have priority
over any other Member as to return of Capital Contributions or allocations of income, gain,
profits, losses, credits or deductions or as to distributions.

9.7    Liability of Members and Their Affiliates for Capital and Debts.
Except as otherwise provided by applicable law, the debts, obligations and liabilities of the
Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and
liabilities of the Company.  Neither the Members nor any Person Affiliated with a Member shall
be obligated personally for such debt, obligation or liability of the Company solely by reason of
being a Member or being an Affiliate of a Member.

10.    Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)    The Company shall maintain a separate capital account
("Capital Account") for each Member and its successors and permitted assigns.

(b)    The Capital Account of each Member shall initially be
equal to the amount of the initial Capital Contribution as set forth on Schedule I and increased
by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions
of property assumed by the Company or subject to which the Company takes such property); (ii)
allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of
any Company liabilities assumed by such Member not otherwise taken into account in
determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss
and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and
withdrawals of cash and property to such Member (to the extent of the fair market value thereof,
net of liabilities securing such property assumed by the Member or subject to which the Member
takes the property); and (C) the amount of any liabilities of such Member assumed by the
Company not otherwise taken into account in determining Capital Accounts.

(c)    In the event the Gross Asset Value of an asset of the
Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members
shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized
by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an
amount equal to the Gross Asset Value.  For purposes of this Agreement, "Gross Asset Value"
means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as
adjusted from time to time pursuant to Section 10.1(d).

(d)    In accordance with Regulation Section 1.704-1(b)(2)(iv)(f),
the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective

-7-



gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(e)    For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

(g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.

(a)    The Company shall distribute all or any portion of Available Cash to the Members pro rata in accordance with their respective Units.

(b)    Notwithstanding Section 10.2(a) above, in the event that the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have each received cash flow percentages therefrom equal to their Membership Interests. Any cash flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

(c)    Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

(d)    Notwithstanding Section 10.2(c) above, upon the Company achieving:

(i)    Annual revenues of $500,000;

(ii)    a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

(iii)    Other milestones agreed upon by all the Members

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective Units.

10.3    <u>Distributions in Kind</u>.  In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4    <u>Profits and Losses</u>.

(a)    <u>Generally</u>.

(i)    The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes.  Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii)    In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "<u>Effective Date</u>") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)    <u>Allocation of Profits and Losses</u>.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise

-9-



provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

(c)    Special Allocation Provisions.

(i)    Qualified Income Offset.  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

(ii)    Member Nonrecourse Deductions.  Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.  If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iii)    Minimum Gain Chargeback.

(A)    Company Minimum Gain.  Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be



allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)    Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)    Section 704(c) Allocation.

(A)    Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax

-11-

purposes and its fair market value at the time such property was contributed to the Company.

(B)    In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

(C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)    <u>Members' Interest in Company Profits For Purposes of Section 752</u>. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)    <u>Nonrecourse Deductions</u>. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)    <u>Regulatory Compliance</u>. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)    <u>Curative Allocations</u>. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising



its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix)    Loss Allocation Limitation.  Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).  All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

10.5    No Obligation to Restore Negative Balances in Capital Accounts.  No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

10.6    Tax Allocations.  All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

10.7    Member Tax Distributions.

(a)    Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

(b)    A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

(i)    his share of the Company's income for such Fiscal Year over

(ii)    the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

(c)    The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

(d)    This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

(e)    Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

(f)    To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

10.8    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.    Books and Records.

11.1    Books of Account.

(a)    Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon reasonable advance request.

(b)    Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law,

-14-

provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.2    Tax Elections.  The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company.  As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3    Bank Accounts.  The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

11.4    Tax Returns.  The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities.  Upon filing, a copy of each such tax return will be provided to all Members.  The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes.  The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5    Tax Matters Member.  The Members shall designate the LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.    Transfers of Interests of Members.

12.1    General.

(a)    Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members.  All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any.  Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1.  In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer.  The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided,

-15-

however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)    If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

(i)    The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)    the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)    the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)    the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)    if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)    the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)    the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring

-16-

JS

Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

        (c)     A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

        (d)     Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

        (e)     In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The

terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

12.2    Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

12.3    Death or Permanent Disability of a Member.

(a)    Death. Not later than ninety (90) days after the death of any Member (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their

economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)　　Permanent Disability. Not later than ninety (90) days after the determination that any Member has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers. If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company. For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)　　Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee,  may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company.

-19-

Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

12.4    Transfers by operation of Law. In the event that the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

12.6    Purchase Price.

(a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

(b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity

-20-

purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

(c)    Manner of Payment.    The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

(i)    An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

(ii)    The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

(iii)    in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

(iv)    the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall

-21-

be entitled to  bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if  insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer  whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale.  The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default.  Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him.  Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said Units.  Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

(v)   The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

(1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

(2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

(3) the buyer is adjudicated a bankrupt,  makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

13.   Withdrawal or Resignation.  Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.   Admission of Additional Members.  The Company may admit new Members, subject to Section 14.1.

14.1   Right of First Offer.  Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

(a)   If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

-22-

(b)     The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

15.    Dissolution.

15.1    Dissolution. The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2    Liquidation.

(a)     Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)     Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

(a)     General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

(b)     Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law,

-23-

provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.    Participation in Sales.

16.1    Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

16.2    Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

16.3    Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

16.4    "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and the majority of the Members of the Company approves such transaction, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

-24-

17.    Reserved.

18.    Guaranty of Real Estate Obligations.  PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

19.    Miscellaneous.

19.1    Entire Agreement; Amendment.  This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled.  This Agreement may not be changed, modified, amended, discharged, abandoned or terminated orally, but only by an agreement in writing, signed by all of the Members.

19.2    Severability.  If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3    Preparation and Review of Agreement.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.  Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4    Notices.  Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4.  Notices shall be effective upon receipt or refusal.  Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5    Governing Law; Venue.

(a)    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)    Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such

-25-

action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

        19.6    Counterparts; Signatures.  This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

        19.7    No Third Party Beneficiaries.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

        [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of NEW YORK
The foregoing instrument was acknowledged before me this 28 of JULY, 2015, by Joel Schreiber, who personally appeared.

Notary's Signature
My commission expires the 17 of January, 20 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

Lisa Skye Hain

Daniel Orenstein

State of New York,
County of NEW YORK
The foregoing instrument was acknowledged before me this 28 of JULY, 2015, by Lisa Skye Hain and Daniel Orenstein who each personally appeared.

Notary's Signature
My commission expires the 17 of January, 20 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Units |
|--------|-----------------|----------------------|-------|
| Primary Member, LLC | 7 Times Square 37th Floor New York, NY 10036 | $400.00 | 3,600.00 |
| Lisa Skye Hain | 110 Livingston St. Apt. 15H Brooklyn, NY 11201 | $300.00 | 2,700.00 |
| Daniel Orenstein | 52 Fort Greene Pl. Apt. 1 Brooklyn, NY 11217 | $300.00 | 2,700.00 |
| The 2015 Company Unit Option Plan | | TBD | 1,000.00 |
| Total: | | $1,000.00 | 10,000.00 |

JS    mo
       LБ

Schedule 2

Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

*"Business Day"* shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

*"Business Hours"* shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

Field Code Changed

***"Capital Account"*** shall have the meaning set forth in Section 10.1(a).

***"Capital Contributions"*** means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

***"Code"*** shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

***"Company"*** shall have the meaning set forth in the introductory paragraphs hereto.

***"Courts"*** shall have the meaning set forth in Section 16.5.

***"Economic Risk of Loss"*** shall have the meaning set forth in Section 10.4(c).

***"Effective Date"*** shall have the meaning set forth in Section 10.4(a).

***"Fiscal Year"*** or ***"Fiscal Period"*** means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

***"Gross Asset Value"*** shall have the meaning set forth in Section 10.1(c).

***"Indemnitee"*** shall have the meaning set forth in Section 8.5(b).

***"Liquidity Event"*** Each of the following events shall be considered a "Liquity Event" unless the Members elect otherwise by written notice:

    (a)    a merger or consolidation  in which

        (i)    the Company is a constituent party or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

    except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

    (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company

Field Code Changed

of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

"*Loan Documents*" shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

"*Member(s)*" shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

"*Member Nonrecourse Deductions*" shall have the meaning set forth in Section 10.4(c).

"*New Securities*" shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "*Exempted Securities*"):

(i)    Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Members;

(iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Members;

(vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

(vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Members; or

Field Code Changed

Sch. 2 – Page 3

(viii)    Units, Options or Convertible Securities issued in connection with strategic partnerships approved by the Members.

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

*"Profits"* or *"Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Property"* shall have the meaning set forth in Section 2.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions. In the case of PM, the Transfer of any of the interests of PM to any

Sch. 2 – Page 4

Field Code Changed




Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

*"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Units shall be considered personal property. The initial Units of each Member are set forth on Schedule 1 annexed hereto.

Field Code Changed

## Schedule 8.6

### Fees, Expenses and Compensation

Effective on the Effective Date, the Company shall pay to LS on a monthly basis an amount equal to ten thousand dollars ($10,000.00) (the "LS Salary"), as may be amended pursuant the consent of the Members.

Effective on the Effective Date, the Company shall pay to DO on a monthly basis an amount equal to two thousand five hundred dollars ($2,500.00) until the six-month anniversary of the Effective Date, at which time the Company shall pay to DO on a monthly basis ten thousand dollars ($10,000.00) (the "DO Salary"), as may be amended pursuant the consent of the Members.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LSH Salary (the "PM Payment"). PM may waive the Company's obligation to pay the PM Payment, in its sole discretion.

Field Code Changed

**EXECUTION COPY**

## FIRST AMENDMENT TO

# LIMITED LIABILITY COMPANY AGREEMENT

of

## LIVE PRIMARY, LLC,
## A DELAWARE LIMITED LIABILITY COMPANY

Dated: As of December 15, 2017

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS
AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT AND BY THE
JULY 28, 2016 LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN
REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS
AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH
INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE
DISPOSED OF AT ANY TIME, EXCEPT IN COMPLIANCE WITH (i) THE
REQUIREMENTS OF THE SECURITIES ACT AND ANY OTHER APPLICABLE
LAWS, RULES AND REGULATIONS AND (ii) THE OTHER TRANSFER
RESTRICTIONS SET FORTH HEREIN.

1

**THIS FIRST AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT OF LIVE PRIMARY, LLC** (this "Amendment"), dated as of December 15, 2017, is entered into by and among the members (each individually a "Member" and collectively the "Members") of Live Primary, LLC (the "Company").

**WHEREAS,** the initial Members of the Company entered into a Limited Liability Company Agreement dated as of July 28, 2015 (the "Initial LLC Agreement"); and

**WHEREAS,** the Company and the Members wish to amend the Initial LLC Agreement;

**NOW, THEREFORE,** for and in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**Section 2 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:**

2.   *Name.*

*The name of the Company shall be "Live Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.*

**Section 7 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:**

7.   *Members, Units and and Voting.*

*(a) Members. As of the date hereof, the Company has three (3) Members. The names, mailing addresses and the number of ownership Units in the Company held by the Members are as set forth on Schedule 1.*

*(b) Classification of Units. The Company shall have two classes of equity, which shall be represented by limited liability company units ("Units"). After giving effect to the redemption of 2,430 Units from DO, the conversion of DO's remaining 270 Units to Class B Units and the issuance of a total of 2,430 Class A Units to LSH and PM as of the date of the First Amendment to this Agreement, a total of 8,730 Class A Units and 1,270 Class B Units are issued and outstanding or reserved for issuance as set forth on Schedule 1.*

*(c) Voting. Unless otherwise set forth in this Agreement, only the holders of Class A Units shall have the right to vote, pro rata, in proportion to their ownership of Class A Units on matters presented to the Members. References in this Agreement to the vote of the Members or to the approval or consent of the Members shall mean the vote, approval or consent of the holders of Class A Units. Any action which may be taken at a meeting of the Members may be taken without a meeting if Members representing votes sufficient to approve such action consent thereto in writing. Upon redemption of all Class A Units (if such a redemption occurs), the*

1

holders of Class B Units shall be entitled to vote, pro rata, in proportion to their ownership of Class B Units.

**Section 8.1 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:**

8.1     The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized person(s) for all purposes of the Act is and shall be LSH as a member-manager, together with any such additional managers as might be added by later amendment of this Agreement (individually and collectively, the "Manager" or "Managers" of the Company). DO has resigned as a Manager as of the date of the First Amendment to this Agreement. The Manager(s) shall be the sole Person(s) with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by a unanimous vote of all of the Class A Members. The Manager(s) shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company. In the event that additional Manager(s) are appointed in the future, and a disagreement between them occurs, such disagreement shall be resolved by a vote of the holders of Class A Units (also referred to as the "Class A Members"), pro rata, in proportion to their ownership of Class A Units.

**Section 8.2 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:**

8.2     (a) The Company shall have a supervisory committee (the "Supervisory Committee"), for the sole purpose of deciding on the significant matters listed in clauses (i) through (v) of this Section 8.2(a) (each, a "Supervisory Committee Major Decision"). The initial members of the Supervisory Committee shall be Joel Schreiber, Lisa Skye Hain and Brian Hain. LSH shall at all times have the right to appoint two members to the Supervisory Committee, and PM shall at all times have the right to appoint one member to the Supervisory Committee. The Manager(s) shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do, approve, or otherwise act on any of the following Supervisory Committee Major Decisions without the affirmative written consent of at least two (2) members of the Supervisory Committee:

(i)     the decision to open additional locations;

(ii)    the raising of additional equity capital, including by creating or issuing any additional Units; provided, however, that PM shall have the right of first refusal to invest additional capital on the terms and conditions that are offered by the Company to any third party, which right must be exercised by PM by notice delivered to the Company within ten (10) business days after PM's receipt of the Company's written notice containing the material terms and conditions of the proposed third party investment, including a copy of any term sheet or letter of intent;

2

(iii)   make any individual capital expenditure in an amount between $10,000 and $30,000 that is not already included in a budget approved by the Class A Members; such items shall not exceed $75,000 in any calendar year;

(iv)   incur any aggregate indebtedness, except for an aggregate amount not to exceed $100,000, not already included in a budget approved by the Class A Members, other than trade credit incurred in the ordinary course of business; or

(v)   enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company of money and/or assets in an amount not greater than $50,000.

(b) The following actions shall require the unanimous written approval of all Class A Members:

(i)   liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(ii)   amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(iii)   make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(iv)   make, or permit any subsidiary to make, any loan or advance to, any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Supervisory Committee;

(v)   guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000, except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(vi)   make any individual capital expenditure greater than $30,000 that is not already included in a budget approved by the Class A Members;

(vii)   incur any indebtedness not already included in a budget approved by the Class A Members (except for an aggregate amount not to exceed $100,000 that may be approved by the Supervisory Committee and except for trade credit incurred in the ordinary course of business);

(viii)   enter into any corporate strategic relationship involving the payment, contribution or assignment by the Company of money and/or assets in an amount greater than $50,000;

3

(ix)     enter into or be a party to any transaction with any Member or executive officer level employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by the Supervisory Committee;

(x)     hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment and the LS Salary, which are contractual obligations of the Company and shall be determined pursuant to Schedule 4.0), including approving any option grants or Unit awards to executive officers or Members; or

(xi)     deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget.

Section 8.5(a) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

(a)     The Manager(s) of the Company shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

Section 8.5(c) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

Section 8.6(a) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

The Company shall indemnify and hold harmless each Member, Manager and Supervisory Committee member from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member, Manager or Supervisory Committee member in any way related to or arising out of this Agreement, the Company's affairs, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of

4

the Member, Manager or Supervisory Committee member on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's, Manager's or Supervisory Committee member's reasonable attorney's fees in connection with any action or proceeding brought against the Member, Manager or Supervisory Committee member, except where the Member, Manager or Supervisory Committee member is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member, Manager or Supervisory Committee member in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member, Manager or Supervisory Committee member to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

## Section 8.7 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

8.7     Expenses, Fees, and Compensation. Except as may be (a) approved by a vote of the Class A Members, (b) set forth in an Approved Budget or (c) pursuant to a Company reimbursement policy approved by a vote of all of the Members holding Class A Units, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 4 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Class A Members.

## Section 9.3 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

9.3     Disbursement Process. The Manager(s) shall deliver a written Disbursement Request to PM in accordance with and pursuant to an Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement Request is not funded in full by PM within seventy-two (72) Business Hours after the Disbursement Request is sent by the Manager(s) (the time which is seventy-two (72) Business Hours after the Disbursement Request is sent being the "Disbursement Deadline"), PM shall be in default hereunder (a "Disbursement Default"). A Disbursement Default will automatically and immediately trigger the Default Fee, Bridge and all other rights and obligations set forth in Sections 9.3(a), 9.3(c) and 9.3(d). PM shall cure the Disbursement Default within ten (10) Business Days (the date falling ten (10) Business Days from the Disbursement Deadline being the "Trigger Date"), by funding in full the Disbursement Request. A failure of PM to so cure on or before the Trigger Date will automatically and immediately trigger all of the rights and obligations set forth in Section 9.3(b).

## Section 10.2(d) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

5

*(d)*        *Notwithstanding Section 10.2(c) above, upon the Company achieving:*

*(i)*        *Annual revenues of $500,000;*

*(ii)*       *a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or*

*(iii)*      *Other milestones agreed upon by all Class A Members or the Supervisory Committee*

*at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective ownership of Units.*  —

# Section 16.4 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

*16.4      "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and such transaction is approved by a vote of the Members holding a majority of Class A Units, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered  to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.*

[REMAINDER OF PAGE INTENIONALLY LEFT BLANK]

**Schedule 1 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following Schedule 1:**

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Class A Units | Class B Units |
|---|---|---|---|---|
| Primary Member, LLC | 115 West 18th Street 2nd Floor New York, NY 10011 | $400.00 | 4,365.00 | -- |
| Lisa Skye Hain | 70 Washington Street Apt. 2U Brooklyn, NY 11201 | $300.00 | 4,365.00 | -- |
| Daniel Orenstein | 110 Livingston Street Apt. 10J Brooklyn, NY 11201 | $300.00 | -- | 270.00 |
| The 2015 Company Unit Option Plan | | TBD | -- | 1,000.00* |
| Total: | | $1,000.00 | 8,730.00 | 1,270.00 |

* The option plan Units have been set aside for future issuance. No options have been granted as of the date hereof.

7

Schedule 2 of the Initial LLC Agreement shall be, and hereby is, revised by adding the following definition:

*"Approved Budget"* means a budget in the form of Schedule 3 to this Agreement, and signed by the Members, together with such supporting materials as the Manager(s) deem appropriate in his/her/their sole discretion.

Schedule 2 of the Initial LLC Agreement shall be, and hereby is, revised by replacing the prior corresponding definitions in the Initial LLC Agreement, with the following definitions:

*"Agreement"* shall mean the Limited Liability Company Agreement of Live Primary, LLC, dated as of July 28, 2015, as amended by a First Amendment to Limited Liability Company Agreement dated as of December 15, 2017.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by a vote of the Members holding a majority of Class A Units, in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with an Approved Budget and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Class A Interests"* means such Membership Interests in the Company evidenced by Class A Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class A Unit"* shall mean a Unit of Membership Interests designated as a Class A Unit and having the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class B Interests"* means such Membership Interests in the Company evidenced by Class B Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"Class B Unit"* shall mean a Unit of Membership Interests designated as a Class B Unit and having the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"New Securities"* shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

(i)     Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)     Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)     Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by a vote of the Members holding a majority of Class A Units;

(iv)     Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)     Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by a vote of the Members holding a majority of Class A Units;

(vi)     Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

(vii)     Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by a vote of the Members holding a majority of Class A Units; or

(viii)     Units, Options or Convertible Securities issued in connection with strategic relationships approved by a vote of the Members holding a majority of Class A Units.

The Initial LLC Agreement shall be, and hereby is, revised by adding the following Schedule 3:

Schedule 3

Form Of Approved Budget

**APPROVED BUDGET**

Project Name: _____

|    | **Budget Item** | **Cost** |
|----|-----------------|----------|
| 1  | Build Out | $ |
| 2  | Security Deposit | $ |
| 3  | Architect, Filing Fees, Engineering, Tools | $ |
| 4  | Primary Website & Design | $ |
| 5  | Sales & Marketing | $ |
| 6  | G & A | $ |
| 7  | COGS (e.g. Food & Beverage) | $ |
| 8  | Accounting Systems Setup | $ |
| 9  | Security Deposit | $ |
| 10 | Personnel Costs | $ |
| 11 | Legal Fees | $ |
| 12 | Fees for Professional Services | $ |
| 13 | Miscellaneous | $ |
|    | **Total Budget** | $ |

This Budget is hereby approved by the undersigned Class A Members or their undersigned approved representatives.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

Lisa Skye Hain

- 3 -

The Initial LLC Agreement shall be, and hereby is, revised by changing the schedule number of the previously numbered "Schedule 8.6" (entitled "Fees, Expenses and Compensation") to "Schedule 4." Said re-numbered Schedule 4 shall be amended to read in its entirety as follows:

Schedule 4

Fees, Expenses and Compensation

The Company shall continue to pay to LS on a monthly basis an amount equal to five thousand dollars ($5,000.00) (the "LS Salary"). The amount of the LS Salary may be changed with the consent of all Class A Members. All parties accept and confirm the prior payments made to LS for her efforts on behalf of the Company.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LS Salary (the "PM Payment"). PM Payments for the period prior to January 1, 2018 shall be payable at any time at the discretion of the Manager. PM may waive the Company's obligation to pay the PM Payment, in its sole discretion, provided, that the parties acknowledge that no such waiver had occurred as of the date of the First Amendment to the Agreement.

- 4 -

All remaining provisions of the Initial LLC Agreement not revised by any of the foregoing, are hereby incorporated by reference herein and hereby restated herein.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this First Amendment to Limited Liability Company Agreement as of the date set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of New York
The foregoing instrument was acknowledged
before me this 5th of December, 2017, by
Joel Schreiber, who personally appeared.

SOO HYUN KIM
Notary Public - State of New York
NO. 01KI6389938
Qualified in New York County
My Commission Expires Apr 8, 2023

Notary's Signature
My commission expires the 8th of
April, 20 23

Lisa Skye Hain

Daniel Orenstein

State of New York,
County of Kings
The foregoing instrument was acknowledged
before me this 5 of December, 2017, by
Lisa Skye Hain and Daniel Orenstein,
who each personally appeared.

Notary's Signature
My commission expires the 16 of
March, 2019

MOSES GANTZ
Notary Public, State of New York
No. 01GA6320995
Qualified in Kings County
Commission Expires March 16, 2019

- 5 -

EXECUTION VERSION

**FIRST AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

of

**LIVE PRIMARY, LLC,**
**A DELAWARE LIMITED LIABILITY COMPANY**

**Dated:  As of June 14, 2019**

**THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.   SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.**

## FIRST AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## LIVE PRIMARY, LLC

This First Amended and Restated Limited Liability Company Agreement (this "Agreement") of Live Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of June 14, 2019 by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual, Daniel Orenstein ("DO"), an individual, Lampros Polatidis Ttee, Fin Tap 401k ("Polatidis"), and the individuals and/or entities listed on Schedule 1 attached hereto (collectively, the "DK Members") (individually, a "Member" and collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

PM, LSH and DO are parties to the limited liability agreement of the Company dated July 28, 2015, as amended by the First Amendment dated December 15, 2017 (as so amended, the "Original Agreement"). This Agreement amends and restates the Original Agreement in its entirety to, among other things, admit Polatidis and the DK Members as Members of the Company holding Class B Units.

For the purpose of operating the Company as a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.    Formation. The Company was formed on July 27, 2015 under the Act, effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

2.    Name. The name of the Company shall be "Live Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.    Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.    Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

{00022514.DOC:2}

**1.21.21 PM PRODUCTION00016**

5.    Principal Office. The Company's principal office shall be at such location as may be designated by the Class A Members from time to time.

6.    Term. The term of the Company shall commence upon the effective date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

7.    Members, Units and Voting.

(a)    Members. As of the date hereof, the Company has sixteen (16) Members. The Company acknowledges the admission of Polatidis and the DK Members as of the date hereof, which has been unanimously approved by all of the Members holding Class A Units as of such date. The names, mailing addresses and the number of ownership Units in the Company held by the Members as of the date hereof are as set forth on Schedule 1. The Note Purchase Agreement entered into by the Company and the DK Members as of the date hereof contemplates the admission as Members of (i) additional individuals or entities who would become DK Members (up to a maximum investment in the Company by the DK Members of $2,000,000) and (ii) an additional entity that would invest $500,000 in the Company, and the Manager is authorized to amend Schedule 1 appropriately to reflect the admission of such Members. Individuals or entities admitted as Members after the date hereof will be required to sign a counterpart signature page to this Agreement as a condition to their admission.

(b)    Classification of Units. The Company shall have two classes of equity, which shall be represented by limited liability company units ("Units"). Ownership of the Units shall be as set forth on Schedule 1, as it may be amended from time to time in accordance with this Agreement.

(c)    Voting. Unless otherwise set forth in this Agreement, only the holders of Class A Units shall have the right to vote, pro rata, in proportion to their ownership of Class A Units on matters presented to the Members. References in this Agreement to the vote of the Members or the vote of all Members or to the approval or consent of the Members or the approval or consent of all Members shall mean the vote, approval or consent of the holders of Class A Units. Any action which may be taken at a meeting of the Members may be taken without a meeting if Members representing votes sufficient to approve such action consent thereto in writing. Upon redemption of all Class A Units (if such a redemption occurs), the holders of Class B Units shall be entitled to vote, pro rata, in proportion to their ownership of Class B Units.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized person(s) for all purposes of the Act is and shall be LSH as a member-manager, together with any such additional managers as might be added by later amendment of this Agreement (individually and collectively, the "Manager" or "Managers" of the Company). DO has resigned as a Manager as of the date of the First Amendment to this Agreement. The Manager(s) shall be the sole Person(s) with the power to bind the Company, except and to the

2

extent that such power is expressly delegated to any other Person by a unanimous vote of all of the Class A Members. The Manager(s) shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company.  In the event that additional Manager(s) are appointed in the future, and a disagreement between them occurs, such disagreement shall be resolved by a vote of the holders of Class A Units (also referred to as the "Class A Members"), pro rata, in proportion to their ownership of Class A Units.

8.2    (a) The Company shall have a supervisory committee (the "Supervisory Committee"), for the sole purpose of deciding on the significant matters listed in clauses (i) through (iii) of this Section 8.2(a) (each, a "Supervisory Committee Major Decision"). The initial members of the Supervisory Committee shall be Joel Schreiber, Lisa Skye Hain, Brian Hain and David Kirshenbaum (the "DK Representative"). LSH shall at all times have the right to appoint two members to the Supervisory Committee, PM shall at all times have the right to appoint one member to the Supervisory Committee, and the DK Representative shall at all times have the right to serve as a member of the Supervisory Committee until repayment in full or conversion of the Convertible Promissory Notes (the "Note Repayment") issued to the DK Members.  The Manager(s) shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do, approve, or otherwise act on any of the following Supervisory Committee Major Decisions without the affirmative written consent of at least two (2) members of the Supervisory Committee (at least three (3) members, including the DK Representative, for as long as the DK Representative has the right to serve as a member of the Supervisory Committee):

(i)    make a decision to open additional locations;

(ii)    incur any aggregate indebtedness, except for an aggregate amount not to exceed $100,000, not already included in a budget approved by the Class A Members, other than trade credit incurred in the ordinary course of business; or

(iii)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company of money and/or assets in an amount not greater than $50,000.

Individual capital expenditures in an amount between $10,000 and $30,000 that are not already included in a budget approved by the Class A Members can be made with the approval of any two members of the Supervisory Committee; provided, that the total of such expenditures does not exceed $75,000 in any calendar year.

If the Company raises additional equity capital from any third party, including by creating or issuing any additional Units, each of the DK Members, Polatidis and PM shall have a right of first refusal to invest additional capital on the terms and conditions that are offered by the Company to the third party, which right must be exercised by the DK Members, Polatidis and/or PM by notice delivered to the Company within ten (10) business days after the DK Representative's, Polatidis's or PM's, as the case may be, receipt of the Company's written notice containing the material terms and conditions of the proposed third party investment,

3

including a copy of any term sheet or letter of intent (in the event that one or more of the DK Members, Polatidis, and/or PM exercise this right of first refusal, then such exercising Members shall participate in the applicable transaction pro rata in accordance with their respective ownership of Units). For purposes of clarification, the DK Members' right to participate in any additional capital raise shall not terminate upon the Note Repayment.

(b)    The following actions shall require the unanimous written approval of all Class A Members and the DK Representative until Note Repayment:

(i)    the liquidation, dissolution or winding-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(ii)    the amendment, alteration or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(iii)    the making of, or permitting any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(iv)    the making of, or permitting any subsidiary to make, any loan or advance to, any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Supervisory Committee;

(v)    the guarantee of, directly or indirectly, or permitting any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000, except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(vi)    the making of any individual capital expenditure greater than $30,000 that is not already included in a budget approved by the Class A Members;

(vii)    the incurring of any indebtedness not already included in a budget approved by the Class A Members (except for an aggregate amount not to exceed $100,000 that may be approved by the Supervisory Committee and except for trade credit incurred in the ordinary course of business);

(viii)    the entering into any corporate strategic relationship involving the payment, contribution or assignment by the Company of money and/or assets in an amount greater than $50,000;

(ix)    the entering into or becoming a party to any transaction with any Member or executive officer level employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and

4

**1.21.21 PM PRODUCTION00019**

pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by the Supervisory Committee;

(x)    the hiring, termination, or changing the compensation of the executive officers or Members (other than the PM Payment and the LS Salary, which are contractual obligations of the Company and shall be determined pursuant to Schedule 4), including approving any option grants or Unit awards to executive officers or Members; or

(xi)    deviating from the Company's approved business plan, or in the absence of a business plan, changing the principal business of the Company, entering new lines of business, or exiting the current line of business or deviate from the Company's approved annual budget.

8.3    Binding Authority.    Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

8.4    Liability for Certain Acts.    The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.5    Duty to Company.

(a)    The Manager(s) of the Company shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

(b)    The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

(c)    Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

8.6    Indemnification.

5

**1.21.21 PM PRODUCTION00020**

(a)    The Company shall indemnify and hold harmless each Member, Manager and Supervisory Committee member from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member, Manager or Supervisory Committee member in any way related to or arising out of this Agreement, the Company's affairs, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member, Manager or Supervisory Committee member on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's, Manager's or Supervisory Committee member's reasonable attorney's fees in connection with any action or proceeding brought against the Member, Manager or Supervisory Committee member, except where the Member, Manager or Supervisory Committee member is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member, Manager or Supervisory Committee member in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member, Manager or Supervisory Committee member to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the payment of the Indemnitee's reasonable attorney's fees in connection with any action or proceeding brought against the Indemnitee.

8.7    Expenses, Fees, and Compensation.  Except as may be (a) approved by a vote of the Class A Members, (b) set forth in an Approved Budget or (c) pursuant to a Company reimbursement policy approved by a vote of all of the Members holding Class A Units, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 4 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Class A Members.

8.8    Officers.  The Managers may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers. The Managers may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

6

8.9    Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.10    Meetings. All meetings of the Members or Managers shall be held at such time and place as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting. Members and/or Managers may agree to take action by written consent in lieu of a meeting.

9.    Capital Contributions and Loans.

9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2    Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

9.3    Disbursement Process. The Manager(s) shall deliver a written Disbursement Request to PM in accordance with and pursuant to an Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement Request is not funded in full by PM within seventy-two (72) Business Hours after the Disbursement Request is sent by the Manager(s) (the time which is seventy-two (72) Business Hours after the Disbursement Request is sent being the "Disbursement Deadline"), PM shall be in default hereunder (a "Disbursement Default"). A

7

**1.21.21 PM PRODUCTION00022**

Disbursement Default will automatically and immediately trigger the Default Fee, Bridge and all
other rights and obligations set forth in Sections 9.3(a), 9.3(c) and 9.3(d). PM shall cure the
Disbursement Default within ten (10) Business Days (the date falling ten (10) Business Days
from the Disbursement Deadline being the "Trigger Date"), by funding in full the Disbursement
Request. A failure of PM to so cure on or before the Trigger Date will automatically and
immediately trigger all of the rights and obligations set forth in Section 9.3(b).

        (a)     Upon a Disbursement Default, PM shall deliver the
Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"),
prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid
by the Company.

        (b)     Upon the Trigger Date, the Company shall automatically
recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus
additional Units equal to fifty percent of such applicable number. By way of example, if PM
shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company
shall recover six (6) of PM's Units, which reflects the fact that (a) $600,000 is ten percent of the
contemplated $6,000,000 Loan, (b) ten percent of PM's forty (40) Units is four (4) Units, (c)
fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by
the Company.

        (c)     Upon a Disbursement Default, the Company shall have the
immediate right to obtain additional financing (the "Bridge") from third party lenders or equity
investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest
(if any) and the reasonable costs and expenses (including attorney's fees) associated with the
Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

        (d)     In the event the Bridge is a loan, the Company's
obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby
agrees to execute any documentation the lender of the Bridge shall require, and hereby grants
each of the Managers an irrevocable limited power of attorney to execute any applicable
subordination documentation required by the Bridge lender on PM' behalf.

        9.4     <u>No Withdrawal of Capital Contributions</u>. Except upon dissolution
and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand
the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to
receive property other than cash in connection with a distribution herein, or to receive property
other than cash in connection with a distribution or return of capital.

        9.5     <u>Return of Capital Contributions</u>. Except upon dissolution and
liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set,
for the return of any Capital Contribution of any Member.

        9.6     <u>No Priority</u>. Subject to Section 10.2, no Member shall have priority
over any other Member as to return of Capital Contributions or allocations of income, gain,
profits, losses, credits or deductions or as to distributions.

**1.21.21 PM PRODUCTION00023**

    9.7    <u>Liability of Members and Their Affiliates for Capital and Debts</u>. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

    10.    <u>Capital Accounts, Profits, Losses and Distributions</u>.

    10.1    <u>Capital Accounts</u>.

    (a)    The Company shall maintain a separate capital account ("<u>Capital Account</u>") for each Member and its successors and permitted assigns.

    (b)    The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on <u>Schedule 1</u> and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

    (c)    In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "<u>Gross Asset Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

    (d)    In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

    (e)    For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and

9

classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

(g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.

(a)    The Company shall distribute all or any portion of Available Cash to the Members pro rata in accordance with their respective Units.

(b)    Notwithstanding Section 10.2(a) above, in the event that the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have each received cash flow percentages therefrom equal to their Membership Interests. Any cash flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

(c)    Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

(d)    Notwithstanding Section 10.2(c) above, upon the Company achieving:

(i)    Annual revenues of $500,000;

(ii)    a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

10

(iii)    Other milestones agreed upon by all Class A Members or the Supervisory Committee;

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective ownership of Units.

10.3    <u>Distributions in Kind</u>.  In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4    <u>Profits and Losses</u>.

(a)    <u>Generally</u>.

(i)    The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes.  Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii)    In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "<u>Effective Date</u>") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)    <u>Allocation of Profits and Losses</u>.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

(c)    <u>Special Allocation Provisions</u>.

(i)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore

11

**1.21.21 PM PRODUCTION00026**

on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

(ii)    Member Nonrecourse Deductions.  Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.  If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iii)    Minimum Gain Chargeback.

(A)    Company Minimum Gain.  Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to

12

one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)    Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)    Section 704(c) Allocation.

(A)    Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(B)    In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

(C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members

13

in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)    Members' Interest in Company Profits For Purposes of Section 752. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)    Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)    Regulatory Compliance. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)    Curative Allocations. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix)    Loss Allocation Limitation. Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation

14

set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

      10.5    <u>No Obligation to Restore Negative Balances in Capital Accounts</u>. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

      10.6    <u>Tax Allocations</u>. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

      10.7    <u>Member Tax Distributions</u>.

      (a)    Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

      (b)    A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

      (i)    his share of the Company's income for such Fiscal Year over

      (ii)    the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

      (c)    The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

      (d)    This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

      (e)    Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

15

**1.21.21 PM PRODUCTION00030**

(f)    To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

10.8    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.    Books and Records.

11.1    Books of Account.

(a)    Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member at any time during regular business hours upon written request made a reasonable period in advance.

(b)    Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law, provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.2    Tax Elections. The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company. As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3    Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any

16

account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

11.4    Tax Returns. The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5    Tax Matters Member. The Members shall designate LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.    Transfers of Interests of Members.

12.1    General.

(a)    Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided, however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)    If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

17

1.21.21 PM PRODUCTION00032

(i)      The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)      the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)      the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)      the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)      if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)      the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)      the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled.  Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate.  All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

(c)      A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by

18

**1.21.21 PM PRODUCTION00033**

reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

        (d)      Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

        (e)      In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

        12.2    Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer

**1.21.21 PM PRODUCTION00034**

their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member.  Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

12.3   Death or Permanent Disability of a Member.

(a) ·   Death. Not later than ninety (90) days after the death of any Member with the exception of the DK Members (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the  Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)      Permanent Disability. Not later than ninety (90) days after the determination that any Member (with the exception of any DK Member) has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the

**1.21.21 PM PRODUCTION00035**

Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers.  If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company.  For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)     Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company. Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof.  For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

21

**1.21.21 PM PRODUCTION00036**

12.4    Transfers by operation of Law. In the event that any Member, with the exception of any DK Member, (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

12.6    Purchase Price.

(a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

(b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event

22

of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

(c)    <u>Manner of Payment.</u>  The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

(i)    An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

(ii)    The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

(iii)    in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

(iv)    the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall be entitled to bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale. The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default. Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him. Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said

23

**1.21.21 PM PRODUCTION00038**

Units.  Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

(v)    The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

(1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

(2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

(3) the buyer is adjudicated a bankrupt, makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

13.    Withdrawal or Resignation.  Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.    Admission of Additional Members.  The Company may admit new Members, subject to Section 14.1.

14.1    Right of First Offer.  Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

(a)    If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

(b)    The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

15.    Dissolution.

15.1    Dissolution.  The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2    Liquidation.

24

(a)    Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)    Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

(a)    General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

(b)    Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law, provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.    Participation in Sales.

16.1    Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise

25

and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

16.2    Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

16.3    Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

16.4    "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and such transaction is approved by a vote of the Members holding a majority of Class A Units, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

17.    Reserved.

18.    Guaranty of Real Estate Obligations. PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

26

**1.21.21 PM PRODUCTION00041**

19.    <u>Miscellaneous</u>.

19.1    <u>Entire Agreement; Amendment</u>. This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled. This Agreement may not be amended or modified orally, but only by an agreement in writing signed by all of the Class A Members; provided, that any amendment that adversely affects any Member(s) disproportionately as compared to any other Member(s) requires the written agreement of the adversely affected Member(s) and, provided, further, that the DK Representative must approve any amendment or modification whatsoever (except for any amendments required to admit new Members within the parameters of Section 7(a) and Schedule 1) until the Note Repayment.

19.2    <u>Severability</u>. If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3    <u>Preparation and Review of Agreement</u>. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4    <u>Notices</u>. Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on <u>Schedule 1</u> hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5    <u>Governing Law; Venue</u>.

(a)    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)    Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "<u>Courts</u>"), (ii) consents to the bringing of any such action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any

27

objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19.6    Counterparts; Signatures.  This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

19.7    No Third Party Beneficiaries.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

28

**1.21.21 PM PRODUCTION00043**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

Lisa Skye Hain

Daniel Orenstein

**1.21.21 PM PRODUCTION00044**

LAMPROS POLATIDIS TTEE, FIN TAP 401k

By: Lampros Polatidis
Title:  Trustee


BALKIN FAMILY LP, LLC

_____
By:
Title:


A&J POPCORN HOLDINGS, LLC

_____
By:
Title:


_____
Ilene Hechtman


Jeffrey Langenbach as Trustee of the Jeffrey Langenbach Trust dated June 5, 2017

_____
Jeffrey Langenbach, Trustee


MANDELL VENTURES LLC

_____
By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee


BALKIN FAMILY LP, LLC

By: Michael P. Balkin
Title: Managing Member


A&J POPCORN HOLDINGS, LLC

_____

By:
Title:


_____

Ilene Hechtman


Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee


MANDELL VENTURES LLC

_____

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

By:
Title:

A&J POPCORN HOLDINGS, LLC

By: ANDREW S. FREEDMAN
Title: MANAGER

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

_____

By:
Title:

A&J POPCORN HOLDINGS, LLC

_____

By:
Title:

_____
Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

_____

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

By: Lampros Polatidis
Title:  Trustee


BALKIN FAMILY LP, LLC


By:
Title:


A&J POPCORN HOLDINGS, LLC


By:
Title:


Ilene Hechtman


Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017


Jeffrey Langenbach, Trustee


MANDELL VENTURES LLC


By:
Title:

**1.21.21 PM PRODUCTION00049**

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

_____

By:
Title:

A&J POPCORN HOLDINGS, LLC

_____

By:
Title:

_____

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

By: Steven L. Mandell
Title: Managing Partner

**1.21.21 PM PRODUCTION00050**

FLF INVESTOR, LLC

By: Michael Nortman
Title: Manager

NORTMAN HOLDINGS LLC

By: MICHAEL NORTMAN
Title: MANAGER

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____

Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____

David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust

_____

Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____

Jeffrey A. Wellek

FLF INVESTOR, LLC

By: _____
Title:

NORTMAN HOLDINGS LLC

By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_Marcy P. Kahan, Trustee_

Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neil Price, as Trustee of the Neil H. Price
Revocable Trust

FLP INVESTOR, LLC


By: _____
Title:

NORTMAN HOLDINGS LLC


By: _____
Title:


Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000


_____
Marcy P. Kahan, Trustee


David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee


Neal Price, as Trustee of the Neal H. Price
Revocable Trust


_____
Neal Price, Trustee


Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust


_____
Jeffrey A. Wellek

FLF INVESTOR, LLC

_____

By:
Title:

NORTMAN HOLDINGS LLC

_____

By:
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust
_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____
Jeffrey A. Wellek

FLF INVESTOR, LLC


By: _____
Title:

NORTMAN HOLDINGS LLC


By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000


_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96


_____
David Kirshenbaum, Trustee

Neil Price, as Trustee of the Neal H. Price
Revocable Trust


_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust


_____
Jeffrey A. Wellek

**1.21.21 PM PRODUCTION00055**

SUMMIT MONKEYS, LLC

By:    Paul Weinewuth
Title:   Manager

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Class A Units | Class B Units |
|---|---|---|---|---|
| Primary Member, LLC | 115 West 18th Street 2nd Floor New York, NY 10011 | $400.00 | 4,365.00 | -- |
| Lisa Skye Hain | 70 Washington Street Apt. 2U Brooklyn, NY 11201 | $300.00 | 4,365.00 | -- |
| Daniel Orenstein | 110 Livingston Street Apt. 10J Brooklyn, NY 11201 | $300.00 | -- | 270.00 |
| Lampros Polatidis Ttee, Fin Tap 401k | 26 Broadway New York, NY 10014 | | | 73.80 |
| DK Members listed below | Addresses of Investors listed below | | | 369.25 total, allocated as set forth below |
| Company Equity Incentive Plan | | 0 | -- | 1,000.00 (reserved for future issuance) |
| Total: | | $1,040.00 | 8,730.00 | 1,713.05 |

**1.21.21 PM PRODUCTION00057**

## DK Members

| Name of DK Member | Number of Units |
|---|---|
| Balkin Family LP, LLC<br>1145 Green Bay Road<br>Glencoe, IL 60022 | 42.20 |
| A&J Popcorn Holdings, LLC<br>8135 Monticello Avenue<br>Skokie, IL 60076 | 21.10 |
| Ilene Hechtman<br>1018 Knoll Lane<br>Wilmette, IL 60091 | 21.10 |
| Jeffrey Langenbach as Trustee of the<br>Jeffrey Langenbach Trust dated June 5, 2017<br>1701 Kendale Drive<br>Glenview, IL 60025 | 21.10 |
| Mandell Ventures LLC<br>1146 Ashland Avenue<br>River Forest, IL 60305 | 21.10 |
| FLF Investor, LLC<br>Michael Nortman/Crossroads Partners<br>1300 E. Woodfield Road, Suite 150<br>Schaumburg, IL 60173 | 42.20 |
| Nortman Holdings LLC<br>Michael Nortman/Crossroads Partners<br>1300 E. Woodfield Road, Suite 150<br>Schaumburg, IL 60173 | 63.30 |
| Marcy P. Kahan, as Trustee of the<br>Marcy P. Kahan Living Trust dated May 29, 2000<br>1600 Provenance Way<br>Northbrook, IL 60062 | 10.55 |
| David L. Kirshenbaum, as Trustee of<br>the David L. Kirshenbaum Revocable Trust U/T/A<br>1318 Ridge Road<br>Northbrook, IL 60062 | 21.10 |

**1.21.21 PM PRODUCTION00058**

Neal Price, as Trustee of the                                          10.55
Neal H. Price Revocable Trust
1324 Linden Avenue
Deerfield, IL 60015

Jeffrey A. Wellek, as Trustee of the Jeffrey A. Wellek 1994 Trust      10.55
1414 Sheridan Road
Highland Park IL 60035

Summit Monkeys LLC                                                     84.40
1307 Kallien Court
Naperville, IL 60540

## Schedule 2

## Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall mean this First Amended and Restated Limited Liability Agreement of Live Primary, LLC, dated as of the date hereof, as it may be amended from time to time in accordance with its terms.

*"Approved Budget"* means a budget in the form of Schedule 3 to this Agreement, and signed by the Class A Members, together with such supporting materials as the Manager(s) deem appropriate in his/her/their sole discretion.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by a vote of the Members holding a majority of Class A Units, in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with an Approved Budget and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

**1.21.21 PM PRODUCTION00060**

***"Business Day"*** shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

***"Business Hours"*** shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

***"Capital Account"*** shall have the meaning set forth in Section 10.1(a).

***"Capital Contributions"*** means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

***"Class A Interests"*** means such Membership Interests in the Company evidenced by Class A Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

***"Class A Unit"*** shall mean a Unit of Membership Interests designated as a Class A Unit and having the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

***"Class B Interests"*** means such Membership Interests in the Company evidenced by Class B Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

***"Class B Unit"*** shall mean a Unit of Membership Interests designated as a Class B Unit and having the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

***"Code"*** shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

***"Company"*** shall have the meaning set forth in the introductory paragraphs hereto.

***"Courts"*** shall have the meaning set forth in Section 16.5.

***"Economic Risk of Loss"*** shall have the meaning set forth in Section 10.4(c).

***"Effective Date"*** shall have the meaning set forth in Section 10.4(a).

***"Fiscal Year"*** or ***"Fiscal Period"*** means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

**1.21.21 PM PRODUCTION00061**

*"Gross Asset Value"* shall have the meaning set forth in Section 10.1(c).

*"Indemnitee"* shall have the meaning set forth in Section 8.5(b).

*"Liquidity Event"* Each of the following events shall be considered a "Liquidity Event" unless the Class A Members elect otherwise by written notice:

(a)    a merger or consolidation in which

(i)    the Company is a constituent party or

(ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

(b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

*"Loan Documents"* shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

*"Manager"* shall have the meaning set forth in Section 8.1.

*"Member(s)"* shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

*"Member Nonrecourse Deductions"* shall have the meaning set forth in Section 10.4(c).

*"New Securities"* shall mean all Units issued by the Company after July 28, 2015, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, **"Exempted Securities"**):

(i)    Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by a vote of the Members holding a majority of Class A Units;

(iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by a vote of the Members holding a majority of Class A Units;

(vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by a vote of the Members holding a majority of the Class A Units; or

(vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by a vote of the Members holding a majority of Class A Units; or

(viii)    Units, Options or Convertible Securities issued in connection with strategic relationships approved by a vote of the Members holding a majority of Class A Units.

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

*"Profits" or "Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of

**1.21.21 PM PRODUCTION00063**

income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Property"* shall have the meaning set forth in Section 2.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions. In the case of PM, the Transfer of any of the interests of PM to any Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

*"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Units shall be considered personal property. The initial Units of each Member are set forth on Schedule 1 annexed hereto.

**1.21.21 PM PRODUCTION00064**

<u>Schedule 3</u>

<u>Form Of Approved Budget</u>

**APPROVED BUDGET**

Project Name: _____

| | Budget Item | Cost |
|---|---|---|
| 1 | Build Out | $ _____ |
| 2 | Security Deposit | $ _____ |
| 3 | Architect, Filing Fees, Engineering, Tools | $ _____ |
| 4 | Primary Website & Design | $ _____ |
| 5 | Sales & Marketing | $ _____ |
| 6 | G & A | $ _____ |
| 7 | COGS (e.g. Food & Beverage) | $ _____ |
| 8 | Accounting Systems Setup | $ _____ |
| 9 | Security Deposit | $ _____ |
| 10 | Personnel Costs | $ _____ |
| 11 | Legal Fees | $ _____ |
| 12 | Fees for Professional Services | $ _____ |
| 13 | Miscellaneous | $ _____ |
| | **Total Budget** | $ _____ |

This Budget is hereby approved by the undersigned Class A Members or their undersigned approved representatives.

PRIMARY MEMBER, LLC

_____

By:  Joel Schreiber
Title:  Sole Member

_____

Lisa Skye Hain

**1.21.21 PM PRODUCTION00065**

Schedule 4

Fees, Expenses and Compensation

The Company shall continue to pay to LS on a monthly basis an amount equal to five thousand dollars ($5,000.00) (the "LS Salary").  The amount of the LS Salary may be changed with the consent of all Class A Members. All parties accept and confirm the prior payments made to LS for her efforts on behalf of the Company.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LS Salary (the "PM Payment").  PM Payments for the period prior to January 1, 2018 shall be payable at any time at the discretion of the Manager.  PM may waive the Company's obligation to pay the PM Payment, in its sole discretion, provided, that the parties acknowledge that no such waiver had occurred as of the date of the First Amendment to the Agreement.

1.21.21 PM PRODUCTION00066

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## PRIMARY MEMBER LLC

This Limited Liability Company Agreement (this "Agreement") of PRIMARY MEMBER LLC, a Delaware limited liability company (the "Company"), is entered into as of July 28, 2015 by the persons and/or entities listed on Schedule 1 attached hereto, as members (individually, a "Member"; collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.    Formation. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.    Name. The name of the Company shall be "PRIMARY MEMBER LLC" and all business of the Company shall be conducted in such name. The Company shall hold its Investment in the name of the Company and not in the name of the Members.

3.    Purpose. The sole purpose of the Company is to acquire and maintain an investment in PRIMARY LLC , a company which was formed to develop, own, and operate shared office facilities, (the "Investment"), together with such other activities as may be necessary or advisable in connection with the ownership of the Investment. The Company shall not engage in any business, and it shall have no purpose, unrelated to the Investment and shall not acquire any real property or own assets other than those related to the Investment and/or otherwise in furtherance of the limited purposes of the Company.

4.    Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 1013 Centre Road, Suite 403S, Wilmington, Delaware 19805. The Company's registered agent for service of process at that address is Registered Agents Legal Services, LLC.

5.    Principal Office. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.    Term. The term of the Company shall commence upon the effective date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

**1.21.21 PM PRODUCTION00115**

7. <u>Members</u>. The Company shall have initially one (1) Member. The names, mailing addresses and percentage ownership Interest in the Company of the Members are as set forth on <u>Schedule 1</u>.

8. <u>Management</u>.

8.1 The business and affairs of the Company shall be managed solely and exclusively by, and management of the Company shall be vested solely and exclusively in, and the sole authorized person for all purposes of the Act is and shall be the initial Member, as manager ("<u>Manager</u>") of the Company. The Manager shall be the sole Person with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by the Manager. The Manager shall have the right, power and authority, in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company.

8.2 <u>Binding Authority</u>. Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signature of the Manager shall be required to bind the Company.

8.3 <u>Liability for Certain Acts</u>. The Manager shall perform its duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.4 <u>No Exclusive Duty to Company</u>. Each Member recognizes that the other Member has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that such other Member is entitled to carry on such other business interests, activities and investments. No Member shall be obligated to devote all or any particular part of his time and effort to the Company and its affairs. Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

8.5 <u>Indemnification</u>.

(a) The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal,

**1.21.21 PM PRODUCTION00116**

-2-

administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorneys fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.5(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), makes a loan to the Company, or personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all claims and demands to the maximum extent permitted under the Act, including but not limited to the payment of the Indemnitee's reasonable attorneys fees in connection with any action or proceeding brought against the Indemnitee.

8.6    Expenses, Fees, and Compensation. Except as may be approved by the Members in writing, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (a) to reimbursement for expenses incurred on behalf of the Company, or (b) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company.

8.7    Officers. The Manager may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager. The Manager may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

8.8    Affiliated Entities. The fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.9    Meetings. All meetings of the Members or Manager shall be held at such time and place as shall be determined by the Manager for the purpose of the transaction of any business as may come before such meeting.

**1.21.21 PM PRODUCTION00117**

9.    Capital Contributions.

9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2    Additional Contributions. Each Member shall contribute to the capital of the Company, in cash, as and when determined by the Manager, such Member's pro rata share (based upon their respective Interest as set forth on Schedule 1) of all monies that the Manager deems necessary or appropriate (i) to cause the Property to be properly operated and maintained, (ii) to discharge all costs, expenses, obligations and liabilities of the Company to any Person, and (iii) to enter into any Approved Loan.

9.3    No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

9.4    Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

9.5    No Priority. No Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

9.6    Liability of Members and Their Affiliates for Capital and Debts. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

10.    Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and its successors and permitted assigns.

(b)    The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in

**1.21.21 PM PRODUCTION00118**

determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

(c)    In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

(d)    In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(e)    For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

**1.21.21 PM PRODUCTION00119**
-5-

(g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.  The Company shall distribute all Available Cash to the Members parri passu in accordance with their respective Interest.

10.3    Distributions in Kind.  In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4    Profits and Losses.

(a)    Generally.

(i)    The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes.  Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii)    In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "Effective Date") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)    Allocation of Profits and Losses.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

(c)    Special Allocation Provisions.

(i)    Qualified Income Offset.  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having

**1.21.21 PM PRODUCTION00120**

a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible.  To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

(ii)    Member Nonrecourse Deductions.  Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.  If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iii)    Minimum Gain Chargeback.

(A)    Company Minimum Gain.  Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains

recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)   Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)   Section 704(c) Allocation.

(A)   Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(B)   In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

**1.21.21 PM PRODUCTION00122**

(C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)    <u>Members' Interest in Company Profits For Purposes of Section 752</u>.  As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)    <u>Regulatory Compliance</u>.  The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation.  The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)    <u>Curative Allocations</u>.  The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Regulations.  The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses).  In exercising its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix)    <u>Loss Allocation Limitation</u>.  Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period.  In the event some but not all of the

**1.21.21 PM PRODUCTION00123**

Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

        10.5    No Obligation to Restore Negative Balances in Capital Accounts. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

        10.6    Tax Allocations. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

        10.7    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

        11.    Books and Records.

        11.1    Books of Account. Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon request.

        11.2    Tax Elections. The Manager shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Manager determines that such election is in the best interest of the Company. As determined by the Manager, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

        11.3    Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any

account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signature of the Manager, unless the Manager otherwise determines.

11.4    Tax Returns. The Manager shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5    Tax Matters Member. The Members shall designate the Manager to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.    Transfers of Interests of Members.

12.1    General.

(a)    Subject to Section 12.2 herein, no Transfer shall be permitted herein except upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided, however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)    If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

**1.21.21 PM PRODUCTION00125**

(i)    The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)    the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)    the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)    the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)    if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate the Loan Documents, any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)    the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)    the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

(c)    A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by

**1.21.21 PM PRODUCTION00126**
-12-

reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

(d)    Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

(e)    In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

12.2    <u>Certain Permitted Transfers</u>. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer

**1.21.21 PM PRODUCTION00127**
-13-

their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

13.    Withdrawal or Resignation. Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.    Admission of Additional Members. The Company shall not admit any new Members (other than as provided in Article 12 hereof) without the written consent of all Members.

15.    Dissolution.

15.1    Dissolution. The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2    Liquidation.

(a)    Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)    Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Members who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

**1.21.21 PM PRODUCTION00128**

(a)     General. The death or incapacity of any individual
Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of
any Member shall not dissolve or terminate the Company. Upon the occurrence of any such
event, the Interest of such Member and all its rights or obligations under this Agreement shall
devolve unto and vest in such Member's successors or legal representatives, except as otherwise
provided for or restricted by Article 12 of this Agreement.

(b)     Bankruptcy. "Bankruptcy" as used in this Section 15.4
shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization,
arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code
or any other federal or state insolvency law, or a Member's filing an answer consenting to or
acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit
of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of
(A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the
expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title
11 of the United States Code, an application for the appointment of a receiver for substantially
all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization,
arrangement or readjustment of its debts under any other federal or state insolvency law,
provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise
disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has
entered into Bankruptcy within the meaning of this Section 15.4(b).

16.     Miscellaneous.

16.1     Entire Agreement; Amendment. This Agreement contains the
entire agreement of the parties concerning the subject matter hereof, and supersedes any and all
prior agreements oral or written among the parties hereto concerning the subject matter hereof,
which prior agreements are hereby canceled. This Agreement may not be changed, modified,
amended, discharged, abandoned or terminated orally, but only by an agreement in writing,
signed by all of the Members.

16.2     Severability. If any of the provisions of this Agreement is held
invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions
hereof which can be given effect without the invalid provision, and to this end the provisions of
this Agreement are intended to be and shall be deemed severable.

16.3     Preparation and Review of Agreement. This Agreement shall be
construed without regard to any presumption or other rule requiring construction against the
party causing this Agreement to be drafted. Each party acknowledges and agrees that this
Agreement was subject to negotiation and that each party had an opportunity to seek to obtain,
and did obtain, independent counsel prior to executing and delivering this Agreement.

16.4     Notices. Any and all notices, requests, demands or other
communications hereunder shall be in writing and shall be given by personal delivery, by
overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy
(confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule
1 hereto or to such addresses as may from time to time be designated by any of them in writing

**1.21.21 PM PRODUCTION00129**
-15-

by notice similarly given to all parties in accordance with this Section 16.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or any other authorized representative.

16.5    Governing Law; Venue.

(a)    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)    Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

16.6    Waiver of Trial by Jury. **EACH OF THE MEMBERS HEREBY WAIVES TRIAL BY JURY IN ANY ACTION ARISING OUT OF MATTERS RELATED TO THIS AGREEMENT, WHICH WAIVER IS INFORMED AND VOLUNTARY.**

16.7    Counterparts; Signatures. This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document signature (pdf) of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

16.8    No Third Party Beneficiaries. None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**1.21.21 PM PRODUCTION00130**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER LLC

By: _____

Joel Schreiber, Sole Member

**1.21.21 PM PRODUCTION00131**

Schedule I

Members

| Member | Mailing Address | Capital Contribution | Interest |
|---|---|---|---|
| Joel Schreiber | 7 Times Square 37th Floor New York, NY 10036 | $_____ | 100.00% |
| Total: | | $_____ | 100.00% |

1.21.21 PM PRODUCTION00132

## Schedule 2

## Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Approved Loan"* shall mean any loan made to the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

*"Business Day"* shall mean any day other than a Saturday, Sunday or any day on which national banks in the City of New York are not open for business.

*"Capital Account"* shall have the meaning set forth in Section 10.1(a).

1/24/21 PM PRODUCTION00133

*"Capital Contributions"* means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

*"Code"* shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

*"Company"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Courts"* shall have the meaning set forth in Section 16.5.

*"Economic Risk of Loss"* shall have the meaning set forth in Section 10.4(c).

*"Effective Date"* shall have the meaning set forth in Section 10.4(a).

*"Fiscal Year"* or *"Fiscal Period"* means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2013, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

*"Gross Asset Value"* shall have the meaning set forth in Section 10.1(c).

*"Indemnitee"* shall have the meaning set forth in Section 8.5(b).

*"Interest"* means the ownership interest of a Member in the Company consisting of (i) such Member's percentage ownership interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Interests shall be considered personal property. The initial Interest of each Member is set forth on Schedule 1 annexed hereto.

*"Loan Documents"* shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

*"Manager"* shall have the meaning set forth in Section 8.1.

*"Member(s)"* shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

*"Member Nonrecourse Deductions"* shall have the meaning set forth in Section 10.4(c).

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

Sch. 21.2.21 PM **PRODUCTION00134**

*"Profits"* or *"Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Investment"* shall have the meaning set forth in Section 3.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions.

**PRODUCTION00135**

1.21.21 PM PRODUCTION00136

**Liza Izkiayayeva**

| | |
|---|---|
| **Fro** | Lisa Skye Hain <lisa@lisaskyehain.com> |
| **Sent:** | Friday, May 15, 2015 10:27 AM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein; Sona Banker |
| **Subject:** | Follow Up |

Good morning Joel,

Excellent call. Thank you. We are grateful to have your experience, knowledge and insight -- and also thrilled to hear you express your commitment to co-founding and funding a new shared office space venture with us!

To minimize the back and forth on the OA, we think it would be best if you provided us with your draft as a starting point. We're eager to get going, so please let us know if you need anything else from our end to begin assembling the document.

Here's to creating a $20B company!

Many thanks,
  & Danny (& Sona)


Lisa Skye Hain
917.796.6719 (c)

I LOVE CORN (my charitable cookbook -- 75% goes to www.dougy.org) :: http://amzn.to/ilovecorncookbook

Sent from my skye(hain)Phone.

_____

Spam
Phish/Fraud
Not spam
Forget previous vote

**Liza Izkiayayeva**

| | |
|---|---|
| **From:** | lisa@liveprimary.com |
| **Sent:** | Wednesday, August 19, 2015 11:15 PM |
| **To:** | Nanci Hom |
| **Cc:** | Danny Orenstein (d.orenstein@gmail.com); Joel Schreiber; Lisa Izkiayayeva |
| **Subject:** | Re: Primary LLC: $50,000.00 Funding Request |

Hello Nanci,

Many thanks. We will send an itemization for this one by EOD Friday and will do so with all future requests.

Have a lovely day!
Lisa & Brian


Lisa Skye Hain
917.796.6719 (c)

I LOVE CORN (my charitable cookbook -- 75% goes to www.dougy.org) :: http://amzn.to/ilovecorncookbook

Sent from my skye(hain)Phone.

On Aug 18, 2015, at 3:27 PM, Nanci Hom <nhom@waterbridge.com> wrote:

Lisa,

$50,000.00 was wired to your account with JP Morgan Chase ending in 7336.

Please send us a form requisition itemizing the expenses that total this amount, and going forward please submit that with each fund request.

Thank you,
Nanci

Nanci Hom  /  Operations Manager  /  Waterbridge Capital LLC
7 Times Square, 37th Fl,  New York, New York 10036

Office    212-696-2400 / Fax    212-696-2401 /  Email    nhom@waterbridge.com

---

**From:** Nanci Hom
**Sent:** Friday, August 14, 2015 3:31 PM
**To:** 'lisa@liveprimary.com'; Danny Orenstein (d.orenstein@gmail.com)
**Cc:** Joel Schreiber; Lisa Izkiayayeva
**Subject:** Re: Primary LLC: $50,000.00 Funding Request

Hello Lisa and Danny, hope this finds you both well.

**1.21.21 PM PRODUCTION00258**

**Liza Izkiayayeva**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, October 07, 2015 5:11 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Security Deposit // Lease for 26 Broadway |

Hello Joel,

I hope you're enjoying this stunning weather!

As you know, our next request for wired fund includes the security deposit and first month's rent for our space at 26 Broadway - hence it will be a large request.

We will have the final detailed report to you tomorrow. In the interim, I want you to know it is probable to be somewhere between $1.22M and $1.4M.

Many thanks,
Lisa & Danny

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Spam
Phish/Fraud
Not spam
Forget previous vote

**Liza Izkiayayeva**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Thursday, October 08, 2015 11:33 PM |
| To: | Joel Schreiber |
| Cc: | Danny Orenstein; Nanci Hom |
| Subject: | Funds Request + Updated Use of Funds Report 8/1-9/30 |
| Attachments: | Projected Expense Report 10.1.2015.pdf; ATT00001.htm; Use of Funds Report 8.1.2015 - 9.30.2015.pdf; ATT00002.htm |

Good evening Joel + Nanci,

Please find the following attached to this email:

- Our updated Use of Funds Report itemizing the use of the initial $50,000 transfer
- Our Projected Expense Report for the month ahead, which includes the security deposit & first month's rent for 26 Broadway

The Projected Expense Report should serve as our official request for our next funds transfer.

Please let us know if you have any questions at all... and many thanks.

Warm regards,
Lisa & Danny

Spam
Phish/Fraud
Not spam
Forget previous vote

**1.21.21 PM PRODUCTION00281**

1

# Primary

110 Livingston Street #15H
Brooklyn, NY 11201
917-796-6719

## Projected Expense Report

10/1/2015 - 10/31/2015

| Date | Payee | Code | Notes | Amount |
|------|-------|------|-------|--------|
| TBD | Michael Chetrit: 26 Broadway | Real Estate | Security Deposit (12 months rent @ $91,566.17/month) | $1,098,794.00 |
| TBD | Michael Chetrit: 26 Broadway | Real Estate | First month's rent | $91,566.17 |
| 10/28 | Daniel Orenstein | Management | Salary for October | $7,916.66 |
| 10/28 | Lisa Skye Hain | Management | Salary for October | $7,916.66 |
| TBD | Daniel Orenstein | Misc | Reimbursement of overdraft coverage | $100.00 |
| TBD | DIA | Marketing | Remaining balance towards Brand/Identity work | $5,000.00 |
| TBD | TBD | Legal | 26 Broadway Lease / License Agreement | $9,000.00 |
| TBD | A Squared | Architect | Deposit on Architectural Services | $8,000.00 |
| TBD | GEA Consulting Engineers | Engineering | Deposit on Engineering Services | $12,500.00 |
| TBD | Manhattan Concrete | General Construction | Deposit on Floor Refinishing | $34,804.50 |
| 10/28 | Daniel Orenstein | Management | Reimbursement for Laptops / Apple Care / Monitor | $3,661.71 |
| 10/28 | Daniel Orenstein | Management | Reimbursement for Web Hosting | $52.00 |
| 10/28 | Daniel Orenstein | Management | Reimbursement for Measuring Tools / Supplies | $135.96 |
| TBD | DIA | Marketing | Deposit for Web Design work | $20,000.00 |

$1,299,447.66

# Primary

110 Livingston Street #15H
Brooklyn, NY 11201
917-796-6719

## Use of Funds Report

8/1/2015 - 9/30/2015

| Date | Payee | Code | Notes | Amount |
|------|-------|------|-------|--------|
| 8/19 | DIA | Marketing | branding/logo/identity/website (1/2 payment) | $5,000.00 |
| 8/19 | Lisa Skye Hain | Management | | $10,000.00 |
| 8/19 | Daniel Orenstein | Management | | $2,500.00 |
| 8/28 | Lisa Skye Hain | Legal | reimbursement for retainer paid to Homeier and Law PC on 6/22/2015 | $5,000.00 |
| 8/28 | Lisa Skye Hain | Legal | reimbursement for retainer paid to Cole, Schotz, Meisel, Forma on 6/25/2015 | $3,500.00 |
| 8/28 | Lisa Skye Hain | CFO | reimbursement for payment to Sona Banker (financial consulting/model) | $3,375.00 |
| 9/1 | Banker Financial Consulting | CFO | Financial Advisement on Revenue Model for Aug/Sept 2015 | $687.50 |
| 9/28 | Daniel Orenstein | Management | | $10,000.00 |
| 9/30 | Lisa Skye Hain | Management | | $10,000.00 |

$50,062.50

**Liza Izkiayayeva**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Monday, November 09, 2015 10:33 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Nanci Hom; Danny Orenstein |
| **Subject:** | Projected Expenses Nov 2015 :: Funds Request |
| **Attachments:** | Projected Expense Report 11.1.2015.pdf; ATT00001.htm |

Hello Joel,

Please find our next funds request (for the month of November) attached to this email.
The amount requested is $173,999.98

Nanci, could you please confirm receipt of this email?

Many thanks,
Lisa

---

Spam
Phish/Fraud
Not spam
Forget previous vote

# Primary

110 Livingston Street #15H
Brooklyn, NY 11201
917-796-6719

## Projected Expense Report

11/1/2015-11/30/2015

| Date | Payee | Code | Notes | Amount |
|------|-------|------|-------|--------|
| TBD | Halumm China | Construction | Partition Vendor | $44,000.00 |
| TBD | TBD | Construction | Chair Supplier | $25,000.00 |
| TBD | TBD | Construction | Desk Supplier | $26,000.00 |
| TBD | TBD | Construction | Mobile Ped Supplier | $13,000.00 |
| TBD | DIA | Website | Website Design | $8,500.00 |
| TBD | E9 Digital | Website | Website Development | $10,000.00 |
| TBD | TBD | Construction | GC Deposit | $10,000.00 |
| TBD | TBD | Construction | Lighting Deposit | $10,000.00 |
| TBD | TBD | Construction | IT Deposit | $5,000.00 |
| TBD | TBD | Construction | Expediting / Filing Fees | $2,500.00 |
| 10/28 | Daniel Orenstein | Management | | $7,916.66 |
| 10/28 | Lisa Skye Hain | Management | | $7,916.66 |
| 10/28 | Brian Hain | Consulting | | $4,166.66 |

$173,999.98

**Joel Schreiber**

| | |
|---|---|
| **?om:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, December 30, 2015 10:21 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Primary Funding Request |

Hi Joel,

Our next funding request is for $1.1 Million.

Approximately $800K needs to be dispersed to various vendors within the next week. The remainder needs to be dispersed by the 15th.

I will send you a detailed breakdown asap.

Please call me with any questions - and please advise when we can anticipate a wire transfer.

Many thanks,
Lisa

**Lisa Skye Hain**
)-Founder
rrimary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

_____

Spam
Phish/Fraud
Not spam
Forget previous vote

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Sunday, January 17, 2016 3:51 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Request breakdown |

Hello Joel,

At the moment, it would be extremely helpful if you could wire us an additional **$180,000** minimum on Tuesday. We currently have $128,000 in our account.

Funds would be used as follows:
**$150,000 - GC (to make $250k total — reduced from $510k as a courtesy to get started)**
**$148,000 - payments to Asian vendors + shipping expenses**
**$10,000 - misc legal, bookkeeping, etc fees**

Please let Danny and I know if you have any specific questions about this request. I am hopeful this is helpful to you.

Many thanks,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

Spam
Phish/Fraud
Not spam
Forget previous vote

**1.21.21 PM PRODUCTION00340**

1

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Friday, January 15, 2016 5:33 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein; Nanci Hom |
| **Subject:** | Primary Funding Request |

Hello Joel,

We would like to officially request $900,000 as the final request for funds needed to complete our first project (in addition to the funds we will receive from the landlord).

Please let us know if you have any questions and please confirm receipt.

Many thanks,
Lisa & Danny

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

Spam
Phish/Fraud
Not spam
Forget previous vote

**1.21.21 PM PRODUCTION00342**

**Joel Schreiber**

| | |
|---|---|
| om: | Lisa Skye Hain <lisa@liveprimary.com> |
| sent: | Monday, January 18, 2016 12:23 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein; Nanci Hom |
| **Subject:** | Re: Primary Funding Request |

Hello Joel,

I know it is a holiday today. I hope you and your team are enjoying a day off.
Please confirm receipt of this email below when you have a moment.

To summarize, we requested $1,027,793.40 on Dec 30th and $900,000 on Jan 15th — totaling $1,927,793.40.
This brings our total requests to date to $3,401,241.04.

Waterbridge has funded $260,000 since our request on Dec 30th.
The remaining balance to be funded is **$1,667,793.40**.

This amount, in combination with the TI funds coming from the LL, will enable us to complete our project/first location at a number less than $3.7M per our OA (page 5).

On Dec 30th we indicated we would need approximately $800k within one week to pay various vendors. We have been doing our best to negotiate extended payment terms with many different vendors - and, no question, the longer we wait for funding, the further out it pushes our completion date. Thus, we have to manage the expectations of our pre-booked ounding members as well.

We greatly appreciate anything you can do to expedite the wiring of funds from Waterbridge.
Please let us know if you have any specific questions.

As always, many thanks,
Lisa


**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress


On Jan 15, 2016, at 5:33 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:

Hello Joel,

**1.21.21 PM PRODUCTION00343**

**Joel Schreiber**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Saturday, January 23, 2016 11:30 PM |
| To: | Joel Schreiber |
| Cc: | Danny Orenstein |
| Subject: | Payments to make March 15th |

Hello Joel,

Danny has put together this itemization all of our expenses (on the construction side) needed to get us to our much anticipated opening. The amount is approximately **$2,472,525.**

**A&D Engineers - 40,000**
**Atlas Builders - 1,571,745**
**Blue Zebra - 69,337**
**Blueman Hardware - 2,792**
**Brooklyn Plant Studio - 20,000**
**Capital Light - 35,000**
**Catalin Sandru - 500**
**CytexOne - 100,000**
**Delta Testing - 8,500**
**Domo - 15,000**
**Ellis Structured Cabling - 51,186**
**Ferguson - 14,798**
**Ferguson - 16,045**
**Flor - 81,601**
**Halumm - 36,870**
**Ikea - 86,824**
**JAM - 8,800**
**Lucent Lightshop - 19,335**
**Manhattan Concrete - 34,804**
**Artwork - 10,000**
**Studio Equipment - 10,000**
**Marble and Tile Supplier - 20,000**
**Millwork Supplier - 70,000**
**Misc Furniture - 50,000**
**Sabre Security - 20,000**
**Stumptown Coffee - 25,000**
**Tangzhen Lighting - 24,449**
**Vanguard - 22,299**
**Y Lighting - 7,640**

This does not include operational expenses, which are as follows:

**Utilities (Jan & Feb) - 40,000**
**Insurance to Chubb - 5,290**
**Cleaning - 6,000**
**Kitchen supplies - 2,000**
**Office/Bathroom supplies - 4,000**
**SparkGrowth: Social Media - 2,800**
**DIA: Branding - 2,500**
**IT -1,500**

**1.21.21 PM PRODUCTION00349**

**LDI: Printers -1,000**
**8x8: Phones - 2,400**
**E9 Digital: Website - 9,400**
**Legal - 5,000**
**Accounting - 5,000**
**ProfitLine: Bookkeeping - 4,000**
**Payroll (Brian, Gennady, Asst Luminary, Host, Barista, Porter, Bldg Maint, Design Mgr) - 65,000**
**Flag - 5,000**
**Travel/Meals - 3,000**
**Reserve/Misc - 4,000**

Total Operational Expenses: $167,890

TOTAL Capital Needed: **$2,640,415**

Due to the lead times required on key items (HVAC, lighting, equipment) and the complexity of our buildout, opening on March 1st is not going to be attainable at this point due to lack of funding. We are eager and hopeful to open March 15th, provided our funding comes in expeditiously.

Please let us know what question you may have.

We very much look forward to seeing and meeting with you in person as soon as you return to NYC. It is important that you come to 26 Broadway to see the initial progress and give us your blessing. It also will energize you - and show you we are right on point with our projections. Soon we will be searching for location #2 in Manhattan!

Many thanks,
Lisa & Danny

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

Spam
Phish/Fraud
Not spam
Forget previous vote

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Monday, January 25, 2016 10:17 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Re: Urgency of Payments |

FYI - as of now, we do not have enough in our bank account to make payroll of $10,309 on Friday and the $10,251 utility bill to the landlord by Monday. We currently have $9k and $21k is needed.

Thus a transfer of $62k would be most helpful.


**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress



On Jan 25, 2016, at 9:32 PM, Joel Schreiber <js@waterbridge.com> wrote:

We will receive more funding
Sent via BlackBerry by AT&T

**From:** <lisa@liveprimary.com>
**Date:** Mon, 25 Jan 2016 21:28:44 -0500
**To:** Joel Schreiber<js@waterbridge.com>
**Cc:** Danny Orenstein<danny@liveprimary.com>
**Subject:** Re: Urgency of Payments

Danny, thank you for taking your time to detail everything out below.
Can you tell us exactly how long they will continue on $50k? End of the week?

Joel, I want to confirm you saw all of the lead times in Danny's email below. If they are accurate (and I'm sure they are), it appears even April 1st is pushing it if we don't receive more funding by the end of this week.


**Lisa Skye Hain**
Co-Founder
Primary

**1.21.21 PM PRODUCTION00354**

1

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Thursday, January 28, 2016 2:59 PM |
| **To:** | Danny Orenstein |
| **Cc:** | Joel Schreiber |
| **Subject:** | Re: Payment Schedule |

We have $2524 in our account - and payroll of $19,975 coming out automatically tomorrow (which I will have to personally bridge if we don't receive a wire for it by 4:30pm today).

**Summary: Needed today:**
$55,868 + $17,451 = $72,319

**Needed tomorrow (Operations):**
$10,251.66 - Utilities due Monday

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Jan 28, 2016, at 1:14 PM, Danny Orenstein <danny@liveprimary.com> wrote:

Hi Joel,

After further review, please find the full breakdown of immediate costs.
We've gotten the full buy-in from our GC on an April 1st opening if these items are paid out.
Then, we will follow a bi-weekly payment schedule with the GC of $160,790.
This is the baseline to get everything ordered and delivered on time.

Sourcing Asia (Desks) - $25,212
Sourcing Asia (Lighting) - $5,800
Assonhom (Chairs and Misc. Furniture) - $24,856
A&D Engineers - $30,000
Atlas Construction - $263,709
Blue Zebra - $69,337
Capital Light - $9,602.40
Ellis Structured Cabling - $25,593
Ferguson - $15,472
Porcelanosa - $15,408

**1.21.21 PM PRODUCTION00358**

1

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Friday, February 26, 2016 11:48 AM |
| **To:** | Nanci Hom |
| **Cc:** | Danny Orenstein; Joel Schreiber; Lisa Izkiayayeva |
| **Subject:** | Re: Live Primary LLC - AMEX Charges = $25,005.21 |

Nanci,

Thanks so much.

Have a lovely weekend,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Feb 26, 2016, at 10:16 AM, Nanci Hom <nhom@waterbridge.com> wrote:

Good morning,
We know:

| DATE | NAME | AMOUNT | MEMO | FROM |
|---|---|---|---|---|
| 01/27/16 | Ylighting | 1,510.00 | | American Express Credit Card |
| 02/01/16 | Ferguson Enterprises | 7,449.77 | | American Express Credit Card |
| 02/01/16 | Ferguson Enterprises | 8,246.69 | | American Express Credit Card |
| 02/01/16 | Ylighting | 1,050.00 | | American Express Credit Card |
| 02/22/16 | Ylighting | 6,748.75 | | American Express Credit Card |
| | | | | |
| | | | | |
| | **TOTAL** | **$ 25,005.21** | | |

**Waterbridge Capital / Nanci Hom**
**Operations Manager**
**Office (212) 696-2400**
**Waterbridge.com**

**1.21.21 PM PRODUCTION00365**

1

**Joel Schreiber**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Friday, February 26, 2016 2:13 PM |
| To: | Joel Schreiber |
| Cc: | Danny Orenstein |
| Subject: | Primary Funding Request |

Hello Joel,

We are requesting **$298,758.96** to bring us through the next phase of our first Primary project.

Many thanks,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

Spam
Phish/Fraud
Not spam
Forget previous vote

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Friday, February 26, 2016 11:58 AM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Primary :: Outstanding Balances + Trigger Dates |

Hello Joel,

Thank you for your time by phone yesterday.

Per our discussion, I am confirming that the official "trigger dates" are **March 4th** and **March 21st**.
Per our agreement, you are required to fund by the COB on each of those days.

Per our agreement, you are also required to fund a 5% penalty fee on top of the amount to be funded (see 9.3 (a) in our OA) because you did not fund within 2 days.

The following are the requests we have made to date:

| | |
|---|---|
| 10/8/2015 | $1,299,447.66 |
| 11/9/2015 | $173,999.98 |
| 12/30/2015 | $1,027,793.40 |
| 1/15/2016 | $900,000.00 |
| **TOTAL** | **$3,401,241.04** |

We are officially requesting the 5% fee on the remaining two requests - totaling **$1,927,793.40**. The total 5% fee is **$96,389.67**. This amount will be due in addition to the outstanding balances.

Due by March 4th: $228,185.19 + $51,389.67 (5% fee) = **$279,574.86**
Due by March 21st: $900,000 + $45,000 (5% fee) = **$945,000**

Anything you can do to expedite the delivery of these funds is greatly appreciated.
All we want is to move this project forward and open our doors.

Many thanks,
Lisa

**Lisa Skye Hain**
917.796.6719
lisa@lisaskyehain.com

**1.21.21 PM PRODUCTION00388**

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Friday, February 26, 2016 2:07 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein |
| **Subject:** | Re: Primary :: Outstanding Balances + Trigger Dates |

Hello Joel,

Per our conversation, we will waive the 5% fee if/when you fund the outstanding balances on or before the trigger dates mentioned in the email below.

Have a great weekend,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Feb 26, 2016, at 12:28 PM, Joel Schreiber <js@waterbridge.com> wrote:

Lisa,
I tried calling you. please call me
Joel

**From:** Lisa Skye Hain [mailto:lisa@liveprimary.com]
**Sent:** Friday, February 26, 2016 11:58 AM
**To:** Joel Schreiber
**Cc:** Danny Orenstein
**Subject:** Primary :: Outstanding Balances + Trigger Dates
Hello Joel,
Thank you for your time by phone yesterday.
Per our discussion, I am confirming that the official "trigger dates" are **March 4th** and **March 21st.**
Per our agreement, you are required to fund by the COB on each of those days.

**1.21.21 PM PRODUCTION00390**

1

Joel agreed tranches letter 3.7.2016

# PRIMARY

Joel Schreiber
Primary Member, LLC
7 Times Square, 37th Floor
New York, NY 10036

March 7th, 2016

Dear Joel:

This letter confirms the agreement we reached last week regarding the remaining disbursements due from Primary Member, LLC ("PM") to Live Primary, LLC (the "Company"), under the Limited Liability Company Agreement of Primary LLC dated July 28, 2015 (the "OA").

As we agreed, PM shall make the following payments to the Company on the dates indicated:

1. $103,185.19 by close of business on Wednesday, March 15, 2016;
2. $500,000.00 by close of business on Thursday, March 31, 2016;
3. $400,000.00 by close of business on Friday, April 15, 2016; and
4. $298,758.96 by close of business on Saturday, April 30, 2016.

We further agreed that, if any of these payments is not made in full by the date indicated, PM shall immediately be in default under Section 9.3 of the OA and the Disbursement Default penalty shall immediately be triggered (without any additional time to cure, other than the time period already passed prior to the date of this letter) so, for example:

1. Pursuant to Section 9.3(a) of the OA, PM shall immediately pay the company an additional 5% over and above the amounts indicated above, which additional payments shall not be considered part of the Loan and shall not be repaid by the Company; and

2. Immediately upon default, the Company shall automatically recover that portion of PM's Units in the Company provided pursuant to Section 9.3(b) of the OA.

Finally, with respect to your letter to us dated March 3, 2016, an "Approved Budget" does exist (it was sent to you on December 30, 2015) and, in fact, PM has already disbursed $ 2,398,055.85 in funds pursuant to the Approved Budget.

Best Regards,

Lisa Skye Hain

Danny Orenstein

**1.21.21 PM PRODUCTION00403**

**Joel Schreiber**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Friday, April 01, 2016 4:46 PM |
| To: | Nanci Hom; Joel Schreiber |
| Cc: | Danny Orenstein |
| Subject: | Use of Funds Reports |
| Attachments: | Cumulative Expenses 2015_2016 - Feb 2016.pdf; Cumulative Expenses 2015_2016 - Jan 2016.pdf; Cumulative Expenses 2015_2016 - March 2016.pdf |

Hello Nanci,

Please find our Use of Funds itemized on the attached three documents (representing Jan-March 2016).
Please let me know if you require anything further.

Many thanks and enjoy the weekend,
Lisa

---

Spam
Phish/Fraud
Not spam
rget previous vote

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

**1.21.21 PM PRODUCTION00455**

March 2016

| DATE | PAYEE | CODE | NOTES | AMOUNT | METHOD |
|------|-------|------|-------|--------|--------|
| 3/1/2016 | Daniel Orenstein | Reimbursement | | $5,000.00 | QuickPay |
| 3/2/2016 | Broadway 26 Waterview LLC | Landlord / Electric Due 3/1/2016 | | $4,035.62 | Online Payment |
| 3/2/2016 | Daniel Orenstein | Reimbursement | | $5,000.00 | QuickPay |
| 3/2/2016 | Lisa Skye Hain | Reimbursement | | $10,000.00 | Wire |
| 3/3/2016 | Merchant Bank | CC Processing | | $19.95 | ACH |
| 3/3/2016 | Merchant Bank | CC Processing | | $5.00 | ACH |
| 3/3/2016 | Chase Bank Fee | Bank | | $159.95 | Fee |
| 3/4/2016 | Fleet Mechanical | Construction | | $50,000.00 | Wire |
| 3/4/2016 | Fleet Mechanical | Construction | | $28,000.00 | Wire |
| 3/4/2016 | Atlas Builders | Construction | | $22,000.00 | Wire |
| 3/7/2016 | Lisa Skye Hain | Reimbursement | Interest on $20k bridge loan | $183.55 | Online Payment |
| 3/7/2016 | 8x8 | Phones | | $29.43 | Online Payment |
| 3/7/2016 | Chubb | Insurance | | $1,763.50 | Online Payment |
| 3/8/2016 | Atlas Builders | Construction | | $70,000.00 | Wire |
| 3/8/2016 | American Express | Credit Card | | $14,690.09 | ACH |
| 3/9/2016 | Lisa Skye Hain | Reimbursement | | $15,000.00 | Wire |
| 3/10/2016 | Fleet Mechanical | Construction | | $50,000.00 | Wire |
| 3/10/2016 | LF Logistics | Construction | | $69.00 | Check |
| 3/10/2016 | Printech | Marketing | | $97.99 | Online Payment |
| 3/10/2016 | Atlas Builders | Construction | | $175,000.00 | Transfer |
| 3/11/2016 | Insperity | Payroll | | $6,911.12 | ACH |
| 3/11/2016 | Everest Broadband Network | IT | | $350.00 | Online Payment |
| 3/14/2016 | E9 Digital | Marketing | Website #2 | $3,000.00 | ACH |
| 3/14/2016 | Vanguard Construction | Construction | | $11,000.00 | Wire |
| 3/14/2016 | Danielle Galland | Construction | | $2,097.50 | ACH |
| 3/14/2016 | RV Stapleton | Construction | | $5,142.52 | Wire |
| 3/15/2016 | E9 Digital | Marketing | | $2,127.37 | ACH |
| 3/17/2016 | Cole Schotz LLP | Legal | | $214.50 | Online Payment |
| 3/17/2016 | 8x8 | Phones | | $29.43 | Online Payment |

March 2016

| DATE | PAYEE | CODE | NOTES | AMOUNT | METHOD |
|------|-------|------|-------|--------|--------|
| 3/18/2016 | Banker Financial Consulting | CFO | | $1,750.00 | Online Payment |
| 3/22/2016 | LF Freight | Construction | | $3,190.00 | Wire |
| 3/23/2016 | A&D Associates | Construction | | $5,000.00 | Check 1014 |
| 3/25/2016 | Lucent Lighting Shop | Construction | | $9,802.50 | ACH |
| 3/25/2016 | Atlas Builders | Construction | | $300,000.00 | Transfer |
| 3/25/2016 | Think Wider | Marketing | Adam Davis Photography | $300.00 | Transfer |
| 3/25/2016 | Fleet Mechanical | Construction | | $100,000.00 | Wire |
| 3/25/2016 | Brooklyn Plant Studio | Marketing | | $560.00 | ACH |
| 3/25/2016 | Lisa Skye Hain | Reimbursement | | $20,000.00 | Wire |
| 3/25/2016 | Iron Oaks | Construction | | $22,055.89 | ACH |
| 3/25/2016 | Lisa Skye Hain | Management | | $4,833.33 | Wire |
| 3/25/2016 | American Express | CC Processing | | $20,000.00 | ACH |
| 3/25/2016 | Insperity | Payroll | | $6,792.57 | ACH |
| 3/28/2016 | Lisa Skye Hain | Reimbursement | Bartenders Payment (Influencer Event) | $320.00 | Online Payment |
| 3/28/2016 | Daniel Orenstein | Reimbursement | | $5,000.00 | QuickPay |
| 3/28/2016 | Daniel Orenstein | Management | | $4,833.33 | QuickPay |
| 3/29/2016 | JAM Consultants | Construction | | $5,528.00 | Online Payment |
| 3/30/2016 | Broadway 26 Waterview LLC | Landlord / Electric Due 4/1/2016 | | $7,034.49 | Online Payment |
| | | | **MARCH TOTAL** | **$998,926.63** | |

1.21.21 PM PRODUCTION00457

Feb 2016

| DATE | PAYEE | CODE | NOTES | AMOUNT | METHOD |
|------|-------|------|-------|--------|--------|
| 2/1/2016 | | | Transfer to Savings to establish Account | $25.00 | |
| 2/1/2016 | Banker Financial Consulting | CFO | | $2,375.00 | Online Payment |
| 2/1/2016 | Daniel Orenstein | Management | | $4,833.33 | QuickPay |
| 2/1/2016 | A&D Consulting Engineers | Construction | | $20,000.00 | Check 1011 |
| 2/3/2016 | Merchant Bank | CC Processing | | $19.95 | ACH |
| 2/3/2016 | Merchant Bank | CC Processing | | $19.95 | ACH |
| 2/3/2016 | Merchant Bank | CC Processing | | $5.05 | ACH |
| 2/3/2016 | Merchant Bank | CC Processing | | $5.00 | ACH |
| 2/3/2016 | Chase Bank Fee | Bank | | $160.00 | |
| 2/4/2016 | Broadway 26 Waterview LLC | Landlord / Electric | Due 2/1/2016 | $10,251.66 | Check 1009 |
| 2/5/2016 | AMEX | Credit Card | | $3,946.40 | ACH |
| 2/5/2016 | Atlas | Construction | | $190,000.00 | Wire |
| 2/8/2016 | Printech | Marketing | | $2,417.03 | Online Payment |
| 2/8/2016 | Eaton & Van Winkle LLP | Legal | | $4,536.31 | Wire |
| 2/8/2016 | A&D Consulting Engineers | Construction | | $10,000.00 | Check 1012 |
| 2/9/2016 | E9 Digital | Marketing | | $3,000.00 | ACH |
| 2/9/2016 | E9 Digital | Marketing | | $2,124.00 | ACH |
| 2/10/2016 | | | Security Deposit transfer | $1,275.00 | |
| 2/10/2016 | Atlas Builders | Construction | | $50,000.00 | Wire |
| 2/12/2016 | | | Security Deposit transfer | $2,025.00 | |
| 2/12/2016 | Insperity | Payroll | | $10,492.69 | ACH |
| 2/12/2016 | Merchant Bank | CC Processing | | $20.51 | ACH |
| 2/12/2016 | Merchant Bank | CC Processing | | $0.75 | ACH |
| 2/16/2016 | Atlas Builders | Construction | | $50,000.00 | Transfer |
| 2/16/2016 | Fleet Mechanical | Construction | | $75,000.00 | Wire |
| 2/16/2016 | LevelDesk | Construction | | $40,000.00 | Wire |
| 2/17/2016 | Cole Schotz LLP | Legal | | $427.25 | Online Payment |
| 2/17/2016 | Fleet Mechanical | Construction | | $25,000.00 | ACH |
| 2/22/2016 | Gerstein Strauss & Rinaldi LLP | Legal | | $1,000.00 | Online Payment |

**1.21.21 PM PRODUCTION00458**

Feb 2016

| DATE | PAYEE | CODE | NOTES | AMOUNT | METHOD |
|------|-------|------|-------|--------|--------|
| 2/23/2016 | Lisa Skye Hain | Reimbursement | | $10,000.00 | Wire |
| 2/24/2016 | E9 Digital | Marketing | | $3,000.00 | ACH |
| 2/24/2016 | Egan Ltd. | Taxes | | $5,000.00 | POS Debit |
| 2/24/2016 | Daniel Orenstein | Reimbursement | | $5,000.00 | QuickPay |
| 2/25/2016 | E9 Digital | Marketing | | $1,795.00 | ACH |
| 2/26/2016 | Chubb | Insurance | | $1,775.45 | POS Debit |
| 2/26/2016 | Lisa Skye Hain | Management | | $4,833.33 | Wire |
| 2/26/2016 | Insperity | Payroll | | $7,317.64 | ACH |
| 2/29/2016 | Daniel Orenstein | Reimbursement | | $5,000.00 | QuickPay |
| 2/29/2016 | Daniel Orenstein | Management | | $4,833.33 | QuickPay |
| 2/29/2016 | Cash | | Pay to Valentin (intern) | $400.00 | ATM Cash |
| | | | **FEBRUARY TOTAL** | **$557,914.63** | |

**1.21.21 PM PRODUCTION00459**

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Tuesday, April 19, 2016 6:27 PM |
| **To:** | Nanci Hom |
| **Cc:** | Joel Schreiber; Danny Orenstein; Lisa Izkiayayeva |
| **Subject:** | Re: Live Primary LLC |

Confirmed.

Very much looking forward to learning when the remaining $340,000 expected last Friday will be coming through. We are in the final 11 day countdown to our opening! Life is good.

Many thanks,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Apr 19, 2016, at 5:02 PM, Nanci Hom <nhom@waterbridge.com> wrote:

Lisa,
We just wired $10,000.00 to your account with JP Morgan Chase ending in 7336, please confirm once received.
Thank you,
Nanci
**Waterbridge Capital / Nanci Hom**
**Operations Manager**
**Office (212) 696-2400**
**Waterbridge.com**

**From:** Nanci Hom
**Sent:** Friday, April 15, 2016 4:54 PM
**To:** 'lisa@liveprimary.com'
**Cc:** Joel Schreiber; Danny Orenstein; Lisa Izkiayayeva
**Subject:** RE: Live Primary LLC
Great, have a wonderful weekend
**Waterbridge Capital / Nanci Hom**
**Operations Manager**
**Office (212) 696-2400**

**1.21.21 PM PRODUCTION00497**

## Joel Schreiber

**From:**
**Sent:** lisa@livePrimary.com
**To:** Friday, April 22, 2016 2:50 PM
**Cc:** Danny Orenstein
**Subject:** Nanci Hom; Joel Schreiber; Lisa Izkiayayeva
Re: Live Primary LLC - Funding

Nanci,

As you may know, we were expecting $400,000 last Friday. Joel said that the remaining $350,000 would come this week. We had a number of bills due today that we cannot pay as a result. Payroll was one (thank you for the $11k transfer).

We currently have a $183,000 balance on our Amex and $23,000 is due today. Our account is now suspended. I just received a call letting me know this.

As mentioned to Joel, we need a minimum $200,000 today to be able to honor commitments due over the past week. This delay is causing damage to our project both today and in our ability to compete by May 1st.

Please keep us advised.

Many thanks,
Lisa


**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Apr 22, 2016, at 1:49 PM, Danny Orenstein <danny@liveprimary.com> wrote:

Hi Nanci,

That's unfortunate news.
Please keep us looped in as funding becomes available.
Thank you,
Danny

**Danny Orenstein**
Co-Founder
Primary
+1 (718) 669-9973
d...y@liveprimary.com

Visit us at liveprimary.com for updates on our progress

**1.21.21 PM PRODUCTION00511**

1

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Monday, April 25, 2016 11:22 AM |
| **To:** | Nanci Hom |
| **Cc:** | Joel Schreiber; Danny Orenstein; Lisa Izkiayayeva |
| **Subject:** | Re: Live Primary LLC |

Confirmed.

As mentioned, our AMEX currently has a past due balance of $22,000 (due last Friday) and the full balance is $183,000. I spoke with them on Saturday and we can no longer spend on the card until the balance is significantly reduced.

We expected $400,000 from Waterbridge on April 15th (which is part of the funds requested back on January).

We cannot reach out completion this coming Monday without significantly more funding.

We have 17 companies with 32 people moving in on Monday.

Please advise when the remaining approx. $300k will arrive.

Further, $298k - also requested back in January - is due by this weekend per our last amended agreement with Mr Schreiber. Please advise if this will be received on time as well.

Thank you,
Lisa & Danny


**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress


On Apr 25, 2016, at 11:14 AM, Nanci Hom <nhom@waterbridge.com> wrote:

Lisa,
We just wired $10,000.00 to your account with JP Morgan Chase ending in 7336, please confirm once received.
Thank you,
Nanci

**1.21.21 PM PRODUCTION00516**

# Joel Schreiber

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Monday, April 25, 2016 1:48 PM |
| To: | Joel Schreiber |
| Cc: | Danny Orenstein; Nanci Hom |
| Subject: | Payment |
| Attachments: | New tranches letter to JS 3.7.2016.pdf |

Hello Joel,

Danny just let me know you called to say that next Monday/Tuesday May 2/3rd will be the latest latest you will be funding us.

To confirm, this is the remaining $291,620.35 (part of the $400,000 that was due by April 15, 2016) and the $298,758.96 that is due by this Saturday, April 30, 2016 — per the attached letter which we sent to your office in a letter dated March 7th (see attached). We also emailed this letter to you twice - on March 8th and March 9th. I will forward these emails to you and Nanci again now.

Please confirm.

Thank you,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

Spam
Phish/Fraud
Not spam
Forget previous vote

**1.21.21 PM PRODUCTION00531**

**Joel Schreiber**

| | |
|---|---|
| **om:** | lisa@liveprimary.com |
| **sent:** | Tuesday, May 03, 2016 9:23 AM |
| **To:** | Joel Schreiber |
| **Cc:** | Nanci Hom; Danny Orenstein |
| **Subject:** | Re: Funding. |

Good morning,

Please advise when we can expect funding today. We need to pay off our $150k Amex bill so that the cards can be re-activated and we can resume needed purchases and putting recurring purchases in place.

Thank you,
Lisa


**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

visit us at liveprimary.com for updates on our progress

On May 2, 2016, at 8:04 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:

Hello Joel!

I hope you had a lovely day - it was a wonderful day first here at Primary.

We owe $150k ++ on our AMEX and I am still personally out of pocket bridging the launch of our company…. and Danny and I now both have charges on personal cards. The AMEX account has bene suspended for almost two weeks. When can we expect the full funding you promised to us in a schedule last month? You are currently in default on your promises to fund on April 15th and also on April 30th.

Please advise.

Have a wonderful night,
Lisa


**Lisa Skye Hain**
}-Founder
Primary
+1 (917) 796-6719

**1.21.21 PM PRODUCTION00547**

1

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Monday, August 01, 2016 9:22 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Danny Orenstein; Brian Hain |
| **Subject:** | August Invoicing + Expenses/Income |
| **Attachments:** | 2016_08_01 July and August Expenses.xlsx; ATT00001.htm |

Joel,

Please see attached.
One is the summary of income via monthly fees, security deposits, setup fees, etc) - $89,669.
One is the breakdown of expenses and income for August.

If we can put ABS, Ellis and Leveldesk on your AMEX, that leaves us at needing $120k to get through the next week's expense requirements. We have $89,669 coming in over the next 2-3 days so that leaves us needing $30k to bridge us.

As you know, we plan to have $110k in TI (less the $45k we owe our GC) coming in over the next 2-3 months (pending the department of building sign offs on all of the permits) — so $65k. We are happy to send these funds your way as we are able/as it comes in.

Please let us know what question you have...

Many thanks,
Lisa

Spam
Phish/Fraud
Not spam
Forget previous vote

**1.21.21 PM PRODUCTION00629**

1

## Joel Schreiber

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Wednesday, August 24, 2016 9:56 PM
**To:** breifler@forefrontgroup.com
**Cc:** Joel Schreiber
**Subject:** Re: Primary per Joel Schreiber

Hello Brad,

We would love to establish a larger/long term relationship with Forefront. I understand $100-150k isn't a sexy amount so we propose taking $500k line of credit with an immediate draw down of $50k. Would you be available for a call early tomorrow? We would like to effectuate this immediately,

All the best,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great
liveprimary.com

On Aug 24, 2016, at 5:10 PM, Joel Schreiber <js@waterbridge.com> wrote:

Sent via BlackBerry by AT&T

**From:** Bradley Reifler <breifler@forefrontgroup.com>
**Date:** Wed, 24 Aug 2016 20:55:56 +0000
**To:** Joel Schreiber<js@waterbridge.com>
**Subject:** RE: Primary per Joel Schreiber

Thank you Lisa for contacting me. I am a major Joel fan and he speaks very highly of you and what you are building.
I would be interested in pursuing this if there is some collateral or preferred cash flow to pay down the loan. Most of our loans are mid teens in rate and we prefer sub 1 year in duration.
It would be important that if we do transact the loan then we get some type of carve out for future loans up to some amount. Time management and time maximization would not warrant just doing 1 loan for 100K-150K but if we knew the business could grow (additional loans to finance your growth) then we would certainly analyze the opportunity.
Please let me know what you would propose in terms of collateral and cash flow as well as use of funds. We then can go to the next level. The process can be expedited but we need to make sure we know how we will be paid back and what can happen to delay or worse lose the principal.

**1.21.21 PM PRODUCTION00654**

1

**Joel Schreiber**

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, September 21, 2016 11:24 AM |
| **To:** | Alan. Feldman |
| **Cc:** | Joel Schreiber; Bradley Reifler; Frank Argenziano |
| **Subject:** | Re: check in |

Hello Alan,

Thank you for this thoughtful reply.
Yes to 16%. No to equity.
Can we move forward? Feel free to call me if more efficient on your end.

Best,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

On Sep 21, 2016, at 11:03 AM, Alan. Feldman <afeldman@forefrontincometrust.com> wrote:

Hi Lisa,
Our cost of capital is too high to do a 12% loan with no kickers. 16% is actually on the lower end
of the spectrum for a loan like this considering there are no legal or other fees to you, which
would make it much more expensive on a percentage basis for a loan this size and short duration.
I can't spend too much more time on this until we have an agreement on terms so I suggest
seeking out other sources and come back to us if nothing else pans out. We would very much
like to work with you but need to act as responsible fiduciaries for the fund and its investors.
Thank you,
Alan
Alan Feldman
Senior Managing Director
**Forefront Income Trust**
7 Times Square Tower, 37th Fl.
New York, NY 10036
Phone: 212.607.2465
Mobile: 917.214.2713
afeldman@forefrontincometrust.com

**1.21.21 PM PRODUCTION00874**

1

**Joel Schreiber**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Saturday, September 24, 2016 4:51 PM |
| To: | Joel Schreiber; Danny Orenstein |
| Subject: | loan doc ($100,000) |
| Attachments: | SKYE LOAN AGREEMENT NOTE ver4[1].doc |

Can you both please review the attached doc ASAP? I want to send it to her tomorrow.
Per my understanding of our OA, as Managing Members of the entity, Danny and I are ok to sign this alone. Correct me if I am mistaken please.

Thank you!
Lisa

Spam
Phish/Fraud
Not spam
Forget previous vote

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

**1.21.21 PM PRODUCTION00885**

# LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE, is made this ____ day of September, 2016, by and among **LIVE PRIMARY LLC**, a Delaware Limited Liability Company (hereinafter known as "BORROWER") and **KELLY NOONAN**, an individual residing in the State of California (hereinafter known as "LENDER").

BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole. THIS LOAN AGREEMENT AND PROMISSARY NOTE DOES NOT CONSTITUTE EITHER AN OFFER TO SELL OR AN OFFER TO PURCHASE SECURITIES.

## PROMISSORY NOTE

FOR VALUE RECEIVED, BORROWER promises to pay to the order of LENDER, the sum of one hundred thousand dollars (**$100,000.00**) together with interest thereon at a rate of ten percent (10%) per annum on the unpaid balance (hereinafter, "the Loan Balance"). The entire outstanding Loan Balance (including principal and any accrued unpaid interest) shall, after one full calendar year, become fully due and payable by BORROWER. Should BORROWER fail to make payment in full to LENDER within (45) forty-five days of any actual demand, BORROWER shall be in default of the terms of this loan agreement. This agreement is subject to additional terms found below.

## ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legal bound as follows:

A. **Loan Payment Terms**.
BORROWER to pay monthly installment interest payments of two thousand dollars ($2,000) to LENDER every month for the life of the loan, beginning January 1, 2017. The first payment shall be due on January 1, 2017 and continue each month on the 1st of the month until the Loan Balance, including principal and accrued unpaid interest, is paid in full or demand for payment in full is made by LENDER, in which case a prorated portion of interest shall be paid by BORROWER depending on when payment in full is made during the Post Demand Period.

B. **Demand by Lender**. This is a "demand" loan agreement and promissory note under which BORROWER is required to repay in full the entire outstanding Loan Balance within forty-five (45) days of receiving a written demand from LENDER for full repayment of the Loan Balance. Delivery of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. For mailing of said notice, LENDER shall use BORROWER'S address as stated below in the portion of this agreement pertaining to default.

C. **Method of Loan Payment**. The BORROWER shall make all payments called for under this loan agreement by providing a check or other negotiable instrument made payable to the following individual or entity at the address indicated:

**1.21.21 PM PRODUCTION00886**

**Kelly Noonan**
**49 Beverly Park Circle**
**Beverly Hills, CA 90210**

If Lender gives written notice to Borrower that a different address shall be used for making payments under this loan agreement, Borrower shall use the new address so given by Lender.

D. **Default**. The occurrence of any of the following events shall constitute a Default by the Borrower of the terms of this loan agreement and promissory note:

1. Borrower's failure to pay any amount due as principal or interest on the date required under this loan agreement, after a five (5) day grace period
2. Borrower seeks an order of relief under the Federal Bankruptcy laws
3. Borrower becomes insolvent
4. A federal tax lien is filed against the assets of Borrower

E. **Additional Provisions Regarding Default:**

1. **Addressee and Address** to which Lender is to give Borrower written notice of Default:

   **Lisa Skye Hain**
   **c/o Primary**
   **26 Broadway, 8th floor**
   **New York, NY 10004**

If Borrower gives written notice to Lender that a different address shall be used, Lender shall use that address for giving notice of default (or any other notice called for herein) to Borrower.

2. **Cure of Default.** Upon default, Lender shall give Borrower written notice of default. Mailing of written notice by Lender to Borrower via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. Borrower shall have 10 days after receipt of written notice of default from Lender to cure said default. In the case of default due solely to Borrower's failure to make timely payment as called for in this loan agreement, Borrower may cure the default by making full payment of any principal and accrued interest whose payment to Lender is overdue under the loan agreement and, also, the late payment penalty described below.

3. **Penalty for Late Payment.** For late payment of interest, there shall be imposed upon Borrower a one hundred fifty dollar ($150) penalty for any late payment of interest whose payment to Lender is more than five (5) days overdue under this loan agreement. For example, if the agreement calls for monthly payments of $2,000 upon the fifth day of each month and Borrower fails to make timely payment of said amount by the tenth day of the month, Borrower shall be liable to Lender for a penalty of one hundred and fifty dollars ($150) and, to become current, the Borrower must pay to Lender the overdue interest payment of $2,000 and a penalty of ($150.00), for a total of ($2150). For late payment of the Loan Balance after Lender's demand of payment, there shall be imposed upon Borrower a one tenth of one percent (.01%) per day penalty for the full amount due to Lender under this loan agreement and for which Lender has delivered a notice of default to Borrower. For example, if the Loan Balance is one hundred thousand dollars ($100,000) and the Post Demand Period expires upon the fifth day of the month, and Borrower makes payment of said amount on the 20th day of the month, the Loan Balance shall have accrued additional interest in the

2

**1.21.21 PM PRODUCTION00887**

amount of $1,500 as a penalty. Borrower (after receipt of a default notice from Lender), to cure the default, shall be liable to Lender for the penalty of $1,500, the overdue accrued interest of $500 accrued during the half-month after the expiration of the Post Demand Period and the Loan Balance, for a total of $102,000.

4. **Acceleration**. If the Borrower fails to cure any default on or before the expiration of the ten (10) day cure period that starts on the date Borrower receives written notice from Lender that an event of default has occurred under this loan agreement, the entire unpaid principal, accrued interest, and penalties under this loan agreement shall accelerate and become due and payable immediately.

5. **Security**. Borrower agrees that this note is secured by a two percent (2%) equity interest in the property and business more formally known as Live Primary LLC. Borrower warrants that at the time of this writing such percentage has a value equivalent to the amount being lent by Lender. Should Borrower default under any of the terms of this agreement Lender it its option may seek to claim a percentage interest equal to the total amount currently due to Lender. Lender agrees to allow an additional 60-day period to cure all defaults or to facilitate such transfer of ownership. To the extent that Lender can collateralize its interest in Live Primary LLC, such payments shall serve to offset any amounts still due and owing to Lender by Borrower. However, nothing herein shall serve as a waiver of any moneys due Lender.

6. **Indemnification of Attorneys Fees and out of pocket costs.** Should any party materially breach this agreement, the non breaching party shall be indemnified by the breaching party for its reasonable attorney's fees and out of pocket costs which in any way relate to, or were precipitated by, the breach of this agreement. The term "out of pocket costs", as used herein, shall not include lost profits. A default by Borrower which is not cured within 10 days after receiving a written notice of default from Lender constitutes a material breach of this agreement by Borrower.

F. **Parties that are not individuals**. If any Party to this agreement is other than an individual (i.e., a corporation, a Limited Liability Company, a Partnership, or a Trust), said Party, and the individual signing on behalf of said Party, hereby represents and warrants that all steps and actions have been taken under the entity's governing instruments to authorize the entry into this Loan Agreement. Breach of any representation contained in this paragraph is considered a material breach of the Loan Agreement.

G. **Integration**. This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated agreement.

H. **Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

I. **Waiver**. The failure by one party to require performance of any provision shall not affect that party's right to require performance at any time thereafter, nor shall a waiver of any breach or default of this Contract constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

J. **Modification**. Except as otherwise provided in this document, this agreement may be modified,

superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.  This agreement may be renewed for a period of one (1) additional year provided LENDER grants such consent to BORROWER and BORROWER requests in writing and executes an Extension/ Modification agreement no later than 30 days prior to the expiration of this Agreement. BORROWER agrees to pay for any and all reasonable legal expenses associated with the production of an appropriate Extension/ Modification agreement.

K. **Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in New York, NY for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts of New York, NY shall have exclusive jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sounds in contract, tort, or other areas of the law.

L. **State Law**. This Agreement shall be interpreted under, and governed by, the laws of the state of New York.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

**BORROWER:**

_____
**As a Managing Member of Live Primary LLC, Lisa Skye Hain**
Dated: September _____, 2016

_____
**As a Managing Member of Live Primary LLC, Daniel Orenstein**
Dated: September _____, 2016

**LENDER:**

_____
**Kelly Noonan**
Dated: September _____, 2016

**Joel Schreiber**

| | |
|---|---|
| From: | lisa@liveprimary.com |
| Sent: | Saturday, September 24, 2016 8:21 PM |
| To: | Danny Orenstein |
| Cc: | Joel Schreiber |
| Subject: | Re: loan doc ($100,000) |

I think we send it to her first (not notarized) for her review. Then she sends back or Ives approval - and then we can notarize. Can you both let me know what you think ASAP so I can send tomorrow for her review?

Thanks!

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

On Sep 24, 2016, at 5:22 PM, Danny Orenstein <danny@liveprimary.com> wrote:

Hi Lisa

We will need to get this notarized on Monday.
I'll review in the interim.
Thanks
Danny

On Sep 24, 2016, at 4:50 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:

Can you both please review the attached doc ASAP? I want to send it to her tomorrow.
Per my understanding of our OA, as Managing Members of the entity, Danny and I are ok to sign this alone. Correct me if I am mistaken please.

Thank you!
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.

**1.21.21 PM PRODUCTION00891**

1

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, October 04, 2017 4:07 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Rafay Khalid; Brian Hain |
| **Subject:** | Fwd: Primary Selected Financials as 9/30/2017 |
| **Attachments:** | Primary Select Financials 09302017.pdf |

Joel, see attached.

Please let us know if you agree/are ok with us sending these (to Peter Sabesan for the 30th Street deal) as the snapshot of current financials.

And/or let us know if you would make any changes.


Begin forwarded message:

**From:** Rafay Khalid <rafayzkhalid@gmail.com>
**Subject: Primary Selected Financials as 9/30/2017**
**Date:** October 4, 2017 at 12:36:05 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>, Brian Hain <brian@liveprimary.com>

Hi Lisa and Brian,

Attached is the selected financials for Primary 9/30/2017.

Thank you,

Rafay

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*CONFIDENTIAL\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Primary**
**P&L for 26 Broadway**
*as of September 2017*

| | Actual FY 2016 | Actual Jan-17 | Actual Feb-17 | Actual Mar-17 | Actual Apr-17 | Actual May-17 | Actual Jun-17 | Actual Jul-17 | Actual Aug-17 | Actual Sep-17 | Actual YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 635,989 | $ 129,410 | $ 136,313 | $ 159,204 | $ 149,780 | $ 143,563 | $ 165,326 | $ 143,300 | $ 162,173 | $ 155,156 | $ 1,344,223 |
| Gross Profits | $ 614,034 | $ 124,194 | $ 131,045 | $ 152,324 | $ 143,037 | $ 136,080 | $ 159,326 | $ 137,240 | $ 156,052 | $ 148,974 | $ 1,288,272 |
| *gross margin* | 97% | 96% | 96% | 96% | 95% | 95% | 96% | 96% | 96% | 96% | 96% |
| **Expenses** | | | | | | | | | | | |
| Total Expenses | $1,260,531 | $161,756 | $126,727 | $159,727 | $160,927 | $151,226 | $153,227 | $156,677 | $118,343 | $148,573 | $1,337,185 |
| *SG&A margin* | 198% | 125% | 93% | 100% | 107% | 105% | 93% | 109% | 73% | 96% | 99% |
| Operating Income | $ (646,497) | $ (37,562) | $ 4,318 | $ (7,404) | $ (17,891) | $ (15,147) | $ 6,099 | $ (19,438) | $ 37,709 | $ 401 | $ (48,914) |
| *operating margin* | -102% | -29% | 3% | -5% | -12% | -11% | 4% | -14% | 23% | 0% | -4% |
| Net Income | $ (646,497) | $ (42,562) | $ (682) | $ (12,404) | $ (27,891) | $ (25,147) | $ (3,901) | $ (31,938) | $ 21,209 | $ (16,099) | $ (139,414) |
| *net margin* | -102% | -33% | -1% | -8% | -19% | -18% | -2% | -22% | 13% | -10% | -10% |

**1.21.21 PM PRODUCTION01203**

**Primary**

**Balance Sheet**

*as of September 2017*

**ASSETS**

**CURRENT ASSETS**

| | Sep-17 |
|---|---|
| Cash | $ 46,294 |
| Cash - Security Deposits Customers | $ 242,000 |
| Cash - Security Deposits Primary | $ 1,098,794 |
| **Total Current Assets** | $ 1,387,088 |
| | |
| **Net Fixed Assets** | $ 2,097,237 |
| | |
| **TOTAL ASSETS** | $ 3,484,325 |

**LIABILITIES & EQUITY**

**LIABILITIES**

| | |
|---|---|
| Accounts Payable | $ 76,000 |
| Security Deposits | $ 242,000 |
| Note / LOC | $ 280,000 |
| **Total Liabilities** | $ 598,000 |
| | |
| **EQUITY** | |
| Capital | $ 3,672,236 |
| Retained Earnings | $ (646,497) |
| Current Year Acc Income (Loss) | $ (139,414) |
| **Total Equity** | $ 2,886,325 |
| | |
| **TOTAL LIABILITIES & EQUITY** | $ 3,484,325 |

*****************CONFIDENTIAL*********************************************

**1.21.21 PM PRODUCTION01204**

**Joel Schreiber**

---

**om:**          Lisa Skye Hain <lisa@liveprimary.com>
**Sent:**         Thursday, February 01, 2018 7:54 PM
**To:**           Joel Schreiber
**Cc:**           Brian Hain
**Subject:**      Funding Request

Joel,

This is our formal request for $970,048.66 - which is comprised of the security deposit and first month's rent for 251 West 30th Street.

Many thanks,
Lisa + Brian

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



ou work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - Inc Magazine
*NYC's Coolest New Wellness-Focused Co-Working Space* - Harper's Bazaar
*Co-Working for Grownups* - Fortune Magazine

**1.21.21 PM PRODUCTION01217**

1

## Joel Schreiber

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Thursday, April 12, 2018 4:06 PM |
| To: | Joel Schreiber; Nanci Hom |
| Subject: | Fwd: American Express Merchant Financing - Loan Application SE# 2310484019 |

Joel/Nanci,
Please see attached.
They need Waterbridge Capital to complete section B on this Docusign form. It's for the Amex merchant loan ($324,000).
Let me know if you have questions.
Many thanks,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when feel great.
liveprimary.com

*Best New Co-Working Space 2016* - *Inc Magazine*
*NYC's Coolest New Wellness-Focused Co-Working Space* - *Harper's Bazaar*
*Co-Working for Grownups* - *Fortune Magazine*

---------- Forwarded message ----------
From: **Rafay Khalid** <rafay@liveprimary.com>
Date: Thu, Apr 12, 2018 at 2:32 PM
Subject: Fwd: American Express Merchant Financing - Loan Application SE# 2310484019
To: Lisa BNI Boom 68 Skye Hain <lisa@liveprimary.com>, brian@liveprimary.com

Hi Lisa,

Please ask Waterbridge Capital to complete section B on this Docusign form. It's for the Amex merchant loan.

Rafay

Begin forwarded message:

> **From:** "Merchant Financing via DocuSign" <dse@docusign.net>
> **Date:** April 12, 2018 at 2:30:23 PM EDT
> **To:** "LISA SKYE HAIN" <rafay@liveprimary.com>

1.21.21 PM PRODUCTION01231

**Joel Schreiber**

| | |
|---|---|
| **from:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, May 16, 2018 10:40 AM |
| **To:** | Joel Schreiber; Brian Hain |
| **Subject:** | Fwd: Primary - 26 Broadway - 3rd Floor |
| **Attachments:** | Cad Release Form - 1.pdf; Primary - 26 Broadway - 3rd Floor TVPC Statement-051618.pdf |

FYI $50k owed today to release drawings to GC
Can you release the remaining $200k today?

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - Inc Magazine
*NYC's Coolest New Wellness-Focused Co-Working Space* - Harper's Bazaar
*Co-Working for Grownups* - Fortune Magazine

Begin forwarded message:

**From:** Thomas Veltre <tveltre@tomvpe.com>
**Date:** May 16, 2018 at 10:09:21 AM EDT
**To:** Brian Hain <brian@liveprimary.com>, Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Adam Finkelman <adam@liveprimary.com>, Nathan Minett <nathan@wakedesign.org>
**Subject:** Primary - 26 Broadway - 3rd Floor

Good Morning Brian/Lisa,

We have received a request from Blueberry for our CAD files relative to the topic project via the Procore portal. Accordingly, we requested that Blueberry execute and return our CAD release form. I have attached herewith a copy of that form.

That being said, it is our policy that we do not release our instruments of service to contractors without first bringing the account up to date. I have attached a statement for your review and action.

**1.21.21 PM PRODUCTION01247**

1

**Joel Schreiber**

| | |
|---|---|
| **⟩m:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Friday, June 08, 2018 10:57 AM |
| **To:** | Joel Schreiber |
| **Subject:** | Fwd: Upcoming Payments - Blueberry |
| **Attachments:** | PCO #1- Spiral Ducts Throughout_Primary Signed.pdf |

See below.
We need $400,000 to keep the project going over the next week...


**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great
liveprimary.com


⟩ Fri, Jun 8, 2018 at 8:37 AM Russell Goss <rgoss@blueberrybuilders.com> wrote:

Morning Adam,


Happy Friday.

Please see below payment breakdown


HVAC – Blueberry and HVAC company fronted $300,000 of the $378,000 needed to release the units.  We still owe the HVAC team $100,000 on the unit release.

- Need to release Spiral duct fabrication at approximately $100,000

Electrical – Elpo has requested $175,000.  We have given them $50,000

- Need to release more money so he can give deposits to low voltage and fire alarm – Another $25,000 minimum

Carpenters – Need a payment by next week to keep things moving as we continue to framing, they are moving

- $125,000 to keep them operating

**1.21.21 PM PRODUCTION01269**

1

**Joel Schreiber**

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Tuesday, June 19, 2018 10:36 AM |
| To: | Joel Schreiber |
| Cc: | Brian Hain |
| Subject: | $485k |

Per our call, we agree to pay a $20k fee for a $485k loan with 30 days terms. Please confirm this can be transferred today.

Our banking details are as follows:
Wire Transfer Information:
Routing number: 021000021
Swift code: CHASUS33
Account number: 755697336
Bank Address: 405 Lexington Ave New York NY 10174
Bank Name—JPMorgan Chase Bank NA
Business Legal Name: Live Primary LLC
Address: 26 Broadway, 8th floor, NY NY 10004

Best,
Lisa

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016 - Inc Magazine*
*NYC's Coolest New Wellness-Focused Co-Working Space - Harper's Bazaar*
*Co-Working for Grownups - Fortune Magazine*

## Joel Schreiber

**From:**
**Sent:**          Lisa Skye Hain <lisa@liveprimary.com>
**To:**            Friday, June 22, 2018 5:27 PM
**Cc:**            Joel Schreiber
**Subject:**       Lisa Izkiayayeva; Charles Valentino
                   Fwd: Paying Brian and Lisa

Joel, we got approved for $100k. Need your personal returns for last two years ASAP. See below.

Please confirm you can send on Monday.
Thank you!


**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com





You work best when you feel great.
liveprimary.com


_Best New Co-Working Space 2016_ - Inc Magazine
_NYC's Coolest New Wellness-Focused Co-Working Space_ - Harper's Bazaar
_Co-Working for Grownups_ - Fortune Magazine


Begin forwarded message:

**From:** Chad Gordon <chad@fundera.com>
**Date:** June 22, 2018 at 4:47:36 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Brian Hain <brian@liveprimary.com>
**Subject: Re: Paying Brian and Lisa**

Hi Lisa,

Thanks for your time on the phone, as we discussed please find the pre-qualified offer from Credibility below along with
the documentation needed to finalize the offer:

Maximum Loan Amount: $100,000
Term: 24 months
Interest Rate: 13.99%

**1.21.21 PM PRODUCTION01274**

1

Monthly Payments: $4,800.82
Total Payback: $114,930.84
Origination Fee: $5,000 (5%)

Closing Documents:
1. 2017 Business Tax extensions
2. 2017 and 2016 Personal Taxes for both owners (if they filed extensions we would need 2015 Personal taxes, extension forms, and W-2s for both owners)



On Mon, Jun 18, 2018 at 4:20 PM, Chad Gordon <chad@fundera.com> wrote:
Hi Frankie,

Thank you for sending this over, confirming receipt. I'll have an update for you later this week. Thanks for sending everything over!

Best,

Chad



On Mon, Jun 18, 2018 at 4:02 PM, Frankie Morales <emorales@liveprimary.com> wrote:
Hi Chad,

Hope you are having a good Monday thus far. Attached are bank statements for May and April 2018. Please let me know if there are any complications.

Thanks,
Frankie

On Mon, Jun 18, 2018 at 3:57 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:
Hello Chad,
Absolutely.
Frankie, see below. Please forward these two statements from our Chase account to Chad.
Thank you!
Lisa


**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



**1.21.21 PM PRODUCTION01275**

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Thursday, July 19, 2018 9:18 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Brian Hain |
| **Subject:** | Fwd: $800,000 FUNDING -- WE CAN FUND IN 24 HOURS |

Read from bottom up

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

_Best New Co-Working Space 2016_ - Inc Magazine
_NYC's Coolest New Wellness-Focused Co-Working Space_ - Harper's Bazaar
_Co-Working for Grownups_ - Fortune Magazine

Begin forwarded message:

**From:** James Scarlo <james@sapphirefundingsolutions.com>
**Date:** July 19, 2018 at 7:56:02 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Brian Hain <brian@liveprimary.com>
**Subject: Re: $800,000 FUNDING -- WE CAN FUND IN 24 HOURS**

For Option #1 800k it would be a separate deal that i can fund in 1 hour, if you would like to payoff existing lines with that you can do so, and once we have payment history on the 800k we can Refinance the deal. please let me know whenever you are ready to make your decision and we can wrap this up , I have all documents already,

feel free to call/text me at any time with any questions or details,

On Thu, Jul 19, 2018 at 5:49 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:
James, you are rolling our current lines into the 800K?

Lisa Skye Hain

**1.21.21 PM PRODUCTION01294**

1

CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

_Best New Co-Working Space 2016_ - Inc Magazine
_NYC's Coolest New Wellness-Focused Co-Working Space_ - Harper's Bazaar
_Co-Working for Grownups_ - Fortune Magazine

On Jul 19, 2018, at 2:04 PM, Brian Hain <brian@liveprimary.com> wrote:

Thank you for the clarification. For the $800, you are rolling our current lines into that?

**Brian Hain**
COO/Co-Founder
Primary
+1 (212) 495-9962
brian@liveprimary.com



You work best when you feel great
liveprimary.com

On Thu, Jul 19, 2018 at 1:44 PM James Scarlo <james@sapphirefundingsolutions.com> wrote:
So payment on option number 2 is 14k a month for the funding amount of 300k every 60 days until you hit the 1.2m ( full credit line)

payback will be 18% annually , however the first 300k will be 30% fixed factor rate which comes out to 3% a month cost per capital as that is the first influx of capital and it is a relationship starter on a unsecured credit line, we also use your payments as a credit builder so we can we can move The business to our SBA department after a few months of payments,

the deal was sent to SBA underwriting and it was declined however we work with our credit committee to monitor payments from our credit line programs and report them to our in house SBA underwriting so we can make you more bankable.

call/ text/email with any additional questions or information needed.

**1.21.21 PM PRODUCTION01295**

On Thu, Jul 19, 2018 at 12:22 PM, Brian Hain <brian@liveprimary.com> wrote:
Can you explain the 2nd offer a little more? The $14K per month until reaching the full line of credit? Amounting to $1.2M? Where/what is the interest?

**Brian Hain**
COO/Co-Founder
Primary
+1 (212) 495-9962
brian@liveprimary.com



You work best when you feel great
liveprimary.com

On Thu, Jul 19, 2018 at 1:17 PM Lisa Skye Hain <lisa@liveprimary.com> wrote:
Thanks.
Will review with my partner and revert back.
He is cc'd.

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

Best New Co-Working Space 2016 - Inc Magazine
NYC's Coolest New Wellness-Focused Co-Working Space - Harper's Bazaar
Co-Working for Grownups - Fortune Magazine

On Jul 19, 2018, at 1:15 PM, James Scarlo <james@sapphirefundingsolutions.com> wrote:

Please see offers below as per our discussion.

OFFER #1

**1.21.21 PM PRODUCTION01296**

Funded Amount $800,000
Payback $1,040,000
Daily payment $5,714

This deal is structured as a starter deal to establish payment history after 28 days (18 payments) we will Renew this deal on our monthly program and extend the term by additional 14 months as you will than be considered a platinum tired client .

Please keep in mind you do not need to accept the full amount to establish payment history , you can accept how ever much you like and than wait the 28 day period to than accept the additional funds at our cheaper pricing

Offer #2
line of credit 1.2m
we release $300,000 every 60 days up until we reach the full credit line on a payment of $14,000 a month,

Pleas let me know if any of these options can work for the business .

ALSO KEEP IN MIND THAT WE CAN FUND THIS DEAL IN 24 HOURS WITH A SIGNED AGREEMENT, DRIVERS , LICENSE, VOID CHECK, AND PROOF OF OWNERSHIP.

feel free to call/text or email at any time.

--

Warm Regards,

**James Scarlo**

Funding Specialist

Office: 786-564-6466

Fax: 888-372-0132

Email: james@sapphirefundingsolutions.com

Visit us at: www.sapphirefundingsolutions.com

--

Warm Regards,

**James Scarlo**

**1.21.21 PM PRODUCTION01297**

# Balance Sheet

## Live Primary LLC
## As of December 31, 2018

|  | DEC 31, 2018 |
|---|---|
| **Assets** | |
| **Current Assets** | |
| **Cash and Cash Equivalents** | |
| 26 Broadway, 3rd Floor | 476,250.82 |
| 26 Broadway, 8th Floor | 306,048.33 |
| Chase Checking xx7336 | 18,872.70 |
| Chase Saving xx5995 | 701.44 |
| Square Cash | 677.11 |
| 30th Street Account | 70,319.47 |
| **Total Cash and Cash Equivalents** | **874,869.87** |
| Bank Clearing Account | 107,230.83 |
| Prepaid Rent | 179,201.00 |
| **Total Current Assets** | **1,161,301.70** |
| **Fixed Assets** | |
| Fixed Assets:Computer Equipment | 71,307.39 |
| Fixed Assets:Accum. Dep. - Computer Equip | (1,193.61) |
| Fixed Assets:Furniture and Equipment | 214,828.66 |
| Fixed Assets:Accum. Dep. - Furn. & Equip. | (2,501.97) |
| Fixed Assets:Leasehold Improvements | 1,784,957.31 |
| Fixed Assets:Accum. Dep - Leasehold Improv. | (21,405.85) |
| Furniture & Equipment - 30th St | 16,819.08 |
| **Total Fixed Assets** | **2,062,811.01** |
| **Long Term Assets** | |
| **Construction in Progress** | |
| 3rd Floor - 26 Broadway | (600.00) |
| 3rd Floor Construction | 3,287,683.64 |
| **Total Construction in Progress** | **3,287,083.64** |
| 8th Floor - 26 Broadway | (236,810.81) |
| 30th Street Construction | 615,827.17 |
| 3rd Floor Construction TI | (1,379,000.00) |
| Security Deposit | 831,470.28 |
| **Total Long Term Assets** | **3,118,570.28** |
| **Total Assets** | **6,342,682.99** |

**EXHIBIT**

Lisa-2

exhibitsticker.com

**Balance Sheet**

## Liabilities and Equity

| | DEC 31, 2018 |
|---|---|
| **Liabilities** | |
| **Current Liabilities** | |
| Accounts Payable | |
| Business Line of Credit - Kabbage Inc. | (260.00) |
| Loan Payable - Jonathan Mines | 68,165.91 |
| Loan Payable - Kelly Noonan | 149,325.80 |
| Loan Payable - Lisa Skye Hain | 62,000.00 |
| Loans & Advances | 23,500.00 |
| Security Deposits Collected | 1,240,871.99 |
| American Express x10000 | 325,197.33 |
| Brian & Lisa AMEX CC - 2018 | 6,800.68 |
| Total Current Liabilities | 22,910.48 |
| | 1,898,512.19 |
| **Long Term Liabilities** | |
| Funds from Waterbridge | 6,182,102.76 |
| Total Long Term Liabilities | 6,182,102.76 |
| **Total Liabilities** | 8,080,614.95 |
| **Equity** | |
| Current Year Earnings | 190,852.00 |
| Member Contributions:Member - DO | 20,000.00 |
| Member Distributions:Member - DO | (52,660.00) |
| Member Contributions:Member - LSH | 68,500.00 |
| Member Distributions:Member - LSH | (147,227.80) |
| Retained Earnings | (1,817,396.16) |
| Total Equity | (1,737,931.96) |
| **Total Liabilities and Equity** | 6,342,682.99 |

LP009793

# Live Primary LLC
## Statement of Cash Flows
### January - April, 2019

|  | Total |
|---|---:|
| **OPERATING ACTIVITIES** | |
| Net Income | 307,668.49 |
| Adjustments to reconcile Net Income to Net Cash provided by operations: | |
| Accounts Receivable (A/R) | -262,095.91 |
| Accounts Payable (A/P) | 128,273.66 |
| American Express:1004 - Delta Skymiles | -760.44 |
| American Express:1008 - Delta Skymiles | 112.07 |
| American Express:1009 - Blue | -532.83 |
| American Express:2008 - Platinum Business | 2,247.95 |
| American Express:8154 - Bank of America | -1,871.74 |
| Chase Cards:5065 - Chase Freedom | -1,031.00 |
| Chase Cards:6590 - Chase Ink | -590.00 |
| Chase Cards:6700 - Chase Ink Visa | -712.26 |
| Other Cards:0086 - Capital One Quicksilver | -218.00 |
| Other Cards:1937 - Barclay | -135.00 |
| Other Cards:1980 - UBS Visa Signature | -4,319.08 |
| Other Cards:5779 - Discover | -96.41 |
| Other Cards:7330 - Citi Diamond Preferred | 3,446.63 |
| Other Cards:Paypal LOC | 89.82 |
| Store Cards:5903 - West Elm | 742.25 |
| Store Cards:7563 - Brand Smart | -130.00 |
| Accrued Interest | 10,290.92 |
| Loan Payable:Fundera Loan | 10,680.21 |
| Loan Payable:Kabbage LOC | 4,430.78 |
| Loan Payable:Kapitus Loan (formerly Strategic) | -72,750.00 |
| Loan Payable:Square Capital | -1,178.09 |
| NorthStar Leasing | 3,074.86 |
| Other Current Liabilities | 0.00 |
| Sales Tax Payable | 323.02 |
| Security Deposits Held:Downtown | -276,542.15 |
| Security Deposits Held:Penn Station | -40,605.00 |
| Short-Term Loan Payable | 0.00 |
| Short-Term Loan Payable:Eric Barron Inc Loan | 30,000.00 |
| Short-Term Loan Payable:Franklin Funding Group LLC | 120,000.00 |
| Short-Term Loan Payable:GTR Source Loan | 13,840.00 |
| Short-Term Loan Payable:I-Style LLC | -15,000.00 |
| Unearned Revenue | 58,315.34 |
| Unearned Revenue:Armory Square Ventures | 838.23 |
| Unearned Revenue:Arora | 18,780.00 |
| Unearned Revenue:Big League Finance | -4,000.00 |
| Unearned Revenue:CEO Works | -9,800.00 |

LP009794

| | | |
|---|---|---:|
| Unearned Revenue:ChartIQ | | 28,000.00 |
| Unearned Revenue:Cohley | | -16,660.00 |
| Unearned Revenue:Cornerstone Mgmt | | -613.00 |
| Unearned Revenue:DMZ | | 0.00 |
| Unearned Revenue:Duolingo, Inc. | | 4,675.00 |
| Unearned Revenue:EES Financial | | -750.00 |
| Unearned Revenue:Healthcare Inc. | | -14,800.00 |
| Unearned Revenue:Ippolita | | -34,127.00 |
| Unearned Revenue:Nucleus Marketing | | 30,600.00 |
| Unearned Revenue:Solidus Labs | | 25,195.00 |
| Unearned Revenue:Spitfire Strategies | | 80,000.00 |
| Unearned Revenue:Thankview LLC | | 48,150.00 |
| Unearned Revenue:Tobii Technology Inc | | -779.00 |
| Unearned Revenue:Valiant Pictures | | 0.00 |
| Unearned Revenue:Xignite | | 10,000.00 |
| Total Adjustments to reconcile Net Income to Net Cash provided by operations: | -$ | 127,991.17 |
| Net cash provided by operating activities | $ | 179,677.32 |
| INVESTING ACTIVITIES | | |
| Fixed Asset Artwork | | -6,075.00 |
| Fixed Asset Computers | | 8,982.00 |
| Fixed Asset Equipment | | -10,578.83 |
| Leasehold Improvements:26 Broadway 3rd Floor | | -193,105.99 |
| Leasehold Improvements:26 Broadway 3rd Floor:3rd Floor Construction TI | | -22,568.38 |
| Leasehold Improvements:Penn Station | | -26,485.00 |
| Security Deposits:Penn Station | | 42,393.83 |
| Net cash provided by investing activities | -$ | 207,437.37 |
| FINANCING ACTIVITIES | | |
| Convertible Notes:Bar Capital Loan #2 | | 48,700.00 |
| Notes Payable:Brian Skokowski Loan | | 115,000.00 |
| Notes Payable:Carl Skokowski Loan | | -37,500.00 |
| Notes Payable:Kelly Noonan Loan | | -8,000.00 |
| Notes Payable:Shareholder Note Payable - LSH | | -54,272.37 |
| Notes Payable:Waterbridge Loan | | 165,000.00 |
| Opening Balance Equity | | -190,788.97 |
| Retained Earnings | | 2,495.14 |
| Net cash provided by financing activities | $ | 40,633.80 |
| Net cash increase for period | $ | 12,873.75 |
| Cash at beginning of period | | 50,807.65 |
| Cash at end of period | $ | 63,681.40 |

Saturday, May 18, 2019 04:44:03 PM GMT-7

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                    Chapter 11

LIVE PRIMARY, LLC,                                        Case No. 20–11612 (MG)

                            Debtor.


## DEBTOR'S PLAN OF REORGANIZATION


Sanford P. Rosen
**ROSEN & ASSOCIATES, P.C.**
747 Third Avenue
New York, NY 10017-2803

*Counsel to the Debtor and Debtor in Possession*

Dated: November 9, 2020

Live Primary, LLC, (the "**Debtor**"), hereby proposes the following *Debtor's Plan of Reorganization* (the "**Plan**") pursuant to sections 1121(c) and 1123 of title 11 of the United States Code (the "**Bankruptcy Code**"). Reference is made to the Disclosure Statement that will be filed with the Bankruptcy Court for a discussion of certain transactions and other matters germane to the implementation of the Plan and the Debtor's Chapter 11 Case, as well as a summary discussion of the terms and conditions of the Plan.

## ARTICLE I
Definitions and Construction of Terms

The following terms utilized in the Plan shall have the following definitions:

1.1    <u>Administrative Expense Claim(s)</u> means, except as otherwise set forth in this Plan, a Claim (or a portion of a Claim) for any cost or expense of administration in connection with the Chapter 11 Case, including, without limitation, any actual, necessary costs and expenses of preserving the Debtor's Estate, and all fees and charges assessed against the Debtor's Estate, as defined herein, pursuant to 28 U.S.C. § 1930. The term Administrative Expense Claim does not include Professional Fee Claims or Priority Claims, as defined herein and which are treated separately in this Plan.

1.2    <u>Administrative Expense Claim Reserve</u> means any Cash held in a reserve to be established and maintained by the Debtor in accordance with the terms and conditions of this Plan.

1.3    <u>Allowed</u> means, with reference to any Claim (including any Administrative Expense Claim) that portion of a Claim: (i) which has been allowed by a Final Order; (ii) which is allowed under the terms of this Plan; or (iii) (a) which has been scheduled by the Debtor as not disputed, not contingent and not unliquidated, or (b) for which a proof of claim was timely and otherwise properly filed on or before the Bar Date with the Bankruptcy Court, and with respect to Claims described in this clause (iii) as to which no objection to the allowance thereof has been interposed within the period of time fixed by the Bankruptcy Code, the Plan, the Bankruptcy Rules or an order of the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such Claim or any portion thereof. Except as otherwise specifically set forth in this Plan, each Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the Bankruptcy Code and applicable law.

1.4    <u>Assets</u> mean (a) all assets and properties of every kind, nature, character and description, whether real, personal, or mixed, whether tangible or intangible (including contract rights), wherever situated and by whomever possessed, including the goodwill related thereto, operated, owned, or leased by, or an behalf of, the Debtor that constitute property of the Estate within the meaning of section 541 of the Bankruptcy Code, including, without limitation, Cash, any and all Claims, Causes of Action, or rights of the Debtor under federal, state or foreign law, letters of credit issued for or on behalf of the Debtor and the monies deposited to secure the performance of any contract or lease by the Debtor; and (b) the proceeds, products, rents, and/or profits of any of the foregoing.

1.5    <u>Avoidance Actions</u> mean any action arising under chapter 5 of the Bankruptcy Code, including, sections 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or under

2

similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced as of the Confirmation Date to prosecute such actions.

1.6    <u>Ballot</u> means the form distributed to each holder of a Claim against the Debtor that is entitled to vote to accept or reject the Plan on which is to be indicated, among other things, acceptance or rejection of the Plan.

1.7    <u>Bankruptcy Code</u> means title 11 of the United States Code, 11 U.S.C. § 101, et. seq., as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to this Chapter 11 Case.

1.8    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York and any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom, or any successor thereto that may be established by any act of Congress, or otherwise, and which has competent jurisdiction over the Chapter 11 Case or the Plan.

1.9    <u>Bankruptcy Rules</u> mean (i) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court, as provided under section 2075 of title 28 of the United States Code, as such Rules may be amended from time to time, and (ii) any Local Rules of the Bankruptcy Court.

1.10    <u>Bar Date</u> means [insert date here], 2020, which was the date fixed in the Bar Date Order as the deadline to file a proof of Claim in the Chapter 11 Case.

1.11    <u>Bar Date Order</u> means the Order Establishing [insert date here], 2020 as the Deadline for Filing Proofs of Claims and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on [insert date here], 2020.

1.12    <u>Business Day</u> means any day other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.13    <u>Case Professionals</u> mean all Persons retained pursuant to a Final Order of the Bankruptcy Court who are to be compensated pursuant to sections 326, 327, 328, 330, and 1103 of the Bankruptcy Code.

1.14    <u>Cash</u> means cash or cash equivalents, including, but not limited to, wire transfers, checks, other readily marketable direct obligations of the United States of America, and certificates of deposit issued by a federally insured depository institution.

1.15    <u>Cause(s) of Action</u> means, without limitation, (a) all pending suits to which the Debtor is a party, whether as plaintiff or defendant, as of the date the Confirmation Order becomes a Final Order, and (b) any and all other actions, proceedings, causes of action, liabilities, obligations, suits, accounts, controversies, agreements, rights to legal remedies, rights to equitable remedies, rights to payment and claims, damages, judgments, claims and demands whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted

3

or assertible directly or derivatively, in law, equity or otherwise, existing or hereafter arising, to which the Debtor had any rights or obligations whatsoever, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case (including through the Effective Date), including, without limitation, all Avoidance Actions.

1.16    Chapter 11 Case means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor, bearing the caption In re: Live Primary, LLC, 20–11612 (MG) and pending before the Bankruptcy Court.

1.17    Claim means any "claim" within the meaning of section 101(5) of the Bankruptcy Code.

1.18    Class means a category of holders of Claims as set forth in Article III and IV of the Plan.

1.19    Confirmation Date means the date on which the Confirmation Order is entered on the docket in the Chapter 11 Case and the conditions set forth in Section 10.1 of the Plan have been satisfied.

1.20    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.21    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.22    Creditor means any holder of a Claim against the Debtor or the Estate or holder of any Claim against property of the Debtor or the Estate.

1.23    Debtor means Live Primary, LLC.

1.24    Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented, or modified from time to time and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.25    Disclosure Statement Approval Order means that certain order entered by the Bankruptcy Court approving the Disclosure Statement.

1.26    Disputed Claim means every Claim that is not yet Allowed.

1.27    Disputed Claims Reserve means any Cash held in a reserve to be established and maintained by the Debtor, and funded by the Debtor, in amounts sufficient for the Debtor to make Distributions under the Plan on account of all Disputed Claims in the event, and to the extent, they become Allowed Claims. For the avoidance of doubt, the amount retained on account of a Disputed Claim shall be the lesser of the amount of such Claim as (i) asserted by the holder of such Claim against the Debtor, or (ii) estimated for the purposes of the Plan by Final Order of the Bankruptcy Court; provided, however, the Debtor shall not be required to retain any amount on account of contingent or unliquidated Claims. Any portion of a Disputed Claim that is disallowed by Final

4

Order of the Bankruptcy Court, or waived by the holder of such Claim, shall become available to the Debtor to distribute in accordance with the terms and conditions of the Plan.

1.28    <u>Distribution(s)</u> means the distribution or distributions on account of Allowed Claims to be made by the Debtor in accordance with the terms and conditions of the Plan.

1.29    <u>Effective Date</u> means the fifth Business Day on or after the Confirmation Date, on which the conditions precedent to the effectiveness of the Plan specified in Section 10.2 of the Plan shall have been satisfied.

1.30    <u>Entity</u> shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

1.31    <u>Estate</u> means the estate of the Debtor in the Chapter 11 Case, created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

1.32    <u>Exculpated Claim</u> means any Claim, Cause of Action, obligation or liability asserted or assertible against the Exculpated Parties, related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Case and any proceeding therein; including, without limitation, the Debtor's administration of the Estate, the Distribution of any Asset of the Estate; the formulation, preparation, dissemination, negotiation and promulgation of this Plan and the accompanying Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, or the pursuit of confirmation of this Plan or the administration and implementation of this Plan; <u>provided, however,</u> Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by this Plan constitutes an Exculpated Claim.

1.33    <u>Exculpated Party</u> means the Case Professionals.

1.34    <u>Executory Contract</u> means any executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, between the Debtor and any other Person, including, without limitation, the Lease.

1.35    <u>Final Order</u> means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal or move for reargument or for a rehearing or for leave to appeal has expired, or (b) if an appeal has been sought, no stay (temporary or otherwise) pending appeal has been obtained.

1.36    <u>General Unsecured Claim</u> means a Claim which is not an Administrative Expense Claim, a Secured Claim, a Priority Claim, or a Professional Fee Claim.

1.37    <u>Impaired</u> means when used with reference to a Claim, a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.38    <u>Interests</u> mean the equity interests in the Debtor.

1.39    Insider shall have the meaning given to such term as defined in section 101(31) of the Bankruptcy Code.

1.40    Insider Claims means the General Unsecured Claims of Lisa Skye Hain, Joel Schreiber, Waterbridge Capital and Primary Member LLC and their respective successors and assigns including any holders of all or any portion of the Insider Claims.

1.41    Lease means that certain lease by and between Broadway 26 Waterview LLC, as landlord, and the Debtor, as tenant, dated as of November 3, 2015, as amended by that certain First Amendment of Lease dated as of February 9, 2016 and by that certain Second Amendment to Lease dated as of December 14, 2007 and by that certain Third Amendment to Lease dated as of February 11, 2019, covering the entire rentable area of the third (3rd) floor and a rentable portion of the eighth (8th) floor as more particularly described in the Lease in the building known as 26 Broadway, New York, New York 10004.

1.42    Lien has the meaning given to such term in section 101(37) of the Bankruptcy Code (but a lien that has or may be avoided pursuant to an Avoidance Action shall not constitute a Lien).

1.43    Noteholder means the holder of a Note.

1.44    Notes mean the secured and unsecured Notes held by the Noteholders listed on Schedule "A" to this Plan.

1.45    Office Space Member means a person who is party to a member agreement with the Debtor providing for coworking and shared space with related amenities.

1.46    Office Space Member Claim means the General Unsecured Claim of an Office Space Member.

1.47    Other Priority Claim means any Claim, other than an Administrative Expense Claim, a Secured Claim, a Priority Tax Claim, or a General Unsecured Claim.

1.48    Person means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.49    Petition Date means July 12, 2020, the date the Debtor filed the petition commencing the Chapter 11 Case.

1.50    Plan means this Plan of Reorganization, including, without limitation, any exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time.

1.51    Plan Distribution Funds means all unrestricted Cash on hand in the Debtor's accounts.

1.52    Plan Distribution Account means the escrow account to be created by the Debtor's counsel prior to the Confirmation Hearing.

1.53    Plan Supplement means the compilation of documents, including any exhibits to the Plan not included herewith, that the Debtor shall file with the Bankruptcy Court at least ten (10) days prior to the deadline established by the Bankruptcy Court for filing objections to Confirmation of the Plan (or at such later date as may be approved by the Bankruptcy Court).

1.54    Priority Claim means a Claim that is either a Priority Tax Claim or Other Priority Claim.

1.55    Priority Tax Claim means any Claim which is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.56    Professional Fee Claim means Claims of Case Professionals or any other Person for compensation and / or reimbursement of expenses pursuant to sections 327, 328, 330, or 331 of the Bankruptcy Code.

1.57    Professional Fee Claim Reserve means any Cash held in a reserve to be established and maintained by the Debtor in accordance with the terms and conditions of this Plan.

1.58    Pro Rata means with respect to an Allowed Claim, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.59    Released Party means each of the following in its capacity as such, and only in its capacity as such: (a) the Debtor and (b) the Case Professionals.

1.60    Reorganized Debtor means the Debtor on and after the Effective Date.

1.61    Reorganized Debtor Common Interests means the common equity interests in the Reorganized Debtor, of which (i) seventy-three percent (73%) will be issued to those Class II Noteholders who elect on their Ballot to receive equity in exchange for their Allowed Secured and General Unsecured Claims, and (ii) twenty-seven percent (27%) will be issued to management of the Reorganized Debtor.

1.62    Reorganized Debtor Preferred Interests means the preferred equity interests in the Reorganized Debtor aggregating one hundred percent (100%) of such interests that will be issued to investors in exchange for new investments aggregating approximately $500,000.

1.63    SBA Unsecured Claim means the General Unsecured Claim of the SBA arising under its loan agreement with the Debtor under the Paycheck Protection Program.

1.64    SBA means the Small Business Administration.

1.65    Schedules means the schedules of assets and liabilities and the statement of financial affairs filed with the Bankruptcy Court by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 on March 16, 2018, as such schedules and statements have been or may be supplemented or amended from time to time.

1.66    Secured Claim means any Claim other than a Claim which is an Administrative Expense

Claim, a Priority Claim, a Professional Fee Claim, or a General Unsecured Claim.

1.67    Unimpaired means when used with reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code and is designated as such under Article III of this Plan.

1.68    United States Trustee means the United States Trustee appointed under section 591, title 28, United States Code to serve in the Southern District of New York.

1.69    United States Trustee Fees means all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code, and interest, if any, for delinquent fees pursuant to section 3717 of Title 31 of the United States Code.

Interpretation; Application of Definitions and Rules Construction Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan. The words "herein", "hereof", "hereto", "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan. Unless otherwise indicated herein, all references to dollars means United States dollars.

## ARTICLE II
Treatment of Administrative Expense Claims and Priority Tax Claims

2.1    Non-Classification. As provided in section 1123(a) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims are not classified for purposes of voting on or receiving Distributions under the Plan. All such Claims are instead treated separately in accordance with the terms and conditions set forth in this Article II.

2.2    Administrative Expense Claims. Following the Effective Date, the Debtor shall establish and fund the Administrative Expense Claim Reserve as forth in Article V of the Plan. Except to the extent that any Person or Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim or Priority Tax Claim specifically addressed below) shall (i) receive Cash in an amount equal to such holder's Allowed Administrative Expense Claim on the Effective Date or as soon as practicable after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (ii) be assumed and paid in the ordinary course by the Debtor, after the occurrence of the Effective Date; provided, however, the Debtor shall be responsible for the satisfaction of United States Trustee Fees arising under 28 U.S.C. § 1930 and 31 U.S.C. § 3717 from the Effective Date through the entry of a final decree closing the Chapter

11 Case. Each holder of an Administrative Expense Claim (other than a Professional Fee Claim or Priority Tax Claim) is required to file a proof of Administrative Expense Claim within thirty (30) days after the Effective Date. Nothing herein extends any Bar Date previously established by the Bankruptcy Court. Any request for payment of an Administrative Expense Claim (other than a Professional Fee Claim or Priority Tax Claim) that is not timely filed as set forth above shall be forever barred, and holders of such Claims shall not be able to assert such Claims in any manner against the Debtor or the Estate or any of the foregoing parties' accountants, advisors, agents, attorneys, consultants, directors, employees, members, officers, representatives, or Case Professionals.

The Debtor shall have ninety (90) days after the Effective Date to file objections, if any, to Administrative Expense Claims (other than a Professional Fee Claim or Priority Tax Claim) and serve such objections upon the holder of the affected Claim. The Debtor shall have the right to seek authority from the Bankruptcy Court to extend the dates for filing and serving the objections to the holders of such Claims.

2.3    Priority Tax Claims. Except to the extent that the Debtor determines to make Distributions to the holder of a Priority Tax Claim in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or the holder of an Allowed Priority Tax Claim has been satisfied prior to the Effective Date or agrees to a different treatment, the Debtor shall pay to each holder of an Allowed Priority Tax Claim, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim on the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, with interest as may be required by the Bankruptcy Code and provided under applicable non-bankruptcy law.

2.4    Professional Fee Claims. Following the Effective Date, the Debtor shall establish, and the Debtor shall fund, the Professional Fee Claims Reserve as set forth in Article V of the Plan. All Persons and Entities seeking an allowance of their Professional Fee Claim for services rendered and expenses incurred through and including the Confirmation Date under sections 330 or 331 of the Bankruptcy Code shall file their respective application for allowance of their Professional Fee Claim by not later than the date which is thirty(30) days after the Confirmation Date or such other date as may be fixed by the Bankruptcy Court, and if granted, the Allowed Professional Fee Claim filed by the Bankruptcy Court shall be paid by the Debtor in full, in Cash and in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which such Professional Fee Claim becomes an Allowed Claim or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between the holder of an Allowed Professional Fee Claim and the Debtor, or (iii) in accordance with the terms and conditions of any applicable order entered by the Bankruptcy Court.

## ARTICLE III
### Classification of Claims and Interests

Other than Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims, Claims are classified for all purposes, including voting, confirmation and Distribution pursuant to the Plan, as set forth below:

| Class I | Allowed Secured Claims except for Secured Claims of Noteholders | Unimpaired/Deemed to Accept |
|---|---|---|
| Class II | Allowed Claims of Noteholders | Impaired |
| Class III | Allowed Other Priority Claims | Unimpaired/Deemed to Accept |
| Class IV | Allowed General Unsecured Claims except for General Unsecured Claims of Noteholders, Insiders, Office Space Members and the SBA | Impaired |
| Class V | Allowed Office Space Member Claims and SBA Unsecured Claim | Unimpaired/Deemed to Accept |
| Class VI | Allowed Insider Claims | Impaired/Deemed to Reject |
| Class VII | Allowed Interests | Impaired/Deemed to Reject |

## **ARTICLE IV**
Treatment of Claims

4.1    Class I: Secured Claims Except for Secured Claims of Noteholders.

(a)    Classification. Class I consists of Allowed Secured Claims Except for Secured Claims of Noteholders.

(b)    Treatment. Except to the extent that a holder of an Allowed Secured Claim Except for Secured Claims of Noteholders has agreed to less favorable treatment, each such holder shall, at the option of the Debtor (i) be paid the Allowed amount of such Secured Claim in full, in Cash in accordance with Article V of this Plan, in full and final satisfaction of such Claim; (ii) receive delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) be paid by the Debtor from and after the Effective Date in the amounts and on the terms and conditions of the underlying agreements evidencing such Secured Claims, and the holders of such Allowed Secured Claims shall retain all of the rights provided to such holders under such agreements, without modification by the Plan, including without limitation, the Liens securing such Allowed Secured Claims, provided, however, on the Effective Date, the Debtor shall satisfy any amounts owed to the holders of Allowed Secured Claims (including any attorney's fees and late charges) that have accrued prior to the Effective

Date and remain unpaid.

The holders of the Allowed Secured Claims Except for Secured Claims of Noteholders shall retain the Liens, if any, securing their respective Allowed Secured Claim until full and final payment of such Allowed Secured Claim is made as provided herein. Further, pending satisfaction of an Allowed Secured Claim, the loan documents and judgment liens pertaining to the Allowed Secured Claim shall remain in full force and effect, provided, however, that the remedies available to the holder of the Allowed Secured Claim under any retained security interest and the loan documents and judgment lien giving rise to the Claim, including the right to exercise secured party rights, shall be exercisable only in the event the Debtor defaults on the payment obligations hereunder. The holders of the Allowed Secured Claims shall have no recourse against the Estate or the Debtor.

(c)    Voting. Class I is Unimpaired. Each holder of an Allowed Secured Claim Except for Secured Claims of Noteholders is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.2    Class II:  Allowed Claims of Noteholders.

(a)    Classification.  Class II consists of the Allowed Claims of Noteholders.

(b)    Treatment. Except to the extent that a holder of an Allowed Claim of a Noteholder has agreed to less favorable treatment, each Note of the holder of an Allowed Claim of a Noteholder shall be deemed cancelled and of no further force and effect as of the Effective Date and each such holder shall receive, at its option, to be exercised on the Ballot, (i) $0, or (ii) Reorganized Debtor Common Interests equal to its Pro Rata share of seventy-three percent (73%) percent of the Reorganized Debtor Common Interests.

(c)    Voting. Class II is Impaired. Each holder of an Allowed Claim of a Noteholder is entitled to vote to accept or reject the Plan.

4.3    Class III: Other Priority Claims.

(a)    Classification. Class III consists of Allowed Other Priority Claims.

(b)    Treatment. Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, the Debtor shall pay to each holder of an Allowed Other Priority Claim, in full and complete settlement, satisfaction and discharge of its Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim on the later to occur of (a) the Effective Date or (b) the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

(c)    Voting. Class III is Unimpaired. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.4    Class IV: General Unsecured Claims Except General Unsecured Claims of Noteholders, Insiders, Office Space Members, and the SBA.

    (a)    Classification. Class IV consists of Allowed General Unsecured Claims Except General Unsecured Claims of Noteholders, Insiders, Office Space Members, and the SBA.

    (b)    Treatment. Commencing on the later to occur of (i) the Effective Date or (ii) upon becoming an Allowed Claim, or as soon as practicable thereafter, holders of Allowed General Unsecured Claims Except General Unsecured Claims of Noteholders, Insiders, Office Space Members and the SBA shall receive, in full and final satisfaction, release and settlement of such Allowed Claim, Distributions in Cash equal to such Allowed General Unsecured Claim, which Distributions shall be paid in ten (10) equal consecutive monthly installments of ten percent (10%) of such Allowed General Unsecured Claim .

    (c)    Voting. Class IV is Impaired.

4.5    Class V: General Unsecured Claims of Office Space Members and the SBA Unsecured Claim

    (a)    Classification. Class V consists of Allowed Office Space Member Claims and the SBA Unsecured Claim.

    (b)    Treatment. Except to the extent that a holder of an Allowed Office Space Member Claim or SBA Unsecured Claim has agreed to less favorable treatment, each such holder shall be paid by the Debtor from and after the Effective Date in the amounts and on the terms and conditions of the underlying agreements evidencing such Claims, and the holders of such Allowed Claims shall retain all of the rights provided to such holders under such agreements, without modification by the Plan.

    (c)    Voting. Class V is Unimpaired. Each holder of an Allowed Office Space Member Claim and SBA Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.6    Class VI:  Insider Claims

    (a)    Classification. Class VI consists of Allowed Insider Claims.

    (b)    Treatment. Except to the extent that a holder of an Allowed Insider Claim has agreed to less favorable treatment, all Insider Claims shall be deemed to be considered, and treated as, Interests, all of which Interests are cancelled as of the Effective Date.

    (c)    Voting. Class VI is Impaired. Each holder of an Allowed Insider Claim is deemed to reject the Plan.

4.6    Class VII: Interests.

(a)    Classification. Class VII consists of Allowed Interests.

(b)    Treatment. The Interests of the holders of Class VII Allowed Interests shall be cancelled as of the Effective Date.

(c)    Voting. Class VII is Impaired. Each holder of an Allowed Interest is deemed to reject the Plan.

## ARTICLE V
### Implementation of the Plan

5.1    Plan Funding.

(a)    Source of Plan Funding. Distributions of Cash to be made under the Plan will derive from equity investments aggregating approximately $500,000 to be made in and to the Reorganized Debtor in exchange for which such investors will receive their proportionate share of seventy-three percent (73%) of the Reorganized Debtor Preferred Interests.

(b)    Plan Distribution Account. The Plan shall be funded by Cash on deposit in the Plan Distribution Account on the Effective Date.  At least five (5) days prior to the Confirmation Hearing, the Debtor shall deposit all Plan Distribution Funds into the Plan Distribution Account.

(c)    Assumptions.

Investment Proceeds. The Plan assumes that the Debtor will raise approximately $500,000 of new equity investments.

5.2    Distributions on Account of Allowed Claims. As provided for below and elsewhere in this Plan, the Debtor's counsel shall administer the Plan Distribution Account and make Distributions therefrom in accordance with the following procedures and priorities:

(a)    First, to make Distributions as necessary to satisfy Allowed Administrative Expense Claims as set forth in Section 2.2 of the Plan and the professional fees of the Noteholders, and retain in the Plan Distribution Account (i) an amount of Cash, reasonably determined by the Debtor  in its discretion, to be held as the Administrative Expense Claim Reserve sufficient for any future Distributions on account of Allowed Administrative Expense Claims, and (ii) an amount of Cash, reasonably determined by the Debtor to be held as the Professional Fee Claim Reserve sufficient for any future Distributions on account of Allowed Professional Fee Claims; and

(b)    Second, to make Distributions as necessary to satisfy the Allowed Claims in Classes I, III, and IV pursuant to the terms of this Plan in the order of priority as set forth in the Plan, and to retain in the Plan Distribution Account an amount of Cash to fund the Disputed Claims Reserve in accordance with the terms and conditions of the Plan; and

5.3    Vesting of Assets. Except as otherwise provided in this Plan and the Confirmation Order, and after all Distributions in accordance with Section 5.3 of this Plan have been made, all Assets

remaining in the Plan Distribution Account shall vest in the Debtor pursuant to section 1141(b) of the Bankruptcy Code, in each case free and clear of all Claims, Liens and Interests.

5.4  Liquidation of Assets. From and after the Effective Date, except as otherwise expressly provided herein, the Debtor may, without further approval of the Bankruptcy Court, use, sell at public or private sale, assign, transfer, or otherwise dispose of any remaining Assets and convert same to Cash to make Distributions on account of Allowed Claims.

5.5  Post-Confirmation Date Fees and Expenses. Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor may pay the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtor and its professionals in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

5.6  Payment of Quarterly Fees. After the Confirmation Order becomes a Final Order, the Debtor shall Pay quarterly fees, pursuant to 28 U.S.C. § 1930(a)(6), to the United States Trustee until the Chapter 11 Case has been converted, dismissed or closed by the Bankruptcy Court.

5.7  Effectuating Documents. The Debtor may execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements and documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

5.8  Direction to Parties. From and after the Effective Date, the Debtor  may apply to the Bankruptcy Court for an order directing any Entity to execute or deliver, or to join in the execution or delivery of, any instrument required to perform any act that is necessary for the consummation of the Plan, pursuant to section 1142(b) of the Bankruptcy Code.

## **ARTICLE VI**
Provisions Governing Distributions and Voting on the Plan

6.1  Distributions. As set forth in Section 5.3 above, the Debtor shall make all Distributions from the Plan Distribution Account. Whenever any Distribution shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the day immediately succeeding a Business Day, but shall be deemed to have been made on the date due. For federal income tax purposes, a Distribution will be allocated to the principal amount of a Claim first and then to the extent the Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, to the extent applicable.

6.2  Timing of Distributions. Each Distribution shall be made from time to time commencing on the Effective Date or as soon as reasonably practical thereafter.

6.3  Address for Delivery of Distributions. If any Distribution is returned to the Debtor as undeliverable, no Distributions shall be made to such holder unless the Debtor is notified of such holder's then current address within ninety (90) days after such Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such

14

Distribution, and the undeliverable Distributions shall be reallocated and distributed to the other holders of Allowed Claims in accordance with the Plan.\

6.4    Distributions under Twenty-Five Dollars. The Debtor shall not be required to make any Cash payment of less than twenty-five dollars ($25.00) with respect to any Claim unless a request therefor is made in writing to the Debtor on or before twenty (20) days after the Effective Date. Any such Distributions not subject to a timely request for payment shall be distributed by the Debtor to the other holders of Allowed Claims in accordance with the Plan.

6.5    Time Bar to Cash Payments. Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Debtor by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such voided check shall be made on or before 120 days from the date on which such original Distribution was made. If no Claim is made as provided in the preceding sentence, any Claims in respect of such void check shall be discharged and forever barred and such unclaimed Distribution shall be reallocated and distributed to those other holders of Allowed Claims in accordance with the Plan.

6.6    Unclaimed Distributions at Closing of Bankruptcy Case. In the event that any unclaimed Distributions exist on the date the Bankruptcy Court enters a Final Order and decree closing the Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code and Rule 3022 of the Federal Rules of Bankruptcy Procedures, such Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Debtor, and the Claims with respect to which those Distributions are made shall be automatically cancelled and  the claim of any Person to those Distributions shall be deemed forfeited. Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim. All Cash or other Assets that revert to the Debtor pursuant to this Article VI shall be distributed by the Debtor in accordance with the terms and conditions of the Plan.

6.7    Manner of Payments under the Plan. Unless the Person or Entity receiving a Distribution agrees otherwise, any Distribution to be made in Cash under the Plan shall be made, at the election of the Debtor by check drawn on a domestic bank or by wire transfer from a domestic bank.

6.8    Setoffs and Recoupment. Except as otherwise provided in this Plan, the Debtor may, but shall not be required to, setoff against or recoup from any Claim or Claims of any nature whatsoever that the Estate may have against the Creditor holding such Claim(s) and such holder shall have the right to object to any such setoff or recoupment made by the Debtor, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such Claim.

6.9    No Interest. Unless otherwise specifically provided for in the Plan (including with respect to the Allowed amount of any Claims hereunder), required under applicable bankruptcy law, or agreed to by the Debtor, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution

is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

6.10     Plan Amendment. The Debtor reserves the right to amend the Plan in accordance with the terms hereof.

## ARTICLE VII
Provisions for Resolving and Treating Disputed Claims

7.1     Disputed Claim Objection Deadline. On and after the Effective Date, the Debtor may continue to attempt to resolve consensually any Disputed Claim and the Debtor shall have the right, but not the obligation, to object to the allowance of any Claim and may file with the Bankruptcy Court any other appropriate motion or adversary proceeding with respect thereto. All such objections may be litigated to Final Order. The Debtor shall retain the rights and defenses of the Estate with respect to any Claim, subject to the provisions of this Plan. Objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made no later than ninety (90) days after the Effective Date.

7.2     Disputed Claims Settlement. Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date and subject to the provisions of this Plan, the Debtor shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

7.3     Distributions on Account of Disputed Claims. A Disputed Claim, to the extent it becomes an Allowed Claim for Distribution purposes, shall receive from the Disputed Claims Reserve any amounts held in the Disputed Claims Reserve attributable to the Allowed amount of such Claim, as set forth in the Plan.

7.4     No Distribution Pending Allowance; Subsequent Distribution. Notwithstanding any other provision of the Plan, no Cash shall be distributed under the Plan on account of any Disputed Claim unless and until such Claim is Allowed in accordance with the Plan. Upon a determination that such Disputed Claim is an Allowed Claim for purposes of the Plan, the Claim as Allowed shall be paid from the Disputed Claims Reserve in accordance with the terms and conditions of the Plan, but the amount distributed shall not exceed the amount in the Disputed Claim Reserve reserved on account of such Claim.

7.5     Excess Funds. Promptly after all Disputed Claims, as to which Cash has been retained therefor in the Disputed Claims Reserve, have become Allowed Claims or have otherwise been resolved by Final Order of the Bankruptcy Court, and all applicable Distributions have been made from the Disputed Claims Reserve, any amounts remaining in the Disputed Claims Reserve shall be further distributed by the Debtor in accordance with the Plan.

7.6     Estimation. The Debtor may request estimation or limitation of any Claim pursuant to Bankruptcy Code section 502(c) regardless of whether that Claim was previously objected to or whether the Bankruptcy Court has ruled on any such objection; provided, however, that the Bankruptcy Court will determine (a) whether such Claims are subject to estimation pursuant to

Bankruptcy Code section 502(c) and (b) the timing and procedures for such estimation proceedings, if any. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection and estimation may be compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

7.7    <u>Remedies Not Exclusive.</u> All of the Claims objection and estimation procedures set forth in this Article VII are cumulative and not exclusive of one another.

## ARTICLE VIII
### Executory Contracts and Unexpired Leases

8.1    <u>Assumption or Rejection of Executory Contracts.</u> Effective on the Confirmation Date, all Executory Contracts, to the extent such exist, are hereby specifically deemed rejected, except for any Executory Contract (a) that has been specifically assumed, or assumed and assigned, by the Debtor on or before the Confirmation Date with the approval of the Bankruptcy Court, (b) in respect of which a motion for assumption or assumption and assignment has been filed with the Bankruptcy Court on or before the Confirmation Date, or (c) that is specifically designated as a contract to be assumed on a schedule to be included as part of the Plan Supplement.

8.2    <u>Approval of Assumption or Rejection of Executory Contracts.</u> Entry of the Confirmation Order, but subject to the occurrence of the Effective Date, shall constitute (a) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the assumption, or assumption and assignment, of the Executory Contracts assumed, or assumed and assigned, in accordance with Section 8.1 of the Plan, and (b) the approval pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code of the rejection of the Executory Contracts rejected in accordance with Section 8.1 of the Plan.

8.3    <u>Bar Date for Filing. Proofs of Claim Relating to Executory Contracts Rejected Pursuant to the Plan.</u> Claims against the Debtor arising out of the rejection of Executory Contracts pursuant to the Plan must be filed with the Court no later than thirty (30) days after the later of service of (a) notice of entry of an order approving the rejection of such Executory Contract which Order may be the Confirmation Order, and (b) notice of occurrence of the Effective Date. Any such Claims not filed within such time shall be forever barred from assertion against the Estate, and any and all of the Assets of the Estate.

## ARTICLE IX
### Effect of Confirmation

9.1    <u>Term of Bankruptcy Injunction or Stays</u>. Subject to the rights of the holders of Allowed

17

Secured Claims under Section 4.1 of the Plan, unless otherwise provided in the Confirmation Order, any injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Plan has been fully performed.

9.2    Releases by the Debtor and the Estate.  Except for the right to enforce this Plan, or as otherwise provided herein, the Debtor, and the Estate shall, effective upon occurrence of the Effective Date, be deemed to forever release, waive and discharge the Released Parties and the Noteholders (as those terms are defined in the Plan) of and from any and all Claims, demands, Causes of Action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise; provided, however, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Parties in respect of any express contractual obligation of any such party effective from and after the Effective Date; provided, further, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Debtor in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court.

9.3    Releases by Holders of Claims. Except for the right to enforce this Plan, or as otherwise provided herein, each holder of a Claim against the Debtor or the Estate shall be deemed to forever release, waive and discharge the Released Parties and the Noteholders of and from any and all Claims, demands, Causes of Action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise; provided, however, such release, waiver and discharge shall not operate as a release, waiver or discharge of any Released Party in respect of any express contractual obligation of any such party effective from and after the Effective Date; provided, further, that notwithstanding the foregoing or any other provision of the Plan, nothing in the Plan, any Plan Supplement, or any order confirming the Plan shall affect any Causes of Action, Claims, or counter-Claims that may be asserted by the Debtor in connection with an objection to a Claim that has not been Allowed, in each case as determined by the Bankruptcy Court.

9.4    Injunctions. In addition to the releases provided for in Section 9.2 and 9.3 of the  Plan, the following provisions shall apply and shall be fully set forth in the Confirmation Order:

(a)    Injunctions Against Interference with Consummation or Implementation of Plan. Upon the Effective Date all Persons shall be enjoined from commencing or continuing any judicial or administrative proceeding, employing any process, or taking any action whatsoever against estate, the Debtor or any Released Parties with the intent or effect of interfering with the consummation and implementation of this Plan.

18

(b)    Injunction Against Prosecution of Causes of Action. Except as otherwise specifically provided for by this Plan, as of the Effective Date, all Persons shall be enjoined from taking any of the following actions in respect to any released Claims as set forth in Section 9.2 and 9.3 of the Plan:

    (i)    the commencement or continuation of any action or proceedings;

    (ii)    the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order;

    (iii)    the creation, perfection or enforcement of any encumbrance of any kind; and

    (iv)    the assertion of any right of setoff, subrogation or recoupment of any kind against any obligation due from any such entity.

9.5    Exculpation. Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, or obligation, Cause of Action or liability for any Exculpated Claim, and shall be entitled to rely reasonably on the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. Each Exculpated Party and their respective affiliates, agents, directors, members, managers, officers, officials, employees, advisors and attorneys have, and upon the Effective Date shall be deemed to have, participated in the promulgation of this Plan and in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law and shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or Distributions made pursuant to this Plan. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability satisfied, enjoined or subject to exculpation pursuant to this Article IX ; provided, however, that nothing in the Plan or the Confirmation Order shall, or shall be deemed to, release or exculpate the Exculpated Parties and representatives with respect to its, obligations or covenants claims and liabilities arising from bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. Upon the Confirmation Date, Creditors will be unable to pursue any Claims that are satisfied, enjoined or subject to exculpation under the Plan, but Creditors may pursue Claims that may arise in the future, or pursuant to the Plan or Confirmation Order.

9.6    Binding Effect. Subject to the earlier of the Confirmation Order becoming a Final Order or substantial consummation of the Plan, on and after the Confirmation Date, the Plan shall be binding upon and inure to the benefit the Debtor and the holders of Claims and Interests and their respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

9.7    Discharge. Confirmation of the Plan discharges the Debtor from any debt pursuant to section 1141(d) of the Bankruptcy Code.

## ARTICLE X
Conditions to Confirmation

10.1    Conditions Precedent to Confirmation. The following are conditions precedent to the occurrence of the Confirmation Date:

    (a)    The Debtor shall have filed a certification prior to the Confirmation Hearing, attesting that the Plan Distribution Funds on deposit in the Plan Distribution Account are sufficient to fund the distributions required at that time pursuant to the terms of the Plan;

    (b)    The Plan shall not have been materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the terms of this Plan;

    (c)    The Confirmation Order is in form and substance reasonably satisfactory to the Debtor and the Noteholders;

    (d)    The Bankruptcy Court shall have entered an order authorizing the Debtor to enter into that certain Fourth Amendment to Lease, made as of October 1, 2020 and further authorizing the Debtor to assume the Lease as amended by such amendment; and

    (e)    The Debtor shall have raised approximately $500,000 in exchange for which it shall issue 100% of the Reorganized Debtor Preferred Interests and a proportionate share of seventy-three percent (73%) of the Reorganized Debtor Common Interests; and

    (f)    The Confirmation Order shall provide that all Insider Claims shall be deemed to be considered, and treated as, Interests, all of which Interests are cancelled as of the Effective Date.

10.2    Conditions Precedent to Occurrence of Effective Date. The following are conditions precedent to the occurrence of the Effective Date of the Plan:

    (a)    The Bankruptcy Court shall have approved the Confirmation Order by Final Order.

    (b)    The Bankruptcy Court shall have entered a Final Order (contemplated to be part of the Confirmation Order) authorizing the Debtor to take all actions necessary or appropriate to implement the Plan and the other transactions contemplated by the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

    (c)    No stay of the Confirmation Order shall then be in effect, unless the Plan shall have been substantially consummated before entry of any stay.

    (d)    The Plan, and any Exhibits and Schedules thereto, shall not have been

materially amended, altered or modified, unless such material amendment, alteration or modification has been made in accordance with the Plan.

(e)   The Effective Date shall occur no later than sixty (60) calendar days after the Bankruptcy Court approves the Confirmation Order by Final Order.

## ARTICLE XI
### Certain Post Confirmation Matters

11.1   <u>Closing of the Chapter 11 Case.</u> As soon as practicable after each Disputed Claim filed against the Debtor has become an Allowed Claim or a disallowed Claim, and upon the Distribution to all holders of Allowed Claims as required under the Plan, the Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

11.2   <u>Reservation and Preservation of Causes of Action.</u>

(a)   On the Effective Date, any and all Causes of Action including, without limitation, claims for turnover of property, breach of fiduciary duty, malpractice, or alter ego liability, shall be expressly preserved for the benefit of the Debtor; **provided, however,** that any and all Avoidance Actions shall be deemed forever released, waived and discharged by the Debtor and the Estate.  Until such time as all Allowed Claims have been paid in full as set forth in the Plan, all Causes of Action not otherwise released may be prosecuted solely and exclusively by the Debtor for the benefit of holders of Allowed Claims.

(b)   The Debtor retains standing to bring and prosecute any Cause of Action not released hereunder, as determined by the Debtor in the Debtor's discretion. Such power shall include the power to sue on behalf of the Debtor and the Estate, to collect any amounts due on any Cause of Action, and the power to compromise any claim described in such Cause of Action. Except as otherwise provided in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor shall retain and may in the Debtor's discretion and business judgment (except as otherwise limited by the Plan) enforce Causes of Action, Claims and defenses and counterclaims to all Claims asserted against the Debtor and the Estate, including but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

## ARTICLE XII
### Retention of Jurisdiction

12.1   <u>Jurisdiction of Bankruptcy Court</u>. The Bankruptcy Court shall retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)   To hear and enforce any of the injunctive provisions of this Plan.

(b)     To hear and determine any and all adversary proceedings, applications and contested matters relating to the Chapter 11 Case and this Plan, even if filed after confirmation of the Plan.

(c)     To hear and determine any objections to Claims, including Administrative Expense Claims and Professional Fee Claims of the Bankruptcy Code, and all disputes concerning the classification and allowance of any Claim and the reexamination of Claims that have been allowed for the purposes of voting.

(d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated.

(e)     To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code.

(f)     To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order.

(g)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or Confirmation Order.

(h)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

(i)     To hear and determine any requests to sell any Assets as to which Bankruptcy Court approval is required under the terms of the Plan.

(j)     To hear and determine all actions not released under the Plan, any collection matters related thereto, and settlements thereof, and any other Causes of Action properly within the jurisdiction of the Bankruptcy Court.

(k)     To hear and determine any disputes concerning quarterly fees owing or claimed to be owing to the Office of the United States Trustee under section 1930(a)(6) of title 28 of the United States Code.

(l)     To enter a final decree closing the Chapter 11 Case.

(m)     To address, hear and determine any other issues or disputes that arise under the Plan.

22

## ARTICLE XIII
Miscellaneous Provisions

13.1    Exemption from Transfer Taxes. Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer or exchange of notes or issuance of debt or equity securities under this Plan, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, registration, licensing, sales or similar tax.

13.2    Successors and Assigns. The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

13.3    Entire Agreement. The Plan constitutes the entire agreement and understanding among the Debtors and their creditors relating to payment and treatment of all Claims  and Interests in bankruptcy.

13.4    Amendment or Modification of the Plan. Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that (a) the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and (b) the Debtor shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified by the Debtor at any time after the Confirmation Date and before substantial consummation, provided that (a) the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, (b) and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such holder or any Distribution to be received in connection with any settlement pertaining to such holder. Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan or the Disclosure Statement without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

13.5    Severability. In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan and shall not require the re-solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

13.6    Revocation or Withdrawal of the Plan. The Debtor reserves the right to revoke or withdraw

the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, the Plan shall be deemed withdrawn and shall be deemed null and void.

13.7     Notices. All notices, requests and demands to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or made by electronic means with confirmation of receipt.

> To the Debtor:
>
> c/o Sanford P. Rosen, Esq.
> **ROSEN & ASSOCIATES, P.C.**
> 747 Third Avenue
> New York, NY 10017-2803
> E-mail: srosen@rosenpc.com

13.8     Governing Law. Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent any exhibit to the Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

13.9     Withholding and Reporting Requirements. In connection with the consummation of the Plan, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority in connection with all Distributions made hereunder.

13.10   Headings. Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

13.11   Schedules. All exhibits and schedules to the Plan are incorporated into and are a part of this Plan as if set forth in full herein.

13.12   Filing of Additional Documents. On or before confirmation of the Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents, if any, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

13.13   Conflict. To the extent this Plan is inconsistent with the Disclosure Statement the provisions of the Plan shall be controlling. In the event there is an inconsistency between the Plan and the Confirmation Order, the Confirmation Order controls.

13.14   Time. In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.15   Effect of Withdrawal, Revocation, or Non-Consummation. If the Debtor revokes or withdraws this Plan prior to the earlier of the Effective Date or substantial consummation of the Plan or if neither of the foregoing occurs, the Plan, any settlement or compromise embodied in the

Plan or any exculpation, release, or indemnification provided for in the Plan, shall be null and void. In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claim(s) or Causes of Action by or against the Debtor, the holders of Claims against the Debtor, or any other Person or Entity in any further proceeding involving the Debtor, or to constitute an admission of any sort by the Debtor, any Claim holder, or any Person or Entity.

Dated: November 9, 2020

**Live Primary, LLC**

*Debtor and Debtor in Possession*

By: */s/ Lisa Skye Hain*
        Lisa Skye Hain, its Chief
        Executive Officer

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor*
 *in Possession*

By: */s/ Sanford P. Rosen*
      Sanford P. Rosen

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100

**Howard Borin**

**Subject:**                              FW: Additional loan to Live Primary today - Senior Secured

**From:** Liza Izkiayayeva [mailto:lizkiyayeva@waterbridge.com]
**Sent:** Wednesday, January 27, 2021 1:13 PM
**To:** Neal Rosenbloom; Kevin Nash
**Cc:** Joel Schreiber; Avi Rosen
**Subject:** FW: Additional loan to Live Primary today - Senior Secured

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Thursday, July 11, 2019 12:34 PM
**To:** Liza Izkiayayeva <lizkiyayeva@waterbridge.com>
**Cc:** Joel Schreiber <js@waterbridge.com>
**Subject:** Re: Additional loan to Live Primary today - Senior Secured

Confirmed, thank you.

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great
liveprimary.com

On Thu, Jul 11, 2019 at 12:10 PM Liza Izkiayayeva <lizkiyayeva@waterbridge.com> wrote:

Wired $150,000 **Confirmation:** WTX:2019071100329346

Please confirm once received

Thank you

Liza Izkiayayeva

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Monday, July 01, 2019 4:52 PM
**To:** Charles Valentino <cvalentino@waterbridge.com>; Joel Schreiber <js@waterbridge.com>
**Cc:** Maureen W. McCarthy <maureen@mwmccarthylaw.com>; Avi Rosen <arosen@waterbridge.com>; Liza Izkiayayeva <lizkiyayeva@waterbridge.com>; Jimmy Park <jimmy@liveprimary.com>; sam@liveprimary.com; David Kirshenbaum <dknj18@comcast.net>; Mike Balkin <mpbalkin@gmail.com>
**Subject:** Re: Additional loan to Live Primary today - Senior Secured

Joel,

These are the terms you agreed to on behalf of Waterbridge Capital if Live Primary LLC sends $150,000 to Waterbridge today:

a.  Primary sends $150,000 to Waterbridge in full payment of the remaining amount due on the loan Waterbridge made to Primary on April 18,2019.
b.  Waterbridge agrees to loan the $150,000 back to Primary on or before July 16th, 2019and will transmit $150,000 back to Primary by that date.
c.  If the $150,000 does not hit Primary's bank account by EOD July 16, 2019 it permanently nullifies Primary Member's rights under the equal pay clause set forth in Schedule 4 of the amended and restated operating agreement of Primary dated June 14, 2019, and Primary Member forfeits all of its rights to receive any payments under that clause.  All funds and amounts due to Primary Member under that clause are suspended unless and until the funds are timely received by Primary.

**Lisa Skye Hain**

CEO/Co-Founder

Primary

+1 (917) 796-6719

lisa@liveprimary.com

You work best when you feel great

liveprimary.com

On Jun 28, 2019, at 2:23 PM, Charles Valentino <cvalentino@waterbridge.com> wrote:

As per the email below, Waterbridge funded a senior secured note to Live Primary in the amount of $200,000.

The current outstanding amount of this loan is $150,000.

This loan is currently in default as it was not repaid from the recent financing proceeds received from the Chicago group of investors.  Joel's consent to this financing was with the understanding that this loan would be paid off.

Unless this loan is paid in full by the end of the day on July 1, 2019 Joel will inform the Chicago investors of this default and his intent to take legal action.

Please advise your client accordingly.

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Thursday, April 18, 2019 2:11 PM
**To:** Joel Schreiber <js@waterbridge.com>; Anand Shahi <anand@liveprimary.com>
**Cc:** Liza Izkiayayeva <lizkiyayeva@waterbridge.com>
**Subject:** Re: Additional loan to Live Primary today - Senior Secured

3

Joel,

Confirmed.

Once Primary secures additional funding to consolidate hard money and operational costs, we will repay your loans as a priority.

Thank you,

Lisa

**Lisa Skye Hain**

CEO/Co-Founder

Primary

+1 (917) 796-6719

lisa@liveprimary.com

You work best when you feel great

liveprimary.com

On Thu, Apr 18, 2019 at 1:53 PM Joel Schreiber <js@waterbridge.com> wrote:

Lisa,

Per our conversation,

Live Primary owes me an additional $35k to date (besides the $6mn)

I am funding today an additional $165k as a loan.

Waterbridge Capital will have a total Senior Secured loan to Live Primary in the amount of $200k

Please confirm,

Respectfully,

Joel Schreiber

**Howard Borin**

Subject:                          FW: Additional loan to Live Primary today - Senior Secured

---

**From:** Liza Izkiayayeva [mailto:lizkiyayeva@waterbridge.com]
**Sent:** Wednesday, January 27, 2021 1:14 PM
**To:** Neal Rosenbloom; Kevin Nash
**Cc:** Joel Schreiber; Avi Rosen
**Subject:** FW: Additional loan to Live Primary today - Senior Secured


**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Thursday, September 19, 2019 5:57 PM
**To:** Joel Schreiber <js@waterbridge.com>
**Cc:** Liza Izkiayayeva <lizkiyayeva@waterbridge.com>; Giuseppe Salamone <gsalamone@saybookkeeping.com>; Tomer Benami <tomer@liveprimary.com>
**Subject:** Re: Additional loan to Live Primary today - Senior Secured

Joel,
This email confirmation should serve as confirmation Primary will repay the $200k loan from Waterbridge at 10% interest.
Could Lisa please send us a document to use for our reconciliation?
Thank you,
Lisa


**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great
liveprimary.com



On Thu, Apr 18, 2019 at 1:53 PM Joel Schreiber <js@waterbridge.com> wrote:

Lisa,

Per our conversation,

Live Primary owes me an additional $35k to date (besides the $6mn)

I am funding today an additional $165k as a loan.

Waterbridge Capital will have a total Senior Secured loan to Live Primary in the amount of $200k

Please confirm,

Respectfully,

Joel Schreiber

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:                                                    Chapter 11

LIVE PRIMARY LLC                                          Case No. 20-11612 (MG)

                              Debtor.
----------------------------------------------------------X

## DECLARATION IN OPPOSITION TO
## MOTION TO RECLASSIFY AND/OR DISALLOW CLAIM

     Joel Schreiber declares the following under penalties of perjury pursuant to 28 U.S.C.

§1746:

     1.     I am the Managing Member of Primary Member LLC ("PM"). I was directly

involved in all aspects of the negotiations and implementation of the loans made by PM to the

Debtor. As such, I have personal knowledge of this matter and I am competent to submit testimony

in support of PM's claims in this Chapter 11 case.

### INTRODUCTION

     2.     I submit this Declaration in Opposition to the Debtor's motion, dated January 5,

2021 (ECF No. 97) (the "Objection"), seeking to reclassify or disallow Claim No. 8 filed by PM in

the total sum of $6,436,184 (the "Claim"), a copy of which is annexed hereto as Exhibit "A". The

Claim has its genesis in a series of pre-petition loans made to the Debtor which were always

intended to be debt obligations and not capital contributions. The Objection is a paradigm of

revisionist thinking, attempting to alter the original intent of the parties as reflected in the parties

Limited Liability Company Agreement ("LLC Agreement") dated as of July 28, 2015, a copy of

which is annexed hereto as <u>Exhibit "B"</u>.[1]  Besides addressing issues of corporate governance, the

LLC Agreement also provided a well-defined framework for the making and funding of loans to the

Debtor.

3.      Accordingly, I take strong exception with the Debtor's efforts to recharacterize the

Claim as equity (years after the fact) as a means to effectively wipe out a $6 million debt obligation

without affording PM or me the opportunity to have any meaningful say in the disposition of the

Chapter 11 case.

4.      While the terminology employed by the parties may not always be dispositive, the

fact that the "Loans" were defined throughout the LLC Agreement certainly lends support to my

view that they were real and not disguised capital.   Indeed, the terms of the LLC Agreement

recognize the existence of the "Loans" in multiple places, which are expressly delineated and

defined in Section 9 thereof.

5.      The LLC Agreement functionally served as the equivalent of a loan agreement

containing provisions relating to the procedures for draws and disbursements to the Debtor, as well

as establishing an interest rate, maturity events and even a penalty for late funding.

6.      The fact that I was also a non-manager member of the Company should not and does

not negate the fact that I made substantial loans with the legitimate expectation that I would be

repaid.  PM received an equity position as part of PM's agreement to lend $6,000,000 to the Debtor,

not as a substitute or means to disguise capital.

7.      To be clear, I never would have allowed PM to make a $6,000,000 capital

investment in the Debtor.  What I agreed to do was to have PM make a $6,000,000 loan with the

---

[1] None of the amendments to the LLC Agreement affect the terms and conditions of the loans.
There are three iterations of the LLC Agreement - the original Agreement dated as of July 28,
2015, a First Amendment dated December 15, 2017 and a First Amended and Restated Limited
Liability Agreement dated as of June 14, 2019.

2

expectation that it would be paid by the Debtor. The best way to characterize PM is that it functioned as the initial lending sponsor for the Debtor's start-up operations under credit line incentivized by an equity position.

8.      Over a period of three (3) years, and at the specific requests of the Debtor, PM made over sixty (60) loan advances to the Debtor pursuant to the terms of the LLC Agreement. The specific loan advances are delineated in the schedule to the Claim filed with the Court. (*See,* Exhibit "A" herein)

9.      If these loans were not extended, the Debtor would not have been able to, *inter alia,* start operating, including the payment of the security deposit to the landlord, build-out its facilities located on the 3rd and 8th floors of 26 Broadway, New York, New York, build-out its facility on West 30th Street or to meet its payroll and other operating expenses during its early years of its existence.

10.     Separate and apart from the $6,000,000 of loans made under the LLC Agreement, the Debtor pleaded with PM to extend additional loans totaling more than $365,000 at ten (10%) percent per annum to help keep it afloat while it tried to expand and to reach profitability.

11.     All of the loans are, in fact, reflected as loans (not capital) on the Debtor's books and records, including specific references in the financial statements, and the Debtor's federal and state tax returns. For the Court's ready reference, annexed hereto as Exhibit "C" is a copy of the balance sheets included as part of the Debtor's income statements for the periods ending December 31, 2018 and December 31, 2019 reflecting and characterizing the PM loan as a Long-Term Liability[2]. The loans were also reflected on the balance sheets made a part of the Debtor's 2018 and 2019 tax

---

[2] Waterbridge is the parent investment company from which loans were funded to the Debtor.

returns. A redacted copy of excerpted portions of the 2018 and 2019 tax returns including the balance sheets is annexed hereto as Exhibit "D".

12. The loans were gratefully acknowledged by the Debtor during the pre-petition period and were fully disclosed and were known to the Noteholders before they extended their secured loans to the Debtor.

13. The current litigation position taken by the Debtor and the Noteholders runs counter to this financial reporting and is a brazen attempt to extinguish PM's valid Claim.

14. To make matters worse, the Debtor and the Noteholders have opposed PM's desire to protect its position by offering an alternative plan to creditors.

## BACKGROUND

15. I met Lisa Hain in 2010. Ms. Hain was the first sales person for We Work. She impressed me as having very good skills and the ability to interface with the We Work community. I was the first Lender Investor in We Work. Ms. Hain left We Works' employ sometime in late 2011, and we remained in contact thereafter. After leaving We Works, Ms. Hain and I had conversations about opening another alternative office type business and she asked me to come aboard as a lender and investor.

16. I formed PM as the vehicle for the Live Primary project. In addition to putting together the first form of the LLC Agreement which was signed as of July 28 2015, the Debtor began to search out an acceptable location for what would be its flagship location. Ultimately the Debtor decided to take space at 26 Broadway, New York, New York. A lease was signed for part of the eighth floor which was later expanded to include the entire third floor.

17. The loans under the LLC Agreement required that PM lend $3.7 million for the first location. In the ordinary course of business, PM went back and forth with the Debtor's

4

representatives on the timing and the amount of the loan advances. PM loaned the $3.7 million for the development of the eighth floor at 26 Broadway. The first part of the loan is clearly shown on the loan schedule made a part of the Claim as Exhibit "A". The balance of the loan commitment was later extended to include the development of the eighth floor at 26 Broadway, along with the development of two floors at 251 West 30th Street, New York, New York.

18.     All of the locations opened and conducted business pre-petition; however, I believe that the 30th Street location was closed by the Debtor and the space was given back to the landlord. While PM was required to provide total loans of $6,000,000, it actually advanced $6,131,522.77 on the project. The Loans were funded pursuant to a clearly delineated borrowing structure under the LLC Agreement pursuant to which the Debtor would provide PM with Disbursement Requests predicated upon a budget in accordance with the provisions of Section 9.3. The draws and budget are consistent with arm's length lending practices, and PM would independently check and verify many budget line items before issuing its loan advances.

19.     Even after advancing the loans, PM would attempt to monitor the Debtor's payments to the parties who were supposed to receive same. Often, payment of the advances was held back because of construction delays which were commonplace. There were many emails back and forth with the Debtor concerning Disbursement Requests. Most Disbursement Requests were funded by wire transfers and all of the loan tranches are shown on the schedule appended to the Claim as Exhibit "A".

20.     Additionally, under the LLC Agreement, the loans were required to be repaid before any distribution to its members in accordance with Section 10.2(c) further cementing the parties' actual intent that the loans are real debt obligations.

5

## ADDITIONAL LOANS

21.     The original loans were not enough and in early 2018 Ms. Hain requested PM to extend additional loans.  It was agreed that these additional loans would be made outside the scope of the LLC Agreement.  These additional loans came in several tranches and were repayable on demand, bearing interest at ten (10%) percent per annum.  This was done at Ms. Hain's suggestion. In fact, Ms. Hain indicated that a 10% interest rate was less than the interest rate she was paying for other loans obtained at that time.

## THE EQUITY POSITION

22.     It was specifically understood that Ms. Hain and I would both have an equity interest, or membership, in the Debtor where I initially owned 3,600 units, Ms. Hain owned 2,700 units and Daniel Orenstein owned 2,700 units.

23.     Had the loans been capital, obligations to extend such advances to the Debtor would have been equally required of Ms. Hain and Mr. Orenstein.  However, when searching the four corners of the LLC Agreement, there is no contractual obligation placed upon them to extend loans. I note that Ms. Hain has asserted that she is owed approximately $230,000 on account of monies which she loaned to the Debtor.  Her loans to the Debtor were voluntary advances made to help the struggling company through difficult times.  PM's loans were contractual, subject to default provisions, and equity dilution provisions contained within Section 9.3 of the LLC Agreement.

24.     I also wish to point out that many of the provisions within the LLC Agreement are typical of what one would expect to find under a conventional loan agreement.  For example, PM and I had no control over the day-to-day operations of the company.  Ms. Hain ran the Debtor.  I was only consulted with respect to defined major actions.  For example, my company's consent

6

was required and was given in connection with the loans made to the Debtor by the Noteholders. [*See,* Section 8.2 of the LLC Agreement].

25.    I fully appreciate that PM made the loans without issuance of a note.  However, execution of a note was contemplated by the LLC Agreement, although not signed, without fault of either party.  Section 9.2 of the LLC Agreement states that the loans may (but not shall) be evidenced by execution of a Loan Agreement.

26.    The LLC Agreement provides that the loans bear interest and are payable on the occurrence of a Liquidity Event as defined in Schedule 2 of the LLC Agreement.  PM believes that the proposed recapitalization under the Plan involving a cancellation of the Debtor's equity and the transfer to new ownership constitutes the liquidity event triggering maturity.  As such the PM claim should be recognized and addressed under the Plan.  There is no accusation of wrongful conduct by PM.

27.    I am told that the Court will look to the Company's ability to obtain outside financing when considering whether an advance should be considered loan or equity.  While the Debtor did not obtain an institutional loan, it did receive $2.8 million loan from the Noteholders who were given a security interest on the Debtor's business assets.  The records reviewed by the Noteholders reflected the long-term debt owed to PM when that loan was granted.  PM was required to consent to the Noteholder loan.  Clearly, a consent would not be required had the advances been equity rather than a loan.

28.    Moreover, the legal recharacterization argument ignores economic reality, whereby entrepreneurs seek to be repaid for monies loaned to startup companies.  Entrepreneurs would be hesitant to lend monies to "risky" business ventures where aside from the normal risks of a new venture, they would further risk having a Court at a later date reclassify their loans even though they

are not guilty of any wrongful or overreaching.  All of the actions taken by PM were designed to try

to help the Debtor establish itself.  The legal position taken by the Debtor and the Noteholders

undercuts all of these legitimate expectations.  If PM's loans were equity contributions, why didn't

Ms. Hain and Mr. Orenstein (the other original stockholder) make similar contributions?

## CONCLUSION

29.     PM loaned $6,000,000 to the Debtor pursuant to the LLC Agreement, independent

of its membership status.  In the process, PM performed all its obligations under the LLC

Agreement and there have been no claims of default, overreaching or other improprieties.  While

PM may have disagreed with the Debtor on the timing and the amounts needed for various

expenditures, PM extended over 60 sets of disbursements totaling over $6 million.  The loan

enabled the Debtor to fund its leasehold commitments, construct its premises and operate its

business.  PM was not responsible for the decline in alternative office business or for the economic

distress caused by COVID.  The Debtor's books and records, financial statements and tax returns

reflect the PM loans, and this is a critical factor which militates against reclassification.  Any

repayments of the 10% Loans were made in the ordinary course of business pursuant to the LLC

Agreement, commensurate with the compensation paid to Ms. Hain during the one year period prior

to the filing of the Chapter 11 case.

30.     In view of all of the foregoing, the Court should deny the Debtor and the

Noteholder's request to reclassify PM's loans.

Dated: New York, New York
        January 25, 2021

                                    PRIMARY MEMBER LLC

                        By:    /s/ Joel Schreiber
                               Joel Schreiber
                               Managing Member

8

To:    Sanford Rosen, Esq.
Rosen & Associates PC
747 Third Avenue
New York, NY 10017

Daniel J. Weiner, Esq.
Schaefer & Weiner
40950 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304
dweiner@schaeferandweiner.com

Fill in this information to identify the case:

Debtor 1    Live Primary, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of New York

Case number   20-11612-MG

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Primary Member LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Kevin J. Nash, Esq./Goldberg Weprin Finkel
Name

1501 Broadway, 22nd Floor
Number    Street

New York            NY        10036
City                State       ZIP Code

Contact phone  212-301-6944

Contact email  knash@gwfglaw.com

Where should payments to the creditor be sent? (if different)

Name
Number    Street
City      State      ZIP Code

Contact phone _____
Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
            MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. How much is the claim? | $ _____ 6,436,184.00 . Does this amount include interest or other charges? <br> ☐ No <br> ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. <br> Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). <br> Limit disclosing information that is entitled to privacy, such as health care information. <br><br> <u>Loans extended to Debtor as per operating agreement</u> |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No <br> ☐ Yes. The claim is secured by a lien on property. <br><br> **Nature of property:** <br> ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.* <br> ☐ Motor vehicle <br> ☐ Other. Describe: _____ <br><br> **Basis for perfection:** _____ <br> Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) <br><br> Value of property:  $ _____ <br> Amount of the claim that is secured:  $ _____ <br><br> Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.) <br><br> Amount necessary to cure any default as of the date of the petition:  $ _____ <br><br> Annual Interest Rate (when case was filed) ____% <br> ☐ Fixed <br> ☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No <br> ☐ Yes. Amount necessary to cure any default as of the date of the petition.  $ _____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No <br> ☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. *Check one:* | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   11/02/2020
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Joel Schreiber | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Member | | |
| Company | Primary Member LLC c/o Waterbridge Capital | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 214 West 29th Street | | |
| | Number    Street | | |
| | New York | NY | 10001 |
| | City | State | ZIP Code |
| Contact phone | 212-607-8134 | Email js@waterbridge.com | |

| Establishment & Operation Loan | |
| --- | --- |
| Principal Due | 6,131,148 |
| Interest Due | 223,752 |
| Total Due | 6,354,900 |

| Other Loans | |
| --- | --- |
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

| Total Loans | |
| --- | --- |
| Principal Due | 6,194,041 |
| Interest Due | 242,143 |
| Total Due | 6,436,184 |

Live Primary LLC
Establishment & Operation Loan Detail

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 08/18/15 | Live Primary LLC | 50,000.00 | 50,000.00 | 1% | 1.37 | 58 | 79.45 |
| 10/15/15 | Live Primary LLC | 25,000.00 | 75,000.00 | 1% | 2.05 | 6 | 12.33 |
| 10/21/15 | Live Primary LLC | 84,087.49 | 159,087.49 | 1% | 4.36 | 7 | 30.51 |
| 10/28/15 | Live Primary LLC | 91,566.17 | 250,653.66 | 1% | 6.87 | 1 | 6.87 |
| 10/29/15 | Live Primary LLC | 549,397.00 | 800,050.66 | 1% | 21.92 | 18 | 394.55 |
| 11/16/15 | Live Primary LLC | 173,999.98 | 974,050.64 | 1% | 26.69 | 2 | 53.37 |
| 11/18/15 | Live Primary LLC | 137,000.00 | 1,111,050.64 | 1% | 30.44 | 6 | 182.64 |
| 11/24/15 | Live Primary LLC | 412,000.00 | 1,523,050.64 | 1% | 41.73 | 38 | 1,585.64 |
| 01/01/16 | YE 2015 Totals | 1,523,050.64 | 1,523,050.64 | | | | 2,345.36 |
| 01/01/16 | Live Primary LLC | - | 1,523,050.64 | 1% | 41.73 | 5 | 208.64 |
| 01/06/16 | Live Primary LLC | 5,000.00 | 1,528,050.64 | 1% | 41.86 | 2 | 83.73 |
| 01/08/16 | Live Primary LLC | 5,000.00 | 1,533,050.64 | 1% | 42.00 | 5 | 210.01 |
| 01/13/16 | Live Primary LLC | 50,000.00 | 1,583,050.64 | 1% | 43.37 | 2 | 86.74 |
| 01/15/16 | Live Primary LLC | 200,000.00 | 1,783,050.64 | 1% | 48.85 | 11 | 537.36 |
| 01/26/16 | Live Primary LLC | 50,000.00 | 1,833,050.64 | 1% | 50.22 | 1 | 50.22 |
| 01/27/16 | Live Primary LLC | 30,000.00 | 1,863,050.64 | 1% | 51.04 | 0 | |
| 01/27/16 | Ylighting | 1,510.00 | 1,864,560.64 | 1% | 51.08 | 1 | 51.08 |
| 01/28/16 | Live Primary LLC | 20,000.00 | 1,884,560.64 | 1% | 51.63 | 1 | 51.63 |
| 01/29/16 | Live Primary LLC | 50,000.00 | 1,934,560.64 | 1% | 53.00 | 3 | 159.00 |
| 02/01/16 | Ferguson Enterprises | 7,449.77 | 1,942,010.41 | 1% | 53.21 | 0 | . |
| 02/01/16 | Ferguson Enterprises | 8,246.69 | 1,950,257.10 | 1% | 53.43 | 0 | . |
| 02/01/16 | Ylighting | 1,050.00 | 1,951,307.10 | 1% | 53.46 | 4 | 213.84 |
| 02/05/16 | Live Primary LLC | 190,000.00 | 2,141,307.10 | 1% | 58.67 | 0 | - |
| 02/05/16 | Live Primary LLC | 10,000.00 | 2,151,307.10 | 1% | 58.94 | 5 | 294.70 |
| 02/10/16 | Live Primary LLC | 50,000.00 | 2,201,307.10 | 1% | 60.31 | 2 | 120.62 |
| 02/12/16 | Live Primary LLC | 25,000.00 | 2,226,307.10 | 1% | 60.99 | 7 | 426.96 |
| 02/19/16 | Live Primary LLC | 25,000.00 | 2,251,307.10 | 1% | 61.68 | 3 | 185.04 |
| 02/22/16 | Live Primary LLC | 15,000.00 | 2,266,307.10 | 1% | 62.09 | 0 | . |
| 02/22/16 | Ylighting | 6,748.75 | 2,273,055.85 | 1% | 62.28 | 8 | 498.20 |
| 03/01/16 | Live Primary LLC | 25,000.00 | 2,298,055.85 | 1% | 62.96 | 3 | 188.88 |
| 03/04/16 | Live Primary LLC | 100,000.00 | 2,398,055.85 | 1% | 65.70 | 4 | 262.80 |
| 03/08/16 | Live Primary LLC | 103,185.19 | 2,501,241.04 | 1% | 68.53 | 1 | 68.53 |
| 03/09/16 | Live Primary LLC | 250,000.00 | 2,751,241.04 | 1% | 75.38 | 8 | 603.01 |
| 03/17/16 | Live Primary LLC | 10,000.00 | 2,761,241.04 | 1% | 75.65 | 8 | 605.20 |
| 03/25/16 | Live Primary LLC | 15,000.00 | 2,776,241.04 | 1% | 76.06 | 6 | 456.37 |
| 03/31/16 | Live Primary LLC | 225,000.00 | 3,001,241.04 | 1% | 82.23 | 15 | 1,233.39 |
| 04/15/16 | Live Primary LLC | 50,000.00 | 3,051,241.04 | 1% | 83.60 | 4 | 334.38 |
| 04/19/16 | Live Primary LLC | 10,000.00 | 3,061,241.04 | 1% | 83.87 | 1 | 83.87 |
| 04/20/16 | Leveldesk | 8,405.67 | 3,069,646.71 | 1% | 84.10 | 0 | . |
| 04/20/16 | Leveldesk | 2,900.87 | 3,072,547.58 | 1% | 84.18 | 2 | 168.36 |
| 04/22/16 | Live Primary LLC | 11,000.00 | 3,083,547.58 | 1% | 84.48 | 3 | 253.44 |
| 04/25/16 | Live Primary LLC | 10,000.00 | 3,093,547.58 | 1% | 84.75 | 0 | . |
| 04/25/16 | Directview | 11,282.68 | 3,104,830.26 | 1% | 85.06 | 1 | 85.06 |
| 04/26/16 | Live Primary LLC | 10,000.00 | 3,114,830.26 | 1% | 85.34 | 6 | 512.09 |
| 05/02/16 | Live Primary LLC | 50,000.00 | 3,164,830.26 | 1% | 86.71 | 4 | 346.83 |
| 05/06/16 | Live Primary LLC | 100,000.00 | 3,264,830.26 | 1% | 89.45 | 4 | 357.79 |
| 05/10/16 | Live Primary LLC | 20,000.00 | 3,284,830.26 | 1% | 90.00 | 1 | 90.00 |
| 05/11/16 | Live Primary LLC | 10,000.00 | 3,294,830.26 | 1% | 90.27 | 2 | 180.54 |
| 05/13/16 | Live Primary LLC | 40,000.00 | 3,334,830.26 | 1% | 91.37 | 3 | 274.10 |
| 05/16/16 | Live Primary LLC | 50,000.00 | 3,384,830.26 | 1% | 92.74 | 2 | 185.47 |
| 05/18/16 | Live Primary LLC | 25,000.00 | 3,409,830.26 | 1% | 93.42 | 2 | 186.84 |
| 05/20/16 | Live Primary LLC | 25,000.00 | 3,434,830.26 | 1% | 94.10 | 21 | 1,976.20 |
| 06/10/16 | Live Primary LLC | 20,000.00 | 3,454,830.26 | 1% | 94.65 | 5 | 473.26 |
| 06/15/16 | Live Primary LLC | 245,000.00 | 3,699,830.26 | 1% | 101.37 | 199 | 20,171.68 |
| 12/31/16 | YE 2016 Totals | 2,176,779.62 | 3,699,830.26 | | | | 32,275.81 |

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 01/01/17 | Live Primary LLC | - | 3,699,830.26 | 1% | 101.37 | 348 | 35,275.09 |
| 12/15/17 | Live Primary LLC | 800,000.00 | 4,499,830.26 | 1% | 123.28 | 17 | 2,095.81 |
| 01/01/18 | YE 2017 | 800,000.00 | 4,499,830.26 | | | | 37,370.91 |
| 1/1/2018 | Live Primary LLC | - | 4,499,830.26 | 1% | 123.28 | 37 | 4,561.47 |
| 02/07/18 | Live Primary LLC | 945,674.08 | 5,445,504.34 | 1% | 149.19 | 0 | |
| 02/07/18 | Live Primary LLC | 14,000.00 | 5,459,504.34 | 1% | 149.58 | 71 | 10,619.86 |
| 04/19/18 | Live Primary LLC | 100,000.00 | 5,559,504.34 | 1% | 152.32 | 5 | 761.58 |
| 04/24/18 | Live Primary LLC | 120,000.00 | 5,679,504.34 | 1% | 155.60 | 2 | 311.21 |
| 04/26/18 | Live Primary LLC | 75,000.00 | 5,754,504.34 | 1% | 157.66 | 12 | 1,891.89 |
| 05/08/18 | Live Primary LLC | 100,000.00 | 5,854,504.34 | 1% | 160.40 | 3 | 481.19 |
| 05/11/18 | Live Primary LLC | 25,000.00 | 5,879,504.34 | 1% | 161.08 | 6 | 966.49 |
| 05/17/18 | Live Primary LLC | 50,000.00 | 5,929,504.34 | 1% | 162.45 | 5 | 812.26 |
| 05/22/18 | Live Primary LLC | 70,121.08 | 5,999,625.42 | 1% | 164.37 | 1 | 164.37 |
| 05/23/18 | Live Primary LLC | 131,522.77 | 6,131,148.19 | 1% | 167.98 | 223 | 37,458.80 |
| 01/01/19 | YE 2018 | 1,631,317.93 | 6,131,148.19 | | | | 58,029.12 |
| 01/01/19 | Live Primary LLC | - | 6,131,148.19 | 1% | 167.98 | 365 | 61,311.48 |
| 01/01/20 | YE 2019 | - | 6,131,148.19 | | | | 61,311.48 |
| 01/01/20 | Live Primary LLC | - | 6,131,148.19 | 1% | 167.98 | 193 | 32,419.50 |
| 07/17/20 | YE 2020 | - | 6,131,148.19 | | | | 32,419.50 |

| Est. & Operation Loan Summary | |
|---|---|
| Loan Duration | 4.9 Years |
| Principal Due | 6,131,148.19 |
| Interest Due | 223,752.17 |
| Total | 6,354,900.36 |

**Other Loans**

| Period Start | Period End | Principal @ Start Period | Principal Adjustments | Principal @ End Period | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|---|
| 01/01/18 | 06/01/18 | - | 50,000.00 | 50,000.00 | 10% | 0 | 0 | 0 |
| 06/01/18 | 06/14/18 | 50,000.00 | (1,500.00) | 48,500.00 | 10% | 14 | 13 | 178 |
| 06/14/18 | 06/28/18 | 48,500.00 | (2,500.00) | 46,000.00 | 10% | 13 | 14 | 186 |
| 06/28/18 | 07/23/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 25 | 315 |
| 07/23/18 | 07/25/18 | (4,000.00) | 10,000.00 | 6,000.00 | 10% | (1) | 2 | (2) |
| 07/25/18 | 07/27/18 | 6,000.00 | 10,000.00 | 16,000.00 | 10% | 2 | 2 | 3 |
| 07/27/18 | 07/31/18 | 16,000.00 | 10,000.00 | 26,000.00 | 10% | 4 | 4 | 18 |
| 07/31/18 | 08/13/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 13 | 93 |
| 08/13/18 | 08/13/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 0 | 0 |
| 08/13/18 | 08/15/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 2 | (2) |
| 08/15/18 | 08/27/18 | 46,000.00 | (20,000.00) | 26,000.00 | 10% | 13 | 12 | 151 |
| 08/27/18 | 08/27/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 0 | 0 |
| 08/27/18 | 08/31/18 | 46,000.00 | (10,000.00) | 36,000.00 | 10% | 13 | 4 | 50 |
| 08/31/18 | 08/31/18 | 36,000.00 | (40,000.00) | (4,000.00) | 10% | 10 | 0 | 0 |
| 08/31/18 | 09/06/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 6 | (7) |
| 09/06/18 | 09/12/18 | 46,000.00 | (25,000.00) | 21,000.00 | 10% | 13 | 6 | 76 |
| 09/12/18 | 09/18/18 | 21,000.00 | 25,000.00 | 46,000.00 | 10% | 6 | 6 | 35 |
| 09/18/18 | 11/05/18 | 46,000.00 | (5,000.00) | 41,000.00 | 10% | 13 | 48 | 605 |
| 11/05/18 | 11/14/18 | 41,000.00 | (15,000.00) | 26,000.00 | 10% | 11 | 9 | 101 |
| 11/14/18 | 03/21/19 | 26,000.00 | 3,217.88 | 29,217.88 | 10% | 7 | 127 | 905 |
| 03/21/19 | 03/22/19 | 29,217.88 | 1,674.93 | 30,892.81 | 10% | 8 | 1 | 8 |
| 03/22/19 | 04/18/19 | 30,892.81 | 165,000.00 | 195,892.81 | 10% | 8 | 27 | 229 |
| 04/18/19 | 05/17/19 | 195,892.81 | 5,000.00 | 200,892.81 | 10% | 54 | 29 | 1,556 |
| 05/17/19 | 06/20/19 | 200,892.81 | (10,000.00) | 190,892.81 | 10% | 55 | 34 | 1,871 |
| 06/20/19 | 06/26/19 | 190,892.81 | (40,000.00) | 150,892.81 | 10% | 52 | 6 | 314 |
| 06/26/19 | 07/01/19 | 150,892.81 | (150,000.00) | 892.81 | 10% | 41 | 5 | 207 |
| 07/01/19 | 07/11/19 | 892.81 | 150,000.00 | 150,892.81 | 10% | 0 | 10 | 2 |
| 07/11/19 | 08/01/19 | 150,892.81 | (5,000.00) | 145,892.81 | 10% | 41 | 21 | 868 |
| 08/01/19 | 08/29/19 | 145,892.81 | (10,000.00) | 135,892.81 | 10% | 40 | 28 | 1,119 |
| 08/29/19 | 10/07/19 | 135,892.81 | (5,000.00) | 130,892.81 | 10% | 37 | 39 | 1,452 |
| 10/07/19 | 11/12/19 | 130,892.81 | (5,000.00) | 125,892.81 | 10% | 36 | 36 | 1,291 |
| 11/12/19 | 01/23/20 | 125,892.81 | (8,000.00) | 117,892.81 | 10% | 34 | 72 | 2,483 |
| 01/23/20 | 02/11/20 | 117,892.81 | (5,000.00) | 112,892.81 | 10% | 32 | 19 | 614 |
| 02/11/20 | 03/12/20 | 112,892.81 | (10,000.00) | 102,892.81 | 10% | 31 | 30 | 928 |
| 03/12/20 | 04/22/20 | 102,892.81 | (25,000.00) | 77,892.81 | 10% | 28 | 41 | 1,156 |
| 04/22/20 | 06/08/20 | 77,892.81 | (15,000.00) | 62,892.81 | 10% | 21 | 47 | 1,003 |
| 06/08/20 | 07/12/20 | 62,892.81 | - | 62,892.81 | 10% | 17 | 34 | 586 |
| | | | 62,893 | | | | 772 | 18,391 |

| Other Loans Summary | |
|---|---|
| Loan Duration | 2.1 Years |
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

9.      Capital Contributions and Loans.

        9.1      Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule I attached hereto and in accordance with their Interest.

        9.2      Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement; the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

# LIMITED LIABILITY COMPANY AGREEMENT

of

## PRIMARY, LLC,
### A DELAWARE LIMITED LIABILITY COMPANY

**Dated: As of July 28, 2015**

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.   SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## PRIMARY, LLC

This Limited Liability Company Agreement (this "Agreement") of Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of July 28, 2015 (the "Effective Date") by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual and Daniel Orenstein ("DO"), an individual, as members (individually, a "Member" and collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.     Formation. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.     Name. The name of the Company shall be "Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.     Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.     Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

5.     Principal Office. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.     Term. The term of the Company shall commence upon the Effective Date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

JS   DO
LSH

7.      **Members.** The Company shall have initially three (3) Members. The names, mailing addresses and the number of ownership Units in the Company held by the Members are as set forth on Schedule 1. Notwithstanding the pro rata ownership of the Members, on any corporate action on which the Members are required to consent pursuant to this Agreement, the consent of PM shall be required for the approval of such corporate action.

8.      **Management.**

8.1      The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized persons for all purposes of the Act is and shall be LSH and DO each as a member-manager (collectively the "Managers" and each individually a "Manager") of the Company. The Managers shall be the sole Persons with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by both Managers. The Managers shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company. In the event of a disagreement between the Managers, the majority vote of the Members shall determine the outcome of such disagreement.

8.2      Furthermore, notwithstanding the foregoing, the Managers shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the written consent or affirmative vote of all the Members, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)      liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(b)      amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(c)      create, or authorize the creation of, or issue or obligate itself to issue any additional Units or increase the authorized number of any Units, except pursuant to this Agreement;

(d)      make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(e)      make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Members;

-2-

(f) guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000 except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(g) make any investment inconsistent with any investment policy approved by the Members;

(h) make any capital expenditure that is not already included in a budget approved by the Members greater than $10,000;

(i) incur any aggregate indebtedness greater than $10,000 that is not already included in a budget approved by the Members, other than trade credit incurred in the ordinary course of business;

(j) otherwise enter into or be a party to any transaction with any Member, officer, or employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Members;

(k) hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment, which shall be determined pursuant to Schedule 8.6 ), including approving any option grants or Unit awards to executive officers or Members;

(l) deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget; or

(m) enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000.

8.3 Binding Authority. Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

8.4 Liability for Certain Acts. The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.5 Duty to Company.

-3-

(a)    As Managing Members of the Company, LSH and DO shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

(b)    The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

(c)    Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH and DO may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

8.6    Indemnification.

(a)    The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorney's fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the

-4-

payment of the Indemnitee's reasonable attorney's fees in connection with any action or
proceeding brought against the Indemnitee.

8.7    Expenses, Fees, and Compensation. Except as may be (a) approved
by the Members in writing, (b) set forth in any budget approved by the Members related to a shared
office facility or (c) pursuant to a Company reimbursement policy approved by the Members, none
of the Members or Manager nor any of their respective stockholders, partners, members, directors,
officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on
behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered
to, or on behalf of, the Company, except as set forth in Schedule 8.6 attached hereto and
incorporated by reference herein, as may be amended from time to time by a vote of the Members.

8.8    Officers. The Managers may designate one or more individuals as
officers of the Company, who shall have such titles and exercise and perform such powers and
duties as shall be assigned to them from time to time by the Managers. The Managers may remove
any officer at any time, with or without cause. Each officer shall hold office until his or her
successor is appointed and qualified. The same individual may hold any number of offices.

8.9    Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or
any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed
by the Company to render or perform any services, or to or from whom the Company may
purchase, sell or lease any real or personal property, shall not prohibit such Member from
employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor
any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.10   Meetings. All meetings of the Members or Managers shall be held at
such time and place as shall be determined by the Managers for the purpose of the transaction of
any business as may come before such meeting.

9.    Capital Contributions and Loans.

9.1    Initial Capital. As of the date hereof, each Member shall have
made, or shall be deemed to have made, Capital Contributions to the Company in cash in the
aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto
and in accordance with their Interest.

9.2    Loans by PM. PM has agreed to lend the funds required by the
Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for
the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in
addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by
the Company, provided however that the start-up expenses and costs for the first Initial Center
shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement
(the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall
be evidenced by a promissory note made by the Company in favor of PM (the "Note" and
together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the
Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from
the Managers, depositing same into the Company's bank account, when such funds are requested

-5-

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

       9.3    <u>Disbursement Process</u>. The Managers shall deliver a written Disbursement Request to PM in accordance with and pursuant to the Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement request is not funded by PM within two (2) business days (the "Disbursement Date"), PM shall be in default hereunder (a "Disbursement Default"). PM shall have a period of sixty (60) days from the Disbursement Date to cure the Disbursement Default before the Disbursement Default penalty is triggered (the "Trigger Date").

       (a)    Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

       (b)    Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount <u>plus</u> additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM' Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM' forty (40) Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

       (c)    Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

       (d)    In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

       9.4    <u>No Withdrawal of Capital Contributions</u>. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to

-6-

receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

9.5    Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

9.6    No Priority. Subject to Section 10.2, no Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

9.7    Liability of Members and Their Affiliates for Capital and Debts. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

10.    Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and its successors and permitted assigns.

(b)    The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

(c)    In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

(d)    In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective

-7-

gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

       (e)    For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

       (i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

       (ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

       (f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

       (g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

    10.2   Distributions of Available Cash.

       (a)    The Company shall distribute all or any portion of Available Cash to the Members pro rata in accordance with their respective Units.

       (b)    Notwithstanding Section 10.2(a) above, in the event that the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have each received cash flow percentages therefrom equal to their Membership Interests. Any cash flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

(c)     Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

(d)     Notwithstanding Section 10.2(c) above, upon the Company achieving:

(i)     Annual revenues of $500,000;

(ii)     a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

(iii)     Other milestones agreed upon by all the Members

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective Units.

10.3     Distributions in Kind.  In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4     Profits and Losses.

(a)     Generally.

(i)     The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes.  Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii)     In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "Effective Date") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)     Allocation of Profits and Losses.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise

-9-

provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

  (c) <u>Special Allocation Provisions</u>.

   (i) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

   (ii) <u>Member Nonrecourse Deductions</u>. Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "<u>Member Nonrecourse Deductions</u>") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "<u>Economic Risk of Loss</u>") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

   (iii) <u>Minimum Gain Chargeback</u>.

    (A) <u>Company Minimum Gain</u>. Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be

-10-

allocated to each Member, before any other allocation pursuant to Section
10.4 hereof is made under Section 704(b) of the Code of Company items
for such Fiscal Year, items of income and gain for such year (and, if
necessary, for subsequent years) equal to such Member's share of the net
decrease in Company Minimum Gain. A Member's share of the net
decrease in Company Minimum Gain is the amount of such total net
decrease multiplied by the Member's percentage share of the Company's
Minimum Gain at the end of the immediately preceding taxable year,
determined in accordance with Section 1.704-2(g)(1) of the Regulations.
Items of income and gain to be allocated pursuant to the foregoing
provisions of this Section 10.4(c)(iii)(A) shall consist first of gains
recognized from the disposition of items of Company property subject to
one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3)
of the Regulations) of the Company, and then of a pro rata portion of the
other items of Company income and gain for that year.

(B)    Member Nonrecourse Debt Minimum Gain. Except
to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there
is, for any Fiscal Year of the Company, a net decrease in Member
Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt
minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as
the same may be modified in the context of limited liability companies),
there shall be allocated to each Member that has a share of Member
Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year
before any other allocation pursuant to Section 10.4 hereof (other than an
allocation required pursuant to Section 10.4(c)(iii)(A)) is made under
Section 704(b) of the Code of Company items for such Fiscal Year, items
of income and gain for such year (and, if necessary, for subsequent years)
equal to such Member's share of the net decrease in the Member
Nonrecourse Debt Minimum Gain. The determination of a Member's
share of the net decrease in Member Nonrecourse Debt Minimum Gain
shall be made in a manner consistent with the principles contained in
Section 1.704-2(g)(1) of the Regulations. The determination of which
items of income and gain to be allocated pursuant to the foregoing
provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is
consistent with the principles contained in Section 1.704-2(f)(6) of the
Regulations.

(iv)    Section 704(c) Allocation.

(A)    Any item of Company income, gain, loss, deduction
or credit attributable to property contributed to the Company, solely for
tax purposes, shall be allocated among the Members in accordance with
the principles set forth in Section 704(c) of the Code and the Regulations
promulgated thereunder so as to take account of any variation between the
adjusted basis of such property to the Company for federal income tax

-11-

purposes and its fair market value at the time such property was contributed to the Company.

(B)     In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

(C)     Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)     Members' Interest in Company Profits For Purposes of Section 752. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)     Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)     Regulatory Compliance. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)     Curative Allocations. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising

-12-

its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix)   Loss Allocation Limitation.  Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).  All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

10.5   No Obligation to Restore Negative Balances in Capital Accounts. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

10.6   Tax Allocations.  All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

10.7   Member Tax Distributions.

(a)   Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

(b)   A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

(i)   his share of the Company's income for such Fiscal Year over

(ii)   the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

-13-

      (c)     The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

      (d)     This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

      (e)     Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for-dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

      (f)     To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

     10.8    <u>Withholding Taxes</u>. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

    11.    <u>Books and Records</u>.

     11.1    <u>Books of Account</u>.

      (a)     Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon reasonable advance request.

      (b)     Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law,

provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.2   Tax Elections. The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company. As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3   Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

11.4   Tax Returns. The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5   Tax Matters Member. The Members shall designate the LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.   Transfers of Interests of Members.

12.1   General.

(a)   Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided,

-15-

however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)     If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

(i)     The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)     the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)     the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)     the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)     if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)     the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)     the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring

-16-

Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

(c)    A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

(d)    Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

(e)    In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The

-17-

JS    MO
VM

terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

12.2    Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

12.3    Death or Permanent Disability of a Member.

(a)    Death. Not later than ninety (90) days after the death of any Member (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their

-18-

economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)    Permanent Disability. Not later than ninety (90) days after the determination that any Member has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers. If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company. For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)    Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company.

JS    OVO
VVK

Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

12.4    Transfers by operation of Law. In the event that the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

12.6    Purchase Price.

(a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

(b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity

-20-

purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

(c)   Manner of Payment.   The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

(i)   An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

(ii)   The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

(iii)   in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

(iv)   the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall

-21-

be entitled to bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale. The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default. Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him. Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said Units. Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

    (v)    The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

    (1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

    (2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

    (3) the buyer is adjudicated a bankrupt, makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

    13.    **Withdrawal or Resignation.** Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

    14.    **Admission of Additional Members.** The Company may admit new Members, subject to Section 14.1.

    14.1    **Right of First Offer.** Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

    (a)    If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

-22-

(b)      The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

15.     Dissolution.

15.1     Dissolution.  The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2     Liquidation.

(a)      Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company.  The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)      Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3     Termination.  The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement.  Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4     Effect of Certain Events on the Company's Existence.

(a)      General.  The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company.  Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

(b)      Bankruptcy.  "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law,

-23-

provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.    Participation in Sales.

16.1    Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

16.2    Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

16.3    Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

16.4    "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and the majority of the Members of the Company approves such transaction, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

17.   Reserved.

18.   Guaranty of Real Estate Obligations.  PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

19.   Miscellaneous.

19.1   Entire Agreement; Amendment.  This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled.  This Agreement may not be changed, modified, amended, discharged, abandoned or terminated orally, but only by an agreement in writing, signed by all of the Members.

19.2   Severability.  If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3   Preparation and Review of Agreement.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.  Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4   Notices.  Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4.  Notices shall be effective upon receipt or refusal.  Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5   Governing Law; Venue.

(a)   This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)   Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such

-25-

action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19.6   Counterparts; Signatures. This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

19.7   No Third Party Beneficiaries. None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of __NEW YORK__
The foregoing instrument was acknowledged before me this __28__ of __July__, 2015, by Joel Schreiber, who personally appeared.

Notary's Signature
My commission expires the __17__ of __January__, 20 __16__

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires __01/17/16__

Lisa Skye Hain

Daniel Orenstein

State of New York,
County of __NEW YORK__
The foregoing instrument was acknowledged before me this __28__ of __July__, 2015, by Lisa Skye Hain and Daniel Orenstein who each personally appeared.

Notary's Signature
My commission expires the __17__ of __January__, 20 __16__

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires __01/17/16__

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires __01/17/16__

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Units |
|---|---|---|---|
| Primary Member, LLC | 7 Times Square 37th Floor New York, NY 10036 | $400.00 | 3,600.00 |
| Lisa Skye Hain | 110 Livingston St. Apt. 15H Brooklyn, NY 11201 | $300.00 | 2,700.00 |
| Daniel Orenstein | 52 Fort Greene Pl. Apt. 1 Brooklyn, NY 11217 | $300.00 | 2,700.00 |
| The 2015 Company Unit Option Plan | | TBD | 1,000.00 |
| Total: | | $1,000.00 | 10,000.00 |

Schedule 2

Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

*"Business Day"* shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

*"Business Hours"* shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

Field Code Changed

"*Capital Account*" shall have the meaning set forth in Section 10.1(a).

"*Capital Contributions*" means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

"*Company*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Courts*" shall have the meaning set forth in Section 16.5.

"*Economic Risk of Loss*" shall have the meaning set forth in Section 10.4(c).

"*Effective Date*" shall have the meaning set forth in Section 10.4(a).

"*Fiscal Year*" or "*Fiscal Period*" means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

"*Gross Asset Value*" shall have the meaning set forth in Section 10.1(c).

"*Indemnitee*" shall have the meaning set forth in Section 8.5(b).

"*Liquidity Event*" Each of the following events shall be considered a "Liquity Event" unless the Members elect otherwise by written notice:

    (a)    a merger or consolidation in which

        (i)    the Company is a constituent party or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

    (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company

Field Code Changed

Sch. 2 – Page 2

of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

"*Loan Documents*" shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

"*Member(s)*" shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

"*Member Nonrecourse Deductions*" shall have the meaning set forth in Section 10.4(c).

"*New Securities*" shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "*Exempted Securities*"):

      (i)    Units, Options or Convertible Securities issued as a dividend or distribution;

      (ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

      (iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Members;

      (iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

      (v)    Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Members;

      (vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

      (vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Members; or

Field Code Changed

(viii)   Units, Options or Convertible Securities issued in connection with strategic partnerships approved by the Members.

"**Person**" shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Profits**" or "**Losses**" for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

"**Property**" shall have the meaning set forth in Section 2.

"**Regulations**" shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" shall have the meaning set forth in Section 10.4(c).

"**Tax**" or "**Taxes**" means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

"**TMP**" shall have the meaning set forth in Section 11.5.

"**Transfer**" means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions.  In the case of PM, the Transfer of any of the interests of PM to any

Field Code Changed



Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

   *"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement.  All Units shall be considered personal property. The initial Units of each Member are set forth on <u>Schedule 1</u> annexed hereto.

Field Code Changed

Schedule 8.6

Fees, Expenses and Compensation

Effective on the Effective Date, the Company shall pay to LS on a monthly basis an amount equal to ten thousand dollars ($10,000.00) (the "LS Salary"), as may be amended pursuant the consent of the Members.

Effective on the Effective Date, the Company shall pay to DO on a monthly basis an amount equal to two thousand five hundred dollars ($2,500.00) until the six-month anniversary of the Effective Date, at which time the Company shall pay to DO on a monthly basis ten thousand dollars ($10,000.00) (the "DO Salary"), as may be amended pursuant the consent of the Members.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LSH Salary (the "PM Payment"). PM may waive the Company's obligation to pay the PM Payment, in its sole discretion.

Field Code Changed

# Balance Sheet

## Live Primary LLC
## As of December 31, 2018

|  | DEC 31, 2018 |
| --- | --- |
| **Assets** | |
| **Current Assets** | |
| **Cash and Cash Equivalents** | |
| 26 Broadway, 3rd Floor | 478,250.82 |
| 26 Broadway, 8th Floor | 306,048.33 |
| Chase Checking xx7336 | 18,872.70 |
| Chase Saving xx5995 | 701.44 |
| Square Cash | 677.11 |
| 30th Street Account | 70,319.47 |
| **Total Cash and Cash Equivalents** | **874,869.87** |
| Bank Clearing Account | 107,230.83 |
| Prepaid Rent | 179,201.00 |
| **Total Current Assets** | **1,161,301.70** |
| **Fixed Assets** | |
| Fixed Assets:Computer Equipment | 71,307.39 |
| Fixed Assets:Accum. Dep. - Computer Equip | (1,193.61) |
| Fixed Assets:Furniture and Equipment | 214,828.66 |
| Fixed Assets:Accum. Dep. - Furn. & Equip. | (2,501.97) |
| Fixed Assets:Leasehold Improvements | 1,784,957.31 |
| Fixed Assets:Accum. Dep - Leasehold Improv. | (21,405.85) |
| Furniture & Equipment - 30th St | 16,819.08 |
| **Total Fixed Assets** | **2,062,811.01** |
| **Long Term Assets** | |
| **Construction in Progress** | |
| 3rd Floor - 26 Broadway | (600.00) |
| 3rd Floor Construction | 3,287,683.64 |
| **Total Construction in Progress** | **3,287,083.64** |
| 8th Floor - 26 Broadway | (236,810.81) |
| 30th Street Construction | 615,827.17 |
| 3rd Floor Construction TI | (1,379,000.00) |
| Security Deposit | 831,470.28 |
| **Total Long Term Assets** | **3,118,570.28** |
| **Total Assets** | **6,342,682.99** |

Balance Sheet

|  | DEC 31, 2018 |
|---|---|
| **Liabilities and Equity** |  |
| Liabilities |  |
| Current Liabilities |  |
| Accounts Payable | (260.00) |
| Business Line of Credit - Kabbage Inc. | 68,165.91 |
| Loan Payable - Jonathan Mines | 149,325.80 |
| Loan Payable - Kelly Noonan | 62,000.00 |
| Loan Payable - Lisa Skye Hain | 23,500.00 |
| Loans & Advances | 1,240,871.99 |
| Security Deposits Collected | 325,197.33 |
| American Express x10000 | 6,800.68 |
| Brian & Lisa AMEX CC - 2018 | 22,910.48 |
| **Total Current Liabilities** | **1,898,512.19** |
| Long Term Liabilities |  |
| Funds from Waterbridge | 6,182,102.76 |
| **Total Long Term Liabilities** | **6,182,102.76** |
| **Total Liabilities** | **8,080,614.95** |
| **Equity** |  |
| Current Year Earnings | 190,852.00 |
| Member Contributions:Member - DO | 20,000.00 |
| Member Distributions:Member - DO | (52,660.00) |
| Member Contributions:Member - LSH | 68,500.00 |
| Member Distributions:Member - LSH | (147,227.80) |
| Retained Earnings | (1,817,396.16) |
| **Total Equity** | **(1,737,931.96)** |
| **Total Liabilities and Equity** | **6,342,682.99** |

# Primary

## BALANCE SHEET

As of December 31, 2019

| | TOTAL |
|---|---:|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| Chase Accounts | |
| 0828 - Penn Station Operating | 826.56 |
| 5995 - Chase Savings | 7.64 |
| 7336 - Downtown Operating | 237,141.27 |
| 7956 - Downtown 3rd Fl Construction | 203.00 |
| **Total Chase Accounts** | **238,178.47** |
| Heartland System Clearing | -3,667.75 |
| Stripe Clearing | 4.00 |
| **Total Bank Accounts** | **$234,514.72** |
| Accounts Receivable | |
| Accounts Receivable (A/R) | 80,094.51 |
| **Total Accounts Receivable** | **$80,094.51** |
| Other Current Assets | |
| Prepaid Expenses | 2,750.00 |
| Prepaid Insurance | 8,706.77 |
| **Total Prepaid Expenses** | **11,456.77** |
| Uncategorized Asset | 0.00 |
| Undeposited Funds | 0.00 |
| **Total Other Current Assets** | **$11,456.77** |
| **Total Current Assets** | **$326,066.00** |
| Fixed Assets | |
| Fixed Asset Artwork | 24,204.63 |
| Fixed Asset Computers | 62,325.39 |
| Accumulated Depreciation | -1,193.61 |
| **Total Fixed Asset Computers** | **61,131.78** |
| Fixed Asset Equipment | 18,559.90 |
| Fixed Asset Furniture & Fixtures | 292,397.45 |
| Accumulated Depreciation | -191.86 |
| **Total Fixed Asset Furniture & Fixtures** | **292,205.59** |
| Fixed Asset IT Infrastructure | 154,063.50 |
| Leasehold Improvements | 914.14 |
| 26 Broadway 3rd Floor | 3,639,029.22 |
| 3rd Floor Construction TI | -1,379,000.00 |
| **Total 26 Broadway 3rd Floor** | **2,260,029.22** |
| 26 Broadway 8th Floor | 1,791,191.31 |
| Accumulated Depreciation | -21,405.85 |
| **Total 26 Broadway 8th Floor** | **1,769,785.46** |
| Penn Station | 630,060.19 |
| **Total Leasehold Improvements** | **4,660,789.01** |

20-11612-mg    Doc 100-3    Filed 01/25/21    Entered 01/25/21 20:29:54    Exhibit Pg 4
of 6

|                                          | TOTAL           |
|------------------------------------------|-----------------|
| **Total Fixed Assets**                   | **$5,210,954.41** |
| Other Assets                             |                 |
| Security Deposits                        |                 |
| Downtown                                 | 1,099,794.00    |
| Penn Station                             | 830,295.28      |
| **Total Security Deposits**              | **1,930,089.28** |
| **Total Other Assets**                   | **$1,930,089.28** |
| **TOTAL ASSETS**                         | **$7,467,109.69** |
| LIABILITIES AND EQUITY                   |                 |
| Liabilities                              |                 |
| Current Liabilities                      |                 |
| Accounts Payable                         |                 |
| Accounts Payable (A/P)                   | 654,728.18      |
| **Total Accounts Payable**               | **$654,728.18** |
| Credit Cards                             |                 |
| American Express                         |                 |
| 1004 - Delta Skymiles                    | 0.00            |
| 1008 - Delta Skymiles                    | 0.00            |
| 8154 - Bank of America                   | 0.00            |
| **Total American Express**               | **0.00**        |
| Chase Cards                              |                 |
| 6590 - Chase Ink                         | 187.70          |
| 6700 - Chase Ink Visa                    | 32.66           |
| **Total Chase Cards**                    | **220.36**      |
| Other Cards                              |                 |
| 0086 - Capital One Quicksilver           | 4,965.18        |
| 1937 - Barclay                           | 0.00            |
| 1980 - UBS Visa Signature                | 18,533.09       |
| 5779 - Discover                          | 0.00            |
| 7330 - Citi Diamond Preferred            | 0.00            |
| Paypal LOC                               | 3,829.27        |
| **Total Other Cards**                    | **27,327.54**   |
| Store Cards                              |                 |
| 2575 - Crate & Barrel                    | 0.00            |
| 5903 - West Elm                          | 0.00            |
| 7563 - Brand Smart                       | 0.00            |
| **Total Store Cards**                    | **0.00**        |
| **Total Credit Cards**                   | **$27,547.90**  |
| Other Current Liabilities                |                 |
| Accrued Expenses                         | 0.00            |
| Accrued Interest                         | 15,309.74       |
| Delya Zaitova                            | 0.00            |
| Disputed Transactions                    | 0.00            |
| Loan Payable                             |                 |
| Fundera Loan                             | 142.73          |
| Kabbage LOC                              | -855.70         |
| Kapitus Loan (formerly Strategic)        | 0.00            |
| Square Capital                           | 11,957.85       |

| | TOTAL |
|---|---|
| **Total Loan Payable** | **11,244.88** |
| NorthStar Leasing | 1,052.68 |
| Other Current Liabilities | 6,660.00 |
| Sales Tax Payable | -1,898.95 |
| Security Deposits Held | |
| Downtown | 718,782.85 |
| Penn Station | 265,066.68 |
| **Total Security Deposits Held** | **983,849.53** |
| Short-Term Loan Payable | 0.00 |
| Eric Barron Inc Loan | 0.00 |
| Franklin Funding Group LLC | 0.00 |
| GTR Source Loan | 0.00 |
| I-Style LLC | 0.00 |
| Lampros Polatidis | 27,168.26 |
| Two Three Zone Dedicated | 0.00 |
| **Total Short-Term Loan Payable** | **27,168.26** |
| Unearned Revenue | 14,869.32 |
| 4Catalyzer | 0.00 |
| Above Average | 0.00 |
| Amanda Watts | 0.00 |
| Armory Square Ventures | 0.00 |
| Arora | 4,800.00 |
| Big League Finance | 0.00 |
| ChartIQ | 0.00 |
| Cohley | 2,975.00 |
| Cornerstone Mgmt | 3,995.00 |
| DMZ | 0.00 |
| EES Financial | 0.00 |
| Four Sigmatic | 0.00 |
| GTR Source LLC | 12,500.00 |
| Healthcare Inc. | 0.00 |
| Homa Zaryouni | 0.00 |
| Nucleus Marketing | 0.00 |
| Nylas | 0.00 |
| Reboot Investing | 0.00 |
| Solidus Labs | 0.00 |
| Spitfire Strategies | 48,000.00 |
| Stockking Holdings Inc | 57.72 |
| Street Cred | 0.00 |
| Thankview LLC | 0.00 |
| The Intern Group | 0.00 |
| Tobii Technology Inc | 0.00 |
| Valiant Consulting | 504.00 |
| Valiant Pictures | 0.00 |
| Xignite | 0.00 |
| **Total Unearned Revenue** | **87,701.04** |
| **Total Other Current Liabilities** | **$1,131,087.18** |
| **Total Current Liabilities** | **$1,813,363.26** |
| Long-Term Liabilities | |

| | TOTAL |
|---|---|
| Convertible Notes | |
| A&J Popcorn Holdings, LLC | 100,000.00 |
| Arjun Dhamija | 150,000.00 |
| Balkin Family LP, LLC | 200,000.00 |
| Bryan Schwartz | 49,250.00 |
| Buzz Ruttenberg | 250,000.00 |
| Charles Dann Family Trust | 50,000.00 |
| David & Helaine Sherwyn | 50,000.00 |
| David Kirshenbaum | 100,000.00 |
| David Ritter LLC | 50,000.00 |
| FLF Investor LLC | 200,000.00 |
| Ivyconnect Inc | 850.00 |
| Jeffrey A Hechtman | 100,000.00 |
| Jeffrey A Wellek | 50,000.00 |
| Jeffrey G Langenbach | 100,000.00 |
| Josh Goldberg | 50,000.00 |
| Lampros Polatidis | 350,000.00 |
| Leslie Imber | 50,000.00 |
| Mandell Ventures LLC | 100,000.00 |
| Marcy P Kahan | 50,000.00 |
| MC Opportunities Fund | 237,250.00 |
| Neal Price | 46,925.00 |
| Nortman Holdings | 281,100.00 |
| Robert Dann (Dann Trust) | 48,700.00 |
| Summit Monkeys LLC | 400,000.00 |
| Two Three Zone | 85,000.00 |
| Accrued Repayment | -10,000.00 |
| **Total Two Three Zone** | **75,000.00** |
| **Total Convertible Notes** | **3,139,075.00** |
| Long Term Loan Payable | |
| Bar Capital Loan #1 | 100,000.00 |
| Bar Capital Loan #2 | 150,000.00 |
| Carl Skokowski | 0.00 |
| Danny Orenstein | 202,000.00 |
| Kelly Noonan | 40,916.48 |
| Nathan Shultz | 0.00 |
| Shareholder Note Payable - LSH | 235,438.20 |
| Waterbridge Loan | 6,277,102.76 |
| **Total Long Term Loan Payable** | **7,005,457.44** |
| **Total Long-Term Liabilities** | **$10,144,532.44** |
| **Total Liabilities** | **$11,957,895.70** |
| Equity | |
| Opening Balance Equity | -1,457,938.00 |
| Retained Earnings | -1,909,067.91 |
| Net Income | -1,123,780.10 |
| **Total Equity** | **$ -4,490,786.01** |
| **TOTAL LIABILITIES AND EQUITY** | **$7,467,109.69** |

Form **1065**

U.S. Return of Partnership Income

**2019**

LIVE PRIMARY LLC
70 WASHINGTON ST
Brooklyn                    NY 11201

07/27/2015

5,088,170

| | | |
|---|---|---|
| 1a Gross receipts or sales | 4,445,560 | |
| 2 Cost of goods sold | | 209,101 |
| 7 | | 1,796 |
| 8 Total income (loss) | | 4,239,249 |
| | | 412,597 |
| 11 Repairs and maintenance | | 102,274 |
| 13 Rent | | 3,727,985 |
| 14 Taxes and licenses | | 39,790 |
| 15 Interest | | 360,234 |
| 16a Depreciation | 1,344,478 | |
| 16c | | 1,344,478 |
| 20 Other deductions    See Statement 1 | | 1,499,377 |
| 21 Total deductions | | 7,709,655 |
| 22 Ordinary business income (loss) | | -3,470,406 |

Sign Here

Paid Preparer Use Only

Beverly Solomon CPA PC
123 Long Kay
Hampton NY                27362-3691              631-840-0571

Form 1065 (2019)   LIVE PRIMARY LLC   Page 5

**Analysis of Net Income (Loss)**

| | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| 1 Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 16l | | | | | -1,470,406 | |
| 2 Analysis by partner type: | | | | | | |
| a General partners | | -1,683,147 | | | | |
| b Limited partners | | -1,787,259 | | | | |

**Schedule L   Balance Sheets per Books**

| Assets | (a) | (b) Beginning of tax year | (c) | (d) End of tax year |
|---|---|---|---|---|
| 1 Cash | | 57,379 | | 232,957 |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets   See Stmt 4 | | 2,430,454 | | 2,540,933 |
| 7a Loans to partners (or persons related to partners) | | | | |
| b Mortgage and real estate loans | | | | |
| 8 Other investments | | | | |
| 9a Buildings and other depreciable assets | 7,725,591 | | 8,295,052 | |
| b Less accumulated depreciation | 6,435,294 | 1,290,297 | 7,979,772 | 315,280 |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | | | |
| 13 Other assets | | | | |
| 14 Total assets | | 3,778,530 | | 3,089,170 |

| Liabilities and Capital | | | | |
|---|---|---|---|---|
| 15 Accounts payable | | | | |
| 16 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 Other current liabilities   See Stmt 5 | | 980,547 | | 1,419,430 |
| 18 All nonrecourse loans | | | | |
| 19a Loans from partners (or persons related to partners) | | | | |
| b Mortgages, notes, bonds payable in 1 year or more | | 8,108,476 | | 10,457,706 |
| 20 Other liabilities | | | | |
| 21 Partners' capital accounts | | -5,310,493 | | -8,786,966 |
| 22 Total liabilities and capital | | 3,778,530 | | 3,089,170 |

**Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return**

Note: The partnership may be required to file Schedule M-3. See instructions.

| | | | | |
|---|---|---|---|---|
| 1 Net income (loss) per books | -2,266,663 | 6 Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
| 2 Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize):   See Stmt 6   1,721 | 1,721 | a Tax-exempt interest $ | | |
| 3 Guaranteed payments (other than health insurance) | | 7 Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | | |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | a Depreciation $   1,212,232 | 1,212,232 | 1,212,232 |
| a Depreciation $ | | | | |
| b Travel and entertainment $   6,768 | 6,768 | 8 Add lines 6 and 7 | | 1,212,232 |
| 5 Add lines 1 through 4 | -2,258,174 | 9 Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | | -3,470,406 |

**Schedule M-2   Analysis of Partners' Capital Accounts**

| | | | | |
|---|---|---|---|---|
| 1 Balance at beginning of year | -5,310,493 | 6 Distributions: a Cash | | |
| 2 Capital contributed: a Cash | | b Property | | |
| b Property | | 7 Other decreases (itemize):   See Stmt 7   1,209,810 | 1,209,810 | 1,209,810 |
| 3 Net income (loss) per books | -2,266,663 | | | |
| 4 Other increases (itemize): | | 8 Add lines 6 and 7 | | 1,209,810 |
| 5 Add lines 1 through 4 | -7,577,156 | 9 Balance at end of year. Subtract line 8 from line 5 | | -8,786,966 |

Form 1065 (2019)

# Form 1065

**U.S. Return of Partnership Income**

**2018**

A  REAL ESTATE

B  Office Space

C  531120

Name of partnership: **LIVE PRIMARY LLC**

70 WASHINGTON ST

Brooklyn    NY 11201

E  Date business started  07/27/2015

F  Total assets  3,778,530

See Statement 1

G  Check applicable boxes: (1) Initial return (2) Final return (3) Name change (4) Address change (5) ☒ Amended return

H  Check accounting method: (1) ☒ Cash (2) Accrual (3) Other (specify) ▶

I  Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶  **3**

J  Check if Schedules C and M-3 are attached

| | | | |
|---|---|---|---|
| 1a Gross receipts or sales | 1a | 1,657,060 | |
| 1b Returns and allowances | 1b | | |
| 1c Balance. Subtract line 1b from line 1a | | 1c | |
| 2 Cost of goods sold (attach Form 1125-A) | | 2 | 57,955 |
| 3 Gross profit. Subtract line 2 from line 1c | | 3 | |
| 4 Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | | 4 | |
| 5 Net farm profit (loss) (attach Schedule F (Form 1040)) | | 5 | |
| 6 Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | 6 | |
| 7 Other income (loss) (attach statement)    See Statement 2 | | 7 | |
| 8 Total income (loss). Combine lines 3 through 7 | | 8 | |
| 9 Salaries and wages (other than to partners) (less employment credits) | | 9 | 538,653 |
| 10 Guaranteed payments to partners | | 10 | |
| 11 Repairs and maintenance | | 11 | 41,159 |
| 12 Bad debts | | 12 | |
| 13 Rent | | 13 | 705,451 |
| 14 Taxes and licenses | | 14 | 185,653 |
| 15 Interest (see instructions) | | 15 | |
| 16a Depreciation (if required, attach Form 4562) | 16a | 6,055,945 | |
| 16b Less depreciation reported on Form 1125-A and elsewhere on return | 16b | | |
| 16c | | 16c | 6,055,945 |
| 17 Depletion (Do not deduct oil and gas depletion.) | | 17 | |
| 18 Retirement plans, etc. | | 18 | |
| 19 Employee benefit programs | | 19 | |
| 20 Other deductions (attach statement)    See Statement 3 | | 20 | 695,001 |
| 21 Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | | 21 | 8,221,902 |
| 22 Ordinary business income (loss). Subtract line 21 from line 8 | | 22 | -4,127,371 |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |
| 26 | | 26 | |
| 27 | | 27 | |
| 28 | | 28 | |
| 29 | | 29 | |
| 30 | | 30 | |

**Sign Here**

| | | |
|---|---|---|
| | Date 10/14/20 | |

**Paid Preparer Use Only**

Print/Type preparer's name ▶ **Beverly Holmes CPA PC**

▶ 11 Tony Kay

Hitchcock, TX    77563-3691

Firm's EIN ▶ 45-3816376

Phone no. 631-848-0571

For Paperwork Reduction Act Notice, see separate instructions.    Form 1065 (2018)

20-11612-mg    Doc 106-4    Filed 01/25/21    Entered 01/25/21 20:29:54    Ex D    Pg

Form 1065 (2018)  LIVE PRIMARY LLC    of 4

**Analysis of Net Income (Loss)**

| | (i) Corporate | (ii) Individual active | (iii) Individual passive | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| 1 Net income (loss) | | | | | | -4,127,371 |
| 2 Analysis by partner type: | | | | | | |
| a General partners | | | -2,001,775 | | | |
| b Limited partners | | | -2,125,596 | | | |

**Schedule L    Balance Sheets per Books**

| Assets | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|
| | (a) | (b) | (c) | (d) |
| 1 Cash | | 674,870 | | 57,535 |
| 2 Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets  See Stmt 5 | | 938,701 | | 2,430,654 |
| 7a Loans to partners (or persons related to partners) | | | | |
| b Mortgage and real estate loans | | | | |
| 8 Other investments | | | | |
| 9a Buildings and other depreciable assets | 4,729,260 | | 7,725,591 | |
| b Less accumulated depreciation | 714,761 | 4,014,499 | 6,435,294 | 1,290,297 |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | | | |
| 12 Other assets | | | | |
| 14 Total assets | | 5,628,070 | | 3,778,530 |
| **Liabilities and Capital** | | | | |
| 15 Accounts payable | | | | |
| 16 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 Other current liabilities  See Stmt 6 | | 354,908 | | 2,218,995 |
| 18 All nonrecourse loans | | | | |
| 19a Loans from partners (or persons related to partners) | | | | |
| b Mortgages, notes, bonds payable in 1 year or more | | 6,995,367 | | 6,870,028 |
| 20 Other liabilities | | | | |
| 21 Partners' capital accounts | | -1,522,205 | | -5,310,493 |
| 22 Total liabilities and capital | | 5,828,070 | | 3,778,530 |

**Schedule M-1    Reconciliation of Income (Loss) per Books With Income (Loss) per Return**

Note: The partnership may be required to file Schedule M-3. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 Net income (loss) per books | | 1,753,193 | 6 Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
| 2 Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | | a Tax-exempt interest $ | | |
| 3 Guaranteed payments (other than health insurance) | | | 7 Deductions included on Schedule K, lines 1 through 13d, and 16l, not charged against book income this year (itemize): | | |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 13d, and 16l (itemize): | | | a Depreciation $    5,897,436 | | |
| a Depreciation $ | | | | | 5,897,436 |
| b Travel and entertainment $ | 16,872 | | | | 5,897,436 |
| | | 16,872 | 8 Add lines 6 and 7 | | |
| 5 Add lines 1 through 4 | | 1,770,065 | 9 Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | | -4,127,371 |

**Schedule M-2    Analysis of Partners' Capital Accounts**

| | | | | | |
|---|---|---|---|---|---|
| 1 Balance at beginning of year | | -1,522,205 | 6 Distributions  a Cash | | |
| 2 Capital contributed: a Cash | | | b Property | | |
| b Property | | | | | |
| 3 Net income (loss) per books | | 1,753,193 | 7 Other decreases (itemize):  See Stmt 7 | 5,541,481 | 5,541,481 |
| 4 Other increases (itemize): | | | | | 5,541,481 |
| | | | 8 Add lines 6 and 7 | | |
| 5 Add lines 1 through 4 | | 230,988 | 9 Balance at end of year. Subtract line 8 from line 5 | | -5,310,493 |

Form **1065** (2018)

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and*
*Debtor in Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LIVE PRIMARY, LLC, | Case No. 20-11612 (MG) |
| Debtor. | |

**AMENDED AND RESTATED DECLARATION OF LISA SKYE HAIN,**
**MANAGING MEMBER AND CHIEF EXECUTIVE OFFICER**
**OF LIVE PRIMARY, LLC IN SUPPORT OF**
**DEBTOR'S OBJECTION TO CLAIM NO. 8 OF PRIMARY MEMBER LLC**

I, Lisa Skye Hain, being first duly sworn, deposes and says:

1.      I make this declaration (the "Declaration") in support of *Debtor's Objection to Claim No. 8 of Primary Member LLC* [Docket No. 93].

2.      The facts stated in this Declaration are based upon my personal knowledge, my review of the relevant documents, information provided to me by employees with responsibility for the relevant matters, and/or my opinion based on my experience and knowledge. I am authorized to submit this Declaration on behalf

of the Debtor and, if sworn as a witness, I am fully competent to testify to the facts set forth herein.

## I.    MY BACKGROUND AND POSITION WITH THE DEBTOR

3.      I serve as the Chief Executive Officer and Founding and Managing Member of Live Primary, LLC, a privately-held limited liability corporation organized under the laws of Delaware, and the debtor and debtor in possession in the above-captioned case (the "Debtor").

4.      I graduated from New York University in 2001 with a Bachelor of Arts in Mass Communication and Broadcast Journalism. Following graduation, I had numerous different jobs, including television anchor, television producer, and cookbook author.

5.      In 2010, I joined the startup WeWork, a pioneer in the coworking shared office space market, as a Founding Community Manager. With WeWork, I booked the company's first 250 offices in Soho and Midtown locations — and managed the extensive waiting list of potential clients seeking office space. Additionally, I was responsible for creating community, developing connections, managing staffing and training of employees, and overseeing sales, billing, and various Information Technology needs.

6.      In my capacity as Managing Member and Chief Executive Officer of the Debtor, my responsibilities include overseeing all the Debtor's operations and finances, including monitoring cash flow, creating and maintaining business relationships, resolving workforce issues, and creating and implementing financial planning. As a Founding Member of the Debtor, I was extensively involved with the Debtor's formation and, as Managing Member and Chief Executive Officer I maintain detailed knowledge of the Debtor's business, finances, daily operations, books and records, and the industry and environment in which the Debtor operates.

## II.    FORMATION OF THE DEBTOR

7.      While at WeWork, I had the opportunity to meet Joel Schreiber ("Schreiber"), who was one of the original financial investors in WeWork. Shortly after my departure from WeWork in 2011, Schreiber contacted me and indicated that he would be interested in being a financial investor if I wanted to form my own coworking company. Over the next several years I had numerous other conversations with Schreiber in which he expressed an interest in investing in a coworking company that I formed.

8.      In 2015, I determined that I would form a coworking company. I contacted Schreiber to confirm that he was still interested in investing in my start-up coworking company. Schreiber confirmed his continued interest. Based on Schreiber's expression of interest, I prepared a preliminary budget (the "Preliminary

Budget") for the creation, establishment, and operation of two shared office facilities, which would be located in New York City. The preliminary budget indicated that $6,000,000 would be required to launch this start-up coworking venture.

9.      Daniel Orenstein ("Orenstein"), who had also worked at WeWork, agreed to join the planned start-up company to manage construction of the facilities.

10.      Schreiber, Orenstein, and I planned and agreed that Schreiber would invest the entire $6,000,000 necessary to start the busines in exchange for 40% of the membership interest in the company, and Orenstein and I would invest no funds, and instead would work full time for the new start-up in exchange for 30% each of the membership interest in the company.

11.      In or about June 2015, Schreiber provided a draft operating agreement for the Debtor (the "Draft OA"). In the Draft OA, Schreiber's investment in the start-up, through an entity that he formed called Primary Member, LLC ("PM") was labeled as a "loan". Under the terms of the "loan" PM accrued interest at 1% per year, and repayment would be made only in the event of an initial public offering (an "IPO") or a "Liquidity Event" as defined in the Draft OA, such as the sale of all the Debtor's assets.

12.      Although this was not specifically the initial structure Schreiber and I had discussed, I moved forward as I had an investor who was ready, willing, and

able to invest the $6,000,000 required to establish and operate two coworking office facilities. In addition, as the terms of the Draft OA required no repayment of the purported "loan" unless and until there was an IPO or a Liquidity Event, they did not affect the Preliminary Budget and would not affect any operational projections.

13.    The Draft OA also provided that the investment monies would be forwarded to the Debtor in traunches. The schedule of the traunches was agreed to and then amended several times after PM did not comply with the first schedule. PM's *pro rata* share was dilutable if PM did not provide the investment funds in accordance with the schedule. PM also would be subject to an additional penalty. In other words, if PM did not make the "loan" it could not retain its equity.

14.    PM did not provide the funds as required by the schedule, the funds were often provided late, which created additional challenges for the fitting-out of the space and operation of the business. I did not take action to dilute PM's shares because Schreiber said he would cease any and all future funding. I couldn't afford to take the risk that he would withhold the funds because, with the Debtor still an unproven business and in the middle of construction, it was unlikely that I would be able to obtain funding from another source. Instead, I continued to do everything I could to finish the spaces and operate the business.

## The First Operating Agreement

15.    On July 27, 2015, the Debtor was formed as a limited liability corporation under the laws of the state of Delaware. On July 28, 2015, Orenstein, Schreiber on behalf of PM, and I executed the Limited Liability Company Agreement of Primary, LLC (the "First Operating Agreement")[1]. The terms of the First Operating Agreement were substantially similar to the terms of the Draft OA.

16.    Schreiber caused Waterbridge Capital, LLC ("Waterbridge") to start making PM's required investment in the Debtor by forwarding funds to the Debtor. Although Paragraph 9.2 ("Paragraph 9.2") of the First Operating Agreement, and the subsequent operating agreements,[2] required that promissory notes be issued for each of the fund transfers to the Debtor, the Debtor never issued a single promissory note to PM, and PM never requested a promissory note from the Debtor.

## The Second Operating Agreement

17.    After signing the First Operating Agreement, we found the space for our first location at 26 Broadway, New York, New York ("26 Broadway"). We agreed that the start-up costs for the first location would be capped at $3,700,000. Eventually we would open the second facility with the remainder of the initial

---

[1] The First Operating Agreement refers to the Debtor as Primary LLC because that was the Debtor's intended name. That name however, was unavailable, so the Debtor was registered only as Live Primary, LLC.
[2] Paragraph 9.2 does not change through the three versions of the operating agreement.

$6,000,000 ($2,300,000). With the opening of one location and the corresponding diminished need for developmental services, and the mutual agreement that the partnership was not working as anticipated, Orenstein amicably determined to reduce his role in, and membership share of the Debtor. Accordingly, in December of 2017, Orenstein and the Debtor agreed that the Debtor would purchase Orenstein's membership interest in the Debtor and Orenstein would no longer provide significant services to the Debtor. The agreement was effected on December 15, 2017, with the execution of the First Amendment to Limited Liability Company Agreement of Live Primary, LLC (the "Second Operating Agreement"). The Second Operating Agreement increased my, and PM's, Class A membership interest to forty-eight and one-half percent (48.5%) each and reduced Orenstein's membership interest to three percent (3%). The terms governing the funds PM contributed to the Debtor remained the same.

18.    The Second Operating Agreement included a new paragraph 8.2(b)(ix), which required the unanimous written approval of all Class A members for a member to enter into any transactions with the Debtor not otherwise contemplated by the Second Operating Agreement. This provision did not exist in the First Operating Agreement.

19.    By that time, $3,700,000 had already been invested in the Debtor. After the Second Operating Agreement, no funds were invested in the Debtor for roughly

a year. Toward the end of 2017, the Debtor signed a lease for its second facility and signed another lease for the expansion of its first facility at 26 Broadway. Eight hundred thousand dollars ($800,000) of the six-million-dollar ($6,000,000) investment obligation was contributed to the Debtor which was intended to be used as the security deposit for the space that would become the Debtor's second location. Another one and a half million dollars ($1,500,000), the remainder of the six-million-dollar ($6,000,000) requirement, was forwarded to the Debtor, to be used for the improvement of the second facility's space and the improvement of the additional space at 26 Broadway.

20.    The Debtor required additional funds and Schreiber and I verbally agreed that we would each lend funds to the company. We had previously entered into two promissory notes with ten percent (10 %) interest rates, so we agreed that any loans we made to the Debtor would have the same rate, ten percent (10%). At no point was there ever the unanimous written approval of both Class A members for those "other loans" or 10% interest rate.

### III.    THE CURRENT, THIRD OPERATING AGREEMENT

21.    When it was apparent that the Debtor needed at least another $2.65 Million to complete the fitting-out of the new spaces and to sustain operations. Schreiber had indicated he would assist in obtaining additional funding. However,

as he was unable to fulfill the initial investment obligation at times, I considered working with another investor.

22.    I had met David Kirshenbaum ("Kirshenbaum"), at a Global Workspace Association event in the fall of 2018. In the Spring of 2019 he contacted me and said he had an investor in Chicago who was interested in investing in the Debtor. That investor, Mike Balkin, and Kirshenbaum, after reviewing the financial and legal structure of the Debtor, gathered a group of investors which loaned $2.65 Million to the Debtor (the "Additional Loan").

23.    On June 14, 2019, when the Additional Loan was made by Kirshenbaum and his group, a First Amended and Restated Limited Liability Company Agreement of Live Primary, LLC (the "Third Operating Agreement") was executed.

24.    In the Third Operating Agreement, paragraph 8.2(b)(ix) was modified to not only require the unanimous written approval of all Class A members (myself and PM) for a member to enter into transactions with the Debtor, but the written approval of Kirshenbaum was also required.

25.    Shortly after the Third Operating Agreement was entered into, Schreiber asked the Debtor for a loan of one hundred and fifty thousand dollars ($150,000). Mike Balkin, Kirshenbaum, Schreiber and I spoke together about the request and agreed that the Debtor would lend Waterbridge one hundred and fifty

thousand dollars ($150,000) provided that Waterbridge would repay the Debtor within one week after receipt of the funds. The Debtor transferred the requested funds to Waterbridge, and Waterbridge returned the funds to the Debtor within one week. This repayment was the only time Waterbridge transferred funds to the Debtor after the Third Operating Agreement was executed. There was no written approval for the Debtor to make the loan or receive the repayment.

### A. **The Party Making the "Loan" was not PM**

26.     While each of the Operating Agreements provide for a "Loan" from PM to the Debtor, no amount was ever advanced from PM to the Debtor.

27.     All amounts listed in PM's Proof of Claim were advanced from Waterbridge, which is a different entity, and of which Schreiber is the Chief Executive Officer.

28.     At no point was there an amendment to any of the Operating Agreements that allowed the "loan" under Paragraph 9.2 to be made by an entity other than PM.

29.     Additionally, at no point was there ever written consent for Waterbridge to make the "loan" under paragraph 9.2 or the "other loans" listed on the Proof of Claim.

## B. **The Characteristics of the "Loan" Under Paragraph 9.2**

30.    I understood that even though the term "loan" was used in the operating agreements, the monies PM, or Schreiber, gave to the Debtor to start the business were capital contributions given in exchange for an ownership interest in the Debtor.

### (i) Name given to instrument

31.    While paragraph 9.2 of the First Operating Agreement labeled PM's investment as a "loan" and required a promissory note with each advance, there were never any instruments created or requested related to PM's investment in the Debtor.

### (ii) Presence or absence of fixed maturity date and schedule of payments

32.    Paragraph 9.2 does not require any payments whatsoever unless and until there is an IPO or Liquidity Event, neither of which is sure to happen, and even if it did, it might not create funds with which to pay PM. Regardless, from my viewpoint, as Managing Member, overseeing the operations of the Debtor, there is no repayment of the funds from operations.

### (iii) Presence or absence of a fixed interest rate and interest payment

33.    Paragraph 9.2 provides for a nominal interest rate of 1% but does not require or allow for any interest payments.

### (iv) Source of repayment

34.    The only source of repayment for the "loans" would be the proceeds of an IPO or a Liquidity Event if such an event were to occur. Repayment of the funds

was never a consideration in budgeting as none of the Debtor's income would ever need to be used to pay PM.

### (v) Adequacy or inadequacy of capitalization

35. According to the Preliminary Budget I prepared, $6,000,000 was necessary to fund the establishment and operations of the Debtor's business which was contemplated to include two facilities of between 25,000 and 30,000 square feet each. Absent the "loans" from PM, the entire capitalization of the Debtor was only to be $1,000.00. This amount was never actually funded. With no other capital, it would have been impossible to create the Debtor. We had a simple plan – Schreiber contributed the funds and I contributed my skills, time, and effort to start the Debtor. Both contributions were imperative.

### (vi) Identity of interest

36. PM is a member of the Debtor. Joel Schreiber is the sole member of PM. Joel Schreiber is also the Chief Executive Officer of Waterbridge, the entity that purported to make a "loan" under Paragraph 9.2.

### (vii) Security, if any, for advances

37. The is no security for the purported loan.

**(viii) Corporation's ability to obtain financing from outside lending institutions**

38.    At the time PM invested in the Debtor, the Debtor had no history, no assets, and no operations. Obtaining financing from a traditional lender at that time would have been impossible.

**(ix) Extent to which advances were subordinated to claims of outside creditors**

39.    All other creditors of the Debtor are paid in the ordinary course of business, but PM is paid only if and when an IPO or Liquidity Event takes place. Accordingly, the PM "loan" is and always was, subordinate to all the Debtor's other creditors.

**(x) Extent to which advances were used to acquire capital assets**

40.    All of the Debtor's assets were acquired with the proceeds of the "loan" made by PM. Those funds were the only funds the Debtor had until it began operations, and even then, its operating income was insufficient to complete the contemplated expansion plan.

**(xi) Presence of absence of sinking fund to provide repayments**

41.    The Debtor does not have monies set aside to provide for repayments, nor was it ever discussed, anticipated, or budgeted. The only source of repayment of the advances is an IPO or a Liquidity Event.

## C. The "Other Loans" Asserted

42.    There was no written authorization for the Debtor to borrow the funds referred to in the Proof of Claim as the "Other Loans".

## IV.    CONCLUSION

43.    The Debtor believes that the six million dollars ($6,000,000) which PM contributed to the Debtor pursuant to the operating agreements are "loans" in name only and are truly capital contributions. Upon reviewing the Debtor's books and records, the Debtor also believes that the so-called "other loans" were unauthorized.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: January 25, 2021
              Portland, Oregon

By:    */s/ Lisa Skye Hain*
Lisa Skye Hain, Chief Executive Officer
Live Primary, LLC