EXHIBIT 54



Transcript of theTestimony of

**JOEL SCHREIBER**

January 27, 2021

**In re: LIVE PRIMARY, LLC**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

```
 1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                       - - -

 3       --------------------------:

 4    In re:                  : Chapter 11

 5    LIVE PRIMARY, LLC,      : Case No. 20-11612 (MG)

 6              Debtor. :          COPY
      ------------------------
 7                       - - -

 8              Oral deposition of JOEL

 9    SCHREIBER, was taken by telephone/video conference

10    on Wednesday, January 27, 2021, beginning at 9:30

11    a.m., before Dominique R. Caputo, Professional Court

12    Reporter and Notary Public.

13                       - - -

14

15

16

17

18

19

20

21

22    A & A Court Reporting, Inc.

23    303 Chestnut Street, 2nd Floor

24    Philadelphia, PA 19106

25
```

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 2

```
1   APPEARANCES:
2
3   GOLDBERG, WEPRIN, FINKEL, GOLDSTEIN, LLP
    BY: NEAL ROSENBLOOM, ESQUIRE
4   1501 Broadway, 22nd Floor
    New York, New York 10036
5   Phone: (212)221-5700
    nrosenbloom@gwfglaw.com
6
7   ROSEN AND ASSOCIATES
    BY: SANFORD P. ROSEN, ESQUIRE
8   747 Third Avenue
    New York, New York 10017-2803
9   Phone: (212)223-1100
    srosen@rosenpc.com
10
11  SCHAFER AND WEINER, PPLC
    BY: DAN WEINER, ESQUIRE
12  40950 Woodward Avenue, Suite 100
    Bloomfield Hills, Michigan 48304
13  Phone: (248)540-3340
    dweiner@schaferandweiner.com
14
15  ALSO PRESENT:
16  HOWIE BORIN
17  KEVIN J. NASH
18  MIKE BALKIN
19  LISA SKYE HAIN
20  BOB POLATIDIS
21  CHRISTINE MCCABE DEHNEY
22  DAVID KIRSHENBAUM
23  VINCE SCIAN
24
25
```

Page 3

```
1                    INDEX
2                   - - -
3   WITNESS                             PAGE
4       JOEL SCHREIBER.........................5
5   DIRECT EXAMINATION
6       MR. WEINER............................5
7   CROSS EXAMINATION
8       MR. ROSEN...........................113
9   REDIRECT EXAMINATION
10      MR. WEINER..........................130
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                    EXHIBITS
2                   - - -
3   EXHIBIT NO.      DESCRIPTION              PAGE
4   Exhibit 1    Proof of Claim      10, 57, 58, 101
5   Exhibit 1A   Notice of Deposition          6
6   Exhibit 3    Waterbridge Capital Website  29
7   Exhibit 5    Company Agreement            39
8   Exhibit 8    First Amendment              46
9   Exhibit 8    Limited Liability Agreement  16, 21
10  Exhibit 27   Email February 26, 2016   53, 55
11  Exhibit 53   Email September 24, 2016  64, 65
12  Exhibit 54   Loan Agreement/Promissory Note  64, 68
13  Exhibit 55   Email September 24, 2016  64, 65
14  Exhibit 57   Loan Agreement/Promissory Note  71
15  Exhibit 58   Email June 5, 2017           73
16  Exhibit 59   Email October 4, 2017    78, 79, 83, 85
17  Exhibit 61   Email April 12, 2018      86, 87
18  Exhibit 63   Email June 5, 2018           90
19  Exhibit 65   Email June 19, 2018          92
20  Exhibit 66   Email June 22, 2018          94
21  Exhibit 68   Email July 19, 2018          96
22
23
24
25
```

Page 5

```
1                   - - -
2           JOEL SCHREIBER, having been affirmed to
3   tell the truth, the whole truth, and nothing but the
4   truth, testified as follows:
5                   - - -
6               DIRECT EXAMINATION
7                   - - -
8   BY MR. WEINER:
9       Q    Are you able to hear me through the zoom
10  computer setup?
11      A    Yes.
12      Q    Okay.  We have a few more challenges
13  during depositions these days as a result of what's
14  going on.  So I always like to make sure that the
15  witness can clearly hear me and that I can clearly
16  hear the witness.  So that sounds like we don't have
17  a problem on that today, right?
18      A    Correct.
19      Q    Okay.  Good.
20          MR. WEINER:  This is also the deposition
21  of Mr.Schreiber and a Primary Member with the
22  opportunity for the debtor, of course, to also
23  ask questions if he choses.  Let's start by--
24  is the technician on the phone?  Is that Vince?
25          MR. SCIAN:  Yes, I'm here.
```

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 6

1      MR. WEINER:  Okay.  By the way, to the
2   group, we will be going through a number of
3   exhibits which the tech from the court
4   reporting company will share on screen.  So
5   that's how we will proceed that way.
6      As a preliminary matter let's put up,
7   please, exhibit 1 A.  No, that's exhibit 1.
8   Could you put up exhibit 1 A, please.  It's the
9   notice of deposition.  There we are.  Can
10  everybody see the notice of deposition on the
11  screen?  Mr. Rosenbloom.
12                    - - -
13  Exhibit 1 A was marked for identification.
14                    - - -
15      MR. ROSENBLOOM:  Yes.
16      MR. WEINER:  Okay.  Mr. Nash, you can see
17  it as well?
18      MR. NASH:  I can't see anything.  Neal is
19  on the phone, but I can listen.  That's all I
20  can do.  I apologize.  That's it.
21      MR. WEINER:  All right.
22      MR. NASH:  You will hear me at times, but
23  right now I'm listening.
24      MR. WEINER:  All right.  Fine.
25  Mr. Rosenbloom, this is the notice of

Page 7

1   deposition of Mr. Schreiber.  And the notice
2   contains some language particularly in
3   paragraph nine which requests that counsel for
4   all parties stipulate to several matters within
5   paragraph nine, they go A, B, C, D, E.
6      And without necessarily going through
7   them, could you affirm your stipulation to
8   those matters on the record.  Please feel free
9   to review them and let me know.
10      MR. ROSENBLOOM:  I have no problem with
11  those items.
12  BY MR. WEINER:
13      Q   Okay.  Thank you.  Mr. Schreiber, could
14  you confirm that you are alone in the room where you
15  are giving the testimony this morning?
16      A   Yes.
17      Q   And could you also confirm that you don't
18  have any papers or notes with you?
19      A   I don't.  I'm by myself right now.
20      Q   Okay.  But with no papers or notes with
21  you, correct?
22      A   I do not have any papers with me right
23  now.
24      Q   Okay.  All right.  Thank you very much.
25      MR. WEINER:  Mr. Rosenbloom, my

Page 8

1   understanding is that Primary Member, LLC has
2   designated Mr. Schreiber as corporate
3   representative for purposes of this deposition;
4   is that accurate?
5      MR. ROSENBLOOM:  Correct.
6      MR. WEINER:  Okay.  So this deposition
7   will proceed as a deposition of Mr. Schreiber
8   individually and also as corporate
9   representative of Primary Member, LLC
10  simultaneously.  Okay.  You can take that down
11  please, Vince, thank you.
12  BY MR. WEINER:
13      Q   Mr. Schreiber, have you ever had your
14  deposition taken before?
15      A   Yes.
16      Q   How many times?
17      A   I don't recall.
18      Q   Have you ever had your Zoom deposition
19  taken?
20      A   No.
21      Q   Okay.  Well, it works very similarly, but
22  let's go over a few sort of procedural rules of the
23  road.  I'm going to be asking you a series of
24  questions and asking for your oral answers.  Of
25  course headshakes up and down or sideways don't get

Page 9

1   taken down by the court reporter.  So please respond
2   to everything orally.
3      Let's be sure, especially given Zoom,
4   that if you please wait until I finish asking my
5   question before you answer.  We won't talk over each
6   other.  And I'll do my very best to do the same with
7   you when you respond; is that fair?
8      A   Yes.
9      Q   Okay.  If you need a break during the
10  deposition, please let me know.  I'll do the same.
11  And we'll deal with those as necessary so long as we
12  are not in the middle of a question during the break
13  time.
14      During the examination, Mr.
15  Schreiber, I may ask you questions and Mr.
16  Rosenbloom may object.  And if he does, please wait
17  for him to state his objection before you respond.
18  And he will either instruct you to answer or not to
19  answer as the case may be; is that understood?
20      A   Yes.
21      Q   Okay.  All right.
22      MR. WEINER:  Let's begin.  Vince, could
23  you please put on the screen exhibit number 1.
24                    - - -
25  Exhibit 1 was marked for identification.

Page 10

```
 1                      - - -
 2  BY MR. WEINER:
 3      Q    Mr. Schreiber, do you see exhibit number 1
 4  on the screen?
 5      A    Yes.
 6      Q    Do you recognize this document?
 7      A    It doesn't show me the entire document.
 8  But it says on the top "Proof of Claim"  so I
 9  recognize it.  Now I see.
10      Q    Okay.  By the way, with a multipage
11  document please feel free to ask Vince to scroll
12  down so that you're comfortable and seeing the
13  entire document in front of you.
14          MR. ROSENBLOOM:  Right.  And let's do that
15          for the record, please, because that is just
16          the first page of the Proof of Claim form.
17  BY MR. WEINER:
18      Q    Okay.  So the way we will do this, Mr.
19  Schreiber, is perhaps if this works with Mr.
20  Rosenbloom, when you want to see the next page just
21  indicate and then Vince will scroll down to the next
22  page.
23      A    Okay.
24          MR. ROSENBLOOM:  And is there a way to
25          enlarge the document because for me on my
```

Page 11

```
 1          computer it's very difficult to see it.  oh,
 2          there we go.  Thank you.
 3          MR. WEINER:  That's better for me too.
 4          Thank you, Neal.
 5          MR. ROSENBLOOM:  Right.  I think we can
 6          continue to scroll down.
 7          MR. WEINER:  I'm just going to wait until
 8          you tell me or Mr. Schreiber says he is
 9          finished looking at it.
10          THE WITNESS:  Yes, I'm fine.
11          MR. WEINER:  Okay.  Keep scrolling then
12          please.
13          MR. ROSENBLOOM:  Can we continue scrolling
14          please.  And we can continue please.  And if we
15          can continue please.  And continue.  Again, we
16          can continue.  Again.  Again, please.  And if
17          you can continue just a little further on that
18          page.  And I believe that's the entirety of the
19          Proof of Claim, Joel.
20          MR. WEINER:  Okay.  Thank you.  Thank you.
21  BY MR. WEINER:
22      Q    Mr. Schreiber, this is the Proof of Claim
23  filed by Primary Member, LLC in this bankruptcy
24  case, correct?
25      A    Yes.
```

Page 12

```
 1      Q    And Primary Member filed this claim
 2  alleging to be a creditor in the bankruptcy, right?
 3      A    Correct.
 4      Q    Who prepared Proof of Claim number eight,
 5  the one before you?
 6      A    My counsel.
 7      Q    Did your counsel prepare all of the pages
 8  of Proof of Claim number eight one through eight?
 9      A    My counsel had requested we send them a
10  schedule of the payments and he worked with my
11  office to understand them and got confirmation on
12  these payments and he put them together.
13      Q    So Primary Member provided the information
14  conveying, if I understand it, in the eight pages of
15  the Proof of Claim and then your counsel with your
16  agreement put that information into this Proof of
17  Claim which you signed?
18      A    To the best of my knowledge.
19      Q    Did all of the information in the Proof of
20  Claim filed by Primary Member come from the books
21  and records of Primary Member, LLC?
22      A    Correct.  From Primary Member, LLC and its
23  affiliate Waterbridge Capital, LLC.
24      Q    Waterbridge Capital, LLC did not file the
25  Proof of Claim, correct?
```

Page 13

```
 1      A    Live Primary, LLC filed the Proof of
 2  Claim.
 3      Q    I think you mean--
 4      A    Primary Member, LLC.
 5      Q    Yes.  So Proof of Claim number eight is
 6  not a Proof of Claim filed by an affiliate called
 7  Waterbridge Capital, correct?
 8      A    It's filed by Primary Member, LLC.
 9      Q    Let's turn to-- Vince, could you please
10  scroll down I think to page two or three.  Next page
11  please.  Okay.  Just scroll up a little bit but keep
12  it on that page.  Okay, thank you.
13  BY MR. WEINER:
14      Q    Mr. Schreiber, is that your signature in
15  the middle of the page on the screen which I believe
16  is page three of the eight page Proof of Claim?
17      A    Yes.
18      Q    And before you signed the Proof of Claim,
19  did you read the Proof of Claim and all of the
20  attachments and did you find them to be true and
21  accurate before you signed the Proof of Claim?
22      A    Yes.
23      Q    Mr. Schreiber, did Primary Member, LLC
24  ever advance any money to the debtor?
25      A    Yes.
```

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 14

1    Q    How much money did Primary, LLC advance to
2  the debtor?
3    A    Primary Member, LLC instructed payment of
4  the entire amount in the Proof of Claim.
5    Q    Who did it instruct?
6    A    It instructed-- I am the managing member
7  for Primary Member, LLC.  I funded whatever was
8  needed for Primary Member, LLC's loan commitments to
9  Live Primary, LLC per our operating agreement of
10  giving a loan to Live Primary, LLC.
11    Q    But Primary Member, LLC never advanced
12  money to the debtor; did it?
13         MR. ROSENBLOOM:  Objection, asked and
14      answered.
15  BY MR. WEINER:
16    Q    Mr. Schreiber, you can answer the question
17  unless your counsel, you know, instructs you not to.
18    A    I'll repeat my answer.  Primary Member,
19  LLC funded all its obligations under the loan
20  agreement which we funded which I instructed
21  payment-- loan funding to Live Primary, LLC as an
22  obligation of Primary Member, LLC to fulfill its
23  long commitment to fund the loan to Live Primary,
24  LLC.
25    Q    If Primary-- did Primary Member, LLC ever

Page 15

1  send a wire to the debtor?
2    A    Primary Member, LLC instructed all these
3  payments that the debtor received as a loan on
4  behalf of its loan commitment.
5    Q    I appreciate that, Mr. Schreiber.  But I'm
6  asking you a specific question.  Did Primary Member,
7  LLC ever wire money to the debtor?
8    A    All the money that came to the debtor was
9  from Primary Member, LLC's commitment to give a
10  loan.
11    Q    Okay.  I'll try-- I'll try to ask you
12  again.  The question is did Primary Member, LLC ever
13  send a wire to the debtor?
14    A    I said before all the money that was
15  funded to Live Primary, LLC was funded through
16  Primary Member, LLC as a loan.
17    Q    Did Primary Member-- okay.  Apparently I'm
18  not getting an answer to my question.  I'll ask you
19  a different question.  Did Primary Member, LLC ever
20  write a check to the debtor?
21    A    No.
22    Q    Primary Member, LLC, did it-- strike that.
23    A    I take back my first answer.  Primary
24  Member, LLC may have instructed at times payment by
25  check maybe once or twice, several times.  They

Page 16

1  weren't able to send those funds by wire.  They
2  instructed payment by check.
3    Q    Did Primary Member, LLC ever have a bank
4  account?
5    A    No.
6    Q    Did Primary Member, LLC ever have
7  specifically a checking account or a savings account
8  or brokerage account?
9    A    No.
10    Q    Are you the sole manager and sole member
11  of Primary Member, LLC?
12    A    Yes.
13         MR. WEINER:  Vince, could you put up
14      exhibit two, please.  I'm sorry.  That's not
15      the one we wanted.  Could you please put up
16      exhibit eight.
17             - - -
18      Exhibit 8 was marked for identification.
19             - - -
20  BY MR. WEINER:
21    Q    Mr. Schreiber, can you take a look at the
22  document.  It has a few pages.  Vince is happy to
23  scroll down so you can see the entire document.  And
24  just let him know when you finish with each page so
25  then he can then, you know, scroll to the next.

Page 17

1    A    Yes.  I'm finished when can scroll.  We
2  can keep going
3    Q    Yes.  Just let him know directly.  We'll
4  wait for you to tell him.
5    A    Continue.  Continue.  Continue.  Continue.
6  Continue.  Continue.  Continue.  Continue.
7  Continue.  Continue.  Continue.  Continue.
8  Continue.  Continue.  Continue.  Continue.
9  Continue.  Continue.  Scroll up.  Scroll up.  Okay,
10  continue.  Continue.  Continue.  Continue.
11  Continue.  Continue.  Continue.  Okay.  Hello?  Yes.
12    Q    There's additional pages.  He's scrolling
13  through.
14    A    Okay.  Hold on.  Stop.  Continue.
15  Continue.  Continue.  Okay.  Okay.
16    Q    Mr. Schreiber, this is the limited
17  liability company agreement of Primary Member, LLC
18  signed by you, correct?
19    A    This appears to be an earlier version of
20  the operating agreement because I believe the
21  entity-- but this is signed by me.  But it was a
22  earlier version which was-- it was later updated.
23    Q    Mr. Schreiber, is-- do you have an updated
24  limited liability company agreement of Primary
25  Member, LLC?

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 18

1    A    I have to check. I'm sure we have it in
2  the office. This appears to be a early operating
3  agreement. At the time right when primary was
4  launched it wasn't sure if it's Primary, LLC or Live
5  Primary, LLC.   I still see it has the Primary, LLC.
6  So this appears to be an earlier version.
7    Q    Mr. Schreiber, let's make sure we are-
8      MR. ROSENBLOOM: Let's clarify this.
9      MR. WEINER: Yes.
10      MR. ROSENBLOOM: There is a little
11  confusion of the similarity of the--
12  BY MR. WEINER:
13    Q    Yes. Joel, looking at the first page this
14  is styled as a limited liability company agreement
15  of Primary Member, LLC?
16    A    Yes, but if you look-- I hear someone
17  talking in the background. Whoever is talking,
18  please go on mute. Someone else is speaking
19      MR. WEINER: Someone is speaking on--
20      MS. SKYE HAIN: Whoever is hosting this
21  should be able to control mikes mute and volume
22  and can mute him.
23      MR. WEINER: Vince, are you able to mute?
24      MR. SCIAN: I have to go grab the host
25  key. It will take me two seconds.

Page 19

1      MR. WEINER: Neal, you were in the process
2  of clarifying the document with the witness.
3  Do you want to continue with that?
4      THE WITNESS: Neal, I'll jump to the
5  point. You see in the purpose it says that the
6  company to acquire and maintain investment in
7  Primary, LLC. This was before Live Primary,
8  LLC was formed. There was maybe discussion
9  about having it Primary, LLC. So this appears
10  to be an earlier version.
11      MR. ROSENBLOOM: Okay. But do we have
12  agreement as to, you know, the final version
13  that was signed because I have seen multiple
14  versions myself.
15      THE WITNESS: I have to check. And we'll
16  come back to that but I--
17      MR. ROSENBLOOM: So my question does the
18  debtor have-- what does the debtor think is the
19  final version?
20      MR. WEINER: Let's clarify here. This is
21  not an operating agreement of the debtors.
22  This is an operating agreement of Primary
23  Member, LLC, the one that signed the Proof of
24  Claim.
25  BY MR. WEINER:

Page 20

1    Q    So my question to Mr. Schreiber is is this
2  the operating agreement of the party that signed the
3  Proof of Claim?
4    A    I believe there was an updated operating
5  agreement right after we funded or arranged to fund
6  the loan. And I have to check. It looks like we
7  got an old version.
8      MR. WEINER: Mr. Rosenberg, I think we had
9  requested if you have an updated version of the
10  Primary Member, LLC that's the members
11  agreement that filed the Proof of Claim could
12  you provide that to me at your earliest
13  opportunity?
14      MR. ROSENBLOOM: Of course.
15      MR. WEINER: Thank you.
16  BY MR. WEINER:
17    Q    Mr. Schreiber, Primary Member, LLC was
18  never capitalized; is that correct?
19    A    It was capitalized. I mean, in what sense
20  do you say capitalized? Explain to me the question.
21    Q    Was there ever a capital contribution that
22  was made to Primary Member, LLC?
23    A    Primary Member, LLC had a capital
24  contribution of $6,000,000.
25    Q    That's not my question. Mr. Schreiber, my

Page 21

1  question is-- why don't we go to the page that shows
2  capital contributions--
3    A    I mentioned before there was an updated
4  operating agreement.
5    Q    My question to you was was Primary Member,
6  LLC ever capitalized itself?
7    A    Yes.
8    Q    How much was Primary Member, LLC
9  capitalized with?
10    A    $6,000,000.
11    Q    Who made a $6,000,000 capital contribution
12  to Primary Member, LLC?
13    A    Myself.
14      MR. WEINER: Vince, could you scroll down
15  to one of the exhibits or the schedules in
16  exhibit 8, please.
17  BY MR. WEINER:
18    Q    Mr. Schreiber, is schedule one accurate
19  attached to exhibit 8?
20    A    As I said before, this is a earlier
21  version. There's an updated version.
22    Q    So would an updated version of Primary
23  Member, LLC operating agreement show a capital
24  contribution of $6,000,000 on a schedule?
25    A    I have to check. Definitely 6,000,000,

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 22

1 but it may have been updated in 2018 again once
2 Primary Member has funded more money.  So I have to
3 check if it's 6,000,000 or if it's 6,000,150, but
4 definitely 6,000,000.
5     Q    Okay.  We will leave that where it is with
6 the right to continue to ask you about this if I do
7 get-- Mr. Rosenbloom will graciously agree to
8 provide the-- if it exists-- an updated version, as
9 you indicated, of this operating agreement and then
10 we will see if that happens.  And then we will go
11 from there.
12          Mr. Schreiber, was the Proof of Claim
13 that we talked about a few moments ago truthful and
14 accurate at the time that you signed it on behalf of
15 Primary, LLC?
16     A    To the best of my knowledge.
17     Q    Okay.  Thank you.
18          MR. WEINER:  You could take that off the
19 screen, Vince.  Thank you.
20 BY MR. WEINER:
21     Q    Mr. Schreiber, when were you born?
22     A    Nineteen-- March 16, 1981.
23     Q    And where were you born, sir?
24     A    London.
25     Q    And did you graduate high school in

Page 23

1 London?
2     A    I graduated United Talmudical Academy.
3     Q    And that was in London?
4     A    Correct.
5     Q    And did you obtain any-- a certificate or
6 degree from that school?
7     A    No.
8     Q    What did you study there?
9     A    Talmudical.
10     Q    How long did you study at that place of
11 learning?
12     A    Roughly until '96 and '97.
13     Q    And when did you start?
14     A    Started in '84, '85.
15     Q    So you attended that school for roughly 12
16 or 13 years?
17     A    Correct.
18     Q    Did you attend any other high school or
19 college or university in London?
20     A    No.
21     Q    When did you move to the United States?
22     A    In 2000.
23     Q    And where did you move to, sir?
24     A    New York.
25     Q    Have you lived in New York since 2000 when

Page 24

1 you moved from England?
2     A    Yes.
3     Q    And what city did you move to?
4     A    Brooklyn.
5     Q    After you moved to the United States did
6 you attend any United States college or university?
7     A    No.
8     Q    After you moved to the United States did
9 you obtain any other degree or certification of
10 education of any type?
11     A    No.
12     Q    When you lived in England before you moved
13 to the United States were you employed?
14     A    No.
15     Q    What I mean employed-- I'll broaden it.
16 Did you have a job of any type?
17     A    No.
18     Q    When you moved to the United States did
19 you become employed?
20     A    I started my own company.
21     Q    And when did you start your own company
22 after moving from England to the United States?
23     A    Roughly in 2002 or 2003.
24     Q    And what company did you start at?
25     A    Probably-- I'm sorry.  In 2000 I started a

Page 25

1 real estate company.
2     Q    And what is the name of real estate
3 company you are referring to?
4     A    We had-- it was a separate LLC for a
5 building we bought.  So the particular name was SJC
6 Realty, LLC.
7     Q    Did you form SJC?
8     A    Yes.
9     Q    And when did you form SJC?
10     A    I believe either in 2000 or 2001.
11     Q    And were you the sole member and sole
12 manager of SJC?
13     A    I believe my wife was a member.
14     Q    And you?
15     A    And myself, correct.  To the best of my
16 knowledge.
17     Q    Okay.  What was the purpose of-- were you
18 the managing member of SJC?
19     A    I don't recall.
20     Q    What was the purpose of creating SJC in
21 approximately 2000?
22     A    We bought a property.
23     Q    And when you say "we" do you mean SJC?
24     A    Correct.
25     Q    And what property did SJC buy?

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 26

1     A     A multifamily property.
2     Q     This is residential property?
3     A     Yes.
4     Q     Right?
5     A     Yes.
6     Q     After moving to the United States, did you
7  form any other companies in addition to SJC?
8     A     Yes.
9     Q     What did you form?
10    A     We formed many entities.  I don't recall
11 all the entities.
12    Q     All right.  Approximately, how many
13 entities did you form?
14    A     I don't recall.  A lot.
15    Q     Can you give me your best estimate of a
16 range, please?
17    A     I don't recall.
18    Q     Is it more than twenty?
19    A     Possibly.
20    Q     Is it more than thirty?
21    A     I don't recall.
22    Q     Can you take a moment-- and I'll be happy
23 to wait-- and just sort of give me a range of a
24 number of the properties that you formed since you
25 moved to the United States?

Page 27

1     A     I don't recall.
2     Q     And you don't have any range of that
3  response, right?
4     A     I said it's a lot.  I don't recall how
5  many.
6     Q     Okay.  And for all of the entities that
7  you formed that you don't recall how many-- were you
8  the-- did you control those entities?
9     A     Some of them, some of them not.  I don't
10 recall exactly.
11    Q     So each time you wanted to buy or assume a
12 project, you formed a new LLC?  Is that how it
13 basically worked?
14    A     At times.  Not each time, but at times.
15    Q     Approximately, how many residential
16 projects did you acquire in Brooklyn after you moved
17 here?
18    A     I don't recall.  As I said, this is my
19 business.  I don't want to misstate something by
20 saying too much or too many.  It was a lot of
21 transactions.
22         MR. ROSENBLOOM:  At this point I think we
23     are really getting a field of what's before the
24     Court and what the issue is before us.  So if
25     we can try to get back on track.

Page 28

1         MR. WEINER:  Thank you, Neal.  I'm just
2     understanding some background and I am sure you
3     understand that.
4  BY MR. WEINER:
5     Q     Mr. Schreiber, weren't you also involved
6  in acquiring residential real estate in Upstate New
7  York and also in New Jersey in addition to Brooklyn?
8     A     Yes.
9     Q     And roughly in 2004 did you sell that
10 residential portfolio to concentrate on commercial
11 properties in Manhattan and surrounding area?
12    A     Very possible.
13    Q     Mr. Schreiber, did you form a company
14 called Waterbridge Capital, LLC?
15    A     Yes.
16    Q     When did you form Waterbridge Capital,
17 LLC?
18    A     I believe in 2006.
19    Q     And when you formed Waterbridge Capital in
20 2006 were you the controlling share hold--
21 controlling member and manager?
22    A     Yes.
23    Q     And has that always been the case from
24 approximately 2006 to today?
25    A     Yes.

Page 29

1     Q     You formed Waterbridge Capital as a
2  limited liability company under Delaware Law,
3  correct?
4     A     I don't-- I don't know under which law.  I
5  have to check with my accountant.
6         MR. WEINER:  Okay.  Vince, could you
7     please pull up exhibit three, please.
8                      - - -
9         Exhibit 3 was marked for identification.
10                     - - -
11 BY MR. WEINER:
12    Q     Mr. Schreiber, could you take a look at
13 that.  And I think there's a couple of more pages.
14 And just ask Vince to scroll when you are ready.
15    A     Okay.  Can you scroll.  Okay.  You can
16 scroll.  You can scroll.  Okay.
17    Q     Mr. Schreiber, is this Waterbridge
18 Capital's website; is that correct?
19    A     It looks like.
20    Q     Yes.  And is that website and information
21 contained in that website accurate as of this time?
22    A     I don't recall exactly what it says.  This
23 was done many years ago.  So I don't recall.  I
24 didn't study this and read it carefully.  But at the
25 time it was posted it was accurate.

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 30

1    Q    Okay.  Thank you.  Why did you form
2  Waterbridge Capital?
3    A    This is a real estate business.
4    Q    Yes.
5    A    And a private equity business.
6    Q    I guess before I continue, Mr. Schreiber,
7  you said it was accurate at the time that it was
8  posted I think you said.  But can you look at it and
9  tell me if there is anything materially-- anything
10 that has materially changed as a--
11   A    I will have to carefully study it in
12 detail and not on the phone and in the light of a
13 deposition.  So the answer is no.
14   Q    Could you read just the first page and
15 three paragraphs and let me know if it's materially
16 accurate?
17   A    The assets are much less right now.  So we
18 don't have 3 million (inaudible) under management.
19 We have much less.
20   Q    Okay.  Are paragraphs two and three
21 generally correct today?
22   A    No, things have changed.  Things have
23 changed.
24   Q    Can you be more specific in--
25   A    I cannot.  We are in the middle of a

Page 31

1  pandemic, a lot of interruptions.  And old
2  businesses I have to carefully study before I make a
3  statement.
4    Q    Mr. Schreiber, does Primary Member, LLC,
5  have any assets other than its membership interests
6  in the debtor?
7    A    I have to check.  It may have.
8    Q    You don't know at this time whether it has
9  any other assets other than its membership?
10   A    It's possible.  It's possible.
11        MR. ROSENBLOOM:  Objection.  Asked and
12   answered.
13 BY MR. WEINER:
14   Q    Mr. Schreiber, were you involved in the
15 acquisition of property located at 536 Broadway?
16   A    Yes.
17   Q    What was the approximate purchase price of
18 that property?
19   A    $190 million.
20   Q    Did Waterbridge Capital loan any money to
21 that entity?
22   A    I believe it did, yes.
23   Q    Did Waterbridge Capital receive a
24 promissory note for the money that it lent to the
25 entity?

Page 32

1    A    No.  We had an operating agreement.  We
2  had an agreement to say that.  It was a partnership
3  and I trusted my partners.  And Waterbridge actually
4  lended a lot of money and got paid back in full.
5    Q    And Waterbridge never had a promissory
6  note in its favor?
7    A    I'm sorry.  Again?
8    Q    Did Waterbridge ever have a promissory
9  note from the borrower in Waterbridge's favor?
10   A    On 530 Broadway?
11   Q    536 I believe, right?
12   A    No.  No, it did not.
13   Q    Okay.  Mr. Schreiber, you were an investor
14 to WeWork; is that correct?
15   A    I was a lender to WeWork.
16   Q    And when you say "I" let me clarify--
17   A    Yes, I.  I formed an entity called We
18 Member, LLC.  It's the same way I did with Primary
19 Member, LLC.  And We Member, LLC lent and had the
20 commitment to loan WeWork money and that's what we
21 did.
22   Q    And did WeWork or any other entity sign a
23 promissory note to We Member, LLC?
24   A    No.
25   Q    Okay.

Page 33

1    A    As a matter of fact, the same operating
2  agreement which was used for WeWork was used for
3  Primary Member.  The same format of the loan
4  structure which we fund everything as the loan.
5    Q    Mr. Schreiber, were you involved in the
6  purchase of an assemblage of properties at North
7  Fourth Street and North Third Street and Bedford
8  Avenue in Williamsburg?
9    A    Yes.
10        MR. ROSENBLOOM:  I'm going to object to
11   this line of questioning.  What does Bedford
12   Avenue and Williamsburg have to do with this
13   project?
14        MR. WEINER:  It's background information,
15   Neal, for the deponent and--
16        MR. ROSENBLOOM:  Yes, I understand.  But
17   you know, it's just a bit much at this point.
18   You know, we have established that Mr.
19   Schreiber is a real estate investor and owner
20   of real property.  And okay, so we got that
21   background.  Can we move forward with the--
22        MR. WEINER:  I appreciate it.  I
23   appreciate it, Neal.  I am getting through what
24   I-- what I need.  And we'll keep going.
25 BY MR. WEINER:

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 34

1    Q    Mr. Schreiber, for the last project is
2  that a purchase price of roughly $66 million?
3    A    I'm sorry.  I didn't hear the first part
4  of the question.
5    Q    The North Fourth and North Third Street
6  properties near Bedford Avenue Project, was that
7  purchase price approximately $66 million?
8    A    Yes.
9    Q    And you were involved in the purchase of
10  the top floors of the Woolworth building for
11  approximately $68 million, right?
12    A    Correct.
13    Q    Okay.  Thank you.  What was the purpose--
14  and forgive me if I asked you this before.  What was
15  the purpose of forming Waterbridge Capital, LLC?
16    A    It was a real estate company and private
17  equity company.
18    Q    What did it do?
19    A    It focused on identifying opportunities.
20  Particularly what it did was it was lending money to
21  the companies where I would make investments to.
22    Q    Did any of the projects ever sign a
23  promissory note in favor of Waterbridge?
24    A    Not that I recall.
25    Q    Not a single promissory note that you

Page 35

1  recall?
2    A    Not that I recall.
3    MR. WEINER:  Okay.  Vince, can we go,
4    please, to exhibits-- let's start with exhibit
5    five.  And Neal, just as a courtesy heads-up,
6    I'm going to ask to put on the screen exhibit
7    five, six and seven.  Those are the three
8    operating agreements of the debtor.
9    And what I'm doing after he puts them up
10    there-- and this is just-- perhaps we can save
11    some time.  I am going to ask Mr. Schreiber to
12    authenticate those documents.  They are all
13    executed.  But if you have a stipulation in
14    advanced once you-- it's what was produced.
15    They are fully executed.  I would be happy to
16    look at them.
17    Either I can go through them with Mr.
18    Schreiber or if you are comfortable you can--
19    you are free to stipulate that those are fully
20    executed, the three fully executed operating
21    agreements.
22    MR. ROSENBLOOM:  All right.  Let's-- let's
23    just identify them first.
24    MR. WEINER:  Sure.
25    MR. ROSENBLOOM:  This is number five the--

Page 36

1    MR. WEINER:  Correct.  Correct.
2    MR. ROSENBLOOM:  -- 7/28/15 is the-- what
3  we will call the original LLC agreement.
4    MR. WEINER:  Yes.  I may refer to them--
5  just for my convenience-- as the first
6  operating agreement, the second operating
7  agreement and the third operating agreement.
8    MR. ROSENBLOOM:  All right.  That's fine.
9  So I will assume that these are fully executed
10  documents.  They all, I believe, contain
11  initials on the bottom of the pages.  We can
12  scroll down on page one.
13    MR. WEINER:  Yes.  Perhaps-- this is just
14  a suggestion.
15    MR. ROSENBLOOM:  Okay.
16    MR. WEINER:  If Vince scrolls down to the
17  signature pages maybe that--
18    THE WITNESS:  If I may just jump in, I
19  hear background construction noise.  Whoever is
20  next to construction please go on mute.  I
21  still hear construction noise.
22    MR. WEINER:  I don't hear anything.
23    THE WITNESS:  I'm hearing construction
24  noise.
25    MR. ROSENBLOOM:  All right.  So why don't

Page 37

1  we do this just to facilitate the examination,
2  why don't we assume that these are all fully
3  executed documents.  And we'll stipulate as to
4  their authenticity unless, you know, something
5  were to come up later that would, of course, we
6  need to raise an objection.
7    MR. WEINER:  Okay.  Well, that's-- that's
8  fair.  Those would relate to exhibits five, six
9  and seven.  And I'm sure if you have a question
10  you can call me, but I think you will find they
11  are all fully executed.
12    MR. ROSENBLOOM:  Okay.
13    MR. WEINER:  Thank you very much.  Okay.
14  You can take those off the can screen, Vince.
15  Thank you.
16  BY MR. WEINER:
17    Q    Mr. Schreiber, who is Lisa Skye Hain?
18    A    She runs Primary now.
19    Q    Yes.  And she is your-- she is a partner
20  to Primary Member, LLC and the debtor, right?
21    A    She is a borrower.
22    Q    And she is a member of the debtor, right?
23    A    That's correct.
24    Q    Just like Primary Member, LLC is a member
25  of the debtor?

Page 38

1    A    Correct.
2         MR. ROSENBLOOM: Objection.
3         MR. WEINER: Did Ms-- I'm sorry.
4         MR. ROSENBLOOM: Objection. The document
5    speaks for itself. It spells out what the
6    parties different roles are. She is a managing
7    member and the document speaks for itself.
8         MR. WEINER: Fair enough.
9    BY MR. WEINER:
10   Q    Mr. Schreiber, Ms. Skye Hain asked you to
11   provide drafts of the first operating agreement for
12   the debtor is that-- is that true?
13   A    To the best of my recollection.
14   Q    And you provided-- you provided her with
15   the first draft operating agreement in response to
16   her request. Correct?
17   A    My office did.
18   Q    Yes. And when the second operating
19   agreement was signed, did you provide a draft to her
20   for that as well?
21   A    I don't recall. When you say "the second"
22   I don't recall. It could be it was prepared by her.
23   I don't recall.
24   Q    Okay.
25   A    I'm still hearing construction noise. So

Page 39

1    if someone can go on mute. It just-- it keeps on
2    disturbing me.
3         MR. WEINER: Vince, could you pull up
4    exhibit eight which we-- strike that. One
5    moment. Vince, could you please pull up
6    exhibit-- deposition exhibit five which is the
7    operating agreement dated as of July 28, 2015.
8         And could you scroll down passed the
9    signature page to some of the exhibits. You
10   could stop right there.
11        - - -
12        Exhibit 5 was marked for identification.
13        - - -
14   BY MR. WEINER:
15   Q    Mr. Schreiber, do you see schedule one as
16   part of the first operating agreement on the screen
17   in front of you?
18   A    Yes. Yes.
19   Q    Primary Member, LLC never advanced $400 to
20   the debtor for its capital contribution; did it?
21   A    It instructed to take the $400 from the
22   funds we sent them.
23   Q    It instructed? Who is the "it"?
24   A    I instructed.
25   Q    You instructed whom to do what?

Page 40

1    A    When we send the money for the agreement,
2    $400 of the money we sent went to capital
3    contributions.
4    Q    Did you instruct the debtor to take $400
5    of money that came in and book it as a capital
6    contribution in which--
7    A    We had the written agreement. I'm not
8    sure if the debtor had funded the same way, the
9    $300, or Daniel Ornstein that he funded the $300.
10   But I specifically wanted that my $400 get deducted
11   from the proceeds.
12        As a matter of fact, we funded the
13   $400. If you collect and owe the moneys that was
14   sent, there's extra $400 funded.
15   Q    Do you have any written evidence of what
16   you just testified to?
17   A    I don't recall.
18   Q    You don't recall if you have any written
19   evidence of what you just said?
20   A    I don't recall.
21   Q    Do you recall sending an email to the
22   debtor to say, "I'm not writing a check for 400.
23   Just apply it out of the money that we are going to
24   put into the debtor"?
25   A    I don't recall. All I recall is we had a

Page 41

1    conversation, myself, Charlie Valentino, in my
2    office together with Nancy Hom at the time. We had
3    to live by an operating agreement that we signed
4    with the capital contributions.
5         My staff showed me that $400 will be
6    sent extra or deducted from what we sent to satisfy,
7    besides the loan commitment, satisfy capitol
8    contribution of $400. I rely on staff and delegate
9    stuff to get done.
10   Q    Was it true that a total of $1,000 was the
11   aggregated total of capital contributions made?
12        MR. ROSENBLOOM: Objection. Document
13   speaks for itself.
14   BY MR. WEINER:
15   Q    You can answer, Mr. Schreiber.
16   A    I can repeat what my counsel said. The
17   document speaks for itself.
18   Q    Mr. Schreiber, is it true that the total
19   capital contributions to this debtor aggregated
20   $1,000?
21   A    The document speaks for itself.
22   Q    May I have an answer to my question,
23   please?
24   A    The document speaks for itself.
25   Q    I'm asking you if what the document says

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 42

1    is true.
2        A    The document speaks by itself.
3            MR. ROSENBLOOM:  Can we move onto the next
4    question.
5            MR. WEINER:  Well, the record will reflect
6    that the witness has refused to answer the
7    question.  And we can move on.
8            MR. ROSENBLOOM:  Well--
9            MR. WEINER:  Can you scroll down, Vince,
10   please, a little bit.  Thank you.  Keep going.
11   Keep going.  Keep going.  Keep going.  There.
12   Stop, please.  Thank you.
13   BY MR. WEINER:
14       Q    Mr. Schreiber, this is schedule 8.6
15   attached to the first operating agreement.  Could
16   you please take a look at that and read it and let
17   me know when you finished.
18       A    Yes.
19       Q    Mr. Schreiber, this schedule is part of
20   the agreement provides that Ms. Skye Hain receives a
21   $10,000 a month payment as salary and that-- and
22   that DO is Dan Ornstein, I believe, receives a
23   monthly salary of $2,500 a month for some period of
24   time, correct?
25       A    Yes.

Page 43

1        Q    And the third paragraph says, "Upon
2    commencement of operations of the company's first
3    shared office facility, PM shall be entitled to a
4    monthly payment equal to the LSH salary, defined as
5    the PM payment.  PM may waive the company's
6    obligation to pay the PM payment in its whole
7    discretion."
8        A    Yes.
9        Q    Did I read that accurately?
10       A    Yes.
11       Q    So when the first shared office facility
12   started, Primary Member, LLC was entitled to be paid
13   $10,000 per month, correct?
14       A    Correct.
15       Q    What was the $10,000 a month for?
16       A    So as you can see in the documents,
17   Primary Member extended the loan of $6,000,000-- or
18   a commitment for $6,000,000 as a loan to Live
19   Primary, LLC.  So we didn't want to necessarily make
20   it a huge burden for the company as far as high
21   interest at five, at ten percent.
22            So to offset, instead of an interest
23   payment, we insisted on getting that $10,000 that
24   would offset towards interests that we would
25   regularly normally charge or try to achieve so--

Page 44

1    which was also a minimal amount which $120,000 a
2    year relates to like three percent on the total
3    loan.
4            But even that interest payment Live
5    Primary, LLC has failed to pay its lender after
6    many, many, many, many requests from its lender.  So
7    the borrower failed to pay these payments to the
8    lender.
9        Q    So what you are saying is the $10,000 a
10   month in paragraph three was disguised interest?
11           MR. ROSENBLOOM:  Objection.  Asked and
12   answered.
13   BY MR. WEINER:
14       Q    You can answer, Mr. Schreiber.
15       A    My counsel objected.
16       Q    You are permitted to answer.
17           MR. ROSENBLOOM:  Was it disguised
18   interest?
19           THE WITNESS:  I don't understand the
20   question.
21   BY MR. WEINER:
22       Q    Was the $10,000 a month in paragraph three
23   disguised interest--
24       A    Disguised?
25       Q    -- payable to Primary Member?

Page 45

1        A    What is the question?  If it was interest?
2    The intent was that it should get an income, an
3    income and its loan.  Because as you can see Primary
4    Member didn't-- tried not to give a difficult time
5    or make it as easy as possible to Live Primary, LLC
6    as a borrower.
7            So Primary Member as a lender wanted
8    to make sure, get some kind of income.  So this was
9    the intent of Primary Member getting paid on its
10   loan to get some kind of income from Live Primary,
11   LLC.
12       Q    So the $10,000 a month in paragraph three
13   was designed to be interest on the loan, right?
14       A    It was designed to be a payment in
15   exchange of charging a monthly interest charge.
16       Q    Why didn't you just call it interest if
17   that was the case?
18       A    Because we didn't-- at the time we wanted
19   to support the company which we still want to.  But
20   at the time we didn't want it to be an obligation on
21   the books and liabilities of Live Primary, LLC so it
22   may hold back from different investors or entities
23   or lenders.
24            So the idea was not to make it a
25   liability.  Because if we would have a payable

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 46

1  monthly it would be a liability on the company.  So
2  we were very careful how we written it that it's--
3  company has to make these payments.  However,
4  Primary, as its sole discretion, Primary Member may
5  elect not to charge that interest or that payment.
6          MR. WEINER:  Okay.  Vince, could you
7      please go to exhibit 6 which was the second
8      operating agreement as we are referring to it,
9      please.  And go to the end of that document.
10     Keep-- is that the end?  Scroll back a little
11     bit, please.  Slow down a little bit, please.
12     There you go.
13                      - - -
14     Exhibit 6 was marked for identification.
15                      - - -
16 BY MR. WEINER:
17     Q    Mr. Schreiber, what's on the screen is
18 schedule four attached to exhibit 6 which is the
19 first amendment to the limited liability company
20 agreement of Live Primary.  We are referring to this
21 as the second operating agreement.
22             Does the provision in schedule four
23 provide that Primary Member receives the same
24 monthly payment that Ms. Skye Hain receives a
25 salary, at this point, $5,000 a month?

Page 47

1      A    Correct.
2      Q    And is this disguised interest?
3          MR. ROSENBLOOM:  Objection.
4          THE WITNESS:  I'm happy to answer.  The--
5      Lisa Skye was doing a great job.  And she was,
6      perhaps, considering or trying to get a higher
7      salary.  And we had discussions.
8          And basically, this gives the permission
9      that if she takes the higher salary or whatever
10     the salary is, the same amount will be paid as
11     interest towards the loan that Primary Member
12     advanced to the borrower Live Primary, LLC as a
13     borrower.
14 BY MR. WEINER:
15     Q    So the $5,000 per month was designed to be
16 interest on Primary Member's loan that you are
17 testifying to, right?
18     A    In exchange of interest or designed as
19 interest, but the idea behind it is to get an income
20 on the loan that Primary Member advanced the
21 borrower Live Primary, LLC.
22     Q    Why didn't you just call it interest?
23     A    I answered that before.  Not to put
24 obligations on the company, liabilities and
25 obligations.

Page 48

1      Q    Thank you.
2          MR. WEINER:  Vince, could we go to exhibit
3      eight.  Excuse me.  Exhibit seven which is--
4      Neal, that's the third operating agreement, the
5      first amended and restated.
6          MR. ROSENBLOOM:  This is exhibit seven,
7      correct?
8          MR. WEINER:  Yes, please.  Vince, could
9      you scroll down and look for schedule four
10     towards the end of that document, please.
11     Thank you.
12 BY MR. WEINER:
13     Q    Mr. Schreiber, could you take a look at
14 that page again, please.  And just let me know when
15 you are done.
16     A    Yes, I'm done.
17     Q    Thank you.  So similar to the last two
18 agreements we looked at with these similar
19 paragraphs, is it your testimony that the amounts
20 due to PM in the second paragraph is interest on
21 loans made to the debtor?
22     A    I said before, you can call it an income
23 on the loan.  We didn't call it interest for a
24 reason.
25     Q    What does--

Page 49

1      A    But the reasoning behind it was there
2  should be an income on the loan extended by Primary
3  Member, LLC as a lender to Live Primary, LLC as a
4  borrower.
5      Q    What does income on the loan mean?
6      A    Income on the loan means it should earn an
7  income on the loan.  So you can have interest as an
8  income or you can have income without the words
9  interest.
10         MR. ROSENBLOOM:  Are you referring to
11     principle?
12         THE WITNESS:  No.  No, this would be not
13     principle.  This would be a return on its
14     capital in exchange of interest or in lieu of
15     charging interest, this would be a payment.
16         MR. WEINER:  You mean on receipt-- a
17     payment on its loan, correct?
18         THE WITNESS:  Correct.
19 BY MR. WEINER:
20     Q    So was this designed to be a principle
21 reduction on the loan?  The second paragraph in this
22 document and the previous paragraphs of the first
23 two documents we have just been talking about?
24     A    I-- look we tried to get-- to be as
25 helpful to Live Primary, LLC.  But we also wanted to

*Reliable Court Reporting*

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 50

1  have return of capital.  So very possible this was
2  the intent.
3      Q    Well, I'm asking you what-- you signed
4  this document.  So what was the intent?  Was it
5  interest?  Was it income?  What was it?
6      A    To the best of my knowledge, I believe it
7  was loan payment.
8      Q    Principle?
9      A    Correct.
10     Q    And is that now your testimony with
11 respect to the last two documents that we just
12 looked at where in the last one the PM payment was
13 5,000 and the one before that the PM payment was
14 $10,000 per month?
15     A    I don't recall--
16         MR. ROSENBLOOM:  I'm going to object.
17     He's already testified.  It's been asked and
18     answered.  He has testified as to what those--
19         MR. WEINER:  Well, I-- I appreciate that,
20     but the debtor-- excuse me.  Mr. Schreiber has
21     testified to a number of different things here.
22         And I'm trying to pin down whether his
23     testimony with respect to this document that
24     this is-- the payment on principle is the same
25     testimony that would apply to the PM payments

Page 51

1  in the two previous documents.
2         THE WITNESS:  To the best of my knowledge,
3     we wanted to make it as easy as possible to
4     Live Primary, LLC as a borrower.  So as a
5     lender we didn't want to put an obligation of
6     interest on liability and that's liability on
7     the books.  So the payments would go towards
8     the loan payment of the $6,000,000.
9         Unfortunately, nothing was paid.  I wish
10    it was, but not even one dollar was paid.  When
11    the other entity in the agreement took out
12    hundreds of thousands of dollars, Primary
13    Member didn't receive not even a dollar in loan
14    payments.  But Primary Member as a lender was
15    very supportive to Live Primary, LLC as a
16    borrower.
17        MR. WEINER:  Vince, you can take that off
18    the screen, please.
19 BY MR. WEINER:
20     Q    Mr. Schreiber, with respect to the Proof
21 of Claim we talked about earlier, isn't it true that
22 all of the moneys on the schedule described on the
23 Proof of Claim came from Waterbridge Capital and not
24 from Primary Member, LLC?
25     A    Primary Member instructed payment.

Page 52

1      Q    That's not what my question was, sir.
2      A    It came from its affiliate.
3      Q    What came from its affiliate?
4      A    The funding.  Primary Member as a lender
5  to the borrower Live Primary, LLC has an obligation
6  to lend Live Primary, LLC money.  Primary Member,
7  LLC's affiliate funded that loan obligation to the
8  borrower Live Primary, LLC.
9      Q    So Waterbridge Capital is the one that has
10 the claim against the debtor, not Primary Member?
11        MR. ROSENBLOOM:  Objection.  Calls for a
12    legal conclusion.  Objection.
13 BY MR. WEINER:
14     Q    You can answer.  You can answer, Mr.
15 Schreiber?
16     A    I answered already.  I'll repeat.  Primary
17 Member, LLC funded the loan obligation to Live
18 Primary, LLC, as a borrower, the entire funds it
19 committed as the loan to Live Primary LLC.
20     Q    Mr. Schreiber, do you have an American
21 Express card?
22     A    I do.
23     Q    Have you had an American Express card from
24 2015 forward from the time that Live Primary was
25 formed?

Page 53

1      A    I don't know if it was from 2015.  But at
2  times when Live Primary needed some loans I let them
3  use my card.  So at those times I had one.
4      Q    Yes.  Could you explain how-- how that
5  worked, the mechanics of what you just described?
6      A    So-- of what?  Mechanics of what?
7      Q    When you said you let them use your card,
8  give me an example.
9      A    So if Lisa needed money to pay a vendor
10 and she had no money and if I had funded all my
11 obligations already and she needed more money and
12 she was sure she was getting money in the next week
13 or two or three, I let her use my card to buy
14 product for the company in the understanding that
15 she will-- as an additional loan-- and she will pay
16 back as soon as possible this original-- this loan
17 which in several cases she did-- on all cases on the
18 American Express.
19        MR. WEINER:  Vince, let's turn to-- let's
20    see.  Could you pull up exhibit 27, please.
21            -  -  -
22    Exhibit 27 was marked for identification.
23            -  -  -
24 BY MR. WEINER:
25     Q    And Mr. Schreiber, take a look at that and

*Reliable Court Reporting*

Page 54

1  then Vince will scroll down.
2      A    Can you scroll down?  Scroll down.  Yes.
3  Yes, I'm done.
4      Q    Mr. Schreiber, that's a summery of charges
5  to your personal American Express credit card for
6  certain expenses incurred by the debtor in the
7  construction of the 26 Broadway, is that-- would
8  that be accurate?
9      A    That's how it looks like.
10         MR. ROSENBLOOM:  What is the date of--
11  nevermind.
12         MR. WEINER:  Go ahead, Neal.  What was
13     your question?
14         MR. ROSENBLOOM:  Well, I was going to ask
15     the date of the email, please.
16         MR. WEINER:  February 26th, 2016.
17         MR. ROSENBLOOM:  2/26/16.
18         MR. WEINER:  Yes.
19  BY MR. WEINER:
20      Q    So I'll just refer to her as Lisa as you
21  did.  It's a little simpler.  So if Lisa said the
22  debtor didn't have enough money to pay expenses, how
23  was it that she used-- with your permission-- your
24  personal American Express credit card?
25      A    So on these dates this could be part of

Page 55

1  the funding for the $6,000,000 because we let them
2  use several times our cards.  At that time I don't
3  believe he had funded the entire 6,000,000.
4             So this could have been an advance
5  towards a loan.  I don't recall.  But it could be
6  either we funded it as part of our loan commitment
7  by Primary Member to Live Primary, LLC as the
8  borrower or either it was an additional loan that we
9  wanted to support Live Primary, LLC as a borrower
10  with additional funds.  These are the two scenarios
11  we would fund under-- it was American Express
12  cards-- just to support the borrower when the
13  borrower needed support.
14      Q    So you were the lender of these funds,
15  right?
16      A    Correct.
17      Q    On exhibit 27 in front of us, right?
18      A    To the best of my knowledge.
19      Q    So this wasn't-- this wasn't funding
20  provided by Primary Member?  This was--
21      A    It could be.  No--
22      Q    No--
23         MR. ROSENBLOOM:  Objection.  He asked--
24     that was asked and answered.
25         MR. WEINER:  Okay.  Could we turn to the

Page 56

1  proof-- hold this.  Is there a-- Vince, is
2  there a way to put up the Proof of Claim for a
3  moment at the same time as this exhibit?  It
4  might be easier for the witness.
5         MR. SCIAN:  Yes.  Just remind me what
6  exhibit number that was.
7         MR. WEINER:  Sure.  Sure.  Thank you very
8  much.  It would be number 27.  Okay, could you
9  scroll down in the Proof of Claim to one of the
10  attachments, please.  Keep going please.  All
11  right, slow down.  Slow down.  Is there a way
12  to make that a little larger for Mr. Schreiber
13  and for Neal?
14         THE WITNESS:  I enlarged it.  I have
15  enlarged it.
16  BY MR. WEINER:
17      Q    Okay.  All right.  Good.
18      A    Yes, I see these charges reflecting as a
19  funding by a Primary Member as a loan.
20      Q    What were the terms of that loan?
21      A    This was in terms in reference to the
22  operating agreement signed.
23      Q    Is it your testimony that these were
24  authorized by the operating agreement?
25      A    This was authorized and instructed by

Page 57

1  Primary Member as a lender to issue a loan to Live
2  Primary, LLC as a borrower in the form of using
3  their American Express card.
4      Q    Yes.  But Primary Member wasn't the lender
5  for these amounts, you were, correct?
6         MR. ROSENBLOOM:  Objection.
7         THE WITNESS:  I instructed payment on
8  behalf of Primary Member as the loan to the
9  borrower Live Primary, LLC.
10  BY MR. WEINER:
11      Q    So for these amounts of 25,000,005.21, you
12  were the lender?
13      A    I lended the company--
14         MR. ROSENBLOOM:  Objection.
15         THE WITNESS:  --money, correct.
16  BY MR. WEINER:
17      Q    I'm sorry.  I didn't hear your--  I'm
18  sorry--
19      A    Primary Member-- Primary Member was the
20  lender to it's obligation under it's operating
21  agreement to give a loan to Live Primary, LLC in the
22  amount of $6,000,000.
23         MR. WEINER:  Vince, scroll down, please,
24     to the exhibit 1.  You can take the exhibit on
25     the right screen just to keep it clean.  And go

Page 58

1    back to just the Proof of Claim, please.  Not
2    that one, the other one.  I'm sorry.  Scroll
3    down slowly, please.  Okay.  Keep going,
4    please.  Okay.  Stop, please.  Go back up just
5    a little.
6  BY MR. WEINER:
7    Q    Mr. Schreiber, when you are referring to
8  the $6,000,000 loan, you are referring to the
9  6,131,140.19 as principle on this exhibit?  This is
10 page six of eight on exhibit 1, right?
11   A    To the best of my knowledge.
12        MR. WEINER:  Scroll down, please.  Okay.
13   Stop, please.
14 BY MR. WEINER:
15   Q    Mr. Schreiber, this list of other loans,
16 these other loans were not authorized by any of the
17 operating agreements, were they?
18   A    Which other loans?
19   Q    The one that says "other loans."  It's an
20 attachment that you attached to your Proof of Claim.
21   A    Okay.  This was requested by the company.
22 The company confirmed in email that these funds will
23 be senior secured as a loan in front of anything
24 else.  Upon the confirmation via email from the
25 company that this is a CV secured loan, we send that

Page 59

1  payment.
2    Q    What documents do you have that support
3  your statement that these amounts were senior
4  secured loans?
5    A    Because before we funded, Lisa Skye Hain
6  confirmed an email that this will be a senior secure
7  loan.  Based on her confirmation on email, I funded
8  that amount.
9    Q    Do you have the email that Ms. Sky Hain--
10 that you have testified to that she said these
11 amounts will be in senior secured loan?
12   A    Yeah, I believe we-- I believe we do.  And
13 whatever we searched we gave to our counsel.  But
14 she confirmed in email this is a senior secure loan.
15   Q    Okay--
16   A    And she knows that.  And she should have a
17 copy of that as well.  I believe that note holders
18 David Kirshenbaum and Mike Balkin are aware of it as
19 well because part of my agreement when I allowed the
20 senior secured note holders to come in, I consented
21 on the condition that these senior secured loans
22 owed to me, which was at the time was 165-- or
23 something-- thousand dollars will be paid to me.
24 The company failed to pay it.
25        I assisted and requested many times.

Page 60

1  And we had a few supervisory committee calls with
2  Lisa Skye Hain.  I believe-- I don't know it Brian
3  was on the call.  But David Kirshenbaum was on the
4  call.  Mike Balkin was on the call.  They were aware
5  and they saw these emails where Lisa Skye Hain
6  confirmed that these loans are senior secured to be
7  paid to me at the first priority when the company
8  can.
9        MR. WEINER:  Neal, could I ask you-- I'm
10   representing to you that I don't believe I have
11   the email that the witness is testifying to and
12   I would ask you to check if one exists or if it
13   doesn't exist, if you could either provide or
14   or confirm that to me at your earliest
15   opportunity.
16        MR. ROSENBLOOM:  I will check.
17        MR. WEINER:  Thank you very much.
18 BY MR. WEINER:
19   Q    What was the collateral that this alleged
20 senior secured loan was to be secured by?
21   A    An undertaking of the managing member of
22 Live Primary, LLC as the borrower.
23   Q    What was the collateral my question was.
24   A    Senior secure, my understanding was it's
25 collateralized by whatever the company has.

Page 61

1    Q    Did you ever see a security agreement
2  describing the collateral that you are testifying
3  to?
4    A    Not that I recall.
5    Q    Did you ever get a promissory note from
6  the debtor as to any of the loans described on the
7  schedules attached to your Proof of Claim?
8    A    Not that I recall.
9    Q    Mr. Schreiber, do you have any evidence of
10 written consent by both members of the debtor to any
11 of these loans, unanimous written consent in
12 writing?
13   A    I believe we have it in the operating
14 agreement and that's what we inserted in the
15 operating agreement specifically saying that we are
16 committing to advancing a loan, Primary Member as a
17 lender to Live Primary, LLC as a borrower.
18   Q    The operating agreement though requires
19 unanimous written consent for loans other than under
20 paragraph 9.2.  My question is do you have any
21 unanimous written consents by both members of the
22 class A shares of the debtor?
23   A    I don't recall.
24   Q    Okay.  Same question as to unanimous
25 written consent by both class A members plus David

Page 62

1  Kirshenbaum?
2       A    I don't recall.
3       Q    You never remember seeing any such written
4  consents by those parties though, correct?
5       A    Written consent as far as they knowing
6  that I am a lender?
7       Q    That's not my question.
8       A    What's your second question?
9       Q    You have no written consents by the
10 members-- by the class A members and David
11 Kirshenbaum for any of these loans listed under
12 other loans on the Proof of Claim, correct?
13           MR. ROSENBLOOM:  Objection.
14           THE WITNESS:  To the best of my
15      knowledge--
16           MR. ROSENBLOOM:  Excuse me.
17           THE WITNESS:  -- David Kirshenbaum and
18      Mike Balkin came in after I advanced all the
19      loans.
20 BY MR. WEINER:
21      Q    My question is you have no unanimous
22 written consent by class A members plus David
23 Kurishingbomb, correct?
24      A    I don't recall.  It could be some
25 documents.  I don't have the documents in front of

Page 63

1  me.  But I don't recall what you are referring to.
2       Q    Okay.  We will let the-- we'll let the
3  production speak for itself.  Thank you.
4           MR. WEINER:  Neal, are you okay with
5      taking a short break, please?
6           MR. ROSENBLOOM:  Yes.  I'm fine.
7           MR. WEINER:  Great.  It's-- on my watch,
8      at least, 11:12.  Let's reconvene at 11:45 if
9      that's all right.
10          - - -
11          A brief recess was taken.
12          - - -
13          MR. WEINER:  Okay.  We're back on the
14     record for the deposition of Mr. Schreiber.
15 BY MR. WEINER:
16      Q    Mr. Schreiber, you are still under oath,
17 okay?
18      A    Okay.
19          MR. WEINER:  Great.  Vince, please pull up
20     on the screen deposition exhibits 53 and 54 and
21     55.  We are going to show those to the witness
22     so he has a chance to look at them and then I
23     will ask him some questions.
24 BY MR. WEINER:
25      Q    Mr. Schreiber, when you are done with each

Page 64

1  exhibit just let the court reporter know and he will
2  upload the next two.  This is 53.
3           - - -
4      Exhibit 53 was marked for identification.
5           - -
6           MR. ROSENBLOOM:  Can we just hold on a
7      minute.  I would assume that there's going to
8      be-- I'm just numbering exhibits on a separate
9      sheet of paper.  And I'm not up to 53 yet.
10 BY MR. WEINER:
11      Q    Go to 54.
12      A    Yes, I have read.
13          - - -
14     Exhibit 54 was marked for identification.
15          - - -
16 BY MR. WEINER:
17      Q    Okay.  This is 54 on the screen titled
18 "Loan Agreement and Promissory Note."
19      A    Yes, I have read it.  I have read it.
20          MR. WEINER:  Can you scroll down to the
21     end so Mr. Schreiber can continue to look at
22     it.  Could you now go to 55, please.
23          - - -
24     Exhibit 55 was marked for identification.
25          - - -

Page 65

1  BY MR. WEINER:
2       Q    Are you ready, Mr. Schreiber?
3       A    I am.
4       Q    Okay.  Mr. Schreiber, there came a time in
5  2016 where the debtor needed additional funds beyond
6  the amount that you were providing, correct?
7       A    Beyond the loan amount, correct.
8       Q    Yes, beyond the amount you were providing?
9       A    Beyond the loan amount, correct.
10      Q    Okay, Mr. Schreiber.  You can characterize
11 it however you would like.  That's fine.
12           So you received these emails, the two
13 emails that we-- that email marked as deposition
14 exhibit 53 as well as 55.  And it appears that you
15 also received this exhibit 55 a proposed loan
16 agreement and promissory note; is that correct?
17      A    I see that now.
18      Q    Yes.  But you saw it then, right?
19      A    Possibly.
20      Q    Could-- that's a yes or a no question.  Do
21 you recall seeing it then or not?
22      A    I recall the company taking a loan from
23 this particular person.  I don't recall if I saw the
24 note.
25      Q    Did Ms. Skye Hain ask you whether you

Page 66

1  were-- she was permitted to send the note, the
2  proposed note to the proposed lender here, Kelly--
3      A   I don't recall.  I recall that--
4      Q   Excuse me, Mr. Schreiber.  Let me just
5  finish my question, please.  We have to-- we can't
6  talk over because the court reporter is trying to
7  take down what we are saying.
8          You said okay to Ms. Skye Hain to
9  forward this proposed loan agreement and promissory
10 note to Kelly Newnan, correct?
11     A   I don't recall.
12     Q   Did you object to her forwarding this
13 document to Ms. Newnan?
14     A   I don't recall.
15     Q   Do you recall any response to the emails
16 that Ms. Skye Hain sent you--
17     A   I recall--
18     Q   Excuse me.  Excuse me.  Mr. Schreiber, you
19 have to wait until I finish.  I will wait until you
20 finish, but you have to wait until I finish.  Court
21 reporter, could you please read back the last
22 question.
23              - - -
24          The court reporter read back the last
25 question.

Page 67

1              - - -
2          THE WITNESS:  I don't recall.
3  BY MR. WEINER:
4      Q   You didn't object to her sending this
5  proposed loan agreement and promissory note to Ms.
6  Newnan, did you?
7      A   I'm sorry.  Again.
8      Q   You didn't object to Ms. Skye Hain sending
9  this proposed loan agreement and promissory note to
10 Kelly Newnan, did you?
11     A   Ms. Skye Hain discussed with me that this
12 Kelly Newnan is a potential investor in the company.
13 She is waiting for her husband's permission to make
14 a large investment in the company.  And in the
15 meantime, she has interest to provide Bridge
16 Capital, to the company, was the understanding that
17 she remains very interested to become a partner with
18 Ms. Skye Hain.
19     Q   That didn't answer my question.  Did you
20 object to Ms. Skye Hain sending this document to
21 Ms. Newnan?
22     A   I don't recall.
23     Q   Do you recall whether Ms. Newnan-- do you
24 recall whether the debtor ever signed this document?
25     A   I don't recall.

Page 68

1      Q   You don't recall whether Ms. Newnan signed
2  the document, right?
3      A   I don't recall.
4      Q   And you don't recall whether Ms. Newnan
5  put in the amount described in the proposed loan
6  agreement and promissory note?
7      A   I see-- I see the emails now.  But again,
8  there were many emails.  So I'm reading it now.
9      Q   That didn't answer my question.  Please
10 try to answer my question.  You don't recall whether
11 the borrower signed this document or the lender
12 signed this document; is that it?
13     A   I'm not aware that it was executed.  I'm
14 aware there was discussions.  I'm aware there was
15 loans being discussed with a potential participation
16 and agreement, but that was my involvement as far as
17 I recollect.
18     Q   But you saw this document?  In other
19 words, exhibit 54--
20     A   I don't recall.  I don't--
21     Q   Mr. Schreiber, please allow me to finish
22 asking my question.  Do you recall seeing the
23 proposed loan agreement and promissory note marked
24 as exhibit 54 on or about September 24, 2016?
25     A   I don't recall.

Page 69

1      Q   But Ms. Newnan did put in $100,000 into
2  Live Primary, correct?
3      A   To the best of my recollection, I believe
4  so.
5      Q   And you-- you had no objection to the
6  borrower-- the debtor signing this loan agreement
7  and promissory note with Ms. Newnan, did you?
8      A   Ms. Skye Hain explained to me that Kelly
9  Newnan is a potential very large investor coming in
10 with a lot of money and equity as a partner.  And I
11 trusted her and her inclinations and her decisions.
12     MR. WEINER:  Move to strike.  Please read
13 back the question.
14     MR. WEINER:  Mr. Schreiber, we are going
15 to be here a long time if you don't answer the
16 questions I'm asking you.
17     MR. ROSENBLOOM:  Excuse me.  I believe he
18 did answer the question.  It did not call for a
19 yes, no answer.  And he gave you an
20 explanation.
21     MR. WEINER:  Court reporter, could you
22 read back the question one more time please.
23              - - -
24          The court reporter read back the last
25 question.

Page 70

```
1                    - - -
2   BY MR. WEINER:
3        Q    Let me ask the question again.
4        A    I answered before.  My understanding from
5   Ms. Skye Hain was that this particular investor is
6   going to come in with millions of dollars as an
7   investor in the company and she is waiting for her
8   husband's approval.  In the meantime, she was
9   willing to advance some of the money in the form of
10  a loan.  So I trusted and relied on Ms. Skye Hain's
11  decisions.
12       Q    So you had no objection to the debtor
13  signing this document, did you?
14       A    With my-- with the understanding that this
15  invest-- this person is going to become a major
16  investor to Primary.
17       Q    So the answer to my question is no, you
18  had no objection to the debtor signing this
19  document, right?
20            MR. ROSENBLOOM:  Objection--
21            THE WITNESS:  At the time-- at the time I
22  believe so.
23  BY MR. WEINER:
24       Q    "I believe so" meaning you didn't have an
25  objection at the time?
```

Page 71

```
1        A    I don't recall.  You are asking me now
2   something that happened in 2016.  I gave you what my
3   belief of the conversations was and you keep on
4   asking me again and again.  I can't fabricate
5   situations.
6            To the best of my recollection was--
7   what I remember is that Ms. Skye Hain mentioned to
8   me she is friendly with this person and she is
9   considering putting in millions of dollars or a
10  large investment in the company and she is waiting
11  for her husband's approval.  That's the best of my
12  recollection.  I trusted Ms. Skye Hain to make the
13  decisions on behalf of Live Primary, LLC.
14            MR. WEINER:  Vince, could you upload
15       document 57, please.  Let Mr. Schreiber look at
16       it and scroll down as he--
17                    - - -
18       Exhibit 57 was marked for identification.
19                    - - -
20            THE WITNESS:  Yes.  Hello?  Yes.
21  BY MR. WEINER:
22       Q    Do you want him to scroll down?
23       A    Yes.  Continue.  Continue.  Continue.
24  Continue.  Continue.  Okay.  Okay.
25       Q    Okay.  Mr. Schreiber, referring to exhibit
```

Page 72

```
1   57, you were aware that the debtor was in the
2   process of signing a promissory note to Ms. Gluckow
3   for funds for this operation, correct?
4        A    I don't recall.  It could have been it was
5   sent to me and I didn't review it.  It could be my
6   staff reviewed it.  As I said, I relied on Lisa Skye
7   Hain running the company and making decisions.  I do
8   not recall.
9        Q    You didn't voice any objection to the
10  debtor signing this document with Ms. Gluckow, did
11  you?
12       A    I do not recall.
13       Q    Do you recall Ms. Gluckow loaning $40,000
14  to the company?
15       A    I do not recall.
16       Q    Do you recall Ms. Newnan loaning $100,000
17  to the company?
18       A    I recall-- as I said before, there were
19  discussions about this person coming in as an
20  investor and in the meantime, providing a bridge
21  until that investment goes through and the husband's
22  approval.  That's all I recall.
23            MR. WEINER:  Please put document 58 on the
24       screen.  You can remove these please, Vince.
25       Thank you.  Vince, scroll down a little bit so
```

Page 73

```
1   we can see the entire document, please.
2                    - - -
3       Exhibit 58 was marked for identification.
4                    - - -
5   BY MR. WEINER:
6        Q    Have you reviewed this, Mr. Schreiber?
7        A    Yes.
8        Q    Yes.  This is an email that you received
9   on June 5th, 2017 from Ms. Hain.
10       A    Yes.
11       Q    And an email that you sent on the same day
12  twenty minutes earlier.  You wrote to Ms. Skye Hain
13  at 1:00 and said, "As discussed, please make a
14  distribution today.  Please confirm once done.
15  Thanks."  What did you mean by that?
16       A    I meant a loan payment to the money she
17  owed me.
18       Q    A loan payment?
19       A    Yes.  And she said she couldn't make a
20  company-- a loan payment because the company didn't
21  have enough money and the company owed her money.
22  So I said she should take money for herself too, but
23  I need to get paid.
24       Q    Why did you use the word "distribution"?
25       A    Because for her money it's a distribution.
```

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 74

1    Q    What about for your money?

2    A    For my money it's a loan payment.

3    Q    So you asked her to make a distribution to

4 you, but you meant to say a loan payment to you; is

5 that it?

6    A    This was credited towards a loan payment.

7 She may have said there's no funds for a

8 distribution.  We may have called it distribution,

9 but it meant as a loan payment.

10    Q    So just so I understand your testimony,

11 when you said, "As discussed, please make a

12 distribution" which meant to you that even though

13 you used the word distribution, what you really

14 meant was a loan payment?

15    A    That's correct.

16    Q    And a loan payment on what loan?

17    A    Loan payment on the funds additional to

18 the $6,000,000.  We had lent her additional money

19 that we were not obligated to lend.  And we needed

20 that money back.

21    Q    Did you get $500 on the wire referring to

22 in--

23    A    I have to--

24    Q    Excuse me.  Excuse me.  Mr. Schreiber,

25 please allow me to finish.  I am waiting for you to

Page 75

1 complete your answer.  Please extend me the same

2 courtesy.

3            Did you receive a $500 wire from Ms.

4 Hain or from the debtor on or about June 5th, 2017?

5    A    I believe if the email says that she sent

6 it that we did receive it.  I have to check.  But I

7 believe that if she confirms she sent it, that it

8 was received.

9    Q    And who received the $500 wire that you

10 called a distribution?

11    A    Primary Member as a loan payment from the

12 borrower Live Primary, LLC.

13    Q    But Primary Member never had a bank

14 account?

15    A    Primary Member, LLC, the lender,

16 instructed the borrower, Live Primary, LLC, to make

17 loan payments to Waterbridge Capital as a

18 (inaudible).

19    Q    Oh, that's the first time you have given

20 us that explanation during this deposition.  Where

21 did the $500 get applied?

22    A    Towards the outstanding additional loans

23 that were owed by Live Primary, LLC other than the

24 $6,000,000.

25    Q    Can you show me on the Proof of Claim

Page 76

1 where the $500 was applied?

2    A    I have to check with my staff that put it

3 together.  And it could be-- it could be there was

4 additional funds that wasn't added to the Proof of

5 Claim by extra charges.  And it could be that it was

6 done towards that.

7    Q    But you don't know on the Proof of Claim

8 that you signed whether this money was credited to

9 those transactions, correct?

10    A    That's correct.  One second.  And I'm

11 sorry.  What's the question again?

12         MR. WEINER:  Court reporter, read that

13    back please.

14               - - -

15         The court reporter read back the last

16    question.

17               - - -

18         THE WITNESS:  To the best of my knowledge

19    the $500 was credited.

20 BY MR. WEINER:

21    Q    And can you show me on the Proof of Claim

22 where the credit appears?

23    A    I have to check with whoever put together

24 the schedule.  But what I believe is there is

25 additional funds that we did not put on the schedule

Page 77

1 either by credit cards that were sent and it could

2 be it was credited towards that as my office needed

3 to reconcile.  We did not want to put a claim that

4 is more than is owed.  But possibly it's less.

5            There is a possibility that Live

6 Primary, LLC owes Primary Member, LLC more money.

7 And it could be the $500 was applied over there.

8    Q    So your testimony is you don't know

9 whether the $500 payment was applied to the

10 transactions contained in the Proof of Claim that

11 you signed?

12    A    My testimony is that the $500 was applied

13 to loans owed by Live Primary, LLC.  I just don't

14 know if it is applied in the schedule and the Proof

15 of Claim.

16    Q    Would you know by looking at the Proof of

17 Claim?  You are welcome to take a look at it.

18         MR. ROSENBLOOM:  Objection.  Go ahead,

19    Joel.  I'm sorry.

20         THE WITNESS:  No.  I have to check with my

21    accounting team.  I wouldn't know.  My

22    accounting team would know.

23 BY MR. WEINER:

24    Q    But the Proof of Claim in the transactions

25 described therein was accurate and truthful at the

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 78

1  time that you filed for it?
2      A    That's correct.  I just said-- and I'll
3  repeat my answer.  So listen clearly because I
4  responded to you.  My belief is that Live Primary,
5  LLC, the borrower owes the lender more money than is
6  in the Proof of Claim.
7           But what we didn't want to put in the
8  Proof of Claim is an extra amount of money that is
9  more than we are one hundred percent sure.  So we
10  believe there is more money owed to Primary Member,
11  LLC.
12      Q    Okay.  Thank you very much.
13           MR. WEINER:  Vince, could you please pull
14  up exhibit 59.  You can take this one down.
15           MR. ROSENBLOOM:  This was what?  This was
16  58?
17           MR. WEINER:  Yes, Neal.  And just to let
18  the witness know where I'm going here and you
19  too, Neal, I'm going to ask Vince to display
20  exhibit 59.  Exhibit 59, just one exhibit.
21                    - - -
22      Exhibit 59 was marked for identification.
23                    - - -
24  BY MR. WEINER:
25      Q    Mr. Schreiber, we will wait for you to

Page 79

1  take a look at this.
2      A    Yes, I'm ready.  You can scroll down.
3      Q    Okay.
4      A    Okay.  Yes.
5      Q    So Mr. Schreiber, you have seen these
6  documents before they got produced from your files,
7  right?
8      A    I don't recall.
9      Q    You don't recall if you saw exhibit 59
10  ever before?
11      A    I don't recall.
12      Q    Is there any reason to think you didn't
13  receive exhibit 59?
14      A    I don't know.  It could be I got many
15  emails, not every time I looked at them.
16      Q    Who is Peter S-A-B-E-S-A-N referred to in
17  Ms. Skye Hain's email to you on October 14th, 2017
18  at 4:07 p.m.?
19      A    Peter Sabesan was a broker-- is a real
20  estate broker.
21      Q    And whose real estate broker?
22      A    Peter Sabesan.
23      Q    No.  Whose real estate broker is he?
24      A    I think for himself.  I'm not sure.  I
25  don't know the name of his company right now.  Maybe

Page 80

1  he changed.  I don't know.  But I know him as a
2  broker.
3      Q    Yes.  And who was he brokering for?
4      A    At the time he was a broker for many
5  landlords.
6      Q    Was he a broker for a landlord with whom
7  you were familiar?
8      A    Yes.
9      Q    Which landlord were you familiar that he
10  was a broker for?
11      A    Herald Square Properties.
12      Q    Where is Herald Square Properties located?
13      A    Manhattan.
14      Q    Do you have a street, sir?
15      A    I don't.
16      Q    Was Herald Square Properties a landlord on
17  30th Street?
18      A    I believe so.
19      Q    30th Street that was the second location
20  of Live Primary to build out space used with the
21  funds you provided, correct?
22           MR. ROSENBLOOM:  Objection.  I don't know
23  how you define second property.  There was one
24  property that had two floors that were
25  developed at separate times.  And I would think

Page 81

1  that the second floor being developed was the
2  second property.  This was probably the third
3  property.
4  BY MR. WEINER:
5      Q    Let's go back and clarify.  Mr. Schreiber,
6  the money that got put into the debtor was to-- was
7  to fund the establishment and operation of two
8  facilities, correct?
9      A    Correct.
10      Q    And the first facility had a capital
11  funding of three $3.7 million, right?
12      A    Correct.
13      Q    And that facility was located at 26th
14  Broadway, right?
15      A    Correct.
16      Q    And in connection to that first facility
17  there was a second facility that was-- that received
18  funds provided to the debtor, right?
19      A    I believe so.
20      Q    And that second facility was located on
21  30th Street, right?
22      A    I don't know if you would call it the
23  second or the third location.  But as Neal mentioned
24  before-- but there was capital provided for that.
25      Q    Yes.  It's a separate building than 26th

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 82

1    Broadway, right?
2         A    It's-- it is, but it is a (inaudible)
3    location.  There is one location on the 8th floor,
4    one location on the 3rd floor and another location
5    on 30th Street
6         Q    Okay.  But it's the second building,
7    right?
8         A    Correct.
9         Q    Okay.  So the debtor was interested in
10   developing operations in the second building on 30th
11   Street, right?
12        A    Correct.
13        Q    And part of the funds that were put int
14   the debtor went to fund the items at the second
15   location such as security deposit and first month's
16   rent and other costs, right?
17        A    Correct.
18        Q    Okay.  In connection with the efforts to
19   obtain that space, the landlord asked for a
20   financial information from Live Primary, didn't
21   they?
22        A    I'm sorry.  Repeat the question.
23        Q    Sure.  Sure.  The landlord from the second
24   location on 30th Street asked for financial
25   information from Live Primary, right?

Page 83

1         A    Possibly.
2         Q    Possibly.  Would a landlord entertain a
3    tenant without asking for the tenants financial
4    information?
5         A    Perhaps.
6         Q    I see.  This financial information
7    contained in exhibit 59 was sent along to the
8    landlord of 30th Street, correct?
9         A    Correct.
10        Q    And the balance sheet that was provided to
11   that landlord was accurate, right?
12        A    I don't know.
13        Q    Why don't you know if it was accurate?
14        A    I did not prepare it.
15        Q    Well, looking at it now, could you tell me
16   whether it was accurate?
17        A    I don't believe so.
18             MR. ROSEN:  It's Sandy.  Can you have the
19        court reporter display that balance sheet.
20             MR. WEINER:  Certainly.  Thank you, Sandy.
21             MR. ROSEN:  That's helpful.
22             MR. WEINER:  It's the third page of the--
23             MR. ROSEN:  I got it.
24             THE WITNESS:  I don't believe that's
25        correct, that's accurate.

Page 84

1    BY MR. WEINER:
2         Q    What's inaccurate about it?
3         A    It didn't list the liabilities that it
4    owes to Primary Member, LLC.  It didn't list the
5    loans that it look from Primary Member, LLC as a
6    borrower.
7         Q    Where-- does this document contain a
8    number that you recognized to be the funds advanced
9    to the debtor?
10        A    I'm sorry.  The question again.
11        Q    Sure.  Does this balance sheet anywhere
12   show the amount that you claim was loaned to the
13   debtor?
14        A    I don't see it.  So that's why I believe
15   it's inaccurate.  We have seen balance sheets with
16   the loans with the Primary Member loan in there.  So
17   I don't believe this is a correct balance sheet.
18        Q    Did you ever object to this balance sheet
19   being sent to the landlord at 30th Street?
20        A    I don't recall looking at it.
21        Q    So when Ms. Skye Hain sent you the email
22   that said, "Joel, see attached.  Please let us know
23   if you agree/are okay with us sending these to Peter
24   Sabesan for the 30th Street deal as the snapshot of
25   current financials and/or let us know if you would

Page 85

1    make any changes."  Did I read that email
2    accurately?
3         A    I don't recall.
4         Q    Did I read the email accurately?
5         A    I'm not in front of the email now.  I'm in
6    front of the balance sheet.
7              MR. WEINER:  Okay.  Put the email back in
8         front of the witness, please.  That's the-- we
9         are now looking at he first page of exhibit 59.
10   BY MR. WEINER:
11        Q    You received that email and you don't
12   recall ever responding to Ms. Skye Hain?
13        A    I don't recall.  I don't recall.
14        Q    You don't recall objecting to this
15   financial statement being sent to the landlord on
16   30th Street, right?
17             MR. ROSENBLOOM:  Objection.  Asked and
18        answered.
19   BY MR. WEINER:
20        Q    Mr. Schreiber.
21        A    My counsel objected?
22        Q    I know, but you may answer the question.
23        A    I said I don't recall.  Possibly.
24   Possibly.
25             MR. WEINER:  Vince, could you please

*Reliable Court Reporting*

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 86

1      display exhibit 61.  And scroll down so he can
2      see the complete page.
3                      - - -
4          Exhibit 61 was marked for identification.
5                      - - -
6      BY MR. WEINER:
7          Q    Have you read it, Mr. Schreiber?
8          A    Yes.
9          Q    So Mr. Schreiber, this is an email you
10     received from Ms. Skye Hain on April 12th, 2018.
11     And it says, "Joel, Nancy, please see attached.
12     They need Waterbridge Capital to complete section B
13     on this Docusign form.  It' for the Amex merchant
14     loan $324,000." What loan is Ms. Hain talking
15     about?
16         A    I believe she tried to obtain a loan from
17     American Express and they advised us since I'm--
18     have equity interest as well, that I need to sign.
19         Q    "That I need to sign." Who is the I?
20         A    That Primary Member needs to sign.
21         Q    To sign for what?
22         A    To approve the loan.
23         Q    Does sign to approve the loan mean to
24     become obligated to repay loan?
25         A    No.  That to become-- that to allow-- Live

Page 87

1      Primary, LLC become obligated.
2          Q    So are you saying that section B referred
3      to on this exhibit was simply an expression of
4      authority by Primary Member to authorize the debtor
5      to borrow $324,000?
6          A    To the best of my knowledge, correct.  I
7      have to excuse myself.  I am going to step out for
8      two to three minutes, okay?
9          Q    Yes.
10         A    Thank you.
11                     - - -
12         A brief recess was taken at 1:27 p.m.
13                     - - -
14     BY MR. WEINER:
15         Q    Mr. Schreiber, you continue to be under
16     oath.  Let's go back to exhibit 61.  Was there an
17     Amex Merchant loan made to the debtor?
18         A    I don't recall which loans.  I remember
19     there was a few loans that the debtor needed me to
20     seen.  My understanding was that they needed me as
21     consent or approval because they looked at the
22     operated agreement and required my signature.
23         Q    Do you recall the debtor borrowing
24     $324,000 from Amex?
25         A    I don't recall the amounts.

Page 88

1          Q    Why did Waterbridge Capital have to sign?
2          A    I don't recall.
3          Q    Did Waterbridge Capital sign whatever it
4      was asked to sign in connection with this loan?
5          A    I don't recall.
6          Q    How many employees does Waterbridge
7      Capital have?
8          A    Four.
9          Q    Who is in charge of the money at
10     Waterbridge Capital?
11         A    At the time-- it depends what year-- it
12     was Nancy Hom and Lisa Skye.  And right now it's
13     Lisa Skye.
14         Q    Yes, but at all times you controlled the
15     money at Waterbridge Capital, right?  Where it went?
16         MR. ROSENBLOOM:  Objection.  Objection.
17     BY MR. WEINER:
18         Q    At all times you controlled Waterbridge
19     Capital and what it did with the funds-- with it's
20     funds, correct?
21         A    My counsel objected.
22         MR. ROSENBLOOM:  You can respond.
23         THE WITNESS:  I believe so.
24         MR. WEINER:  Let me reask the question
25     because I'm not clear.  Court reporter, could

Page 89

1      you read back my last question.
2                      - - -
3          The court reporter read back the last
4      question.
5                      - - -
6          THE WITNESS:  Yes.
7      BY MR. WEINER:
8          Q    Did Waterbridge Capital become obligated
9      in anyway for a Amex loan that was made to the
10     debtor?
11         A    I don't recall.
12         Q    Did Waterbridge Capital guarantee an Amex
13     loan made to the debtor?
14         A    I don't recall.
15         Q    And you don't know why Waterbridge
16     Capital, who is not a member of the debtor, was
17     required to sign documents in connection with this
18     Amex merchant loan of $324,000 to the debtor; is
19     that your testimony?
20         MR. ROSENBLOOM:  Objection.  Objection.
21         There is no evidence that an application was
22         ever signed by Waterbridge.  You are assuming
23         something that's not in evidence.
24     BY MR. WEINER:
25         Q    Okay.  Mr. Schreiber, Ms. Skye Hain said

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 90

1  on this exhibit they need Waterbridge Capitol to
2  complete section B in this Docusign form.  It's your
3  testimony you don't remember what the form was and
4  you don't remember if Waterbridge capital ever
5  signed it, is that--
6      A   I don't recall.
7      Q   Okay.  Did the debtor get a loan for
8  approximately $324,000 from Amex?
9      A   I don't know.
10     Q   Did the debtor ever say to you, "Hey,
11  Joel, we didn't get the Amex loan.  We need
12  $324,000.  Can you advance that?"
13     A   I don't recall.
14         MR. WEINER:  Vince, please put up exhibit
15  63.
16             - - -
17     Exhibit 63 was marked for identification.
18             - - -
19  BY MR. WEINER:
20     Q   Mr. Schreiber, could you read that and
21  tell me when you're done.
22     A   I see the email.
23     Q   Mr. Schreiber, this is an email from Ms.
24  Skye Hain to you on June 5th, 2018.  And Ms. Skye
25  Hain indicates in the email there's some documents

Page 91

1  for you to complete-- to complete an application for
2  a $250,000 loan at 8 to 16 percent.  What
3  application were you given?
4      A   I recall that Lisa tried to get a loan
5  from there, Fundera. and it required-- because
6  Primary Member, LLC was a lender, it required me to
7  sign something.
8          And Lisa bagged me to sign it, that
9  they needed the money.  I was hesitant at first, but
10  I wanted to be supportive to the company, to my
11  borrower, Live Primary, LLC.  As a lender I wanted
12  to be supportive to the borrower.
13         MR. WEINER:  For the court reporter, you
14         were probably wondering what Fundera, what that
15         word was or how it is spelled.  So let me tell
16         you.  It's Fundera, F-U-N-D-E-R-A.
17  BY MR. WEINER:
18     Q   Did Fundera or any of its constituent
19  lenders make a loan to the debtor for approximately
20  $250,000 at about--
21     A   I don't-- I don't know the amount, but I
22  remember there was a loan by Fundera.
23     Q   Was that the-- do you recall that the
24  interest rate was between 8 and 16 percent?
25     A   I don't recall.

Page 92

1      Q   Do you recall any interest rate in that
2  financing?
3      A   I don't recall.
4      Q   So you don't know if it was two percent or
5  30 percent?
6      A   I don't recall.
7      Q   Do you have an estimate of what the loan
8  interest was?
9      A   No.
10         MR. WEINER:  Vince, please put up exhibit
11  65.  One moment.  I think that is not 65.
12  Could you check that, please.  There.  That's
13  65.
14             - - -
15     Exhibit 65 was marked for identification.
16             - - -
17  BY MR. WEINER:
18     Q   Mr. Schreiber, please read it and let me
19  know when you are done.
20     A   I see the email.
21     Q   Okay.  So this is an email you received
22  from Ms. Skye Hain on January 19th, 2018?
23     A   Okay.  Correct.
24     Q   Subject $485,000?
25     A   Correct.

Page 93

1      Q   It say, "Per our call, we agreed to a
2  $20,000 fee for a $485,000 loan with 30 day terms.
3  Please confirm this can be transferred today."  And
4  then there are some banking details.  What was
5  discussed during the call that Ms. Skye Hain
6  referenced?
7      A   I believe she needed money.  And I was
8  trying to arrange it from an investor.  I don't
9  recall if it was ever done.
10     Q   So the $20,000 fee was something that a
11  proposed lender-- that you knew of to make a
12  $485,000 loan with 30 day terms to the debtor; would
13  that be fair?
14     A   Yes.  But it was something to-- for me to
15  help the company obtain through a third party
16  investor.
17     Q   I understand, but at this time this
18  lender-- these were the terms that a proposed lender
19  that you knew of would require?
20     A   Correct.
21     Q   And it was your testimony that you don't
22  recall whether this loan was ever made?
23     A   I don't recall.
24         MR. WEINER:  Vince, would you please put
25         up exhibit 66.

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 94

1                - - -
2          Exhibit 66 was marked for identification.
3                - - -
4              THE WITNESS:  Okay.  I see that.
5    BY MR. WEINER:
6      Q    Did you take a look at it, sir?
7      A    Yes.
8      Q    Okay.  This is an email from Ms. Skye Hain
9    to you on June 22nd, 2018 forwarding correspondence
10   that she had received earlier the same day from
11   Fundera; would that be fair?
12     A    Correct.
13     Q    And so Fundera was considering a loan to
14   the company at 13.99 percent interest for $100,000
15   payable in 24 months?
16     A    I'm not sure of the terms.  Lisa, whatever
17   she agreed, I supported her and that's it.  I didn't
18   review the term.
19     Q    Okay.  But the terms are in this email at
20   the bottom.  The terms on which Fundera or one of
21   its constituent lenders would lend, right?
22     A    Yes, it looks like.
23     Q    Did you provide personal returns to Ms.
24   Skye Hain for the last two years in connection with
25   application for this financing?

Page 95

1      A    I don't recall.
2      Q    Do you recall responding to Ms. Skye Hain
3    in response to her request to please provide the
4    personal returns?
5      A    I don't recall.
6      Q    Do you recall whether Ms. Hain was
7    successful in borrowing the $100,000 from Fundera?
8      A    I believe so.
9      Q    Do you believe that Fundera funded without
10   seeing your personal returns?
11     A    I believe-- I don't recall.  I believe
12   they funded.  I don't recall.  I remember I did not
13   want to send my returns, but Lisa had begged me to
14   send them.  And I don't recall if I did.
15     Q    In connection with this $100,000 loan were
16   there any guarantees?
17     A    I don't recall.
18     Q    Did Primary Member ever sign a guarantee
19   funds advanced by third party lenders to the debtor?
20     A    I don't recall.
21     Q    Did Waterbridge Capital ever sign a
22   guarantee-- guaranteeing funds of third party lender
23   funds to the debtor?
24     A    I don't recall.
25          MR. WEINER:  Vince, please put up exhibit

Page 96

1    68.
2                - - -
3          Exhibit 68 was marked for identification.
4                - - -
5    BY MR. WEINER:
6      Q    Have you had a look at that, Mr.
7    Schreiber?
8      A    Can you scroll down?
9      Q    Sure.
10     A    Okay.  Okay.  Back up.
11     Q    This is-- it should be 68.
12     A    Okay.  I see it now.
13     Q    Okay.  I'm sorry to interrupt you.  Thank
14   you.  Does exhibit 68 reflect the debtor's interest
15   in borrowing $800,000 in 24 hours from a merchant
16   cash advanced company?
17     A    I have no idea.  I'm not copied on that
18   email.
19     Q    Well, the email was sent to you on
20   July 19th, 9:18 p.m. by Ms. Skye Hain asking you to
21   read from bottom up.
22     A    I was always against taking these kinds of
23   high interest loans, but I wanted to support Lisa.
24   And I was always against-- it's not something the
25   company could support.  I was against all of that.

Page 97

1      Q    What was-- what was interest rate that
2    went along with this potential funding from a
3    merchant cash advanced lender?
4      A    Repeat the question.
5      Q    Yes.  You testified that you were against
6    the company borrowing from merchant cash advanced
7    lenders presumably because of the very high costs
8    and fees and rates; would that be fair?
9      A    I wasn't in support of borrowing money at
10   high costs.
11     Q    Yes.  And what were the costs-- what was
12   the interest rate in connection with this proposed
13   $800,000 funding?
14     A    I don't know.  I don't know.
15     Q    Do you have a sense of what the rage of
16   the interest rate was?
17     A    I don't.
18     Q    But it was really high, right?
19          MR. ROSENBLOOM:  Objection.
20          THE WITNESS:  I found out afterwards it
21   was really high.
22   BY MR. WEINER:
23     Q    You found out afterwards?  After what?
24     A    After the loan was taken.
25     Q    Oh, the company borrowed $800,000 from--

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 98

1  excuse me--
2       A    Whatever that amount was.  I'm not sure
3  what the amount was.
4       Q    So you were not-- your testimony is you
5  were not aware of the terms that the debtor agreed
6  to when it borrowed this money?
7       A    To the best of my knowledge.
8       Q    Do you have any idea what the interest
9  rate was?
10      A    I don't know.
11      Q    Do you have any estimate of what the range
12  of the interest rate was?
13      A    I don't know.
14      Q    But it was high, right?
15      A    I found out afterwards that it was high.
16      Q    Within this exhibit, Mr. Schreiber, there
17  is discussed from this lender a couple of options.
18  Take a look.  Let the court reporter scroll down so
19  you can see the entire exhibit.  It's offer one and
20  offer two.  So take a minute and let me know when
21  you are done.
22           MR. ROSENBLOOM:  Hold on.  Hold on.
23           THE WITNESS:  You are going too quick.
24      I'm reading it now for the first time.  I don't
25      recall looking at it before.  And if I did, I

Page 99

1       definitely voiced my objection to it that it's
2       crazy high costs.  I would never approve in my
3       right mind such a loan.
4  BY MR. WEINER:
5       Q    But you didn't object and the debtor
6  borrowed the money, right?
7       A    I'm sorry?
8       Q    But you didn't object--
9       A    If I did read this correctly before I
10  definitely objected.  So I can't see my right frame
11  of mind approving such a loan.
12      Q    So the debtor borrowed money from Sapphire
13  in this exhibit over your objection?
14      A    I can't believe that I approved such a
15  loan.
16      Q    When you found out that the debtor had
17  borrowed the money from Sapphire, did you object
18  then?
19      A    I believe I did.  Then I said we have to
20  pay back as soon as possible and get out of this.
21  This is ridiculous.  At that time the borrower said
22  there is a minimum period of time that they-- they
23  have to pay a minimum interest.  And it wouldn't
24  help if we paid back immediately.
25           So I was kind of-- at that time I was

Page 100

1  trying to be supportive to Lisa, but it was very
2  disappointing.
3       Q    Was there collateral given by the debtor
4  for this loan?
5       A    I'm sorry?
6       Q    Was the-- did the debtor pledge collateral
7  to secure its payment obligations on this loan--
8       A    I don't-- I don't know.
9       Q    When you found out afterwards that the
10  debtor borrowed the money from Sapphire under this
11  exhibit did you ever ask to see the documents
12  themselves?
13      A    I'm sorry.  The question again.
14      Q    After you found out that the debtor
15  borrowed this money from Sapphire did you request to
16  see the loan documents that the debtor had signed?
17      A    I don't recall.
18      Q    How did you know the terms of the loan if
19  you hadn't seen the loan documents?
20      A    I'm saying now that I remember that Lisa
21  had said that it's a very high cost.  She was-- I
22  don't recall the interest rate, but they were taking
23  out money of the bank.  And I-- she was being short
24  of money because they are taking out (inaudible)
25  money and that's when I found out it' a very high

Page 101

1  cost.
2           MR. WEINER:  Vince, could you please
3       display exhibit 1.
4  BY MR. WEINER:
5       Q    That's the Proof of Claim, Mr. Schreiber.
6           MR. WEINER:  Let's start at the beginning
7       just so the witness has a chance to look at it
8       again-- in case Mr. Schreiber wants to review
9       it again.
10           Vince, could you scroll down please to the
11      first chart.  I'll tell you when the stop.
12      Please.  Okay, there.  Let's get that on the
13      screen okay.
14  BY MR. WEINER:
15      Q    Mr. Schreiber do you see what's marked at
16  page five of eight of the Proof of Claim that you
17  filed?
18      A    Yes.
19      Q    Which is deposition exhibit 1?
20      A    Yes.
21      Q    And that table of information--
22           MR. WEINER:  And you can scroll down just
23      a little bit, Vince, please, so he can see the
24      whole thing.  Keep going.  Keep going.  Okay.
25  BY MR. WEINER:

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 102

1    Q    So the table on pages five of eight and
2    six of eight, Mr. Schreiber, that's what we have
3    been referring to as the over $6,000,000 loaned to
4    the debtor under the operating agreement as you
5    testified, right?
6    A    Yes.
7    Q    Okay.
8    A    I'm sorry.  What was the question again?
9    Q    I didn't ask a question.  I was just
10   making sure that we were talking about the same
11   document.  And asking you-- I will ask you the
12   question again.  The table that says establishment
13   and operation loan detail, it consists of the-- in
14   excess of $6.1 million referred to under the
15   operating agreement, I believe it's paragraph 9.2.
16   A    That's correct.  That's correct.
17   Q    Okay.  With respect to all of the
18   transactions within this table on pages five and six
19   of eight of the Proof of Claim, there were no
20   schedule of payments to be made by the debtor,
21   correct?
22   A    Not that I recall.
23   Q    And there's no--
24        MR. ROSENBLOOM:  Objection.
25   BY MR. WEINER:

Page 103

1    Q    -- fixed maturity date for these loans as
2    you have described them?
3        MR. ROSENBLOOM:  Objection.
4    BY MR. WEINER:
5    Q    You can answer, Mr. Schreiber.
6    A    I don't understand the question.
7    Q    There was no fixed maturity date to repay
8    these amounts on this exhibit, right?
9    A    There was a maturity date as the time will
10   bring in a new investor, the loan will have to be
11   paid.
12   Q    There was no fixed maturity date?  That
13   event that you just described may or may not occur
14   if ever, right?
15       MR. ROSENBLOOM:  Objection.
16       THE WITNESS:  I believe so.  I believe so.
17   BY MR. WEINER:
18   Q    Mr. Schreiber, under the loan detail as
19   it's described on these two pages, interest payments
20   along the way-- strike that.  The debtor had no
21   obligation to make interest payments along the way,
22   did they?
23   A    Not that I know of.
24   Q    And the sorts of repayments of these
25   amounts did not come from the-- strike that.  The

Page 104

1    debtor was not obligations to repay these amounts
2    out of its operations?
3        MR. ROSENBLOOM:  Objection.  There is an
4        operating agreement which contains the terms on
5        when and how those loans are supposed to be
6        repaid.
7    BY MR. WEINER:
8    Q    You can answer the question, Mr.
9    Schreiber.
10   A    Yes.  There is a schedule in the operating
11   agreement outlining when and how it should be paid.
12   Q    Yes.  And so, your understanding was that
13   the debtor was not obligated to repay these amounts
14   out of operations, correct?
15   A    The debtor was obligated under the
16   operating agreement.
17   Q    My question is is it your understanding
18   that the debtor was not obligated to make these
19   payments out of operations?
20       MR. ROSENBLOOM:  Objection.  Calls for a
21       conclusion of law.
22   BY MR. WEINER:
23   Q    You may answer, Mr. Schreiber.
24   A    I don't know.
25   Q    Was the debtor obligated-- the debtor

Page 105

1    wasn't obligated to make repayments out of its
2    revenue, right?
3        MR. ROSENBLOOM:  Objection.
4        THE WITNESS:  I don't think so.
5    BY MR. WEINER:
6    Q    And the debtor wasn't obligated to make
7    repayments out of its earnings, right?
8    A    The debtor wouldn't be able to make a
9    distribution to anyone before making the payments.
10   If the debtor wanted to make a distribution to
11   itself or anyone else, the debtor would have to
12   first satisfy the loan.
13   Q    I didn't use the word distribution and I'm
14   not referring to distribution.  So Mr. Schreiber,
15   unless under the operating agreement a liquidity
16   event occurred or an IPO occurred, the debtor had no
17   obligation to pay any of the principle or any of the
18   interest; is that fair?
19       MR. ROSENBLOOM:  Objection.  The operating
20       agreement speaks for itself.
21   BY MR. WEINER:
22   Q    Go ahead, Mr. Schreiber.
23   A    Unless the debtor wanted to make a
24   distribution-- before making a distribution they
25   have to first pay back the loan payment.

Page 106

1      Q      But the debtor had no obligation to pay
2  the loan or any of its interest payments along the
3  way out of its operations, right?
4      A      I'm not-- I don't know.  It's all
5  according to the operating agreement.
6      Q      Okay.  Mr. Schreiber, if the company
7  identified a need in its first operating agreement
8  to get $6,000,000 dollars to a startup of the
9  company and fund operations, why was it capitalized
10 for $1,000 dollars total?
11     A      Again?  What's the question?  Can you
12 please repeat the question.
13     Q      Certainly, the company needed $6,000,000
14 at the very beginning to fund operations, right?
15     A      Yes.
16     Q      So why was the total capitalization
17 $1,000?
18            MR. ROSENBLOOM:  Objection.
19            THE WITNESS:  Because the company-- I
20 committed to give a loan to the company as a
21 lender.  Lisa as an entrepreneur-- that's the
22 way these transactions are done.  You couldn't
23 value the company $6,000,000 and give the
24 company $6,000,000 when she gives 0.  This
25 doesn't work.

Page 107

1            So in order to protect myself-- and any
2  normal investor-- or any normal lender would
3  not give this capitalization value of
4  $6,000,000.  It was only as a loan.  She didn't
5  get the money.  She wasn't entitled to do what
6  she wants with the money.  It was specific
7  according to the loan agreement which was in
8  the operating agreement as an entrepreneur to
9  go and start this business as a loan to the
10 company, not as an investment.
11           No one would ever give an investment of
12 this kind of money to lease a startup as an
13 entrepreneur.  So it was done as a loan and
14 that's the evidence of the loan agreement into
15 the operating agreement.  So Primary Member was
16 a lender to the borrower, Live Primary, LLC,
17 $6,000,000.
18 BY MR. WEINER:
19     Q      And there was never any security pledged
20 for that loan, was there?
21     A      The entire company was the security.  She
22 wouldn't be able to do anything without my approval
23 to pay back the lender as a borrower.
24     Q      The debtor never granted a security
25 interest to secure the repayment of $6,000,000,

Page 108

1  correct?
2      A      The debtor signed an operating agreement.
3  I trusted her with $6,000,000 as a loan.  And I
4  trust that she pay back the loan and I still trust
5  today.
6      Q      I appreciate that.  But the debtor never
7  signed a securities agreement; is that correct?
8      A      To the best of my knowledge that's
9  correct.
10     Q      Thank you.  Mr. Schreiber, when the
11 $6,000,000 came in you certainly understood that
12 unless there was a liquidity event or an IPO, the
13 debtor would never have an obligation to repay it,
14 right?
15            MR. ROSENBLOOM:  Objection.
16            MR. WEINER:  I'm asking him for his
17 understanding.  He is the one that put in
18 $6,000,000.
19            THE WITNESS:  My understanding was that as
20 soon as another investor comes in, that
21 investor is going to insist on paying me back
22 because that's a loan.  And that's what I did
23 with WeWork-- WeWork-- I started WeWork and
24 funded it the same way.  I funded it as a loan
25 and then when new investors came in they

Page 109

1  insisted on me getting paid.
2            So I did the same thing, same documents
3  and the same way.  I believe that Lisa is a
4  entrepreneur to build a business at least as
5  value as WeWork or better and that's why I
6  invested and lent the company so much money,
7  $6,000,000.
8            So 100 percent I believe that I will get
9  paid back way before an IPO or a liquidity
10 event because they will-- this will require
11 more investment coming in.
12     Q      But the debtor wasn't obligated to pay the
13 money back absent to a liquidity event or IPO,
14 correct?
15     A      However--
16            MR. ROSENBLOOM:  Objection.  The operating
17 agreement speaks for itself.
18            MR. WEINER:  I'm asking Mr. Schreiber for
19 his understanding.
20            THE WITNESS:  Correct, the operating
21 agreement speaks for itself.  But in any
22 company in order for Live Primary to grow, it
23 will have to seek new investors coming in.  At
24 that stage I would be paid off.  And this
25 happened to me at WeWork.  And this was my plan

In re: LIVE PRIMARY, LLC

Page 110

1    to happen at Live Primary.
2           MR. WEINER: Yes, Mr. Rosenbloom, I agree
3    indeed the operating agreement speaks for
4    itself.
5    BY MR. WEINER:
6       Q    Mr. Schreiber, the initial capital assets
7    of the company was acquired through the proceeds of
8    the $6,000,000, right?
9       A    I'm sorry?
10      Q    The company used the $6,000,000 to-- among
11   other things-- acquire its capital assets, right?
12      A    The company used the $6,000,000 according
13   to a budget. And the budget that the borrower had
14   to provide to the lender every time the borrower
15   needed to borrow funds from the commitment for the
16   $6,000,000 loans.
17           So the borrower had to give in detail
18   what she is going to use the funds for exactly, let
19   us review it and confirm that these are the funds
20   that's going to be used, not as an investment, as a
21   loan to the borrower Live Primary, LLC.
22      Q    And part of the $6,000,000-- strike that.
23   The debtor required capital assets through the
24   $6,000,000 funding, right?
25      A    I'm not sure. Whatever the budget said,

Page 111

1    whatever that budget was. I don't know what you
2    call as a capital asset. If a copy machine is a
3    capital asset-- I'm not sure what you are referring
4    to, but this loan went specifically to a budget.
5       Q    I see. So your testimony is you are
6    really not sure what a capital asset is?
7       A    I'm not sure-- I said the money went
8    according to the budget the borrower provided to the
9    lender.
10      Q    Did the company acquire capital assets?
11           MR. ROSENBLOOM: Objection. Do you want
12      to define what a capital asset is
13   BY MR. WEINER:
14      Q    Do you understand what I mean by capital
15   asset with your experience in real estate?
16      A    I responded. My understanding is the
17   borrower needed money for the business plan and had
18   to give a budget which the borrower did. And the
19   borrower provided a budget. And based on them--
20   they-- based on the budget we provided the loan.
21      Q    And the budget included the acquisition of
22   capital assets; is that fair?
23      A    I'm not sure what you are referring to. I
24   have to apologize. I have to charge my phone. So
25   this will take like two minutes. Sorry.

Page 112

1           - - -
2       A brief recess was taken at 2:10 p.m.
3           - - -
4    BY MR. WEINER:
5       Q    Mr. Schreiber, the debtor never had a
6    sinking fund in which to provide repayments on--
7       A    I'm sorry? I'm sorry?
8       Q    The debtor never had a sinking fund with
9    which to make loan repayments, correct?
10      A    A sinking fund?
11      Q    Yes.
12      A    What do you mean by sinking fund?
13      Q    Didn't have a fund of cash that it could
14   draw from to make loan repayments, a separate
15   account?
16      A    Not that I'm aware of.
17      Q    Okay.
18           MR. WEINER: Neal, subject to potential
19      recross after the debtor has any questions,
20      I'll pass the witness.
21           MR. ROSENBLOOM: Excuse me?
22           MR. WEINER: I'll pass the witness.
23           MR. ROSENBLOOM: I see. Sandy. I'm not
24      hearing Sandy.
25           MR. WEINER: Yes, he's muted.

Page 113

1           MR. ROSEN: How's that.
2           MR. WEINER: There.
3           - - -
4           CROSS EXAMINATION
5           - - -
6    BY MR. ROSEN:
7       Q    Hi, Mr. Schreiber.
8       A    Hi.
9       Q    I have a few questions for you. I'm not
10   going to take very long at all. Do you have any
11   formal education in finance?
12      A    No.
13      Q    And do you have any formal education in
14   business?
15      A    No.
16      Q    Was it your decision to capitalize Live
17   Primary with $6,000,000 of debt--
18           MR. ROSENBLOOM: Objection.
19   BY MR. ROSEN:
20      Q    -- as opposed to equity?
21           MR. ROSENBLOOM: Objection.
22           THE WITNESS: To the best of my
23      knowledge-- to the best of my knowledge
24      originally Lisa said she needs two and a half
25      million dollars but then she said she needs

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 114

1    $6,000,000.  And this conversation from the
2    get-go was always as a loan always.  I would
3    never consider investing $100,000 and nevermind
4    $6,000,000.
5    BY MR. ROSEN:
6    Q    So it was your decision that the
7    investment was going to be--
8    A    No--
9    Q    Let me finish.  It was your decision that
10   the investment was going to be by way of a loan;
11   isn't that right?
12   A    She knew-- she knew that--
13   Q    You are not answering me.
14   A    The only way--
15   Q    The question is-- the question is either
16   it's right or it' wrong.  And I'll ask it again.
17   A    I believe-- I believe it was her request
18   and my-- and our joined decision.
19   Q    To do what?
20   A    That I said that Live Primary Members
21   should lend Live Primary, LLC $6,000,000.
22   Q    And how did you arrive at $6,000,000?
23   A    That's the number that Lisa said the
24   company would need.
25   Q    And she was wrong; wasn't she?

Page 115

1    A    Turns out.
2    Q    She needed much more than $6,000,000;
3    didn't she?
4    A    It turns out.
5    Q    It turns out what?
6    A    That she needed more.
7    Q    And she needed the $2.65 million from the
8    note holders, correct?
9    A    She didn't have-- she had loans.  She
10   could have stayed where it is.  It was just high
11   yielding loans.  She told that this Chicago group
12   may be a great partner and introduced more partners
13   and more investor, they have an option to convert to
14   equity.  She was very optimistic that they will
15   convert to equity and that's why she took it.
16   Q    Okay, but my point is very simple.  She
17   needed much more than the original estimate of
18   $6,000,000, correct?
19   A    She found out-- she found that out later--
20   Q    It's correct yes or no?
21   A    Originally she did not, but the property
22   was mismanaged, the construction was mismanaged,
23   timing was mismanaged.  I am not blaming or pointing
24   fingers at anyone.  A lot of things delayed; the
25   construction company, permits, et cetera, the

Page 116

1    timeframes that we waited for permits to get
2    approval or plans to get filed, et cetera, which
3    exceeded at least ten months or nine months or eight
4    months which resulted in losing free rent.
5         I'm not pointing fingers, but this
6    resulted in having to need the extra few million
7    dollars.  Otherwise, the $6,000,000 would be more
8    than enough for these three locations.
9    Q    Okay.
10   A    It was mismanagement and bad business
11   management.
12   Q    You were on the supervisory committee;
13   were you not?
14   A    After-- after a later date I believe when
15   David Kirshenbaum came in, that's when I was on the
16   supervisory committee that Lisa put this together.
17   But this was after the fact that she took the extra
18   loan.
19   Q    Is it your testimony you became a member
20   of the supervisory committee after the note holders
21   loan with 2.65 million?
22   A    I'm not sure when it was, but I believe
23   David Kirshenbaum joined the supervisory committee
24   and that's when we started having calls or meetings
25   on the phone as a supervisory committee.  Until then

Page 117

1    I don't recall there was a call-- maybe once or two.
2    Q    And what did you do on the supervisory
3    committee if anything?
4    A    I just-- the supervisory committee was
5    after I funded to the best of my knowledge.  So it
6    was just about, you know, hearing or getting to know
7    what's happening.
8    Q    And did you make any decisions as a member
9    of the supervisory committee?
10   A    Yes.  Originally I didn't approve-- I
11   didn't approve taking this loan from the senior
12   secure for a few weeks until Lisa begged me and
13   cried and said she need it and I agreed.  But I was
14   very hesitant for many weeks to take it.  And
15   unfortunately I approved which was a huge mistake on
16   my part.
17   Q    And the senior secure that you are
18   referring to, are you-- is that the note holders?
19   A    That's correct.
20   Q    They were not originally secured, were
21   they?  They were originally unsecured, correct?
22   A    No, they were always secured.
23   Q    Okay.
24   A    I'm only referring to David Kirshenbaum
25   and Mike Balkin's group.  These are the only senior

Page 118

1  secured lenders.  Nobody else is senior secured.
2      Q      Are you there?
3      A      I am.
4      Q      In hindsight the company was
5  undercapitalized; was it not?
6      A      In hindsight the company was mismanaged.
7      Q      I didn't ask you if it was mismanaged or
8  why it needed money.  I just asked you the question
9  in hindsight the company was undercapitalized; isn't
10  that a fact?
11          MR. ROSENBLOOM:  Objection.
12  BY MR. ROSEN:
13      Q      You can answer it?
14      A      The company need more money.
15      Q      Needed much more money, didn't it?
16      A      I don't know about much.
17      Q      Well, it needed at least the 2.65 million
18  that the note holders put in, right?
19      A      I'm not so sure.
20      Q      What do you mean you are not so sure?
21      A      I relied on Lisa's statement to me.
22      Q      Do you think she lied to you?
23      A      I don't know.
24      Q      And they didn't need the money?
25      A      I don't know.

Page 119

1      Q      Did she not explain to you why the company
2  needed the money?
3      A      She did.  But as I said, the company was
4  mismanaged.  We had to--
5      Q      Do you believe that she mismanaged the
6  company?
7      A      I believe a lot of things because I
8  believe we shouldn't have made certain payments
9  which I said stop payment, don't pay this, don't pay
10  that.  They didn't do the job complete.  Instead the
11  company still paid people, still paid rent when I
12  said for months and months and months stop paying
13  rent.  So the company still paid rent for hundreds
14  of thousands of dollars if not a million for more.
15  I was objecting that, begging them not to make these
16  payments.  And the company did not listen to me.
17      Q      And what time period are you referring to
18  now?
19      A      Way before she took money from the Chicago
20  group.
21      Q      And were you involved in making decisions
22  about who to pay and who not to pay?
23      A      Lisa was the managing member.  She made
24  those decisions.  And I just gave my two cents.  But
25  I didn't want to step on the toes of an

Page 120

1  entrepreneur.  I respected her.
2      Q      Was Lisa reporting to you with respect to
3  the moneys that were being spent as they were being
4  spent?
5      A      I don't recall.  When she needed money,
6  she provided the budget and we had to fund according
7  to the budget.
8      Q      Did you ever object to the budget?
9      A      I believe I did.
10      Q      And when did you do that if you recall?
11      A      I don't recall.
12      Q      But you recall generally that you raised
13  an objection to the budget?
14      A      Yes.
15      Q      Was this one budget or were there more
16  than one budget submitted?
17      A      Most likely several budgets.
18      Q      Did you get a budget in connection with
19  each requisition to fund?
20      A      I believe so.
21      Q      And when you say that early on you
22  objected to certain payments, were these budgeted
23  payments?
24      A      I believe so.
25      Q      Do you recall raising an objection to the

Page 121

1  payment of rent?
2      A      I recall, but she was the managing member.
3  And as I said before--
4      Q      I'm asking what your recollection is.
5      A      I don't recall.
6      Q      You don't recall objecting to the payment
7  of rent?
8      A      I recall I did.  You asked me how many
9  times, I don't recall.
10      Q      And what do you recall about the objection
11  to the payment to rent?  What do you recall about
12  that event?
13      A      Certain payments they were on a schedule.
14  For example, paying a guy, HVAC, when he didn't even
15  do the work.  I objected.  I got on calls.  I said
16  it's not right.  How can you pay him?  The guy
17  didn't do the work, the material is not even on the
18  floor.  How can you do this?  Hundreds of thousands
19  of dollars-- you paid him already hundreds of
20  thousands or dollars.
21          It turned out I was right.  The guy
22  screwed the company.  He never ordered the HVAC.  He
23  stole money from the company.  He caused months of
24  delays.  And this is all because the company didn't
25  listen to me.

Page 122

1    Q    And you just referred to a schedule.  What
2    schedule are you talking about?
3    A    I don't--
4    Q    Are you referring to a budget?
5    A    I'm referring to a budget and on a call of
6    funding.  I don't recall which one it was.
7    Q    And how did you know, with respect to the
8    HVAC fellow, that he hadn't done the job properly?
9    A    I went to inspect the property.
10   Q    How often did you inspect the property?
11   A    I don't recall.  But as a lender it's my
12   fiduciary responsibility to check if the borrower
13   utilizes the funds the borrower receives from the
14   lender.  So as a lender I was at an agreement to
15   lend money to the borrower.  And I had to make sure
16   the borrower uses the money to what the borrower
17   says.
18   Q    How often did you visit the property?
19   A    Pretty often, probably around whenever
20   they needed money to make sure that the money is
21   being spent, the job is getting complete.  Probably
22   not enough or I wasn't listened to.
23   Q    Did you ever receive money from Live
24   Primary other than the repayment of the extra loan?
25   A    To the best of my knowledge, whatever was

Page 123

1    received was loan payments to the extra loan.
2    Q    Nothing else?
3    A    I don't recall?
4    Q    Do you recall ever being compensated in
5    your individual capacity for serving on the
6    supervisory committee?
7    A    I don't recall.
8    Q    How would you go about refreshing your
9    recollection about that?
10   A    I would have to check if I received a
11   payment to my personal name.  I don't recall such a
12   payment, but I will have to check again.
13   Q    Do you have any recollection of asking
14   Lisa for payments from time to time--
15   A    I asked Lisa--
16   Q    -- other than with respect to the
17   repayment of the extra loan?
18   A    I asked her many times for payments to pay
19   back the loan.  She promised to pay me back before
20   she took the loan from the Chicago group, the senior
21   secured.  We have an email confirmation that the
22   first money going out is to pay back me and that
23   didn't happen.  So I--
24   Q    Pay back you on account of what?  The
25   extra loan?

Page 124

1    A    Correct.
2    Q    Okay.
3    A    And we have that on an email.  And she
4    never lived up to it and we begged her many. many
5    times to do.  She sent partial payments after I
6    begged and reached out to Kirshenbaum and Mike
7    Balkin.  And that was-- and that loan I'm referring
8    was senior secured loans.
9    Q    What was senior secure loans that you are
10   referring to?
11   A    When I advanced that loan Lisa confirmed
12   that it's senior secured.
13   Q    You mean your extra loan was senior
14   secured?
15   A    That's correct.  That's correct.
16   Q    Okay.  And when you say senior secured,
17   are you seeing senior to the note holders?
18   A    Senior to everyone including the merchant
19   bank she took loans.  This was before the note
20   holders.  She look the senior secured loan before
21   the note holders.  So before she-- before I
22   consented to take the senior secured to approve, to
23   take that loan, I look a verbal promises.  And I
24   believe that's on an email from her counsel as well
25   to my office that the first money out will be paid

Page 125

1    back to this money that is owed to me.  That didn't
2    happen.  And we have that on email.
3    Q    You are familiar with the operating
4    agreements; are you not?
5    A    I'm sorry?
6    Q    You are familiar with the operating
7    agreements; aren't you?
8    A    I am.
9    Q    And you are familiar with the fact that
10   they provide that Primary Members to be repaid in
11   either an IPO or a liquidity event?
12        MR. ROSENBLOOM:  Objection.
13        MR. ROSEN:  Why?
14        MR. ROSENBLOOM:  Provides other things as
15   well.
16        MR. ROSEN:  I'm just talking about this
17   provision.
18        MR. ROSENBLOOM:  Well, that a provision
19   that talks about (inaudible).  There are other
20   provisions that--
21        MR. ROSEN:  I'm talking about this
22   provision.
23        MR. ROSENBLOOM:  Okay.
24   BY MR. ROSEN:
25   Q    You are aware of that provision, right,

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 126

1  Mr. Schreiber?
2       A     I am aware of that provision.  I am aware
3  that when she needed more money I didn't want to
4  give it to her unless she confirms it's senior
5  secured.  And she confirmed that the first moneys
6  coming in and the first money being paid out would
7  be this.  And that didn't happen.
8       Q     What do you mean by this "would be this"?
9  What are you talking about?
10      A     Would be the extra loans that I gave her.
11      Q     Yes.
12      A     So we have given $200,000 of extra loans,
13  okay?
14      Q     Yes.
15      A     At that time.
16      Q     Yes.
17      A     And she confirmed that this money will be
18  paid.  "Once primary secures additional funding to
19  consolidate hard money and operational costs we will
20  repay loans as a priority."  This was sent in an
21  email Thursday, April 18, 2019 at 2:11 p.m. by Lisa
22  Skye Hain to myself.
23            Based on that confirmation from her
24  we advanced her the money as a senior secured
25  lender.  The Chicago group is aware of that.  Mike

Page 127

1  Balkin and David kirshenbaum, we had many
2  discussions on this.  And I wasn't paid back.
3       Q     Well, separate from the extra money, the
4  6,000,000 that went in under the terms of operating
5  agreement, you understand, would be repaid only in
6  the event of either an IPO or a liquidity event,
7  correct?
8            MR. ROSENBLOOM:  Objection.
9            THE WITNESS:  No.  I answered this before
10           to your colleague.  I answered that my
11           understanding was that whenever-- Live Primary
12           is going to grow and expand.  And at that time
13           we will need more investors.  And at that time
14           I will be paid.  That will be a liquidity event
15           to me because I will only allow new investment
16           to come in once I'm paid off as a lender.
17           MR. ROSENBLOOM:  And the agreement speaks
18           for itself.
19  BY MR. ROSEN:
20      Q     Well, let me ask you this question.  You
21  filed a claim for $6,000,000 and change.  You
22  believe you are entitled to be paid that money now?
23      A     One hundred percent.  This is a--
24  bankruptcy is a liquidity event.
25      Q     Is that right?

Page 128

1       A     That's my understanding of bankruptcy.
2       Q     Why is it a liquidity event?
3       A     I'll leave that to counsel.
4       Q     Well, no.  It's your understanding.  I
5  want to probe the basis of your understanding.  Why
6  do you believe bankruptcy is a liquidity event?
7       A     What is the definition of bankruptcy?
8       Q     I'm not being deposed, you are.  I'm
9  asking you why you believe bankruptcy to be a
10  liquidity event here?
11      A     That's what I believe.  I don't have to
12  give you an answer why I believe so.
13      Q     Yes, actually you do.
14      A     I believe bankruptcy is a liquidity event.
15      Q     Would you agree with me that Live Primary
16  is insolvent today?
17      A     No.
18      Q     You think it's solvent?
19      A     I think it's in the course of all the
20  co-working businesses and everyone is in the same
21  boat.  I think bankruptcy was a mistake especially
22  wasting so much time and energy and money for legal
23  counsel.
24      Q     I didn't ask you to weigh in on the wisdom
25  of going bankrupt.  I'm asking you why you believe

Page 129

1  Live Primary is not insolvent?
2       A     They have a space that is probably 11 or
3  12 million dollars was spent on a space.  It's a
4  beautiful space.  One of the nicest co-working
5  spaces in the city.  They have an operator that is a
6  great operator.  It's just the nature of the
7  situation.  It was not-- if COVID wouldn't be around
8  I think Live Primary would blossom away.  And this
9  will pass.
10      Q     Is it your understanding that a bankruptcy
11  is not liquidity event?  That Live Member would not
12  be entitled to be repaid at $6,000,000 loan?
13      A     I think I just answered you on that.
14      Q     No, you didn't.
15      A     My understanding--
16      Q     I'm asking you-- I'll ask it this way.  If
17  bankruptcy is not a liquidity event is it your
18  understanding that Primary Member would not be
19  entitled to be repaid at $6,000,000?
20           MR. ROSENBLOOM:  Objection.  That calls
21           for a legal conclusion.
22           MR. ROSEN:  No.  It's his conclusion that
23           bankruptcy is a liquidity event.  I didn't come
24           up with that theory, he did or his lawyer did.
25

Page 130

```
1  BY MR. ROSEN:
2    Q   I'm asking you, Mr. Schreiber, assuming
3  bankruptcy in fact is not a liquidity event,
4  assuming you are wrong about that, would you agree
5  with me that Primary Member would not be entitled to
6  be repaid at $6,000,000?
7        MR. ROSENBLOOM:  Objection.
8  BY MR. ROSEN:
9    Q   You can answer it.
10   A   I do not agree.  I do not agree with you.
11   Q   Why don't you agree?
12   A   Live Primary, LLC owes Primary Member, LLC
13  $6,000,000.  If bankruptcy is a liquidity event then
14  it has to be paid now.  If it is not a liquidity
15  event then it still owes the money to Primary
16  Member, LLC.  I'm still a lender.
17   Q   Fair enough.  I don't have anymore
18  questions.
19        MR. ROSENBLOOM:  I have no questions.
20        MR. WEINER:  I have a couple of followup
21  questions.
22                    - - -
23              REDIRECT EXAMINATION
24                    - - -
25  BY MR. WEINER:
```

Page 131

```
1    Q   Mr. Schreiber, you had very specific
2  recollection to a specific email that you referred
3  to in your testimony.  Do you have papers in front
4  of you during this deposition?
5    A   I'm sorry?
6    Q   Did you hear my question?
7    A   Can you please repeat.
8    Q   Have you had papers in front of you during
9  this deposition?
10   A   The only paper I have is when we were on
11  the call before you said that you didn't get the
12  email which was sent to you on-- which I believe was
13  sent to you about the senior secured note money.  So
14  during our break I asked our office to print me out
15  that email.
16   Q   Is that the only document that you had
17  with you during the deposition?
18   A   The only document.  I wanted to make sure
19  that whatever I said was one hundred percent
20  accurate.  I had it in my recollection.  I wanted to
21  be one hundred percent sure.  And this was during my
22  break.
23   Q   Would you be sure to send that specific
24  email on April 18th to your counsel and he will send
25  it to me.
```

Page 132

```
1    A   My office had sent it already during the
2  break.
3        MR. ROSENBLOOM:  We will forward that to
4  you.
5        MR. WEINER:  Thank you.  Thank you, Neal.
6  One moment, please.  No more questions at this
7  time for the witness.
8        MR. ROSENBLOOM:  All right.  So why
9  don't-- why don't we talk about mechanics and
10  the--
11        THE WITNESS:  Neal, can I drop out?
12        MR. ROSENBLOOM:  Is it okay for Joel to
13  drop out at this point?
14        MR. WEINER:  Yes, the witness is released.
15        THE WITNESS:  Thank you.
16        MR. WEINER:  And maybe what we ought to
17  do, Neal, is go off the record and just have
18  the conversation among counsel that we talked
19  about earlier.
20        MR. ROSENBLOOM:  So let me just make sure
21  that I am on board with--
22        MR. ROSENBLOOM:  Can we go off the record?
23        MR. ROSENBLOOM:  Well, no.  I want to make
24  sure that the stenographer is-- is on board.
25  Just one second.
```

Page 133

```
1        MR. WEINER:  Sure.
2        MR. ROSENBLOOM:  Yes.  I was told that,
3  you know, we are set up and I will coordinate
4  with the stenographer.  I would assume that we
5  could utilize for tomorrow's deposition the
6  exhibits that you introduced to the extent that
7  we would want to.  Certainly the exhibits five,
8  six and seven which are the operating
9  agreements, there shouldn't be an issue with
10  that, correct?
11        MR. WEINER:  Correct.  All that I'm saying
12  is maybe-- we have some exhibits to talk about,
13  we have some scheduling to talk about and why
14  don't we do that to the extent if we need to
15  get back to the court reporter we can do that.
16        MR. ROSENBLOOM:  Sure.  It is almost 3:00
17  and I don't know how long the court reporter is
18  going to be available.
19        MR. WEINER:  Okay.
20                    - - -
21              Off the record.
22                    - - -
23  The deposition concluded at 2:50 p.m.
24                    - - -
25
```

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL

Page 134

```
 1                    - - -
 2              C E R T I F I C A T I O N
 3                    - - -
 4
 5              I, Dominique R. Caputo, Court Reporter
 6    and Notary Public, certify that the foregoing is a
 7    true and accurate transcript of the foregoing
 8    deposition, that the witness was first sworn at the
 9    time, place and on the date herein set forth.
10              I further certify that I am neither
11    attorney nor counsel for, not related to, nor
12    employed by any of the parties to the auction in
13    which this deposition was taken; further, that I am
14    not a relative or employee of any attorney or any
15    counsel employed in this case, nor am I financially
16    interested in this action.
17
18
19    Dominique R. Caputo
      ----------------------------
      Dominique R. Caputo
20    Court Reporter and
      Notary Public
21
22
23
24
25
```

*Reliable Court Reporting*

In re: LIVE PRIMARY, LLC

SCHREIBER, JOEL Index: $1,000..1:27

## Exhibits

**Exhibit 1 - Schreiber Deposition (** **00887572xCDC30)** 4:4 6:7,8,13 9:23,25 10:3 57:24 58:10 101:3,19

**Exhibit 1A -** **Schreiber Deposition (** **00887556xCDC30)** 4:5

**Exhibit 3 - Schreiber Deposition (** **00887574xCDC30)** 4:6 29:9

**Exhibit 5 - Schreiber Deposition (** **00887575xCDC30)** 4:7 39:12

**Exhibit 6 - Schreiber Deposition (** **00887585xCDC30)** 4:8 46:7,14,18

**Exhibit 7 - Schreiber Deposition (** **00887463xCDC30)**

**Exhibit 8 - Schreiber Deposition (** **00887464xCDC30)** 4:9 16:18 21:16, 19

**Exhibit 27 -** **Schreiber Deposition (** **00887490xCDC30)** 4:10 53:20,22 55:17

**Exhibit 53 -** **Schreiber Deposition (** **00887536xCDC30)** 4:11 64:4 65:14

**Exhibit 54 -** **Schreiber Deposition (** **00887537xCDC30)** 4:12 64:14 68:24

**Exhibit 55 -** **Schreiber Deposition (** **00887538xCDC30)** 4:13 64:24 65:15

**Exhibit 57 -** **Schreiber Deposition (** **00887541xCDC30)** 4:14 71:18,25 72:1

**Exhibit 58 -** **Schreiber Deposition (** **00887542xCDC30)** 4:15 73:3

**Exhibit 59 -** **Schreiber Deposition (** **00887569xCDC30)** 4:16 78:14,20,22 79:9,13 83:7 85:9

**Exhibit 61 -** **Schreiber Deposition (** **00887546xCDC30)** 4:17 86:1,4 87:16

**Exhibit 63 -** **Schreiber Deposition (** **00887549xCDC30)** 4:18 90:14,15,17

**Exhibit 65 -** **Schreiber Deposition (** **00887551xCDC30)** 4:19 92:10,11,15

**Exhibit 66 -** **Schreiber Deposition (** **00887552xCDC30)** 4:20 93:25 94:2

**Exhibit 68 -** **Schreiber Deposition (** **00887571xCDC30)** 4:21 95:25 96:1, 3,14

## $

**$1,000** 41:10,20 106:10,17

**$10,000** 42:21 43:13,15,23 44:9,22 45:12 50:14

**$100,000** 69:1 72:16 94:14 95:7,15 114:3

**$120,000** 44:1

**$190** 31:19

**$2,500** 42:23

**$2.65** 115:7

**$20,000** 93:2,10

**$200,000** 126:12

**$250,000** 91:2,20

**$3.7** 81:11

**$300** 40:9

**$324,000** 86:14 87:5,24 89:18 90:8,12

**$40,000** 72:13

**$400** 39:19,21 40:2,4,10,13,14 41:5,8

**$485,000** 92:24 93:2,12

**$5,000** 46:25 47:15

**$500** 74:21 75:3,9,21 76:1,19 77:7,9, 12

**$6,000,000** 20:24 21:10,11,24 43:18 51:8 55:1 57:22 58:8 74:18 75:24

**102:3** 106:8,13,23,24 107:4,17,25 108:3,11,18 109:7 110:8,10,12,16,24 113:17 114:1,4,21,22 115:2,18 116:7 127:21 129:12,19 130:6,13

**$6,000,000--** 43:17 110:22

**$6.1** 102:14

**$66** 34:2,7

**$68** 34:11

**$800,000** 96:15 97:13,25

## -

**--money** 57:15

## 0

**0** 106:24

## 1

**1** 6:7,8,13 9:23,25 10:3 57:24 58:10 101:3,19

**100** 109:8

**11** 129:2

**11:12** 63:8

**11:45** 63:8

**12** 23:15 129:3

**12th** 86:10

**13** 23:16

**13.99** 94:14

**14th** 79:17

**16** 22:22 91:2,24

**165--** 59:22

**18** 126:21

**18th** 131:24

**1981** 22:22

**19th** 92:22 96:20

**1:00** 73:13

**1:27** 87:12

In re: LIVE PRIMARY, LLC

## 2

**2.65** 116:21 118:17

**2/26/16** 54:17

**2000** 23:22,25 24:25 25:10,21

**2001** 25:10

**2002** 24:23

**2003** 24:23

**2004** 28:9

**2006** 28:18,20,24

**2015** 39:7 52:24 53:1

**2016** 54:16 65:5 68:24 71:2

**2017** 73:9 75:4 79:17

**2018** 22:1 86:10 90:24 92:22 94:9

**2019** 126:21

**22nd** 94:9

**24** 68:24 94:15 96:15

**25,000,005.21** 57:11

**26** 54:7

**26th** 54:16 81:13,25

**27** 53:20,22 55:17 56:8

**28** 39:7

**2:10** 112:2

**2:11** 126:21

**2:50** 133:23

## 3

**3** 29:9 30:18

**30** 92:5 93:2,12

**30th** 80:17,19 81:21 82:5,10,24 83:8 84:19,24 85:16

**3:00** 133:16

**3rd** 82:4

## 4

**400** 40:22

**4:07** 79:18

## 5

**5** 39:12

**5,000** 50:13

**53** 63:20 64:2,4,9 65:14

**530** 32:10

**536** 31:15 32:11

**54** 63:20 64:11,14,17 68:24

**54--** 68:19

**55** 63:21 64:22,24 65:14,15

**57** 71:15,18 72:1

**58** 72:23 73:3 78:16

**59** 78:14,20,22 79:9,13 83:7 85:9

**5th** 73:9 75:4 90:24

## 6

**6** 46:7,14,18

**6,000,000** 21:25 22:3,4 55:3 127:4

**6,000,150** 22:3

**6,131,140.19** 58:9

**61** 86:1,4 87:16

**63** 90:15,17

**65** 92:11,13,15

**66** 93:25 94:2

**68** 96:1,3,11,14

## 7

**7/28/15** 36:2

## 8

**8** 16:18 21:16,19 91:2,24

**8.6** 42:14

**84** 23:14

**85** 23:14

**8th** 82:3

## 9

**9.2** 61:20 102:15

**96** 23:12

**97** 23:12

**9:18** 96:20

## A

**a--** 30:10 56:1 127:23

**about--** 91:20

**absent** 109:13

**Academy** 23:2

**account** 16:4,7,8 75:14 112:15 123:24

**accountant** 29:5

**accounting** 77:21,22

**accurate** 8:4 13:21 21:18 22:14 29:21,25 30:7,16 54:8 77:25 83:11,13, 16,25 131:20

**accurately** 43:9 85:2,4

**achieve** 43:25

**acquire** 19:6 27:16 110:11 111:10

**acquired** 110:7

**acquiring** 28:6

**acquisition** 31:15 111:21

**added** 76:4

**addition** 26:7 28:7

**additional** 17:12 53:15 55:8,10 65:5 74:17,18 75:22 76:4,25 126:18

**advance** 13:24 14:1 55:4 70:9 90:12

**advanced** 14:11 35:14 39:19 47:12, 20 62:18 84:8 95:19 96:16 97:3,6 124:11 126:24

**advancing** 61:16

**advised** 86:17

**affiliate** 12:23 13:6 52:2,3,7

**affirm** 7:7

**affirmed** 5:2

**After--** 116:14

**again--** 101:8

**against--** 96:24

**aggregated** 41:11,19

**agree** 22:7 110:2 128:15 130:4,10,11

**agree/are** 84:23

**agreed** 93:1 94:17 98:5 117:13

**agreement** 12:16 14:9,20 17:17,20, 24 18:3,14 19:12,21,22 20:2,5,11 21:4,23 22:9 32:1,2 33:2 36:3,6,7 38:11,15,19 39:7,16 40:1,7 41:3 42:15,20 46:8,20,21 48:4 51:11 56:22, 24 57:21 59:19 61:1,14,15,18 64:18 65:16 66:9 67:5,9 68:6,16,23 69:6 87:22 102:4,15 104:4,11,16 105:15,20 106:5,7 107:7,8,14,15 108:2,7 109:17, 21 110:3 122:14 127:5,17

**agreements** 35:8,21 48:18 58:17 125:4,7 133:9

**ahead** 54:12 77:18 105:22

**alleged** 60:19

**alleging** 12:2

**allow--** 86:25

**allowed** 59:19

**amended** 48:5

**amendment** 46:19

**American** 52:20,23 53:18 54:5,24 55:11 57:3 86:17

**Amex** 86:13 87:17,24 89:9,12,18 90:8,11

**amount** 14:4 44:1 47:10 57:22 59:8 65:6,7,8,9 68:5 78:8 84:12 91:21 98:2, 3

**amounts** 48:19 57:5,11 59:3,11 87:25 103:8,25 104:1,13

**and--** 33:15

**and/or** 84:25

**answering** 114:13

**answers** 8:24

**any--** 23:5

**anymore** 130:17

**apologize** 6:20 111:24

**Apparently** 15:17

**appears** 17:19 18:2,6 19:9 65:14 76:22

**application** 89:21 91:1,3 94:25

**applied** 75:21 76:1 77:7,9,12,14

**apply** 40:23 50:25

**approval** 70:8 71:11 72:22 87:21 107:22 116:2

**approve** 86:22,23 99:2 117:11 124:22

**approve--** 117:10

**approved** 99:14 117:15

**approving** 99:11

**approximate** 31:17

**approximately** 25:21 26:12 27:15 28:24 34:7,11 90:8 91:19

**April** 86:10 126:21 131:24

**are-** 18:7

**area** 28:11

**arrange** 93:8

**arranged** 20:5

**arrive** 114:22

**asked--** 55:23

**assemblage** 33:6

**asset** 111:2,6,12,15

**asset--** 111:3

**assets** 30:17 31:5,9 110:6,11,23 111:10,22

**assisted** 59:25

**assume** 27:11 36:9 37:2 64:7 133:4

**assuming** 89:22 130:2,4

**attached** 21:19 42:15 46:18 58:20 61:7 84:22 86:11

**attachment** 58:20

**attachments** 13:20 56:10

**attend** 23:18 24:6

**attended** 23:15

**authenticate** 35:12

**authenticity** 37:4

**authority** 87:4

**authorize** 87:4

**authorized** 56:24,25 58:16

**Avenue** 33:8,12 34:6

**aware** 59:18 60:4 68:13,14 72:1 98:5 112:16 125:25 126:2,25

## B

**back** 15:23 19:16 27:25 32:4 45:22 46:10 53:16 58:1,4 63:13 66:21,24 69:13,22,24 74:20 76:13,15 81:5 85:7 87:16 89:1,3 96:10 99:20,24 105:25 107:23 108:4,21 109:9,13 123:19,22, 24 125:1 127:2 133:15

**background** 18:17 28:2 33:14,21 36:19

**bad** 116:10

**bagged** 91:8

**balance** 83:10,19 84:11,15,17,18 85:6

**Balkin** 59:18 60:4 62:18 124:7 127:1

**Balkin's** 117:25

**bank** 16:3 75:13 100:23 124:19

**banking** 93:4

**bankrupt** 128:25

**bankruptcy** 11:23 12:2 127:24 128:1, 6,7,9,14,21 129:10,17,23 130:3,13

**based** 59:7 111:19,20 126:23

**basically** 27:13 47:8

**basis** 128:5

**be--** 64:8 76:3 114:7

**beautiful** 129:4

**become--** 86:25

**Bedford** 33:7,11 34:6

**before--** 81:24 121:3

**begged** 95:13 117:12 124:4,6

**begging** 119:15

**begin** 9:22

**beginning** 101:6 106:14

**behalf** 15:4 22:14 57:8 71:13

In re: LIVE PRIMARY, LLC

**belief** 71:3 78:4

**believe--** 60:2 95:11 114:17

**bit** 13:11 33:17 42:10 46:11 72:25 101:23

**blaming** 115:23

**blossom** 129:8

**board** 132:21,24

**boat** 128:21

**book** 40:5

**books** 12:20 45:21 51:7

**born** 22:21,23

**borrow** 87:5 110:15

**borrowed** 97:25 98:6 99:6,12,17 100:10,15

**borrower** 32:9 37:21 44:7 45:6 47:12, 13,21 49:4 51:4,16 52:5,8,18 55:8,9, 12,13 57:2,9 60:22 61:17 68:11 75:12, 16 78:5 84:6 91:11,12 99:21 107:16, 23 110:13,14,17,21 111:8,17,18,19 122:12,13,15,16

**borrower--** 69:6

**borrowing** 87:23 95:7 96:15 97:6,9

**bottom** 36:11 94:20 96:21

**bought** 25:5,22

**break** 9:9,12 63:5 131:14,22 132:2

**Brian** 60:2

**bridge** 67:15 72:20

**bring** 103:10

**broaden** 24:15

**Broadway** 31:15 32:10 54:7 81:14 82:1

**broker** 79:20,21,23 80:2,4,6,10

**broker--** 79:19

**brokerage** 16:8

**brokering** 80:3

**Brooklyn** 24:4 27:16 28:7

**budget** 110:13,25 111:1,4,8,18,19,20, 21 120:6,7,8,13,15,16,18 122:4,5

**budgeted** 120:22

**budgets** 120:17

**build** 80:20 109:4

**building** 25:5 34:10 81:25 82:6,10

**burden** 43:20

**business** 27:19 30:3,5 107:9 109:4 111:17 113:14 116:10

**businesses** 31:2 128:20

**buy** 25:25 27:11 53:13

**by--** 5:23

## C

**call** 36:3 37:10 45:16 47:22 48:22,23 60:3,4 69:18 81:22 93:1,5 111:2 122:5 131:11

**call--** 117:1

**called** 13:6 28:14 32:17 74:8 75:10

**calls** 52:11 60:1 104:20 116:24 121:15 129:20

**can--** 35:18

**capacity** 123:5

**capital** 12:23,24 13:7 20:21,23 21:2, 11,23 28:14,16,19 29:1 30:2 31:20,23 34:15 39:20 40:2,5 41:4,11,19 49:14 50:1 51:23 52:9 67:16 75:17 81:10,24 86:12 88:1,3,7,10,15,19 89:8,12,16 90:4 95:21 110:6,11,23 111:2,3,6,10, 12,14,22

**Capital's** 29:18

**capitalization** 106:16 107:3

**capitalize** 113:16

**capitalized** 20:18,19,20 21:6,9 106:9

**capitol** 41:7 90:1

**card** 52:21,23 53:3,7,13 54:5,24 57:3

**cards** 55:2 77:1

**cards--** 55:12

**careful** 46:2

**carefully** 29:24 30:11 31:2

**case** 9:19 11:24 28:23 45:17 101:8

**cases** 53:17

**cash** 96:16 97:3,6 112:13

**caused** 121:23

**cents** 119:24

**certificate** 23:5

**certification** 24:9

**cetera** 115:25 116:2

**challenges** 5:12

**chance** 63:22 101:7

**change** 127:21

**changed** 30:10,22,23 80:1

**characterize** 65:10

**charge** 43:25 45:15 46:5 88:9 111:24

**charges** 54:4 56:18 76:5

**charging** 45:15 49:15

**Charlie** 41:1

**chart** 101:11

**check** 15:20,25 16:2 18:1 19:15 20:6 21:25 22:3 29:5 31:7 40:22 60:12,16 75:6 76:2,23 77:20 92:12 122:12 123:10,12

**checking** 16:7

**Chicago** 115:11 119:19 123:20 126:25

**choses** 5:23

**city** 24:3 129:5

**claim** 10:8,16 11:19,22 12:1,4,8,15, 17,20,25 13:2,5,6,16,18,19,21 14:4 19:24 20:3,11 22:12 51:21,23 52:10 56:2,9 58:1,20 61:7 62:12 75:25 76:5, 7,21 77:3,10,15,17,24 78:6,8 84:12 101:5,16 102:19 127:21

**clarify** 18:8 19:20 81:5

**clarify--** 32:16

**clarifying** 19:2

**class** 61:22,25 62:10,22

**clean** 57:25

**clear** 88:25

**co-working** 128:20 129:4

**collateral** 60:19,23 61:2 100:3,6

**collateralized** 60:25

**colleague** 127:10

**collect** 40:13

**college** 23:19 24:6

**comfortable** 10:12 35:18

**commencement** 43:2

**commercial** 28:10

**commitment** 14:23 15:4,9 32:20 41:7 43:18 55:6 110:15

**commitments** 14:8

**committed** 52:19 106:20

**committee** 60:1 116:12,16,20,23,25 117:3,4,9 123:6

**committing** 61:16

**companies** 26:7 34:21

**company** 6:4 17:17,24 18:14 19:6 24:20,21,24 25:1,3 28:13 29:2 34:16, 17 43:20 45:19 46:1,3,19 47:24 53:14 58:21,22,25 59:24 60:7,25 65:22 67:12,14,16 70:7 71:10 72:7,14,17 73:20,21 79:25 91:10 93:15 94:14 96:16,25 97:6,25 106:6,9,13,20,23,24 107:10,21 109:6,22 110:7,10,12 111:10 114:24 115:25 118:4,6,9,14 119:1,3,6,11,13,16 121:22,23,24

**company's** 43:2,5

**company--** 57:13 73:20 106:19

**compensated** 123:4

**complete** 75:1 86:2,12 90:2 91:1 119:10 122:21

**complete--** 91:1

**computer** 5:10 11:1

**concentrate** 28:10

**concluded** 133:23

**conclusion** 52:12 104:21 129:21,22

**condition** 59:21

**confirm** 7:14,17 60:14 73:14 93:3 110:19

**confirmation** 12:11 58:24 59:7 123:21 126:23

**confirmed** 58:22 59:6,14 60:6 124:11 126:5,17

**confirms** 75:7 126:4

**confusion** 18:11

**connection** 81:16 82:18 88:4 89:17

94:24 95:15 97:12 120:18

**consent** 61:10,11,19,25 62:5,22 87:21

**consented** 59:20 124:22

**consents** 61:21 62:4,9

**consists** 102:13

**consolidate** 126:19

**constituent** 91:18 94:21

**construction** 36:19,20,21,23 38:25 54:7 115:22,25

**contained** 29:21 77:10 83:7

**continue** 11:6,13,14,15,16,17 17:5,6, 7,8,9,10,11,14,15 19:3 22:6 30:6 64:21 71:23,24 87:15

**contribution** 20:21,24 21:11,24 39:20 40:6 41:8

**contributions** 40:3 41:4,11,19

**contributions--** 21:2

**control** 18:21 27:8

**controlled** 88:14,18

**controlling** 28:20,21

**convenience--** 36:5

**conversation** 41:1 114:1 132:18

**conversations** 71:3

**convert** 115:13,15

**conveying** 12:14

**coordinate** 133:3

**copied** 96:17

**copy** 59:17 111:2

**corporate** 8:2,8

**correct** 5:18 7:21 8:5 11:24 12:3,22, 25 13:7 17:18 20:18 23:4,17 25:15,24 29:3,18 30:21 32:14 34:12 36:1 37:23 38:1,16 42:24 43:13,14 47:1 48:7 49:17,18 50:9 55:16 57:5,15 62:4,12, 23 65:6,7,9,16 66:10 69:2 72:3 74:15 76:9,10 78:2 80:21 81:8,9,12,15 82:8, 12,17 83:8,9,25 84:17 87:6 88:20 92:23,25 93:20 94:12 102:16,21 104:14 108:1,7,9 109:14,20 112:9 115:8,18,20 117:19,21 124:1,15 127:7 133:10,11

**correctly** 99:9

**correspondence** 94:9

**cost** 100:21 101:1

**costs** 82:16 97:7,10 99:2 126:19

**costs--** 97:11

**Could--** 65:20

**counsel** 7:3 12:6,7,9,15 14:17 41:16 44:15 59:13 85:21 88:21 124:24 128:3,23 131:24 132:18

**couple** 29:13 98:17 130:20

**court** 6:3 9:1 27:24 64:1 66:6,20,24 69:21,24 76:12,15 83:19 88:25 89:3 91:13 98:18 133:15,17

**courtesy** 35:5 75:2

**COVID** 129:7

**crazy** 99:2

**creating** 25:20

**credit** 54:5,24 76:22 77:1

**credited** 74:6 76:8,19 77:2

**creditor** 12:2

**cried** 117:13

**CROSS** 113:4

**current** 84:25

**CV** 58:25

---

**D**

---

**Dan** 42:22

**Daniel** 40:9

**date** 54:10,15 103:1,7,9,12 116:14

**dated** 39:7

**dates** 54:25

**David** 59:18 60:3 61:25 62:10,17,22 116:15,23 117:24 127:1

**day** 73:11 93:2,12 94:10

**days** 5:13

**deal** 9:11 84:24

**debt--** 113:17

**debtor** 5:22 13:24 14:2,12 15:1,3,7,8, 13,20 19:18 31:6 35:8 37:20,22,25

38:12 39:20 40:4,8,22,24 41:19 48:21
52:10 54:6,22 61:6,10,22 65:5 67:24
69:6 70:12,18 72:1,10 75:4 81:6,18
82:9,14 84:9,13 87:4,17,19,23 89:10,
13,16,18 90:7,10 91:19 93:12 95:19,
23 98:5 99:5,12,16 100:3,6,10,14,16
102:4,20 103:20 104:1,13,15,18,25
105:6,8,10,11,16,23 106:1 107:24
108:2,6,13 109:12 110:23 112:5,8,19

**debtor's**  96:14

**debtor--**  50:20

**debtors**  19:21

**decision**  113:16 114:6,9,18

**decisions**  69:11 70:11 71:13 72:7
117:8 119:21,24

**deducted**  40:10 41:6

**define**  80:23 111:12

**defined**  43:4

**definition**  128:7

**degree**  23:6 24:9

**Delaware**  29:2

**delayed**  115:24

**delays**  121:24

**delegate**  41:8

**depends**  88:11

**deponent**  33:15

**deposed**  128:8

**deposit**  82:15

**deposition**  5:20 6:9,10 7:1 8:3,6,7,
14,18 9:10 30:13 39:6 63:14,20 65:13
75:20 101:19 131:4,9,17 133:5,23

**depositions**  5:13

**describing**  61:2

**designated**  8:2

**designed**  45:13,14 47:15,18 49:20

**detail**  30:12 102:13 103:18 110:17

**details**  93:4

**developed**  80:25 81:1

**developing**  82:10

**did--**  53:17

**didn't--**  45:4,18

**difficult**  11:1 45:4

**DIRECT**  5:6

**directly**  17:3

**disappointing**  100:2

**discretion**  43:7 46:4

**discussed**  67:11 68:15 73:13 74:11
93:5 98:17

**discussion**  19:8

**discussions**  47:7 68:14 72:19 127:2

**disguised**  44:10,17,23,24 47:2

**display**  78:19 83:19 86:1 101:3

**distribution**  73:14,24,25 74:3,8,12,
13 75:10 105:9,10,13,14,24

**distribution--**  105:24

**disturbing**  39:2

**document**  10:6,7,11,13,25 16:22,23
19:2 38:4,7 41:12,17,21,24,25 42:2
46:9 48:10 49:22 50:4,23 66:13 67:20,
24 68:2,11,12,18 70:13,19 71:15
72:10,23 73:1 84:7 102:11 131:16,18

**documents**  35:12 36:10 37:3 43:16
49:23 50:11 51:1 59:2 62:25 79:6
89:17 90:25 100:11,16,19 109:2

**Docusign**  86:13 90:2

**does--**  48:25

**dollar**  51:10,13

**dollars**  51:12 59:23 70:6 71:9 106:8,
10 113:25 116:7 119:14 121:20 129:3

**dollars--**  121:19

**don't--**  29:4 68:20 91:21 100:8 122:3
132:9

**draft**  38:15,19

**drafts**  38:11

**draw**  112:14

**drop**  132:11,13

**due**  48:20

---

## E

**earlier**  17:19,22 18:6 19:10 21:20
51:21 73:12 94:10 132:19

**earliest**  20:12 60:14

**early**  18:2 120:21

**earn**  49:6

**earnings**  105:7

**easier**  56:4

**easy**  45:5 51:3

**education**  24:10 113:11,13

**efforts**  82:18

**elect**  46:5

**email**  40:21 54:15 58:22,24 59:6,7,9,
14 60:11 65:13 73:8,11 75:5 79:17
84:21 85:1,4,5,7,11 86:9 90:22,23,25
92:20,21 94:8,19 96:18,19 123:21
124:3,24 125:2 126:21 131:2,12,15,24

**emails**  60:5 65:12,13 66:15 68:7,8
79:15

**employed**  24:13,19

**employed--**  24:15

**employees**  88:6

**end**  46:9,10 48:10 64:21

**energy**  128:22

**England**  24:1,12,22

**enlarge**  10:25

**enlarged**  56:14,15

**entertain**  83:2

**entire**  10:7,13 14:4 16:23 52:18 55:3
73:1 98:19 107:21

**entirety**  11:18

**entities**  26:10,11,13 27:6,8 45:22

**entitled**  43:3,12 107:5 127:22 129:12,
19 130:5

**entity**  31:21,25 32:17,22 51:11

**entity--**  17:21

**entrepreneur**  107:8,13 109:4 120:1

**entrepreneur--**  106:21

**equal**  43:4

**equity**  30:5 34:17 69:10 86:18 113:20
115:14,15

**established**  33:18

In re: LIVE PRIMARY, LLC

SCHREIBER, JOELIndex: establishment..funding

**establishment** 81:7 102:12

**estate** 25:1,2 28:6 30:3 33:19 34:16 79:20,21,23 111:15

**estimate** 26:15 92:7 98:11 115:17

**event** 103:13 105:16 108:12 109:10, 13 121:12 125:11 127:6,14,24 128:2, 6,10,14 129:11,17,23 130:3,13,15

**evidence** 40:15,19 61:9 89:21,23 107:14

**examination** 5:6 9:14 37:1 113:4 130:23

**exceeded** 116:3

**excess** 102:14

**exchange** 45:15 47:18 49:14

**excuse** 48:3 50:20 62:16 66:4,18 69:17 74:24 87:7 98:1 112:21

**executed** 35:13,15,20 36:9 37:3,11 68:13

**exhibit** 6:7,8,13 9:23,25 10:3 16:14, 16,18 21:16,19 29:7,9 35:4,6 39:4,6, 12 46:7,14,18 48:2,3,6 53:20,22 55:17 56:3,6 57:24 58:9,10 64:1,4,14,24 65:14,15 68:19,24 71:18,25 73:3 78:14,20,22 79:9,13 83:7 85:9 86:1,4 87:3,16 90:1,14,17 92:10,15 93:25 94:2 95:25 96:3,14 98:16,19 99:13 100:11 101:3,19 103:8

**exhibit--** 39:6

**exhibits** 6:3 21:15 37:8 39:9 63:20 64:8 133:6,7,12

**exhibits--** 35:4

**exist** 60:13

**exists** 60:12

**exists--** 22:8

**expand** 127:12

**expenses** 54:6,22

**experience** 111:15

**explain** 20:20 53:4 119:1

**explained** 69:8

**explanation** 69:20 75:20

**Express** 52:21,23 53:18 54:5,24 55:11 57:3 86:17

**expression** 87:3

**extend** 75:1

**extended** 43:17 49:2

**extent** 133:6,14

**extra** 40:14 41:6 76:5 78:8 116:6,17 122:24 123:1,17,25 124:13 126:10,12 127:3

**F**

**F-U-N-D-E-R-A** 91:16

**fabricate** 71:4

**facilitate** 37:1

**facilities** 81:8

**facility** 43:3,11 81:10,13,16,17,20

**fact** 33:1 40:12 116:17 118:10 125:9 130:3

**failed** 44:5,7 59:24

**fair** 9:7 37:8 38:8 93:13 94:11 97:8 105:18 111:22 130:17

**familiar** 80:7,9 125:3,6,9

**favor** 32:6,9 34:23

**February** 54:16

**fee** 93:2,10

**feel** 7:8 10:11

**fees** 97:8

**fellow** 122:8

**fiduciary** 122:12

**field** 27:23

**file** 12:24

**filed** 11:23 12:1,20 13:1,6,8 20:11 78:1 101:17 116:2 127:21

**files** 79:6

**final** 19:12,19

**finance** 113:11

**financial** 82:20,24 83:3,6 85:15

**financials** 84:25

**financing** 92:2 94:25

**find** 13:20 37:10

**fine** 6:24 11:10 36:8 63:6 65:11

**fingers** 115:24 116:5

**finish** 9:4 16:24 66:5,19,20 68:21 74:25 114:9

**finished** 11:9 17:1 42:17

**fixed** 103:1,7,12

**floor** 81:1 82:3,4 121:18

**floors** 34:10 80:24

**focused** 34:19

**followup** 130:20

**forgive** 34:14

**form** 10:16 25:7,9 26:7,9,13 28:13,16 30:1 57:2 70:9 86:13 90:2,3

**formal** 113:11,13

**format** 33:3

**formed** 19:8 26:10,24 27:7,12 28:19 29:1 32:17 52:25

**forming** 34:15

**forward** 33:21 52:24 66:9 132:3

**forwarding** 66:12 94:9

**found** 97:20,23 98:15 99:16 100:9,14, 25 115:19

**Fourth** 33:7 34:5

**frame** 99:10

**free** 7:8 10:11 35:19 116:4

**friendly** 71:8

**from--** 97:25

**front** 10:13 39:17 55:17 58:23 62:25 85:5,6,8 131:3,8

**fulfill** 14:22

**full** 32:4

**fully** 35:15,19,20 36:9 37:2,11

**fund** 14:23 20:5 33:4 55:11 81:7 82:14 106:9,14 112:6,8,10,12,13 120:6,19

**funded** 14:7,19,20 15:15 20:5 22:2 40:8,9,12,14 52:7,17 53:10 55:3,6 59:5,7 95:9,12 108:24 117:5

**Fundera** 91:5,14,16,18,22 94:11,13, 20 95:7,9

**funding** 14:21 52:4 55:1,19 56:19

In re: LIVE PRIMARY, LLC

81:11 97:2,13 110:24 122:6 126:18

**funds**  16:1 39:22 52:18 55:10,14 58:22 65:5 72:3 74:7,17 76:4,25 80:21 81:18 82:13 84:8 88:20 95:19,22,23 110:15,18,19 122:13

**funds--**  88:19

### G

**gave**  59:13 69:19 71:2 119:24 126:10

**generally**  30:21 120:12

**get--**  22:7 49:24

**get-go**  114:2

**give**  15:9 26:15,23 45:4 53:8 57:21 106:20,23 107:3,11 110:17 111:18 126:4 128:12

**giving**  7:15 14:10

**Gluckow**  72:2,10,13

**Good**  5:19 56:17

**grab**  18:24

**graciously**  22:7

**graduate**  22:25

**graduated**  23:2

**granted**  107:24

**great**  47:5 63:7,19 115:12 129:6

**group**  6:2 115:11 117:25 119:20 123:20 126:25

**grow**  109:22 127:12

**guarantee**  89:12 95:18

**guarantee--**  95:22

**guaranteeing**  95:22

**guarantees**  95:16

**guess**  30:6

**guy**  121:14,16,21

### H

**had--**  25:4

**Hain**  18:20 37:17 38:10 42:20 46:24 59:5 60:2,5 65:25 66:8,16 67:8,11,18, 20 69:8 70:5 71:7,12 72:7 73:9,12 75:4 84:21 85:12 86:10,14 89:25

90:24,25 92:22 93:5 94:8,24 95:2,6 96:20 126:22

**Hain's**  70:10 79:17

**Hain--**  59:9

**half**  113:24

**happen**  110:1 123:23 125:2 126:7

**happened**  71:2 109:25

**happening**  117:7

**happy**  16:22 26:22 35:15 47:4

**hard**  126:19

**have--**  19:18 115:9

**he--**  71:16

**heads-up**  35:5

**headshakes**  8:25

**hear**  5:9,15,16 6:22 18:16 34:3 36:19, 21,22 57:17 131:6

**hearing**  36:23 38:25 112:24 117:6

**helpful**  49:25 83:21

**Herald**  80:11,12,16

**hesitant**  91:9 117:14

**Hey**  90:10

**high**  22:25 23:18 43:20 96:23 97:7,10, 18,21 98:14,15 99:2 100:21,25 115:10

**higher**  47:6,9

**hindsight**  118:4,6,9

**hold**  17:14 45:22 56:1 64:6 98:22

**hold--**  28:20

**holders**  59:17,20 115:8 116:20 117:18 118:18 124:17,20,21

**Hom**  41:2 88:12

**host**  18:24

**hosting**  18:20

**hours**  96:15

**How's**  113:1

**how--**  53:4

**However--**  109:15

**huge**  43:20 117:15

**hundred**  78:9 127:23 131:19,21

**hundreds**  51:12 119:13 121:18,19

**husband's**  67:13 70:8 71:11 72:21

**HVAC**  121:14,22 122:8

### I

**I'M--**  86:17

**I--**  19:16 33:24 49:24 50:19 100:23 123:23

**idea**  45:24 47:19 96:17 98:8

**identification**  6:13 9:25 16:18 29:9 39:12 46:14 53:22 64:4,14,24 71:18 73:3 78:22 86:4 90:17 92:15 94:2 96:3

**identified**  106:7

**identify**  35:23

**identifying**  34:19

**immediately**  99:24

**in--**  30:24 74:22

**inaccurate**  84:2,15

**inaudible**  30:18 75:18 82:2 100:24 125:19

**inclinations**  69:11

**included**  111:21

**including**  124:18

**income**  45:2,3,8,10 47:19 48:22 49:2, 5,6,7,8 50:5

**incurred**  54:6

**individual**  123:5

**individually**  8:8

**information**  12:13,16,19 29:20 33:14 82:20,25 83:4,6

**information--**  101:21

**initial**  110:6

**initials**  36:11

**inserted**  61:14

**insist**  108:21

**insisted**  43:23 109:1

**insolvent**  128:16 129:1

**inspect**  122:9,10

**instruct**  9:18 14:5 40:4

**instructed** 14:3,20 15:2,24 16:2 39:21,23,24,25 51:25 56:25 57:7 75:16

**instructed--** 14:6

**instructs** 14:17

**int** 82:13

**intent** 45:2,9 50:2,4

**interest** 43:21,22 44:4,10,18 45:1,13, 15,16 46:5 47:2,11,16,18,19,22 48:20, 23 49:7,9,14,15 50:5 51:6 67:15 86:18 91:24 92:1,8 94:14 96:14,23 97:1,12, 16 98:8,12 99:23 100:22 103:19,21 105:18 106:2 107:25

**interest--** 44:23

**interested** 67:17 82:9

**interests** 31:5 43:24

**interrupt** 96:13

**interruptions** 31:1

**introduced** 115:12 133:6

**invest--** 70:15

**invested** 109:6

**investing** 114:3

**investment** 19:6 67:14 71:10 72:21 107:10,11 109:11 110:20 114:7,10 127:15

**investments** 34:21

**investor** 32:13 33:19 67:12 69:9 70:5, 7,16 72:20 93:8,16 103:10 108:20,21 115:13

**investor--** 107:2

**investors** 45:22 108:25 109:23 127:13

**involved** 28:5 31:14 33:5 34:9 119:21

**involvement** 68:16

**IPO** 105:16 108:12 109:9,13 125:11 127:6

**is--** 17:23 21:1 48:3 50:24 96:11 114:15 132:24

**issue** 27:24 57:1 133:9

**it'** 86:13 100:25 114:16

**it's--** 46:2 63:7 82:2

**it--** 15:22

**items** 7:11 82:14

## J

**January** 92:22

**Jersey** 28:7

**job** 24:16 47:5 119:10 122:8,21

**Joel** 5:2 11:19 18:13 77:19 84:22 86:11 90:11 132:12

**joined** 114:18 116:23

**July** 39:7 96:20

**jump** 19:4 36:18

**June** 73:9 75:4 90:24 94:9

**just--** 35:10 39:1 117:4

## K

**Keep--** 46:10

**Kelly** 66:10 67:10,12 69:8

**Kelly--** 66:2

**key** 18:25

**kind** 45:8,10 99:25 107:12

**kinds** 96:22

**kirshenbaum** 59:18 60:3 62:1,11,17 116:15,23 117:24 124:6 127:1

**knew** 93:11,19 114:12

**knew--** 114:12

**knowing** 62:5

**knowledge** 12:18 22:16 25:16 50:6 51:2 55:18 58:11 76:18 87:6 98:7 108:8 113:23 117:5 122:25

**knowledge--** 62:15 113:23

**Kurishingbomb** 62:23

## L

**landlord** 80:6,9,16 82:19,23 83:2,8, 11 84:19 85:15

**landlords** 80:5

**language** 7:2

**large** 67:14 69:9 71:10

**larger** 56:12

**later--** 115:19

**launched** 18:4

**law** 29:2,4 104:21

**lawyer** 129:24

**learning** 23:11

**lease** 107:12

**leave** 22:5 128:3

**legal** 52:12 128:22 129:21

**lend** 52:6 74:19 94:21 114:21 122:15

**lended** 32:4 57:13

**lender** 32:15 44:5,6,8 45:7 49:3 51:5, 14 52:4 55:14 57:1,4,12,20 61:17 62:6 66:2 68:11 75:15 78:5 91:6,11 93:18 95:22 97:3 98:17 106:21 107:2,16,23 110:14 111:9 122:11,14 126:25 127:16 130:16

**lender--** 93:11,18

**lenders** 45:23 91:19 94:21 95:19 97:7 118:1

**lending** 34:20

**lent** 31:24 32:19 74:18 109:6

**Let's--** 35:22

**liabilities** 45:21 47:24 84:3

**liability** 17:17,24 18:14 29:2 45:25 46:1,19 51:6

**lied** 118:22

**lieu** 49:14

**light** 30:12

**limited** 17:16,24 18:14 29:2 46:19

**liquidity** 105:15 108:12 109:9,13 125:11 127:6,14,24 128:2,6,10,14 129:11,17,23 130:3,13,14

**Lisa** 37:17 47:5 53:9 54:20,21 59:5 60:2,5 72:6 88:12,13 91:4,8 94:16 95:13 96:23 100:1,20 106:21 109:3 113:24 114:23 116:16 117:12 119:23 120:2 123:14 124:11 126:21

**Lisa's** 118:21

**Lisa--** 123:15

In re: LIVE PRIMARY, LLC

**list** 58:15 84:3,4

**listed** 62:11

**listen** 6:19 78:3 119:16 121:25

**listened** 122:22

**listening** 6:23

**live** 13:1 14:9,10,21,23 15:15 18:4
19:7 41:3 43:18 44:4 45:5,10,21 46:20
47:12,21 49:3,25 51:4,15 52:5,6,8,17,
19,24 53:2 55:7,9 57:1,9,21 60:22
61:17 69:2 71:13 75:12,16,23 77:5,13
78:4 80:20 82:20,25 86:25 91:11
107:16 109:22 110:1,21 113:16
114:20,21 122:23 127:11 128:15
129:1,8,11 130:12

**lived** 23:25 24:12 124:4

**LLC** 8:1,9 11:23 12:21,22,23,24 13:1,
4,8,23 14:1,3,7,9,10,11,19,21,22,24,
25 15:2,7,12,15,16,19,22,24 16:3,6,11
17:17,25 18:4,5,15 19:7,8,9,23 20:10,
17,22,23 21:6,8,12,23 22:15 25:4,6
27:12 28:14,17 31:4 32:18,19,23
34:15 36:3 37:20,24 39:19 43:12,19
44:5 45:5,11,21 47:12,21 49:3,25
51:4,15,24 52:5,6,8,17,18,19 55:7,9
57:2,9,21 60:22 61:17 71:13 75:12,15,
16,23 77:6,13 78:5,11 84:4,5 87:1
91:6,11 107:16 110:21 114:21 130:12,
16

**LLC's** 14:8 15:9 52:7

**loan** 14:8,10,19,21,23 15:3,4,10,16
20:6 31:20 32:20 33:3,4 41:7 43:17,18
44:3 45:3,10,13 47:11,16,20 48:23
49:2,5,6,7,17,21 50:7 51:8,13 52:7,17,
19 53:16 55:5,6,8 56:19,20 57:1,8,21
58:8,23,25 59:7,11,14 60:20 61:16
64:18 65:7,9,15,22 66:9 67:5,9 68:5,
23 69:6 70:10 73:16,18,20 74:2,4,6,9,
14,16,17 75:11,17 84:16 86:14,16,22,
23,24 87:17 88:4 89:9,13,18 90:7,11
91:2,4,19,22 92:7 93:2,12,22 94:13
95:15 97:24 99:3,11,15 100:4,16,18,
19 102:13 103:10,18 105:12,25 106:2,
20 107:4,7,9,13,14,20 108:3,4,22,24
110:21 111:4,20 112:9,14 114:2,10
116:18,21 117:11 122:24 123:1,17,19,
20,25 124:7,11,13,20,23 129:12

**loan--** 53:15 100:7

**loaned** 84:12 102:3

**loaning** 72:13,16

**loans** 48:21 53:2 58:15,16,18,19 59:4,
21 60:6 61:6,11,19 62:11,12,19 68:15
75:22 77:13 84:5,16 87:18,19 96:23
103:1 104:5 110:16 115:9,11 124:8,9,
19 126:10,12,20

**located** 31:15 80:12 81:13,20

**location** 80:19 81:23 82:3,4,15,24

**locations** 116:8

**London** 22:24 23:1,3,19

**long** 9:11 14:23 23:10 69:15 113:10
133:17

**look--** 18:16

**looked** 48:18 50:12 79:15 87:21

**losing** 116:4

**lot** 26:14 27:4,20 31:1 32:4 69:10
115:24 119:7

**LSH** 43:4

## M

**machine** 111:2

**made** 20:22 21:11 41:11 48:21 87:17
89:9,13 93:22 102:20 119:8,23

**maintain** 19:6

**major** 70:15

**make** 5:14 18:7 31:2 34:21 43:19
45:5,8,24 46:3 51:3 56:12 67:13 71:12
73:13,19 74:3,11 75:16 85:1 91:19
93:11 103:21 104:18 105:1,6,8,10,23
112:9,14 117:8 119:15 122:15,20
131:18 132:20,23

**making** 72:7 102:10 105:9,24 119:21

**management** 30:18 116:11

**manager** 16:10 25:12 28:21

**managing** 14:6 25:18 38:6 60:21
119:23 121:2

**Manhattan** 28:11 80:13

**many--** 27:7

**March** 22:22

**marked** 6:13 9:25 16:18 29:9 39:12
46:14 53:22 64:4,14,24 65:13 68:23
71:18 73:3 78:22 86:4 90:17 92:15
94:2 96:3 101:15

**material** 121:17

**materially** 30:10,15

**materially--** 30:9

**matter** 6:6 33:1 40:12

**matters** 7:4,8

**maturity** 103:1,7,9,12

**maybe--** 133:12

**me--** 98:1

**mean--** 13:3

**meaning** 70:24

**means** 49:6

**meant** 73:16 74:4,9,12,14

**meantime** 67:15 70:8 72:20

**mechanics** 53:5,6 132:9

**meetings** 116:24

**member** 5:21 8:1,9 11:23 12:1,13,20,
21,22 13:4,8,23 14:3,6,7,8,11,18,22,
25 15:2,6,9,12,16,19,22,24 16:3,6,10,
11 17:17,25 18:15 19:23 20:10,17,22,
23 21:5,8,12,23 22:2 25:11,13,18
28:21 31:4 32:18,19,23 33:3 37:20,22,
24 38:7 39:19 43:12,17 44:25 45:4,7,9
46:4,23 47:11,20 49:3 51:13,14,24,25
52:4,6,10,17 55:7,20 56:19 57:1,4,8,
19 60:21 61:16 75:11,13,15 77:6
78:10 84:4,5,16 86:20 87:4 89:16 91:6
95:18 107:15 116:19 117:8 119:23
121:2 129:11,18 130:5,12,16

**Member's** 47:16

**Member--** 15:17 57:19

**members** 20:10 61:10,21,25 62:10,
22 114:20 125:10

**members--** 62:10

**membership** 31:5,9

**mentioned** 21:3 71:7 81:23

**merchant** 86:13 87:17 89:18 96:15
97:3,6 124:18

**middle** 9:12 13:15 30:25

**Mike** 59:18 60:4 62:18 117:25 124:6
126:25

**mikes** 18:21

**million** 30:18 31:19 34:2,7,11 81:11

In re: LIVE PRIMARY, LLC

102:14 113:25 115:7 116:6,21 118:17 119:14 129:3

**millions** 70:6 71:9

**mind** 99:3,11

**minimal** 44:1

**minimum** 99:22,23

**minute** 64:7 98:20

**minutes** 73:12 87:8 111:25

**mismanaged** 115:22,23 118:6,7 119:4,5

**mismanagement** 116:10

**misstate** 27:19

**mistake** 117:15 128:21

**moment** 39:5 56:3 92:11 132:6

**moment--** 26:22

**moments** 22:13

**money** 13:24 14:1,12 15:7,8,14 22:2 31:20,24 32:4,20 34:20 40:1,2,5,23 52:6 53:9,10,11,12 54:22 69:10 70:9 73:16,21,22,25 74:1,2,18,20 76:8 77:6 78:5,8,10 81:6 88:9,15 91:9 93:7 97:9 98:6 99:6,12,17 100:10,15,23,24,25 107:5,6,12 109:6,13 111:7,17 118:8, 14,15,24 119:2,19 120:5 121:23 122:15,16,20,23 123:22 124:25 125:1 126:3,6,17,19,24 127:3,22 128:22 130:15 131:13

**moneys** 40:13 51:22 120:3 126:5

**month** 42:21,23 43:13,15 44:10,22 45:12 46:25 47:15 50:14

**month's** 82:15

**monthly** 42:23 43:4 45:15 46:1,24

**months** 94:15 116:3,4 119:12 121:23

**morning** 7:15

**move** 23:21,23 24:3 33:21 42:3,7 69:12

**moved** 24:1,5,8,12,18 26:25 27:16

**moving** 24:22 26:6

**Mr.schreiber** 5:21

**Ms--** 38:3

**multifamily** 26:1

**multipage** 10:10

**multiple** 19:13

**mute** 18:18,21,22,23 36:20 39:1

**muted** 112:25

**my--** 70:14 114:18

**myself--** 107:1

---

**N**

**Nancy** 41:2 86:11 88:12

**Nash** 6:16,18,22

**nature** 129:6

**Neal** 6:18 11:4 19:1,4 28:1 33:15,23 35:5 48:4 54:12 56:13 60:9 63:4 78:17,19 81:23 112:18 132:5,11,17

**necessarily** 7:6 43:19

**needed** 14:8 53:2,9,11 55:13 65:5 74:19 77:2 87:19,20 91:9 93:7 106:13 110:15 111:17 115:2,6,7,17 118:8,15, 17 119:2 120:5 122:20 126:3

**nevermind** 54:11 114:3

**Newnan** 66:10,13 67:6,10,12,21 68:1, 4 69:1,7,9 72:16

**Newnan--** 67:23

**nicest** 129:4

**Nineteen--** 22:22

**no--** 55:21,22 102:23 114:8

**noise** 36:19,21,24 38:25

**normal** 107:2

**North** 33:6,7 34:5

**not--** 98:4 106:4 129:7

**note** 31:24 32:6,9,23 34:23,25 59:17, 20 61:5 64:18 65:16,24 66:1,2,10 67:5,9 68:6,23 69:7 72:2 115:8 116:20 117:18 118:18 124:17,19,21 131:13

**notes** 7:18,20

**notice** 6:9,10,25 7:1

**number** 6:2 9:23 10:3 12:4,8 13:5 26:24 35:25 50:21 56:6,8 84:8 114:23

**numbering** 64:8

---

**O**

**oath** 63:16 87:16

**object** 9:16 33:10 50:16 66:12 67:4,8, 20 84:18 99:5,17 120:8

**object--** 99:8

**objected** 44:15 85:21 88:21 99:10 120:22 121:15

**objecting** 85:14 119:15 121:6

**objection** 9:17 14:13 31:11 37:6 38:2,4 41:12 44:11 47:3 52:11,12 55:23 57:6,14 62:13 69:5 70:12,18,25 72:9 77:18 80:22 85:17 88:16 89:20 97:19 99:1,13 102:24 103:3,15 104:3, 20 105:3,19 106:18 108:15 109:16 111:11 113:18,21 118:11 120:13,25 121:10 125:12 127:8 129:20 130:7

**Objection--** 70:20

**obligated** 74:19 86:24 87:1 89:8 104:13,15,18 105:1,6 109:12

**obligated--** 104:25

**obligation** 14:22 43:6 45:20 51:5 52:5,7,17 57:20 103:21 105:17 106:1 108:13

**obligations** 14:19 47:24,25 53:11 100:7 104:1

**obtain** 23:5 24:9 82:19 86:16 93:15

**occur** 103:13

**occurred** 105:16

**October** 79:17

**of--** 25:17 54:10 99:25

**offer** 98:19,20

**office** 12:11 18:2 38:17 41:2 43:3,11 77:2 124:25 131:14 132:1

**offset** 43:22,24

**Okay--** 59:15

**on--** 18:19 112:6 131:12

**operated** 87:22

**operating** 14:9 17:20 18:2 19:21,22 20:2,4 21:4,23 22:9 32:1 33:1 35:8,20 36:6,7 38:11,15,18 39:7,16 41:3 42:15 46:8,21 48:4 56:22,24 57:20 58:17 61:13,15,18 102:4,15 104:4,10,16

105:15,19 106:5,7 107:8,15 108:2 109:16,20 110:3 125:3,6 127:4 133:8

**operation** 72:3 81:7 102:13

**operational** 126:19

**operations** 43:2 82:10 104:2,14,19 106:3,9,14

**operator** 129:5,6

**opportunities** 34:19

**opportunity** 5:22 20:13 60:15

**opposed** 113:20

**optimistic** 115:14

**option** 115:13

**options** 98:17

**oral** 8:24

**orally** 9:2

**order** 107:1 109:22

**ordered** 121:22

**original** 36:3 115:17

**original--** 53:16

**originally** 113:24 115:21 117:10,20, 21

**Ornstein** 40:9 42:22

**out--** 115:19

**outlining** 104:11

**outstanding** 75:22

**owe** 40:13

**owed** 59:22 73:17,21 75:23 77:4 78:10 125:1

**owes** 77:6 78:5 84:4 130:12,15

**owned** 77:13

**owner** 33:19

---

**P**

**p.m.** 79:18 87:12 96:20 112:2 126:21 133:23

**pages** 12:7,14 16:22 17:12 29:13 36:11,17 102:1,18 103:19

**paid** 32:4 43:12 45:9 47:10 51:9,10 59:23 60:7 73:23 99:24 103:11 104:11 109:1,9,24 119:11,13 121:19 124:25

126:6,18 127:2,14,16,22 130:14

**pandemic** 31:1

**paper** 64:9 131:10

**papers** 7:18,20,22 131:3,8

**paragraph** 7:3,5 43:1 44:10,22 45:12 48:20 49:21 61:20 102:15

**paragraphs** 30:15,20 48:19 49:22

**part** 34:3 39:16 42:19 54:25 55:6 59:19 82:13 110:22 117:16

**partial** 124:5

**participation** 68:15

**parties** 7:4 38:6 62:4

**partner** 37:19 67:17 69:10 115:12

**partners** 32:3 115:12

**partnership** 32:2

**party** 20:2 93:15 95:19,22

**pass** 112:20,22 129:9

**passed** 39:8

**pay** 43:6 44:5,7 53:9,15 54:22 59:24 99:20,23 105:17,25 106:1 107:23 108:4 109:12 119:9,22 121:16 123:18, 19,22,24

**payable** 44:25 45:25 94:15

**paying** 108:21 119:12 121:14

**payment** 14:3 15:24 16:2 42:21 43:4, 5,6,23 44:4 45:14 46:5,24 49:15,17 50:7,12,13,24 51:8,25 57:7 59:1 73:16,18,20 74:2,4,6,9,14,16,17 75:11 77:9 100:7 105:25 119:9 121:1,6,11 123:11,12

**payment--** 14:21

**payments** 12:10,12 15:3 44:7 46:3 50:25 51:7,14 75:17 102:20 103:19,21 104:19 105:9 106:2 119:8,16 120:22, 23 121:13 123:1,14,18 124:5

**people** 119:11

**percent** 43:21 44:2 78:9 91:2,24 92:4, 5 94:14 109:8 127:23 131:19,21

**Perhaps--** 36:13

**period** 42:23 99:22 119:17

**permission** 47:8 67:13

**permission--** 54:23

**permits** 115:25 116:1

**permitted** 44:16 66:1

**person** 65:23 70:15 71:8 72:19

**personal** 54:5,24 94:23 95:4,10 123:11

**Peter** 79:16,19,22 84:23

**phone** 5:24 6:19 30:12 111:24 116:25

**pin** 50:22

**place** 23:10

**plan** 109:25 111:17

**plans** 116:2

**pledge** 100:6

**pledged** 107:19

**PM** 43:3,5,6 48:20 50:12,13,25

**point** 19:5 27:22 33:17 46:25 115:16 132:13

**pointing** 115:23 116:5

**portfolio** 28:10

**possibility** 77:5

**possibly** 26:19 65:19 77:4 83:1,2 85:23,24

**posted** 29:25 30:8

**potential** 67:12 68:15 69:9 97:2 112:18

**preliminary** 6:6

**prepare** 12:7 83:14

**prepared** 12:4 38:22

**Pretty** 122:19

**previous** 49:22 51:1

**price** 31:17 34:2,7

**primary** 5:21 8:1,9 11:23 12:1,13,20, 21,22 13:1,4,8,23 14:1,3,7,8,9,10,11, 18,21,22,23,25 15:2,6,9,12,15,16,17, 19,22,23 16:3,6,11 17:17,24 18:3,4,5, 15 19:7,9,22 20:10,17,22,23 21:5,8, 12,22 22:2,15 31:4 32:18 33:3 37:18, 20,24 39:19 43:12,17,19 44:5,25 45:3, 5,7,9,10,21 46:4,20,23 47:11,12,16, 20,21 49:2,3,25 51:4,12,14,15,24,25 52:4,5,6,8,10,16,18,19,24 53:2 55:7,9, 20 56:19 57:1,2,4,8,9,19,21 60:22

In re: LIVE PRIMARY, LLC

61:16,17 69:2 70:16 71:13 75:11,12, 13,15,16,23 77:6,13 78:4,10 80:20 82:20,25 84:4,5,16 86:20 87:1,4 91:6, 11 95:18 107:15,16 109:22 110:1,21 113:17 114:20,21 122:24 125:10 126:18 127:11 128:15 129:1,8,18 130:5,12,15

**Primary--** 14:25

**principle** 49:11,13,20 50:8,24 58:9 105:17

**print** 131:14

**priority** 60:7 126:20

**private** 30:5 34:16

**Probably--** 24:25

**probe** 128:5

**problem** 5:17 7:10

**procedural** 8:22

**proceed** 6:5 8:7

**proceeds** 40:11 110:7

**process** 19:1 72:2

**produced** 35:14 79:6

**product** 53:14

**production** 63:3

**project** 27:12 33:13 34:1,6

**projects** 27:16 34:22

**promised** 123:19

**promises** 124:23

**promissory** 31:24 32:5,8,23 34:23, 25 61:5 64:18 65:16 66:9 67:5,9 68:6, 23 69:7 72:2

**Proof** 10:8,16 11:19,22 12:4,8,15,16, 19,25 13:1,5,6,16,18,19,21 14:4 19:23 20:3,11 22:12 51:20,23 56:2,9 58:1,20 61:7 62:12 75:25 76:4,7,21 77:10,14, 16,24 78:6,8 101:5,16 102:19

**proof--** 56:1

**properly** 122:8

**properties** 26:24 28:11 33:6 34:6 80:11,12,16

**property** 25:22,25 26:1,2 31:15,18 33:20 80:23,24 81:2,3 115:21 122:9, 10,18

**proposed** 65:15 66:2,9 67:5,9 68:5, 23 93:11,18 97:12

**protect** 107:1

**provide** 20:12 22:8 38:11,19 46:23 60:13 67:15 94:23 95:3 110:14 112:6 125:10

**provided** 12:13 38:14 55:20 80:21 81:18,24 83:10 111:8,19,20 120:6

**provided--** 38:14

**providing** 65:6,8 72:20

**provision** 46:22 125:17,18,22,25 126:2

**provisions** 125:20

**pull** 29:7 39:3,5 53:20 63:19 78:13

**purchase** 31:17 33:6 34:2,7,9

**purpose** 19:5 25:17,20 34:15

**purpose--** 34:13

**purposes** 8:3

**put** 6:6,8 9:23 12:12,16 16:13,15 35:6 40:24 47:23 51:5 56:2 68:5 69:1 72:23 76:2,23,25 77:3 78:7 81:6 82:13 85:7 90:14 92:10 93:24 95:25 108:17 116:16 118:18

**puts** 35:9

**putting** 71:9

## Q

**question** 9:5,12 14:16 15:6,12,18,19 19:17 20:1,20,25 21:1,5 34:4 37:9 41:22 42:4,7 44:20 45:1 52:1 54:13 60:23 61:20,24 62:7,8,21 65:20 66:5, 22,25 67:19 68:9,10,22 69:13,18,22, 25 70:3,17 76:11,16 82:22 84:10 85:22 88:24 89:1,4 97:4 100:13 102:8, 9,12 103:6 104:8,17 106:11,12 114:15 118:8 127:20 131:6

**questioning** 33:11

**questions** 5:23 8:24 9:15 63:23 69:16 112:19 113:9 130:18,19,21 132:6

**quick** 98:23

## R

**rage** 97:15

**raise** 37:6

**raised** 120:12

**raising** 120:25

**range** 26:16,23 27:2 98:11

**rate** 91:24 92:1 97:1,12,16 98:9,12 100:22

**rates** 97:8

**reached** 124:6

**read** 13:19 29:24 30:14 42:16 43:9 64:12,19 66:21,24 69:12,22,24 76:12, 15 85:1,4 86:7 89:1,3 90:20 92:18 96:21 99:9

**reading** 68:8 98:24

**ready** 29:14 65:2 79:2

**real** 25:1,2 28:6 30:3 33:19,20 34:16 79:19,21,23 111:15

**Realty** 25:6

**reask** 88:24

**reason** 48:24 79:12

**reasoning** 49:1

**recall** 8:17 25:19 26:10,14,17,21 27:1, 4,7,10,18 29:22,23 34:24 35:1,2 38:21,22,23 40:17,18,20,21,25 55:5 61:4,8,23 62:2,24 63:1 65:21,22,23 66:3,11,14,15 67:2,22,23,24,25 68:1, 3,4,10,20,22,25 71:1 72:4,8,12,13,15, 16,22 79:8,9,11 84:20 85:3,12,13,14, 23 87:18,23,25 88:2,5 89:11,14 90:6, 13 91:4,23,25 92:1,3,6 93:9,22,23 95:1,2,5,6,11,12,14,17,20,24 98:25 100:17,22 102:22 117:1 120:5,10,11, 12,25 121:2,5,6,8,9,10,11 122:6,11 123:3,4,7,11

**recall--** 50:15 66:17 72:18

**receipt--** 49:16

**receive** 31:23 51:13 75:3,6 79:13 122:23

**received** 15:3 65:12,15 73:8 75:8,9 81:17 85:11 86:10 92:21 94:10 123:1, 10

In re: LIVE PRIMARY, LLC

**receives** 42:20,22 46:23,24 122:13

**recess** 63:11 87:12 112:2

**recognize** 10:6,9

**recognized** 84:8

**recollect** 68:17

**recollection** 38:13 69:3 71:6,12 121:4 123:9,13 131:2,20

**reconcile** 77:3

**reconvene** 63:8

**record** 7:8 10:15 42:5 63:14 132:17, 22 133:21

**records** 12:21

**recross** 112:19

**REDIRECT** 130:23

**reduction** 49:21

**refer** 36:4 54:20

**reference** 56:21

**referenced** 93:6

**referred** 79:16 87:2 102:14 122:1 131:2

**referring** 25:3 46:8,20 49:10 58:7,8 63:1 71:25 74:21 102:3 105:14 111:3, 23 117:18,24 119:17 122:4,5 124:7,10

**reflect** 42:5 96:14

**reflecting** 56:18

**refreshing** 123:8

**refused** 42:6

**regularly** 43:25

**relate** 37:8

**relates** 44:2

**released** 132:14

**relied** 70:10 72:6 118:21

**rely** 41:8

**remains** 67:17

**remember** 62:3 71:7 87:18 90:3,4 91:22 95:12 100:20

**remind** 56:5

**remove** 72:24

**rent** 82:16 116:4 119:11,13 121:1,7,11

**repaid** 104:6 125:10 127:5 129:12,19 130:6

**repay** 86:24 103:7 104:1,13 108:13 126:20

**repayment** 107:25 122:24 123:17

**repayments** 103:24 105:1,7 112:6,9, 14

**repeat** 14:18 41:16 52:16 78:3 82:22 97:4 106:12 131:7

**reporter** 9:1 64:1 66:6,21,24 69:21,24 76:12,15 83:19 88:25 89:3 91:13 98:18 133:15,17

**reporting** 6:4 120:2

**representative** 8:3,9

**representing** 60:10

**request** 38:16 95:3 100:15 114:17

**requested** 12:9 20:9 58:21 59:25

**requests** 7:3 44:6

**require** 93:19 109:10

**required** 87:22 89:17 91:6 110:23

**required--** 91:5

**requires** 61:18

**requisition** 120:19

**residential** 26:2 27:15 28:6,10

**respect** 50:11,23 51:20 102:17 120:2 122:7 123:16

**respected** 120:1

**respond** 9:1,7,17 88:22

**responded** 78:4 111:16

**responding** 85:12 95:2

**response** 27:3 38:15 66:15 95:3

**responsibility** 122:12

**restated** 48:5

**result** 5:13

**resulted** 116:4,6

**return** 49:13 50:1

**returns** 94:23 95:4,10,13

**revenue** 105:2

**review** 7:9 72:5 94:18 101:8 110:19

**reviewed** 72:6 73:6

**ridiculous** 99:21

**road** 8:23

**roles** 38:6

**room** 7:14

**ROSEN** 83:18,21,23 113:1,6,19 114:5 118:12 125:13,16,21,24 127:19 129:22 130:1,8

**Rosenberg** 20:8

**Rosenbloom** 6:11,15,25 7:10,25 8:5 10:14,20,24 11:5,13 14:13 18:8,10 19:11,17 20:14 22:7 27:22 31:11 33:10,16 35:22,25 36:2,8,15,25 37:12 38:2,4 41:12 42:3,8 44:11,17 47:3 48:6 49:10,16 50:16 52:11 54:10,14, 17 55:23 57:6,14 60:16 62:13,16 63:6 64:6 69:17 70:20 77:18 78:15 80:22 85:17 88:16,22 89:20 97:19 98:22 102:24 103:3,15 104:3,20 105:3,19 106:18 108:15 109:16 110:2 111:11 112:21,23 113:18,21 118:11 125:12, 14,18,23 127:8,17 129:20 130:7,19 132:3,8,12,20,22,23 133:2,16

**Rosenbloon** 9:16

**roughly** 23:12,15 24:23 28:9 34:2

**rules** 8:22

**running** 72:7

**runs** 37:18

**S**

**S-A-B-E-S-A-N** 79:16

**Sabesan** 79:19,22 84:24

**said--** 78:2

**salary** 42:21,23 43:4 46:25 47:7,9,10

**Sandy** 83:18,20 112:23,24

**Sapphire** 99:12,17 100:10,15

**satisfy** 41:6,7 105:12

**save** 35:10

**savings** 16:7

**scenarios** 55:10

**schedule** 12:10 21:18,24 39:15 42:14,19 46:18,22 48:9 51:22 76:24, 25 77:14 102:20 104:10 121:13 122:1,

In re: LIVE PRIMARY, LLC

SCHREIBER, JOELIndex: schedules..staff

2

**schedules**  21:15 61:7

**scheduling**  133:13

**school**  22:25 23:6,15,18

**Schreiber**  5:2 7:1,13 8:2,7,13 9:15 10:3,19 11:8,22 13:14,23 14:16 15:5 16:21 17:16,23 18:7 20:1,17,25 21:18 22:12,21 28:5,13 29:12,17 30:6 31:4, 14 32:13 33:5,19 34:1 35:11,18 37:17 38:10 39:15 41:15,18 42:14,19 44:14 46:17 48:13 50:20 51:20 52:15,20 53:25 54:4 56:12 58:7,15 61:9 63:14, 16,25 64:21 65:2,4,10 66:4,18 68:21 69:14 71:15,25 73:6 74:24 78:25 79:5 81:5 85:20 86:7,9 87:15 89:25 90:20, 23 92:18 96:7 98:16 101:5,8,15 102:2 103:5,18 104:9,23 105:14,22 106:6 108:10 109:18 110:6 112:5 113:7 126:1 130:2 131:1

**SCIAN**  5:25 18:24 56:5

**screen**  6:4,11 9:23 10:4 13:15 22:19 35:6 37:14 39:16 46:17 51:18 57:25 63:20 64:17 72:24 101:13

**screwed**  121:22

**scroll**  10:11,21 11:6 13:10,11 16:23, 25 17:1,9 21:14 29:14,15,16 36:12 39:8 42:9 46:10 48:9 54:1,2 56:9 57:23 58:2,12 64:20 71:16,22 72:25 79:2 86:1 96:8 98:18 101:10,22

**scrolling**  11:11,13 17:12

**scrolls**  36:16

**searched**  59:13

**seconds**  18:25

**section**  86:12 87:2 90:2

**secure**  59:6,14 60:24 100:7 107:25 117:12,17 124:9

**secured**  58:23,25 59:4,11,20,21 60:6, 20 117:20,22 118:1 123:21 124:8,12, 14,16,20,22 126:5,24 131:13

**secures**  126:18

**securities**  108:7

**security**  61:1 82:15 107:19,21,24

**see--**  68:7

**seek**  109:23

**sell**  28:9

**send**  12:9 15:1,13 16:1 40:1 58:25 66:1 95:13,14 131:23,24

**sending**  40:21 67:4,8,20 84:23

**senior**  58:23 59:3,6,11,14,20,21 60:6, 20,24 117:11,17,25 118:1 123:20 124:8,9,12,13,16,17,18,20,22 126:4, 24 131:13

**sense**  20:19 97:15

**separate**  25:4 64:8 80:25 81:25 112:14 127:3

**September**  68:24

**series**  8:23

**serving**  123:5

**set**  133:3

**setup**  5:10

**share**  6:4 28:20

**shared**  43:3,11

**shares**  61:22

**she--**  124:21

**sheet**  64:9 83:10,19 84:11,17,18 85:6

**sheets**  84:15

**short**  63:5 100:23

**show**  10:7 21:23 63:21 75:25 76:21 84:12

**showed**  41:5

**shows**  21:1

**sideways**  8:25

**sign**  32:22 34:22 86:18,19,20,21,23 88:1,3,4 89:17 91:7,8 95:18,21

**signature**  13:14 36:17 39:9 87:22

**signed**  12:17 13:18,21 17:18,21 19:13,23 20:2 22:14 38:19 41:3 50:3 56:22 67:24 68:1,11,12 76:8 77:11 89:22 90:5 100:16 108:2,7

**signing**  69:6 70:13,18 72:2,10

**similar**  48:17,18

**similarity**  18:11

**similarly**  8:21

**simple**  115:16

**simpler**  54:21

**simply**  87:3

**simultaneously**  8:10

**single**  34:25

**sinking**  112:6,8,10,12

**sir**  22:23 23:23 52:1 80:14 94:6

**situation**  129:7

**situations**  71:5

**SJC**  25:5,7,9,12,18,20,23,25 26:7

**Sky**  59:9

**Skye**  18:20 37:17 38:10 42:20 46:24 47:5 59:5 60:2,5 65:25 66:8,16 67:8, 11,18,20 69:8 70:5,10 71:7,12 72:6 73:12 79:17 84:21 85:12 86:10 88:12, 13 89:25 90:24 92:22 93:5 94:8,24 95:2 96:20 126:22

**slow**  46:11 56:11

**slowly**  58:3

**snapshot**  84:24

**so--**  43:25 53:6

**sole**  16:10 25:11 46:4

**solvent**  128:18

**something--**  59:23

**sorry--**  57:18

**sort**  8:22 26:23

**sorts**  103:24

**sounds**  5:16

**space**  80:20 82:19 129:2,3,4

**spaces**  129:5

**speak**  63:3

**speaking**  18:18,19

**speaks**  38:5,7 41:13,17,21,24 42:2 105:20 109:17,21 110:3 127:17

**specific**  15:6 30:24 107:6 131:1,2,23

**specifically**  16:7 40:10 61:15 111:4

**spelled**  91:15

**spells**  38:5

**spent**  120:3,4 122:21 129:3

**Square**  80:11,12,16

**staff**  41:5,8 72:6 76:2

stage 109:24

start 5:23 23:13 24:21,24 35:4 101:6 107:9

started 23:14 24:20,25 43:12 108:23 116:24

startup 106:8 107:12

state 9:17

statement 31:3 59:3 85:15 118:21

States 23:21 24:5,6,8,13,18,22 26:6, 25

stayed 115:10

stenographer 132:24 133:4

step 87:7 119:25

stipulate 7:4 35:19 37:3

stipulation 7:7 35:13

stole 121:23

stop 17:14 39:10 42:12 58:4,13 101:11 119:9,12

street 33:7 34:5 80:14,17,19 81:21 82:5,11,24 83:8 84:19,24 85:16

strike 15:22 39:4 69:12 103:20,25 110:22

structure 33:4

study 23:8,10 29:24 30:11 31:2

stuff 41:9

styled 18:14

subject 92:24 112:18

submitted 120:16

successful 95:7

suggestion 36:14

summery 54:4

supervisory 60:1 116:12,16,20,23,25 117:2,4,9 123:6

support 45:19 55:9,12,13 59:2 96:23, 25 97:9

supported 94:17

supportive 51:15 91:10,12 100:1

supposed 104:5

sure-- 111:7

surrounding 28:11

---

## T

table 101:21 102:1,12,18

takes 47:9

taking 63:5 65:22 96:22 100:22,24 117:11

talk 9:5 66:6 132:9 133:12,13

talked 22:13 51:21 132:18

talking 18:17 49:23 86:14 102:10 122:2 125:16,21 126:9

talks 125:19

Talmudical 23:2,9

team 77:21,22

tech 6:3

technician 5:24

ten 43:21 116:3

tenant 83:3

tenants 83:3

term 94:18

terms 56:20,21 93:2,12,18 94:16,19, 20 98:5 100:18 104:4 127:4

testified 5:4 40:16 50:17,18,21 59:10 97:5 102:5

testifying 47:17 60:11 61:2

testimony 7:15 48:19 50:10,23,25 56:23 74:10 77:8,12 89:19 90:3 93:21 98:4 111:5 116:19 131:3

that's-- 37:7

that-- 36:17 38:12 42:21 54:7 66:3 90:5 114:12 125:20

the-- 18:11 22:8 27:8 33:21 35:25 36:2 47:4 63:2 83:22 85:8 91:23 100:6 102:13 103:25 132:10

them-- 36:4 111:19

theory 129:24

there-- 35:10

they-- 99:22 111:20

thing 101:24 109:2

things 30:22 50:21 115:24 119:7

125:14

things-- 110:11

thirty 26:20

those-- 50:18

thousand 59:23

thousands 51:12 119:14 121:18,20

Thursday 126:21

time 9:13 18:3 22:14 27:11,14 29:21, 25 30:7 31:8 35:11 41:2 42:24 45:4, 18,20 52:24 55:2 56:3 59:22 65:4 69:15,22 70:21,25 75:19 78:1 79:15 80:4 93:17 98:24 99:21,22,25 103:9 110:14 119:17 123:14 126:15 127:12, 13 128:22 132:7

time-- 70:21 88:11 123:14

timeframes 116:1

times 6:22 8:16 15:24,25 27:14 53:2,3 55:2 59:25 80:25 88:14,18 121:9 123:18 124:5

timing 115:23

titled 64:17

to-- 13:9 53:19 66:5 74:23 81:6 93:14 110:10 119:4

today 5:17 28:24 30:21 73:14 93:3 108:5 128:16

toes 119:25

told 115:11 133:2

tomorrow's 133:5

top 10:8 34:10

total 41:10,11,18 44:2 106:10,16

track 27:25

transactions 27:21 76:9 77:10,24 102:18 106:22

transferred 93:3

true 13:20 38:12 41:10,18 42:1 51:21

trust 108:4

trusted 32:3 69:11 70:10 71:12 108:3

truth 5:3,4

truthful 22:13 77:25

try-- 15:11

turn  13:9 53:19 55:25

turned  121:21

turns  115:1,4,5

twenty  26:18 73:12

type  24:10,16

## U

unanimous  61:11,19,21,24 62:21

under--  55:11

undercapitalized  118:5,9

understand  12:11,14 28:3 33:16 44:19 74:10 93:17 103:6 111:14 127:5

understanding  8:1 28:2 53:14 60:24 67:16 70:4,14 87:20 104:12,17 108:17,19 109:19 111:16 127:11 128:1,4,5 129:10,18

understanding--  129:15

understood  9:19 108:11

undertaking  60:21

United  23:2,21 24:5,6,8,13,18,22 26:6,25

university  23:19 24:6

unsecured  117:21

updated  17:22,23 20:4,9 21:3,21,22 22:1,8

upload  64:2 71:14

Upstate  28:6

used--  54:23

utilize  133:5

utilizes  122:13

## V

Valentino  41:1

vendor  53:9

verbal  124:23

version  17:19,22 18:6 19:10,12,19 20:7,9 21:21,22 22:8

versions  19:14

Vince  5:24 8:11 9:22 10:11,21 13:9

16:13,22 18:23 21:14 22:19 29:6,14 35:3 36:16 37:14 39:3,5 42:9 46:6 48:2,8 51:17 53:19 54:1 56:1 57:23 63:19 71:14 72:24,25 78:13,19 85:25 90:14 92:10 93:24 95:25 101:2,10,23

visit  122:18

voice  72:9

voiced  99:1

volume  18:21

## W

wait  9:4,16 11:7 17:4 66:19,20 78:25

wait--  26:23

waited  116:1

waiting  67:13 70:7 71:10 74:25

waive  43:5

wanted  16:15 27:11 40:10 45:7,18 49:25 51:3 55:9 91:10,11 96:23 105:10,23 131:18,20

was--  17:22 55:20 71:6 81:17 97:1 100:21 124:7

wasn't--  55:19

wasting  128:22

watch  63:7

Waterbridge  12:23,24 13:7 28:14,16, 19 29:1,17 30:2 31:20,23 32:3,5,8 34:15,23 51:23 52:9 75:17 86:12 88:1, 3,6,10,15,18 89:8,12,15,22 90:1,4 95:21

Waterbridge's  32:9

way--  103:20 114:14

we--  39:4 59:12 65:13

website  29:18,20,21

week  53:12

weeks  117:12,14

weigh  128:24

WEINER  5:8,20 6:1,16,21,24 7:12,25 8:6,12 9:22 10:2,17 11:3,7,11,20,21 13:13 14:15 16:13,20 18:9,12,19,23 19:1,20,25 20:8,15,16 21:14,17 22:18, 20 28:1,4 29:6,11 31:13 33:14,22,25 35:3,24 36:1,4,13,16,22 37:7,13,16 38:3,8,9 39:3,14 41:14 42:5,9,13

44:13,21 46:6,16 47:14 48:2,8,12 49:19 50:19 51:17,19 52:13 53:19,24 54:12,16,18,19 55:25 56:7,16 57:10, 16,23 58:6,12,14 60:9,17,18 62:20 63:4,7,13,15,19,24 64:10,16,20 65:1 67:3 69:12,14,21 70:2,23 71:14,21 72:23 73:5 76:12,20 77:23 78:13,17, 24 81:4 83:20,22 84:1 85:7,10,19,25 86:6 87:14 88:17,24 89:7,24 90:14,19 91:13,17 92:10,17 93:24 94:5 95:25 96:5 97:22 99:4 101:2,4,6,14,22,25 102:25 103:4,17 104:7,22 105:5,21 107:18 108:16 109:18 110:2,5 111:13 112:4,18,22,25 113:2 130:20,25 132:5,14,16 133:1,11,19

Well--  42:8

were--  66:1

Wework  32:14,15,20,22 33:2 108:23 109:5,25

Wework--  108:23

what--  50:3

whenever--  127:11

Where--  84:7

which--  40:6

wife  25:13

will--  53:15 109:10

Williamsburg  33:8,12

wire  15:1,7,13 16:1 74:21 75:3,9

wisdom  128:24

with--  132:21

wondering  91:14

Woolworth  34:10

word  73:24 74:13 91:15 105:13

words  49:8 68:19

work  106:25 121:15,17

worked  12:10 27:13 53:5

works  8:21 10:19

write  15:20

writing  40:22 61:12

written  40:7,15,18 46:2 61:10,11,19, 21,25 62:3,5,9,22

wrong  114:16,25 130:4

In re: LIVE PRIMARY, LLC

SCHREIBER, JOELIndex: wrote..zoom

**wrote** 73:12

---
### Y
---

**year** 44:2

**year--** 88:11

**years** 23:16 29:23 94:24

**yielding** 115:11

**York** 23:24,25 28:7

**you--** 35:14 60:9 66:16 69:5 102:11
117:18 129:16

**your--** 37:19 57:17

---
### Z
---

**zoom** 5:9 8:18 9:3

Fill in this information to identify the case:

Debtor 1    Live Primary, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Southern District of New York

Case number    20-11612-MG

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | Primary Member LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

3. Where should notices and payments to the creditor be sent?

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

c/o Kevin J. Nash, Esq./Goldberg Weprin Finkel
Name

1501 Broadway, 22nd Floor
Number    Street

New York          NY          10036
City          State          ZIP Code

Contact phone  212-301-6944

Contact email  knash@gwfglaw.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Where should payments to the creditor be sent? (if different)**

Name

Number    Street

City          State          ZIP Code

Contact phone _____

Contact email _____

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on ___/___/___  MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**EXHIBIT**

**1**

exhibitsticker.com

Official Form 410          Proof of Claim          page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $_____6,436,184.00__.  Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Loans extended to Debtor as per operating agreement

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:       $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured:  $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/02/2020
                     MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | | | | |
|---|---|---|---|---|
| Name | Joel Schreiber | | | |
| | First name | Middle name | | Last name |
| Title | Member | | | |
| Company | Primary Member LLC c/o Waterbridge Capital | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | | |
| Address | 214 West 29th Street | | | |
| | Number     Street | | | |
| | New York | | NY | 10001 |
| | City | | State | ZIP Code |
| Contact phone | 212-607-8134 | | Email | js@waterbridge.com |

| Establishment & Operation Loan | |
|---|---|
| Principal Due | 6,131,148 |
| Interest Due | 223,752 |
| Total Due | 6,354,900 |

| Other Loans | |
|---|---|
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

| Total Loans | |
|---|---|
| Principal Due | 6,194,041 |
| Interest Due | 242,143 |
| Total Due | 6,436,184 |

Live Primary LLC
Establishment & Operation Loan Detail

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 08/18/15 | Live Primary LLC | 50,000.00 | 50,000.00 | 1% | 1.37 | 58 | 79.45 |
| 10/15/15 | Live Primary LLC | 25,000.00 | 75,000.00 | 1% | 2.05 | 6 | 12.33 |
| 10/21/15 | Live Primary LLC | 84,087.49 | 159,087.49 | 1% | 4.36 | 7 | 30.51 |
| 10/28/15 | Live Primary LLC | 91,566.17 | 250,653.66 | 1% | 6.87 | 1 | 6.87 |
| 10/29/15 | Live Primary LLC | 549,397.00 | 800,050.66 | 1% | 21.92 | 18 | 394.55 |
| 11/16/15 | Live Primary LLC | 173,999.98 | 974,050.64 | 1% | 26.69 | 2 | 53.37 |
| 11/18/15 | Live Primary LLC | 137,000.00 | 1,111,050.64 | 1% | 30.44 | 6 | 182.64 |
| 11/24/15 | Live Primary LLC | 412,000.00 | 1,523,050.64 | 1% | 41.73 | 38 | 1,585.64 |
| 01/01/16 | YE 2015 Totals | 1,523,050.64 | 1,523,050.64 | | | | 2,345.36 |
| 01/01/16 | Live Primary LLC | - | 1,523,050.64 | 1% | 41.73 | 5 | 208.64 |
| 01/06/16 | Live Primary LLC | 5,000.00 | 1,528,050.64 | 1% | 41.86 | 2 | 83.73 |
| 01/08/16 | Live Primary LLC | 5,000.00 | 1,533,050.64 | 1% | 42.00 | 5 | 210.01 |
| 01/13/16 | Live Primary LLC | 50,000.00 | 1,583,050.64 | 1% | 43.37 | 2 | 86.74 |
| 01/15/16 | Live Primary LLC | 200,000.00 | 1,783,050.64 | 1% | 48.85 | 11 | 537.36 |
| 01/26/16 | Live Primary LLC | 50,000.00 | 1,833,050.64 | 1% | 50.22 | 1 | 50.22 |
| 01/27/16 | Live Primary LLC | 30,000.00 | 1,863,050.64 | 1% | 51.04 | 0 | - |
| 01/27/16 | Ylighting | 1,510.00 | 1,864,560.64 | 1% | 51.08 | 1 | 51.08 |
| 01/28/16 | Live Primary LLC | 20,000.00 | 1,884,560.64 | 1% | 51.63 | 1 | 51.63 |
| 01/29/16 | Live Primary LLC | 50,000.00 | 1,934,560.64 | 1% | 53.00 | 3 | 159.00 |
| 02/01/16 | Ferguson Enterprises | 7,449.77 | 1,942,010.41 | 1% | 53.21 | 0 | - |
| 02/01/16 | Ferguson Enterprises | 8,246.69 | 1,950,257.10 | 1% | 53.43 | 0 | - |
| 02/01/16 | Ylighting | 1,050.00 | 1,951,307.10 | 1% | 53.46 | 4 | 213.84 |
| 02/05/16 | Live Primary LLC | 190,000.00 | 2,141,307.10 | 1% | 58.67 | 0 | - |
| 02/05/16 | Live Primary LLC | 10,000.00 | 2,151,307.10 | 1% | 58.94 | 5 | 294.70 |
| 02/10/16 | Live Primary LLC | 50,000.00 | 2,201,307.10 | 1% | 60.31 | 2 | 120.62 |
| 02/12/16 | Live Primary LLC | 25,000.00 | 2,226,307.10 | 1% | 60.99 | 7 | 426.96 |
| 02/19/16 | Live Primary LLC | 25,000.00 | 2,251,307.10 | 1% | 61.68 | 3 | 185.04 |
| 02/22/16 | Live Primary LLC | 15,000.00 | 2,266,307.10 | 1% | 62.09 | 0 | - |
| 02/22/16 | Ylighting | 6,748.75 | 2,273,055.85 | 1% | 62.28 | 8 | 498.20 |
| 03/01/16 | Live Primary LLC | 25,000.00 | 2,298,055.85 | 1% | 62.96 | 3 | 188.88 |
| 03/04/16 | Live Primary LLC | 100,000.00 | 2,398,055.85 | 1% | 65.70 | 4 | 262.80 |
| 03/08/16 | Live Primary LLC | 103,185.19 | 2,501,241.04 | 1% | 68.53 | 1 | 68.53 |
| 03/09/16 | Live Primary LLC | 250,000.00 | 2,751,241.04 | 1% | 75.38 | 8 | 603.01 |
| 03/17/16 | Live Primary LLC | 10,000.00 | 2,761,241.04 | 1% | 75.65 | 8 | 605.20 |
| 03/25/16 | Live Primary LLC | 15,000.00 | 2,776,241.04 | 1% | 76.06 | 6 | 456.37 |
| 03/31/16 | Live Primary LLC | 225,000.00 | 3,001,241.04 | 1% | 82.23 | 15 | 1,233.39 |
| 04/15/16 | Live Primary LLC | 50,000.00 | 3,051,241.04 | 1% | 83.60 | 4 | 334.38 |
| 04/19/16 | Live Primary LLC | 10,000.00 | 3,061,241.04 | 1% | 83.87 | 1 | 83.87 |
| 04/20/16 | Leveldesk | 8,405.67 | 3,069,646.71 | 1% | 84.10 | 0 | - |
| 04/20/16 | Leveldesk | 2,900.87 | 3,072,547.58 | 1% | 84.18 | 2 | 168.36 |
| 04/22/16 | Live Primary LLC | 11,000.00 | 3,083,547.58 | 1% | 84.48 | 3 | 253.44 |
| 04/25/16 | Live Primary LLC | 10,000.00 | 3,093,547.58 | 1% | 84.75 | 0 | - |
| 04/25/16 | Directiview | 11,282.68 | 3,104,830.26 | 1% | 85.06 | 1 | 85.06 |
| 04/26/16 | Live Primary LLC | 10,000.00 | 3,114,830.26 | 1% | 85.34 | 6 | 512.03 |
| 05/02/16 | Live Primary LLC | 50,000.00 | 3,164,830.26 | 1% | 86.71 | 4 | 346.83 |
| 05/06/16 | Live Primary LLC | 100,000.00 | 3,264,830.26 | 1% | 89.45 | 4 | 357.79 |
| 05/10/16 | Live Primary LLC | 20,000.00 | 3,284,830.26 | 1% | 90.00 | 1 | 90.00 |
| 05/11/16 | Live Primary LLC | 10,000.00 | 3,294,830.26 | 1% | 90.27 | 2 | 180.54 |
| 05/13/16 | Live Primary LLC | 40,000.00 | 3,334,830.26 | 1% | 91.37 | 3 | 274.10 |
| 05/16/16 | Live Primary LLC | 50,000.00 | 3,384,830.26 | 1% | 92.74 | 2 | 185.47 |
| 05/18/16 | Live Primary LLC | 25,000.00 | 3,409,830.26 | 1% | 93.42 | 2 | 186.84 |
| 05/20/16 | Live Primary LLC | 25,000.00 | 3,434,830.26 | 1% | 94.10 | 21 | 1,976.20 |
| 06/10/16 | Live Primary LLC | 20,000.00 | 3,454,830.26 | 1% | 94.65 | 5 | 473.26 |
| 06/15/16 | Live Primary LLC | 245,000.00 | 3,699,830.26 | 1% | 101.37 | 199 | 20,171.68 |
| 12/31/16 | YE 2016 Totals | 2,176,779.62 | 3,699,830.26 | | | | 32,275.81 |

| Date | To | Amount | Cumulative | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|
| 01/01/17 | Live Primary LLC | – | 3,699,830.26 | 1% | 101.37 | 348 | 35,275.09 |
| 12/15/17 | Live Primary LLC | 800,000.00 | 4,499,830.26 | 1% | 123.28 | 17 | 2,095.81 |
| 01/01/18 | YE 2017 | 800,000.00 | 4,499,830.26 | | | | 37,370.91 |
| 1/1/2018 | Live Primary LLC | – | 4,499,830.26 | 1% | 123.28 | 37 | 4,561.47 |
| 02/07/18 | Live Primary LLC | 945,674.08 | 5,445,504.34 | 1% | 149.19 | 0 | – |
| 02/07/18 | Live Primary LLC | 14,000.00 | 5,459,504.34 | 1% | 149.58 | 71 | 10,619.86 |
| 04/19/18 | Live Primary LLC | 100,000.00 | 5,559,504.34 | 1% | 152.32 | 5 | 761.58 |
| 04/24/18 | Live Primary LLC | 120,000.00 | 5,679,504.34 | 1% | 155.60 | 2 | 311.21 |
| 04/26/18 | Live Primary LLC | 75,000.00 | 5,754,504.34 | 1% | 157.66 | 12 | 1,891.89 |
| 05/08/18 | Live Primary LLC | 100,000.00 | 5,854,504.34 | 1% | 160.40 | 3 | 481.19 |
| 05/11/18 | Live Primary LLC | 25,000.00 | 5,879,504.34 | 1% | 161.08 | 6 | 966.49 |
| 05/17/18 | Live Primary LLC | 50,000.00 | 5,929,504.34 | 1% | 162.45 | 5 | 812.26 |
| 05/22/18 | Live Primary LLC | 70,121.08 | 5,999,625.42 | 1% | 164.37 | 1 | 164.37 |
| 05/23/18 | Live Primary LLC | 131,522.77 | 6,131,148.19 | 1% | 167.98 | 223 | 37,458.80 |
| 01/01/19 | YE 2018 | 1,631,317.93 | 6,131,148.19 | | | | 58,029.12 |
| 01/01/19 | Live Primary LLC | – | 6,131,148.19 | 1% | 167.98 | 365 | 61,311.48 |
| 01/01/20 | YE 2019 | – | 6,131,148.19 | | | | 61,311.48 |
| 01/01/20 | Live Primary LLC | – | 6,131,148.19 | 1% | 167.98 | 193 | 32,419.50 |
| 07/12/20 | YE 2020 | – | 6,131,148.19 | | | | 32,419.50 |

| Est. & Operation Loan Summary | |
|---|---|
| Loan Duration | 4.9 Years |
| Principal Due | 6,131,148.19 |
| Interest Due | 223,752.17 |
| Total | 6,354,900.36 |

Other Loans

| Period Start | Period End | Principal @ Start Period | Principal Adjustments | Principal @ End Period | Interest Rate | Interest Per Day | Days | Interest Owed |
|---|---|---|---|---|---|---|---|---|
| 01/01/18 | 06/01/18 | - | 50,000.00 | 50,000.00 | 10% | 0 | 0 | 0 |
| 06/01/18 | 06/14/18 | 50,000.00 | (1,500.00) | 48,500.00 | 10% | 14 | 13 | 178 |
| 06/14/18 | 06/28/18 | 48,500.00 | (2,500.00) | 46,000.00 | 10% | 13 | 14 | 186 |
| 06/28/18 | 07/23/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 25 | 315 |
| 07/23/18 | 07/25/18 | (4,000.00) | 10,000.00 | 6,000.00 | 10% | (1) | 2 | (2) |
| 07/25/18 | 07/27/18 | 6,000.00 | 10,000.00 | 16,000.00 | 10% | 2 | 2 | 3 |
| 07/27/18 | 07/31/18 | 16,000.00 | 10,000.00 | 26,000.00 | 10% | 4 | 4 | 18 |
| 07/31/18 | 08/13/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 13 | 93 |
| 08/13/18 | 08/13/18 | 46,000.00 | (50,000.00) | (4,000.00) | 10% | 13 | 0 | 0 |
| 08/13/18 | 08/15/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 2 | (2) |
| 08/15/18 | 08/27/18 | 46,000.00 | (20,000.00) | 26,000.00 | 10% | 13 | 12 | 151 |
| 08/27/18 | 08/27/18 | 26,000.00 | 20,000.00 | 46,000.00 | 10% | 7 | 0 | 0 |
| 08/27/18 | 08/31/18 | 46,000.00 | (10,000.00) | 36,000.00 | 10% | 13 | 4 | 50 |
| 08/31/18 | 08/31/18 | 36,000.00 | (40,000.00) | (4,000.00) | 10% | 10 | 0 | 0 |
| 08/31/18 | 09/06/18 | (4,000.00) | 50,000.00 | 46,000.00 | 10% | (1) | 6 | (7) |
| 09/06/18 | 09/12/18 | 46,000.00 | (25,000.00) | 21,000.00 | 10% | 13 | 6 | 76 |
| 09/12/18 | 09/18/18 | 21,000.00 | 25,000.00 | 46,000.00 | 10% | 6 | 6 | 35 |
| 09/18/18 | 11/05/18 | 46,000.00 | (5,000.00) | 41,000.00 | 10% | 13 | 48 | 605 |
| 11/05/18 | 11/14/18 | 41,000.00 | (15,000.00) | 26,000.00 | 10% | 11 | 9 | 101 |
| 11/14/18 | 03/21/19 | 26,000.00 | 3,217.88 | 29,217.88 | 10% | 7 | 127 | 905 |
| 03/21/19 | 03/22/19 | 29,217.88 | 1,674.93 | 30,892.81 | 10% | 8 | 1 | 8 |
| 03/22/19 | 04/18/19 | 30,892.81 | 165,000.00 | 195,892.81 | 10% | 8 | 27 | 229 |
| 04/18/19 | 05/17/19 | 195,892.81 | 5,000.00 | 200,892.81 | 10% | 54 | 29 | 1,556 |
| 05/17/19 | 06/20/19 | 200,892.81 | (10,000.00) | 190,892.81 | 10% | 55 | 34 | 1,871 |
| 06/20/19 | 06/26/19 | 190,892.81 | (40,000.00) | 150,892.81 | 10% | 52 | 6 | 314 |
| 06/26/19 | 07/01/19 | 150,892.81 | (150,000.00) | 892.81 | 10% | 41 | 5 | 207 |
| 07/01/19 | 07/11/19 | 892.81 | 150,000.00 | 150,892.81 | 10% | 0 | 10 | 2 |
| 07/11/19 | 08/01/19 | 150,892.81 | (5,000.00) | 145,892.81 | 10% | 41 | 21 | 868 |
| 08/01/19 | 08/29/19 | 145,892.81 | (10,000.00) | 135,892.81 | 10% | 40 | 28 | 1,119 |
| 08/29/19 | 10/07/19 | 135,892.81 | (5,000.00) | 130,892.81 | 10% | 37 | 39 | 1,452 |
| 10/07/19 | 11/12/19 | 130,892.81 | (5,000.00) | 125,892.81 | 10% | 36 | 36 | 1,291 |
| 11/12/19 | 01/23/20 | 125,892.81 | (8,000.00) | 117,892.81 | 10% | 34 | 72 | 2,483 |
| 01/23/20 | 02/11/20 | 117,892.81 | (5,000.00) | 112,892.81 | 10% | 32 | 19 | 614 |
| 02/11/20 | 03/12/20 | 112,892.81 | (10,000.00) | 102,892.81 | 10% | 31 | 30 | 928 |
| 03/12/20 | 04/22/20 | 102,892.81 | (25,000.00) | 77,892.81 | 10% | 28 | 41 | 1,156 |
| 04/22/20 | 06/08/20 | 77,892.81 | (15,000.00) | 62,892.81 | 10% | 21 | 47 | 1,003 |
| 06/08/20 | 07/12/20 | 62,892.81 | - | 62,892.81 | 10% | 17 | 34 | 586 |
| | | | 62,893 | | | | 772 | 18,391 |

| Other Loans Summary | |
|---|---|
| Loan Duration | 2.1 Years |
| Principal Due | 62,893 |
| Interest Due | 18,391 |
| Total Due | 81,284 |

ii.    Capital Contributions and Loans.

9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2    Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LIVE PRIMARY, LLC,<br><br>                          Debtor. | Chapter 11<br><br>Case No. 20–11612 (MG) |

## NOTICE OF DEPOSITION OF JOEL SCHREIBER
## AND A CORPORATE REPRESENTATIVE OF
## <u>PRIMARY MEMBER, LLC</u>

TO:    Joel Schreiber
         c/o Goldberg Weprin Finkel Goldstein LLP
         1501 Broadway, 22nd Floor
         New York, New York 10036
         Attn: Neal M. Rosenbloom, Esq. and Kevin J. Nash, Esq.

**NOTICE IS HEREBY** given that the Noteholders (the "<u>Noteholders</u>") of Live

Primary, LLC, (the "<u>Debtor</u>"), and the Debtor will take the oral deposition of Joel

Schreiber, and a corporate representative of Primary Member, LLC, on **January 27,**

**2021 at 9:30 a.m.** pursuant to Fed. R. Bankr. P. 7030(b)(6).  The deposition will be

conducted remotely, using audio-visual conference technology on the Zoom

platform.  The following protocols will apply to this deposition:

       1.     The testimony will be given before a notary public, court reporter or

other duly authorized officer, authorized to administer oaths ("<u>Court Reporter</u>").

The Court Reporter will also attend the deposition via Zoom.  All parties will be

notified through counsel of the identity of the Court Reporter at least three days

before the date on which the deposition is scheduled to take place.

EXHIBIT

1A

2.      The Court Reporter will record this deposition stenographically and by using the Zoom record feature, and no other recordings of the proceedings will be made.  The Court Reporter will administer the oath to the witness remotely under the Federal Rules of Civil Procedure.  The witness is required to provide government-issued identification satisfactory to the Court Reporter.  This identification must be legible on camera, and a copy must be provided to the Court Reporter at least three business days before the date of the deposition.

3.      All those participating in the deposition, including the witness, must provide the Court Reporter with (i) a telephone number and (ii) an e-mail address at least three business days prior to the deposition. The Court Reporter will be contacting those participants prior to the deposition to provide the necessary credentials, call-in numbers, readiness testing and information.

4.      All participants wishing to appear at the deposition need: (i) a computer with a "webcam" (camera); (ii) internet access; (iii) sufficient bandwidth to support uninterrupted video streaming with audio (generally a minimum internet speed of 1.5Mbs, although 5Mbs is recommended), and (iv) a phone connection.  The witness or counsel for the witness shall be responsible for securing sufficient internet access for the witness.

5.      Counsel for the parties, client attendees, corporate representatives, the court reporter, and the witness will be attending the deposition from various, separate

locations. The witness must either be alone in the room where the testimony is being given, with no other person in physical attendance, or, in the alternative, counsel representing the witness may be in the same room as the witness, as long as both persons are in view of the video camera at all times testimony is being taken.

6.      All persons attending the deposition via video or audio will be noted on the record.

7.      Each participating attorney must be visible to all other participants, and their statements must be audible to all participants.

8.      All exhibits will be provided to all counsel and the witness electronically during the deposition via e-mail and/or shared screen.

9.      Counsel for all parties will be requested to stipulate on the record:

a.      Consent to this manner of deposition;

b.      Waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition;

c.      Administration of oaths may be made remotely and the parties waive any objection to the administration of an oath by a person that may not be authorized to administer oaths in the place where the witness is located;

d.      Counsel defending the deposition will not communicate and has not communicated with the witness during the deposition while the witness

was "on the record" other than communications that have been made before all persons attending the deposition; and

  e. The witness will not use or consult and has not used and consulted any notes or documents (other than deposition exhibits provided during the deposition) or means of communication while "on the record" during the deposition other than audio and video communication used to conduct the deposition itself, including without limitation electronic communications such as e-mail, text, social media, and other communications such as phone and real time feed of the transcript.

10. If any of the parties will refuse to stipulate to any of the rules set forth in paragraph 8 above, counsel for that party is requested to contact counsel for the Noteholders (dweiner@schaferandweiner.com), and Debtor (srosen@rosenpc.com) at least three business days prior to the date on which the deposition is scheduled and give notice of the intended refusal to stipulate.

## MATTERS DESIGNATED

Pursuant to Fed. R. Bankr. P. 30(b)(6), the examination of the corporate representative of Primary Member, LLC will pertain to the following matters:

  A. The relationship between the Debtor and Primary Member, LLC from the Debtor's inception through the date of the conclusion of the evidentiary

hearing on the objection to Proof of Claim No. 8 and attachments (the "Proof of Claim");

      B.      Noteholders' *First Document Request to Primary Member, LLC* ("Claimant") and responses thereto;

      C.      Noteholders' *First Supplement to Noteholders' First Document Request to Claimant* and responses thereto;

      D.      Noteholders' *First Request for Admissions to Claimant* and responses thereto;

      E.      Proof of Claim and attachments;

      F.      The terms and conditions under which loans were allegedly made by Claimant to the Debtor;

      G.      The financial condition of the Debtor at the times the loans were allegedly made;

      H.      The purposes for which the proceeds of the loans were used; and

      I.      The issues raised in the Objection to the Claim.

*Waterbridge Capital, LLC*
*Website*

## About Us

Since 2000, Waterbridge Capital has established itself as a prominent real estate investment firm based in New York City. With strategic joint venture partners, Waterbridge has over 3.0 million square feet of assets under management valued at a market capitalization of over $2.0 billion.

Waterbridge targets investments in core-plus, value-added or opportunistic properties in the office, retail, hotel and multifamily sectors, which they acquire to be repositioned or redeveloped. Waterbridge's asset management team adds value to its investments through efficient property management, capital improvements and enhanced leasing that result in higher income earning investments.

Waterbridge's acquisition team identifies, acquires, and adds value to underperforming real estate assets in prime locations and generates significant returns for investors and partners. As a result of its relationships with the brokerage and investment communities, Waterbridge has a history of identifying off-market investment opportunities. The Waterbridge investment team collectively has more than thirty years of New York City real estate experience.

About Us        Team        Contact Us

**EXHIBIT**

**3**

exhibitsticker.com

## Joel Schreiber – Chief Executive Officer

Joel Schreiber founded Waterbridge Capital in 2006 and serves as the company's CEO. Mr. Schreiber was born & raised in London and currently resides in New York with his wife and children. Since 2000, his first real estate investments in the United States were residential properties in Brooklyn, upstate New York, and New Jersey. By the end of 2004, he sold off most of his residential portfolio and began to focus on commercial properties in Manhattan.

Mr. Schreiber and Waterbridge have been most active acquiring core plus, value-added and opportunistic assets in downtown Manhattan, with a focus on retail, office, and multifamily properties in Soho, Tribeca, the Meatpacking, Nolita, Chelsea, and the West Village.

## Avi Rosen - Chief Operating Officer

Avi Rosen joined Waterbridge Capital in 2013 as Chief Operating Officer. Prior to Waterbridge, Avi was Chief Operating Officer for Carnegie Hill Properties, a full-service real estate organization that owns and manages a cross section of asset classes throughout New York City and Los Angeles valued at over $500 million. In that capacity, Avi oversaw all aspects of the company's operations, including acquisitions, dispositions, asset management, property management, leasing and marketing. Before moving to New York, Avi worked at London & Newcastle, a joint venture company between Londonewcastle, Chelsfield Partners and the Bank of Scotland, in

About Us      Team      Contact Us

between LondonNewcastle, Chelsfield Partners and the Bank of Scotland, in acquisitions, sourcing and acquiring high specification mixed-use developments schemes in central London. During Avi's tenure at London & Newcastle, the pipeline development portfolio was expanded from a gross development value of £150 million to £800 million.

## Charles Valentino – Senior Vice President

Charles Valentino joined Waterbridge Capital in April, 2012 as Senior Vice President. He has nearly forty years of experience in the institutional real estate business with extensive experience in acquisitions, asset management, and portfolio management. Before joining Waterbridge, Mr. Valentino was a Senior Vice President for KBS Realty Advisors with asset management responsibilities for their Northeast Portfolio, which consisted over time of 12.2 million square feet of office, industrial, and residential properties. In this capacity, he was directly responsible for the management, leasing, and repositioning of these assets for disposition. During his tenure at KBS he oversaw the disposition of 6.3 million square feet of properties at a gross sales price of $1.1 billion. These sales generated profits in excess of $200 million. Mr. Valentino has also held a variety of senior level positions with several major firms, most notably, as Managing Director of Acquisitions at Copley Real Estate Advisors (now AEW Capital Management) and as Acquisition Investment Officer of the Real Estate Investment Group of CIGNA.

About Us        Team        Contact Us

Mr. Valentino is a Certified Public Accountant and a graduate of the Wharton School of the University of Pennsylvania..

## Contact Us

**Waterbridge Capital**
115 West 18th Street
2nd Floor
New York, New York 10011

**Phone:** 212-696-2400
**Fax:** 212-696-2401

info@waterbridge.com

About Us      Team      Contact Us

LIMITED LIABILITY COMPANY AGREEMENT

of

PRIMARY, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

Dated:  As of July 28, 2015

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES
SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE
SECURITIES LAWS.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED,
PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN
COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND
ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE
OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.

EXHIBIT

5

exhibitsticker.com

JS 100°
UK,

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### PRIMARY, LLC

This Limited Liability Company Agreement (this "Agreement") of Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of July 28, 2015 (the "Effective Date") by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual and Daniel Orenstein ("DO"), an individual, as members (individually, a "Member" and collectively, the "Members"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.      Formation. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.      Name. The name of the Company shall be "Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.      Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.      Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

5.      Principal Office. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.      Term. The term of the Company shall commence upon the Effective Date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

JS

7.    Members. The Company shall have initially three (3) Members. The names, mailing addresses and the number of ownership Units in the Company held by the Members are as set forth on Schedule I. Notwithstanding the pro rata ownership of the Members, on any corporate action on which the Members are required to consent pursuant to this Agreement, the consent of PM shall be required for the approval of such corporate action.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized persons for all purposes of the Act is and shall be LSH and DO each as a member-manager (collectively the "Managers" and each individually a "Manager") of the Company. The Managers shall be the sole Persons with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by both Managers. The Managers shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company. In the event of a disagreement between the Managers, the majority vote of the Members shall determine the outcome of such disagreement.

8.2    Furthermore, notwithstanding the foregoing, the Managers shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without the written consent or affirmative vote of all the Members, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

(a)    liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(b)    amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(c)    create, or authorize the creation of, or issue or obligate itself to issue any additional Units or increase the authorized number of any Units, except pursuant to this Agreement;

(d)    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(e)    make, or permit any subsidiary to make, any loan or advance to any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Members;

-2-

         (f)      guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000 except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

         (g)      make any investment inconsistent with any investment policy approved by the Members;

         (h)      make any capital expenditure that is not already included in a budget approved by the Members greater than $10,000;

         (i)      incur any aggregate indebtedness greater than $10,000 that is not already included in a budget approved by the Members, other than trade credit incurred in the ordinary course of business;

         (j)      otherwise enter into or be a party to any transaction with any Member, officer, or employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Members;

         (k)      hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment, which shall be determined pursuant to Schedule 8.6 ), including approving any option grants or Unit awards to executive officers or Members;

         (l)      deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget; or

         (m)      enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $50,000.

         8.3      Binding Authority. Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

         8.4      Liability for Certain Acts. The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

         8.5      Duty to Company.

JS

     BYO
     LSB

(a)    As Managing Members of the Company, LSH and DO shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

(b)    The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

(c)    Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH and DO may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

### 8.6    Indemnification.

(a)    The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorney's fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the

-4-

payment of the Indemnitee's reasonable attorney's fees in connection with any action or proceeding brought against the Indemnitee.

        8.7    Expenses, Fees, and Compensation. Except as may be (a) approved by the Members in writing, (b) set forth in any budget approved by the Members related to a shared office facility or (c) pursuant to a Company reimbursement policy approved by the Members, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 8.6 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Members.

        8.8    Officers. The Managers may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers. The Managers may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

        8.9    Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

        8.10    Meetings. All meetings of the Members or Managers shall be held at such time and place as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting.

        9.    Capital Contributions and Loans.

        9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

        9.2    Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested

-5-




by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

          9.3    Disbursement Process. The Managers shall deliver a written Disbursement Request to PM in accordance with and pursuant to the Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement request is not funded by PM within two (2) business days (the "Disbursement Date"), PM shall be in default hereunder (a "Disbursement Default"). PM shall have a period of sixty (60) days from the Disbursement Date to cure the Disbursement Default before the Disbursement Default penalty is triggered (the "Trigger Date").

          (a)    Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

          (b)    Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM' Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM' forty (40) Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

          (c)    Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

          (d)    In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

          9.4    No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to

-6-



receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

9.5     Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

9.6     No Priority. Subject to Section 10.2, no Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

9.7     Liability of Members and Their Affiliates for Capital and Debts. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

10.     Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)     The Company shall maintain a separate capital account ("Capital Account") for each Member and its successors and permitted assigns.

(b)     The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

(c)     In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

(d)     In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective

-7-



gross fair market values, as of the following dates: (i) the issuance of Interests to any new or
existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution);
(ii) the distribution by the Company to a Member of money or other property (other than a *de
minimis* amount) as consideration for an Interest in the Company, unless all Members receive
simultaneous distributions of undivided interests in the distributed assets in proportion to their
Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section
1.704-1(b)(2)(ii)(g).

(e)     For purposes of computing the amount of any item of
Profits and Losses to be reflected in Capital Accounts, the determination, recognition and
classification of each such item shall be the same as its determination, recognition and
classification for federal income tax purposes except that:

(i)     any deductions for depreciation, amortization or similar
expense attributable to property which has a Gross Asset Value different from its
adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value
of such property as determined pursuant to Section 10.1(c).

(ii)     Profits or Losses resulting from any disposition of
Company property shall be computed by reference to the Gross Asset Value of the
property disposed of, notwithstanding that the adjusted tax basis of such property differs
from its Gross Asset Value.

(f)     In the event of a transfer of an Interest or any portion
thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or
successor-in-interest is then a Member, the Person so acquiring such Interest or any portion
thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such
Interest. The cost of computing such adjustment shall be borne by the Member disposing of such
Interest.

(g)     The foregoing provisions and other provisions of this
Agreement relating to the maintenance of Capital Accounts are intended to comply with
Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2     Distributions of Available Cash.

(a)     The Company shall distribute all or any portion of
Available Cash to the Members pro rata in accordance with their respective Units.

(b)     Notwithstanding Section 10.2(a) above, in the event that
the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath
or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and
the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have
each received cash flow percentages therefrom equal to their Membership Interests. Any cash
flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

-8-



(c) Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

(d) Notwithstanding Section 10.2(c) above, upon the Company achieving:

(i) Annual revenues of $500,000;

(ii) a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

(iii) Other milestones agreed upon by all the Members

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective Units.

10.3    Distributions in Kind. In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4    Profits and Losses.

(a)    Generally.

(i) The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii) In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "Effective Date") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)    Allocation of Profits and Losses. Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise

-9-




provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

        (c)    Special Allocation Provisions.

        (i)    Qualified Income Offset. In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

        (ii)    Member Nonrecourse Deductions. Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

        (iii)    Minimum Gain Chargeback.

        (A)    Company Minimum Gain. Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be

-10-



allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)    Member Nonrecourse Debt Minimum Gain.  Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)    Section 704(c) Allocation.

(A)    Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax

-11-

purposes and its fair market value at the time such property was contributed to the Company.

     (B)    In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

     (C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

     (v)    Members' Interest in Company Profits For Purposes of Section 752. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

     (vi)    Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

     (vii)    Regulatory Compliance. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

     (viii)    Curative Allocations. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising

-12-



its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

        (ix)    Loss Allocation Limitation. Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

        10.5    No Obligation to Restore Negative Balances in Capital Accounts. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

        10.6    Tax Allocations. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

        10.7    Member Tax Distributions.

        (a)    Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

        (b)    A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

        (i)    his share of the Company's income for such Fiscal Year

over

        (ii)    the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

-13-

(c)    The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

(d)    This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

(e)    Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for-dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

(f)    To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

10.8    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.    Books and Records.

11.1    Books of Account.

(a)    Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon reasonable advance request.

(b)    Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law,

-14-

provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.2    Tax Elections. The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company. As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3    Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

11.4    Tax Returns. The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5    Tax Matters Member. The Members shall designate the LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.    Transfers of Interests of Members.

12.1    General.

(a)    Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided,

-15-



however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)      If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

(i)      The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)      the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)      the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)      the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)      if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)      the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)      the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring

-16-

Member(s), certifying that the transferee is an "accredited investor" within the meaning
of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company
until all of the reasonable conditions to such Transfer established by the Company have been
fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly
cause any necessary documents or instruments to be filed, recorded or published, wherever
required, if any, showing the substitution of the transferee as a substitute Member in place of the
transferring Member or as an additional Member, as appropriate. All Transfers are subject to
applicable provisions of the Securities Act of 1933, as amended, and all other federal and state
securities laws.

(c)     A transferee of an Interest shall be entitled to receive
distributions of cash or other property from the Company attributable to the Interest acquired by
reason of such Transfer from and after the effective date of the Transfer of such Interest to it;
provided, however, that anything herein to the contrary notwithstanding, the Company shall be
entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and
shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions
that are made in good faith to such transferor until such time as all of the conditions of such
Transfer have been fulfilled, the written instrument of Transfer has been received by the
Company and the effective date of Transfer has passed. Further, a transferee of an Interest under
and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with
respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the
calendar month following receipt of notice of assignment and such documentation as the
Company determines is required. The transferring Member shall cease to be, and the transferee
shall become, a substituted Member as to the Interest so transferred as of the effective date, and
thereafter the transferring Member shall have no rights or obligations with respect to the
Company insofar as the Interest transferred is concerned.

(d)     Notwithstanding anything to the contrary in this
Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person
who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or
otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest,
(iv) which would cause the termination of the Company within the meaning of Section 708 of the
Code and, in addition, such termination would have a material adverse effect on the Members, or
(v) which would cause any Member to cease to qualify as an "accredited investor" within the
meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall
be void *ab initio* and shall not bind the Company.

(e)     In the event that any Transfers under this Agreement result
in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any
previous Transfers which are aggregated with the Transfer in question for purposes of the
imposition of transfer tax), then each transferor (including such previous transferors) whose
Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of
the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The

-17-

JS

terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

            12.2   Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

            12.3   Death or Permanent Disability of a Member.

            (a)   Death. Not later than ninety (90) days after the death of any Member (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their

-18-

economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)    Permanent Disability. Not later than ninety (90) days after the determination that any Member has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers. If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company. For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)    Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company.

-19-

JS    MW
USK

Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

          12.4    Transfers by operation of Law. In the event that the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

          12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

          12.6    Purchase Price.

          (a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

          (b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity

-20-



purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

(c)    Manner of Payment.    The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

(i)    An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

(ii)    The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

(iii)    in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

(iv)    the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall

-21-

be entitled to bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale. The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default. Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him. Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said Units. Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

(v)    The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

(1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

(2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

(3) the buyer is adjudicated a bankrupt, makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

13.    Withdrawal or Resignation. Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.    Admission of Additional Members. The Company may admit new Members, subject to Section 14.1.

14.1    Right of First Offer. Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

(a)    If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

-22-

(b)      The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

15.    Dissolution.

15.1    Dissolution. The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2    Liquidation.

(a)      Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The winding up of the affairs assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)      Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

(a)      General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

(b)      Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law,

-23-

provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

      16.    Participation in Sales.

      16.1    Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

      16.2    Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

      16.3    Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

      16.4    "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and the majority of the Members of the Company approves such transaction, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

-24-

17.    Reserved.

18.    Guaranty of Real Estate Obligations. PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

19.    Miscellaneous.

19.1    Entire Agreement; Amendment. This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled. This Agreement may not be changed, modified, amended, discharged, abandoned or terminated orally, but only by an agreement in writing, signed by all of the Members.

19.2    Severability. If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3    Preparation and Review of Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4    Notices. Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5    Governing Law; Venue.

(a)    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)    Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such

-25-

action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19.6   Counterparts; Signatures.  This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

19.7   No Third Party Beneficiaries.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of NEW YORK
The foregoing instrument was acknowledged before me this 28 of JULY , 2015, by Joel Schreiber, who personally appeared.

Notary's Signature
My commission expires the 17 of January, 20 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

Lisa Skye Hain

Daniel Orenstein

State of New York,
County of NEW YORK
The foregoing instrument was acknowledged before me this 28 of JULY , 2015, by Lisa Skye Hain and Daniel Orenstein who each personally appeared.

Notary's Signature
My commission expires the 17 of January, 20 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

MALGORZATA T LESZCZYNSKA
Notary Public - State of New York
NO. 01LE6254612
Qualified in Kings County
My Commission Expires 01 17 16

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Units |
|--------|-----------------|----------------------|-------|
| Primary Member, LLC | 7 Times Square 37th Floor New York, NY 10036 | $400.00 | 3,600.00 |
| Lisa Skye Hain | 110 Livingston St. Apt. 15H Brooklyn, NY 11201 | $300.00 | 2,700.00 |
| Daniel Orenstein | 52 Fort Greene Pl. Apt. 1 Brooklyn, NY 11217 | $300.00 | 2,700.00 |
| The 2015 Company Unit Option Plan | | TBD | 1,000.00 |
| Total: | | $1,000.00 | 10,000.00 |

JS    mo
LB

Schedule 2

Definitions

"*Act*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Additional Capital Contributions*" means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

"*Affiliate(s)*" shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

"*Agreement*" shall have the meaning set forth in the introductory paragraphs hereto.

"*Approved Loan*" shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

"*Available Cash*" means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

"*Bankrupt*" shall have the meaning set forth in Section 15.4(b).

"*Bankruptcy*" shall have the meaning set forth in Section 15.4(b).

"*Business Day*" shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

"*Business Hours*" shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

Sch. 2 – Page 1

Field Code Changed

*"Capital Account"* shall have the meaning set forth in Section 10.1(a).

*"Capital Contributions"* means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

*"Code"* shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

*"Company"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Courts"* shall have the meaning set forth in Section 16.5.

*"Economic Risk of Loss"* shall have the meaning set forth in Section 10.4(c).

*"Effective Date"* shall have the meaning set forth in Section 10.4(a).

*"Fiscal Year"* or *"Fiscal Period"* means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

*"Gross Asset Value"* shall have the meaning set forth in Section 10.1(c).

*"Indemnitee"* shall have the meaning set forth in Section 8.5(b).

*"Liquidity Event"* Each of the following events shall be considered a "Liquity Event" unless the Members elect otherwise by written notice:

    (a)    a merger or consolidation in which

        (i)    the Company is a constituent party or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

    (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company

Sch. 2 – Page 2

Field Code Changed

of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

"*Loan Documents*" shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

"*Member(s)*" shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

"*Member Nonrecourse Deductions*" shall have the meaning set forth in Section 10.4(c).

"*New Securities*" shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "*Exempted Securities*"):

(i)    Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Members;

(iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Members;

(vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

(vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by the Members; or

Field Code Changed

Sch. 2 – Page 3

(viii)   Units, Options or Convertible Securities issued in connection with strategic partnerships approved by the Members.

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

*"Profits"* or *"Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Property"* shall have the meaning set forth in Section 2.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions. In the case of PM, the Transfer of any of the interests of PM to any

Sch. 2 – Page 4

Field Code Changed




Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

*"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Units shall be considered personal property. The initial Units of each Member are set forth on Schedule 1 annexed hereto.

Field Code Changed

Schedule 8.6

Fees, Expenses and Compensation

Effective on the Effective Date, the Company shall pay to LS on a monthly basis an amount equal to ten thousand dollars ($10,000.00) (the "LS Salary"), as may be amended pursuant the consent of the Members.

Effective on the Effective Date, the Company shall pay to DO on a monthly basis an amount equal to two thousand five hundred dollars ($2,500.00) until the six-month anniversary of the Effective Date, at which time the Company shall pay to DO on a monthly basis ten thousand dollars ($10,000.00) (the "DO Salary"), as may be amended pursuant the consent of the Members.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LSH Salary (the "PM Payment"). PM may waive the Company's obligation to pay the PM Payment, in its sole discretion.

**Field Code Changed**

Sch. 2 – Page 6

EXECUTION COPY

# FIRST AMENDMENT TO

## LIMITED LIABILITY COMPANY AGREEMENT

of

## LIVE PRIMARY, LLC,
## A DELAWARE LIMITED LIABILITY COMPANY

Dated: As of December 15, 2017

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT AND BY THE JULY 28, 2016 LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.

I

**EXHIBIT**

6

**THIS FIRST AMENDMENT TO THE LIMITED LIABILITY COMPANY
AGREEMENT OF LIVE PRIMARY, LLC** (this "Amendment"), dated as of December 15,
2017, is entered into by and among the members (each individually a "Member" and collectively
the "Members") of Live Primary, LLC (the "Company").

**WHEREAS,** the initial Members of the Company entered into a Limited Liability
Company Agreement dated as of July 28, 2015 (the "Initial LLC Agreement"); and

**WHEREAS,** the Company and the Members wish to amend the Initial LLC
Agreement;

**NOW, THEREFORE,** for and in consideration of the agreements and
obligations set forth herein and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**Section 2 of the Initial LLC Agreement shall be, and hereby is, deleted in its
entirety and shall be, and hereby is, replaced by the following:**

2. *Name.*

*The name of the Company shall be "Live Primary, LLC" and all business of the
Company shall be conducted in such name. The Company shall hold all of its Property in the
name of the Company and not in the name of the Members.*

**Section 7 of the Initial LLC Agreement shall be, and hereby is, deleted in its
entirety and shall be, and hereby is, replaced by the following:**

7. *Members, Units and and Voting.*

*(a) Members. As of the date hereof, the Company has three (3) Members. The
names, mailing addresses and the number of ownership Units in the Company held by the
Members are as set forth on Schedule 1.*

*(b) Classification of Units. The Company shall have two classes of equity, which
shall be represented by limited liability company units ("Units"). After giving effect to the
redemption of 2,430 Units from DO, the conversion of DO's remaining 270 Units to Class B
Units and the issuance of a total of 2,430 Class A Units to LSH and PM as of the date of the
First Amendment to this Agreement, a total of 8,730 Class A Units and 1,270 Class B Units are
issued and outstanding or reserved for issuance as set forth on Schedule 1.*

*(c) Voting. Unless otherwise set forth in this Agreement, only the holders of Class
A Units shall have the right to vote, pro rata, in proportion to their ownership of Class A Units
on matters presented to the Members. References in this Agreement to the vote of the Members
or to the approval or consent of the Members shall mean the vote, approval or consent of the
holders of Class A Units. Any action which may be taken at a meeting of the Members may be
taken without a meeting if Members representing votes sufficient to approve such action consent
thereto in writing. Upon redemption of all Class A Units (if such a redemption occurs), the*

1

holders of Class B Units shall be entitled to vote, pro rata, in proportion to their ownership of
Class B Units.

Section 8.1 of the Initial LLC Agreement shall be, and hereby is, deleted in
its entirety and shall be, and hereby is, replaced by the following:

8.1    The business and affairs of the Company shall be managed solely and
exclusively by, management of the Company shall be vested solely and exclusively in, and the
sole authorized person(s) for all purposes of the Act is and shall be LSH as a member-manager,
together with any such additional managers as might be added by later amendment of this
Agreement (individually and collectively, the "Manager" or "Managers" of the Company). DO
has resigned as a Manager as of the date of the First Amendment to this Agreement. The
Manager(s) shall be the sole Person(s) with the power to bind the Company, except and to the
extent that such power is expressly delegated to any other Person by a unanimous vote of all of
the Class A Members. The Manager(s) shall have the right, power and authority, acting jointly in
the management of the business and affairs of the Company, to execute all documents or
instruments, perform all duties and powers and do all things for and on behalf of the Company in
all matters necessary, desirable, convenient or incidental to the purpose of the Company. In the
event that additional Manager(s) are appointed in the future, and a disagreement between them
occurs, such disagreement shall be resolved by a vote of the holders of Class A Units (also
referred to as the "Class A Members"), pro rata, in proportion to their ownership of Class A
Units.

Section 8.2 of the Initial LLC Agreement shall be, and hereby is, deleted in
its entirety and shall be, and hereby is, replaced by the following:

8.2    (a) The Company shall have a supervisory committee (the "Supervisory
Committee"), for the sole purpose of deciding on the significant matters listed in clauses (i)
through (v) of this Section 8.2(a) (each, a "Supervisory Committee Major Decision"). The initial
members of the Supervisory Committee shall be Joel Schreiber, Lisa Skye Hain and Brian Hain.
LSH shall at all times have the right to appoint two members to the Supervisory Committee, and
PM shall at all times have the right to appoint one member to the Supervisory Committee. The
Manager(s) shall not, either directly or indirectly by amendment, merger, consolidation or
otherwise, do, approve, or otherwise act on any of the following Supervisory Committee Major
Decisions without the affirmative written consent of at least two (2) members of the Supervisory
Committee:

(i)    the decision to open additional locations;

(ii)    the raising of additional equity capital, including by creating or issuing
any additional Units; provided, however, that PM shall have the right of first refusal to invest
additional capital on the terms and conditions that are offered by the Company to any third
party, which right must be exercised by PM by notice delivered to the Company within ten (10)
business days after PM's receipt of the Company's written notice containing the material terms
and conditions of the proposed third party investment, including a copy of any term sheet or
letter of intent;

2

(iii)    make any individual capital expenditure in an amount between $10,000 and $30,000 that is not already included in a budget approved by the Class A Members; such items shall not exceed $75,000 in any calendar year;

(iv)    incur any aggregate indebtedness, except for an aggregate amount not to exceed $100,000, not already included in a budget approved by the Class A Members, other than trade credit incurred in the ordinary course of business; or

(v)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company of money and/or assets in an amount not greater than $50,000.

(b) The following actions shall require the unanimous written approval of all Class A Members:

(i)    liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(ii)    amend, alter or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(iii)    make, or permit any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(iv)    make, or permit any subsidiary to make, any loan or advance to, any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Supervisory Committee;

(v)    guarantee, directly or indirectly, or permit any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000, except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(vi)    make any individual capital expenditure greater than $30,000 that is not already included in a budget approved by the Class A Members;

(vii)    incur any indebtedness not already included in a budget approved by the Class A Members (except for an aggregate amount not to exceed $100,000 that may be approved by the Supervisory Committee and except for trade credit incurred in the ordinary course of business);

(viii)    enter into any corporate strategic relationship involving the payment, contribution or assignment by the Company of money and/or assets in an amount greater than $50,000;

3

(ix)    enter into or be a party to any transaction with any Member or executive officer level employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by the Supervisory Committee;

(x)    hire, terminate, or change the compensation of the executive officers or Members (other than the PM Payment and the LS Salary, which are contractual obligations of the Company and shall be determined pursuant to Schedule 4.0), including approving any option grants or Unit awards to executive officers or Members; or

(xi)    deviate from the Company's approved business plan, or in the absence of a business plan, change the principal business of the Company, enter new lines of business, or exit the current line of business or deviate from the Company's approved annual budget.

Section 8.5(a) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

(a)    The Manager(s) of the Company shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

Section 8.5(c) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

Section 8.6(a) of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:

The Company shall indemnify and hold harmless each Member, Manager and Supervisory Committee member from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member, Manager or Supervisory Committee member in any way related to or arising out of this Agreement, the Company's affairs, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of

4

the Member, Manager or Supervisory Committee member on behalf of the Company to the
maximum extent permitted under the Act, including but not limited to the payment of the
Member's, Manager's or Supervisory Committee member's reasonable attorney's fees in
connection with any action or proceeding brought against the Member, Manager or Supervisory
Committee member, except where the Member, Manager or Supervisory Committee member is
found to be grossly negligent or has committed willful misconduct. All costs and expenses
(including reasonable costs and expenses of investigation and reasonable attorneys' fees)
incurred by the Member, Manager or Supervisory Committee member in defending any civil,
criminal, administrative or investigative action, suit or proceeding may be paid by the Company
in advance of the final disposition of such action, suit or proceeding upon receipt of a written
undertaking by, or on behalf of, the Member, Manager or Supervisory Committee member to
repay such amount if it shall ultimately be determined that he or she is not entitled to be
indemnified by the Company as authorized by this Section 8.6(a).

**Section 8.7 of the Initial LLC Agreement shall be, and hereby is, deleted in
its entirety and shall be, and hereby is, replaced by the following:**

8.7    *Expenses, Fees, and Compensation. Except as may be (a) approved by a
vote of the Class A Members, (b) set forth in an Approved Budget or (c) pursuant to a Company
reimbursement policy approved by a vote of all of the Members holding Class A Units, none of
the Members or Manager nor any of their respective stockholders, partners, members, directors,
officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on
behalf of the Company, or (ii) to any fees, salaries or other compensation for any services
rendered to, or on behalf of, the Company, except as set forth in Schedule 4 attached hereto and
incorporated by reference herein, as may be amended from time to time by a vote of the Class A
Members.*

**Section 9.3 of the Initial LLC Agreement shall be, and hereby is, deleted in
its entirety and shall be, and hereby is, replaced by the following:**

9.3    *Disbursement Process. The Manager(s) shall deliver a written
Disbursement Request to PM in accordance with and pursuant to an Approved Budget, although
the amount of capital requested in a Disbursement Request may be in excess of the applicable
budgeted amount to allow the Company to maintain reasonable reserves for various
contingencies. In the event a Disbursement Request is not funded in full by PM within seventy-
two (72) Business Hours after the Disbursement Request is sent by the Manager(s) (the time
which is seventy-two (72) Business Hours after the Disbursement Request is sent being the
"Disbursement Deadline"), PM shall be in default hereunder (a "Disbursement Default"). A
Disbursement Default will automatically and immediately trigger the Default Fee, Bridge and all
other rights and obligations set forth in Sections 9.3(a), 9.3(c) and 9.3(d). PM shall cure the
Disbursement Default within ten (10) Business Days (the date falling ten (10) Business Days
from the Disbursement Deadline being the "Trigger Date"), by funding in full the Disbursement
Request. A failure of PM to so cure on or before the Trigger Date will automatically and
immediately trigger all of the rights and obligations set forth in Section 9.3(b).*

**Section 10.2(d) of the Initial LLC Agreement shall be, and hereby is, deleted
in its entirety and shall be, and hereby is, replaced by the following:**

5

(d)    *Notwithstanding Section 10.2(c) above, upon the Company achieving:*

(i)    *Annual revenues of $500,000;*

(ii)    *a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or*

(iii)    *Other milestones agreed upon by all Class A Members or the Supervisory Committee*

*at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective ownership of Units.*

**Section 16.4 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following:**

16.4    *"Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and such transaction is approved by a vote of the Members holding a majority of Class A Units, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.*

[REMAINDER OF PAGE INTENIONALLY LEFT BLANK]

6

Schedule 1 of the Initial LLC Agreement shall be, and hereby is, deleted in its entirety and shall be, and hereby is, replaced by the following Schedule 1:

Schedule 1

Members

| Member | Mailing Address | Capital Contribution | Class A Units | Class B Units |
|---|---|---|---|---|
| Primary Member, LLC | 115 West 18th Street 2nd Floor New York, NY 10011 | $400.00 | 4,365.00 | -- |
| Lisa Skye Hain | 70 Washington Street Apt. 2U Brooklyn, NY 11201 | $300.00 | 4,365.00 | -- |
| Daniel Orenstein | 110 Livingston Street Apt. 10J Brooklyn, NY 11201 | $300.00 | -- | 270.00 |
| The 2015 Company Unit Option Plan | | TBD | -- | 1,000.00* |
| Total: | | $1,000.00 | 8,730.00 | 1,270.00 |

* The option plan Units have been set aside for future issuance. No options have been granted as of the date hereof.

Schedule 2 of the Initial LLC Agreement shall be, and hereby is, revised by adding the following definition:

*"Approved Budget"* means a budget in the form of Schedule 3 to this Agreement, and signed by the Members, together with such supporting materials as the Manager(s) deem appropriate in his/her/their sole discretion.

Schedule 2 of the Initial LLC Agreement shall be, and hereby is, revised by replacing the prior corresponding definitions in the Initial LLC Agreement, with the following definitions:

*"Agreement"* shall mean the Limited Liability Company Agreement of Live Primary, LLC, dated as of July 28, 2015, as amended by a First Amendment to Limited Liability Company Agreement dated as of December 15, 2017.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by a vote of the Members holding a majority of Class A Units, in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with an Approved Budget and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Class A Interests"* means such Membership Interests in the Company evidenced by Class A Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class A Unit"* shall mean a Unit of Membership Interests designated as a Class A Unit and having the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class B Interests"* means such Membership Interests in the Company evidenced by Class B Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"Class B Unit"* shall mean a Unit of Membership Interests designated as a Class B Unit and having the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"New Securities"* shall mean all Units issued by the Company after the Effective Date, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, **"Exempted Securities"**):

(i)     Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)   Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by a vote of the Members holding a majority of Class A Units;

(iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)     Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by a vote of the Members holding a majority of Class A Units;

(vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Members; or

(vii)   Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by a vote of the Members holding a majority of Class A Units; or

(viii)  Units, Options or Convertible Securities issued in connection with strategic relationships approved by a vote of the Members holding a majority of Class A Units.

The Initial LLC Agreement shall be, and hereby is, revised by adding the following Schedule 3:

Schedule 3

Form Of Approved Budget

## APPROVED BUDGET

Project Name: _____

|    | Budget Item | Cost |
|----|-------------|------|
| 1  | Build Out | $ |
| 2  | Security Deposit | $ |
| 3  | Architect, Filing Fees, Engineering, Tools | $ |
| 4  | Primary Website & Design | $ |
| 5  | Sales & Marketing | $ |
| 6  | G & A | $ |
| 7  | COGS (e.g. Food & Beverage) | $ |
| 8  | Accounting Systems Setup | $ |
| 9  | Security Deposit | $ |
| 10 | Personnel Costs | $ |
| 11 | Legal Fees | $ |
| 12 | Fees for Professional Services | $ |
| 13 | Miscellaneous | $ |
|    | **Total Budget** | $ |

This Budget is hereby approved by the undersigned Class A Members or their undersigned approved representatives.

PRIMARY MEMBER, LLC

_____

By:  Joel Schreiber
Title:  Sole Member

_____

Lisa Skye Hain

- 3 -

The Initial LLC Agreement shall be, and hereby is, revised by changing the schedule number of the previously numbered "Schedule 8.6" (entitled "Fees, Expenses and Compensation") to "Schedule 4." Said re-numbered Schedule 4 shall be amended to read in its entirety as follows:

### Schedule 4

### Fees, Expenses and Compensation

The Company shall continue to pay to LS on a monthly basis an amount equal to five thousand dollars ($5,000.00) (the "LS Salary"). The amount of the LS Salary may be changed with the consent of all Class A Members. All parties accept and confirm the prior payments made to LS for her efforts on behalf of the Company.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LS Salary (the "PM Payment"). PM Payments for the period prior to January 1, 2018 shall be payable at any time at the discretion of the Manager. PM may waive the Company's obligation to pay the PM Payment, in its sole discretion, provided, that the parties acknowledge that no such waiver had occurred as of the date of the First Amendment to the Agreement.

All remaining provisions of the Initial LLC Agreement not revised by any of the foregoing, are hereby incorporated by reference herein and hereby restated herein.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this First Amendment to Limited Liability Company Agreement as of the date set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

State of New York,
County of _Newyork_
The foregoing instrument was acknowledged before me this 5th of December, 2017, by Joel Schreiber, who personally appeared.

SOO HYUN KIM
Notary Public - State of New York
NO. 01KI6389938
Qualified in New York County
My Commission Expires Apr 8, 2023

Notary's Signature
My commission expires the 8th of
April , 20 23

Lisa Skye Hain

Daniel Orenstein

State of New York,
County of _Kings_
The foregoing instrument was acknowledged before me this 15 of December, 2017, by Lisa Skye Hain and Daniel Orenstein, who each personally appeared.

Notary's Signature
My commission expires the 16 of
March , 2017

MOSES GANTZ
Notary Public, State of New York
No. 01GA6529905
Qualified in Kings County
Commission Expires March 16, 2019

- 5 -

EXECUTION VERSION

FIRST AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

of

LIVE PRIMARY, LLC,
A DELAWARE LIMITED LIABILITY COMPANY

Dated: As of June 14, 2019

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES
SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE
SECURITIES LAWS.   SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED,
PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME, EXCEPT IN
COMPLIANCE WITH (i) THE REQUIREMENTS OF THE SECURITIES ACT AND
ANY OTHER APPLICABLE LAWS, RULES AND REGULATIONS AND (ii) THE
OTHER TRANSFER RESTRICTIONS SET FORTH HEREIN.

EXHIBIT

7

exhibitsticker.com

1.21.21 PM PRODUCTION00015

FIRST AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

LIVE PRIMARY, LLC

This First Amended and Restated Limited Liability Company Agreement (this "Agreement") of Live Primary, LLC, a Delaware limited liability company (the "Company"), is entered into as of June 14, 2019 by Primary Member, LLC ("PM"), a Delaware limited liability company, Lisa Skye Hain ("LSH"), an individual, Daniel Orenstein ("DO"), an individual, Lampros Polatidis Ttee, Fin Tap 401k ("Polatidis"), and the individuals and/or entities listed on Schedule 1 attached hereto (collectively, the "DK Members") (individually, a "Member" and collectively, the "Members"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth on Schedule 2 attached hereto.

PM, LSH and DO are parties to the limited liability agreement of the Company dated July 28, 2015, as amended by the First Amendment dated December 15, 2017 (as so amended, the "Original Agreement"). This Agreement amends and restates the Original Agreement in its entirety to, among other things, admit Polatidis and the DK Members as Members of the Company holding Class B Units.

For the purpose of operating the Company as a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "Act"), the Members hereby agree as follows:

1.    Formation. The Company was formed on July 27, 2015 under the Act, effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

2.    Name. The name of the Company shall be "Live Primary, LLC" and all business of the Company shall be conducted in such name. The Company shall hold all of its Property in the name of the Company and not in the name of the Members.

3.    Purpose. The sole purpose of the Company is to develop, own, and operate shared office facilities, together with such other activities as may be necessary or advisable in connection with such operations. The Company shall not engage in any business, and it shall have no purpose, unrelated to the furtherance of the limited purposes of the Company.

4.    Registered Agent; Registered Office. The address of the registered office of the Company in the State of Delaware is 16192 Coastal Highway, City of Lewes, County of Sussex. The Company's registered agent for service of process at that address is Harvard Business Services, Inc.

{00022514.DOC:2}

**1.21.21 PM PRODUCTION00016**

5.    Principal Office. The Company's principal office shall be at such location as may be designated by the Class A Members from time to time.

6.    Term. The term of the Company shall commence upon the effective date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

7.    Members, Units and Voting.

(a)    Members. As of the date hereof, the Company has sixteen (16) Members. The Company acknowledges the admission of Polatidis and the DK Members as of the date hereof, which has been unanimously approved by all of the Members holding Class A Units as of such date. The names, mailing addresses and the number of ownership Units in the Company held by the Members as of the date hereof are as set forth on Schedule 1. The Note Purchase Agreement entered into by the Company and the DK Members as of the date hereof contemplates the admission as Members of (i) additional individuals or entities who would become DK Members (up to a maximum investment in the Company by the DK Members of $2,000,000) and (ii) an additional entity that would invest $500,000 in the Company, and the Manager is authorized to amend Schedule 1 appropriately to reflect the admission of such Members. Individuals or entities admitted as Members after the date hereof will be required to sign a counterpart signature page to this Agreement as a condition to their admission.

(b)    Classification of Units. The Company shall have two classes of equity, which shall be represented by limited liability company units ("Units"). Ownership of the Units shall be as set forth on Schedule 1, as it may be amended from time to time in accordance with this Agreement.

(c)    Voting. Unless otherwise set forth in this Agreement, only the holders of Class A Units shall have the right to vote, pro rata, in proportion to their ownership of Class A Units on matters presented to the Members. References in this Agreement to the vote of the Members or the vote of all Members or to the approval or consent of the Members or the approval or consent of all Members shall mean the vote, approval or consent of the holders of Class A Units. Any action which may be taken at a meeting of the Members may be taken without a meeting if Members representing votes sufficient to approve such action consent thereto in writing. Upon redemption of all Class A Units (if such a redemption occurs), the holders of Class B Units shall be entitled to vote, pro rata, in proportion to their ownership of Class B Units.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized person(s) for all purposes of the Act is and shall be LSH as a member-manager, together with any such additional managers as might be added by later amendment of this Agreement (individually and collectively, the "Manager" or "Managers" of the Company). DO has resigned as a Manager as of the date of the First Amendment to this Agreement. The Manager(s) shall be the sole Person(s) with the power to bind the Company, except and to the

2

**1.21.21 PM PRODUCTION00017**

extent that such power is expressly delegated to any other Person by a unanimous vote of all of the Class A Members. The Manager(s) shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company.  In the event that additional Manager(s) are appointed in the future, and a disagreement between them occurs, such disagreement shall be resolved by a vote of the holders of Class A Units (also referred to as the "Class A Members"), pro rata, in proportion to their ownership of Class A Units.

8.2      (a) The Company shall have a supervisory committee (the "Supervisory Committee"), for the sole purpose of deciding on the significant matters listed in clauses (i) through (iii) of this Section 8.2(a) (each, a "Supervisory Committee Major Decision"). The initial members of the Supervisory Committee shall be Joel Schreiber, Lisa Skye Hain, Brian Hain and David Kirshenbaum (the "DK Representative"). LSH shall at all times have the right to appoint two members to the Supervisory Committee, PM shall at all times have the right to appoint one member to the Supervisory Committee, and the DK Representative shall at all times have the right to serve as a member of the Supervisory Committee until repayment in full or conversion of the Convertible Promissory Notes (the "Note Repayment") issued to the DK Members.  The Manager(s) shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do, approve, or otherwise act on any of the following Supervisory Committee Major Decisions without the affirmative written consent of at least two (2) members of the Supervisory Committee (at least three (3) members, including the DK Representative, for as long as the DK Representative has the right to serve as a member of the Supervisory Committee):

(i)      make a decision to open additional locations;

(ii)      incur any aggregate indebtedness, except for an aggregate amount not to exceed $100,000, not already included in a budget approved by the Class A Members, other than trade credit incurred in the ordinary course of business; or

(iii)      enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company of money and/or assets in an amount not greater than $50,000.

Individual capital expenditures in an amount between $10,000 and $30,000 that are not already included in a budget approved by the Class A Members can be made with the approval of any two members of the Supervisory Committee; provided, that the total of such expenditures does not exceed $75,000 in any calendar year.

If the Company raises additional equity capital from any third party, including by creating or issuing any additional Units, each of the DK Members, Polatidis and PM shall have a right of first refusal to invest additional capital on the terms and conditions that are offered by the Company to the third party, which right must be exercised by the DK Members, Polatidis and/or PM by notice delivered to the Company within ten (10) business days after the DK Representative's, Polatidis's or PM's, as the case may be, receipt of the Company's written notice containing the material terms and conditions of the proposed third party investment,

3

including a copy of any term sheet or letter of intent (in the event that one or more of the DK Members, Polatidis, and/or PM exercise this right of first refusal, then such exercising Members shall participate in the applicable transaction pro rata in accordance with their respective ownership of Units). For purposes of clarification, the DK Members' right to participate in any additional capital raise shall not terminate upon the Note Repayment.

(b)    The following actions shall require the unanimous written approval of all Class A Members and the DK Representative until Note Repayment:

(i)    the liquidation, dissolution or winding-up the business and affairs of the Company, effect any merger or consolidation or consent to any of the foregoing;

(ii)    the amendment, alteration or repeal any provision of this Agreement in a manner that adversely affects the powers, preferences or rights of the Members, or affects any Member(s) disproportionately as compared to any other Member(s);

(iii)    the making of, or permitting any subsidiary to make, any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity, unless it is wholly owned by the Company;

(iv)    the making of, or permitting any subsidiary to make, any loan or advance to, any Person, including, without limitation, any employee or Member of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an employee Unit or option plan approved by the Supervisory Committee;

(v)    the guarantee of, directly or indirectly, or permitting any subsidiary to guarantee, directly or indirectly, any indebtedness greater than $10,000, except for trade accounts of the Company or any subsidiary arising in the ordinary course of business;

(vi)    the making of any individual capital expenditure greater than $30,000 that is not already included in a budget approved by the Class A Members;

(vii)    the incurring of any indebtedness not already included in a budget approved by the Class A Members (except for an aggregate amount not to exceed $100,000 that may be approved by the Supervisory Committee and except for trade credit incurred in the ordinary course of business);

(viii)    the entering into any corporate strategic relationship involving the payment, contribution or assignment by the Company of money and/or assets in an amount greater than $50,000;

(ix)    the entering into or becoming a party to any transaction with any Member or executive officer level employee of the Company, except for transactions contemplated by this Agreement or transactions made in the ordinary course of business and

4

pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by the Supervisory Committee;

      (x)      the hiring, termination, or changing the compensation of the executive officers or Members (other than the PM Payment and the LS Salary, which are contractual obligations of the Company and shall be determined pursuant to Schedule 4), including approving any option grants or Unit awards to executive officers or Members; or

      (xi)      deviating from the Company's approved business plan, or in the absence of a business plan, changing the principal business of the Company, entering new lines of business, or exiting the current line of business or deviate from the Company's approved annual budget.

      8.3      Binding Authority.  Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signatures of both Managers shall be required to bind the Company.

      8.4      Liability for Certain Acts.  The Managers shall perform their duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

      8.5      Duty to Company.

      (a)      The Manager(s) of the Company shall devote their full time and attention to the business and affairs of the Company as shall be necessary for the proper functioning of the Company.

      (b)      The Members recognize that PM has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that PM is entitled to carry on such other business interests, activities and investments.

      (c)      Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member except that LSH may not engage in any business operating a "shared office" facility. Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

      8.6      Indemnification.

5

(a)     The Company shall indemnify and hold harmless each Member, Manager and Supervisory Committee member from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal, administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member, Manager or Supervisory Committee member in any way related to or arising out of this Agreement, the Company's affairs, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member, Manager or Supervisory Committee member on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's, Manager's or Supervisory Committee member's reasonable attorney's fees in connection with any action or proceeding brought against the Member, Manager or Supervisory Committee member, except where the Member, Manager or Supervisory Committee member is found to be or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member, Manager or Supervisory Committee member in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member, Manager or Supervisory Committee member to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company as authorized by this Section 8.6(a).

(b)     In addition, if any Member or any Affiliate thereof (the "Indemnitee"), personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all third party claims and demands to the maximum extent permitted under the Act, including but not limited to the payment of the Indemnitee's reasonable attorney's fees in connection with any action or proceeding brought against the Indemnitee.

8.7     Expenses, Fees, and Compensation.  Except as may be (a) approved by a vote of the Class A Members, (b) set forth in an Approved Budget or (c) pursuant to a Company reimbursement policy approved by a vote of all of the Members holding Class A Units, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (i) to reimbursement for expenses incurred on behalf of the Company, or (ii) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company, except as set forth in Schedule 4 attached hereto and incorporated by reference herein, as may be amended from time to time by a vote of the Class A Members.

8.8     Officers.  The Managers may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Managers. The Managers may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

8.9     Affiliated Entities. Subject to Section 8.2(j) the fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.10     Meetings. All meetings of the Members or Managers shall be held at such time and place as shall be determined by the Managers for the purpose of the transaction of any business as may come before such meeting. Members and/or Managers may agree to take action by written consent in lieu of a meeting.

9.     Capital Contributions and Loans.

9.1     Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2     Loans by PM. PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested by the Managers' to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.

9.3     Disbursement Process. The Manager(s) shall deliver a written Disbursement Request to PM in accordance with and pursuant to an Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement Request is not funded in full by PM within seventy-two (72) Business Hours after the Disbursement Request is sent by the Manager(s) (the time which is seventy-two (72) Business Hours after the Disbursement Request is sent being the "Disbursement Deadline"), PM shall be in default hereunder (a "Disbursement Default"). A

7

Disbursement Default will automatically and immediately trigger the Default Fee, Bridge and all other rights and obligations set forth in Sections 9.3(a), 9.3(c) and 9.3(d). PM shall cure the Disbursement Default within ten (10) Business Days (the date falling ten (10) Business Days from the Disbursement Deadline being the "Trigger Date"), by funding in full the Disbursement Request. A failure of PM to so cure on or before the Trigger Date will automatically and immediately trigger all of the rights and obligations set forth in Section 9.3(b).

(a)    Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

(b)    Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM's Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM's forty (40) Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

(c)    Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

(d)    In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

9.4    No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

9.5    Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

9.6    No Priority. Subject to Section 10.2, no Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

8

1.21.21 PM PRODUCTION00023

9.7     Liability of Members and Their Affiliates for Capital and Debts.
Except as otherwise provided by applicable law, the debts, obligations and liabilities of the
Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and
liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall
be obligated personally for such debt, obligation or liability of the Company solely by reason of
being a Member or being an Affiliate of a Member.

10.     Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)     The Company shall maintain a separate capital account
("Capital Account") for each Member and its successors and permitted assigns.

(b)     The Capital Account of each Member shall initially be
equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased
by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions
of property assumed by the Company or subject to which the Company takes such property); (ii)
allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of
any Company liabilities assumed by such Member not otherwise taken into account in
determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss
and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and
withdrawals of cash and property to such Member (to the extent of the fair market value thereof,
net of liabilities securing such property assumed by the Member or subject to which the Member
takes the property); and (C) the amount of any liabilities of such Member assumed by the
Company not otherwise taken into account in determining Capital Accounts.

(c)     In the event the Gross Asset Value of an asset of the
Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members
shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized
by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an
amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value"
means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as
adjusted from time to time pursuant to Section 10.1(d).

(d)     In accordance with Regulation Section 1.704-1(b)(2)(iv)(f),
the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective
gross fair market values, as of the following dates: (i) the issuance of Interests to any new or
existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution);
(ii) the distribution by the Company to a Member of money or other property (other than a *de
minimis* amount) as consideration for an Interest in the Company, unless all Members receive
simultaneous distributions of undivided interests in the distributed assets in proportion to their
Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section
1.704-1(b)(2)(ii)(g).

(e)     For purposes of computing the amount of any item of
Profits and Losses to be reflected in Capital Accounts, the determination, recognition and

9

classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)    any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)    Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)    In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

(g)    The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.

(a)    The Company shall distribute all or any portion of Available Cash to the Members pro rata in accordance with their respective Units.

(b)    Notwithstanding Section 10.2(a) above, in the event that the Company and/or its subsidiaries engage in any business that operates on the Jewish Sabbath or Jewish Holidays, 100% of the cash flow from those days will be allocated to LSH and DO and the balance of cash flow from other days will be allocated to PM until LSH, DO, and PM have each received cash flow percentages therefrom equal to their Membership Interests. Any cash flow therefrom will be distributed to the Members in accordance with Section 10.2(a).

(c)    Notwithstanding the above, no distributions shall be made to Members in accordance with Sections 10.2(a) and 10.2(b) until the entire Loan has been repaid in full.

(d)    Notwithstanding Section 10.2(c) above, upon the Company achieving:

(i)    Annual revenues of $500,000;

(ii)    a year in which at least one other center or centers (each, an "Additional Center") in addition to the Initial Centers (as defined herein), has been opened; or

10

(iii)    Other milestones agreed upon by all Class A Members or the Supervisory Committee;

at least 50% of all Available Cash shall be distributed to the Members pro rata, in accordance with their respective ownership of Units.

10.3    Distributions in Kind.  In the event any proceeds available for distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the Members shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amount of proceeds due them pursuant to this Section.

10.4    Profits and Losses.

(a)    Generally.

(i)    The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes.  Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized shall be allocated to such Member in the same proportion.

(ii)    In the event of the admission of a new member in the Company or a valid transfer of all or part of a Member's Interest, the non-transferring Member(s) shall determine the manner in which items of income, deduction, gain, loss and/or credit of the Company shall be allocated among those Persons who were Members in the Company prior to the date (the "Effective Date") on which there occurs the admission of a new member in the Company or a valid transfer of all or a part of a Member's Interest, and the Persons who were Members after the Effective Date.

(b)    Allocation of Profits and Losses.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any period shall be allocated among the Members in a manner that, after giving effect to the special allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions required to be made to such Member pursuant to Section 13.2.

(c)    Special Allocation Provisions.

(i)    Qualified Income Offset.  In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is required to restore

11

on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

(ii)    Member Nonrecourse Deductions.  Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures-so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss.  If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iii)    Minimum Gain Chargeback.

(A)    Company Minimum Gain.  Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain.  A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains recognized from the disposition of items of Company property subject to

12

one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)    Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)    Section 704(c) Allocation.

(A)    Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(B)    In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

(C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members

13

in any manner that reasonably reflects the purpose and intention of this Agreement.

(v) <u>Members' Interest in Company Profits For Purposes of Section 752</u>. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi) <u>Nonrecourse Deductions</u>. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii) <u>Regulatory Compliance</u>. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii) <u>Curative Allocations</u>. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix) <u>Loss Allocation Limitation</u>. Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation

14

set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

       10.5   No Obligation to Restore Negative Balances in Capital Accounts. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

       10.6   Tax Allocations. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

       10.7   Member Tax Distributions.

       (a)   Notwithstanding Section 10.2(c), the Managers shall cause the Company to distribute an amount to each Member equal to the Distribution Deficiency (as defined below) for the Member if distributions in accordance with this Article 10 would result in a Member receiving an amount that is less than the Member's Distribution Deficiency.

       (b)   A Member's "Distribution Deficiency" equals the Member's income tax on the excess, if any, of

       (i)   his share of the Company's income for such Fiscal Year over

       (ii)   the aggregate amount of his share of the Company's net losses for all prior Fiscal Years (to the extent not previously taken into account under this sentence).

       (c)   The Manager shall compute the Member's income tax based on a notional computation rate of 42%. The Company shall make this Tax Payment Distribution within 90 days after the end of the Fiscal Year.

       (d)   This Tax Payment Distribution, however, is subject to availability of adequate cash to fund this Tax Payment Distribution.

       (e)   Any distribution pursuant to this Section 10.3 shall reduce on a dollar-for dollar basis subsequent distributions of Distributable Cash to Member under Section 10.2. Upon liquidation of the Company, Member shall be obligated to restore to the Company by a payment in immediately available funds any distributions under this Section 10.3 that have not been recouped under the immediately previous sentence.

15

(f)     To the extent that a tax distribution is not paid to a Member with respect to a Fiscal Year on account of lack of availability of Distributable Cash, the amount of net income during the Fiscal Year shall be deemed to be earned in the next Fiscal Year solely for purposes of determining the amount of the tax distribution, if any, for the next Fiscal Year.

10.8    Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.    Books and Records.

11.1    Books of Account.

(a)     Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member at any time during regular business hours upon written request made a reasonable period in advance.

(b)     Each Member agrees that such Member will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 11.1 by such Member) or (b) is or has been made known or disclosed to the Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that a Member may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company or (ii) as may otherwise be required by law, provided that the Member promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.2    Tax Elections. The Managers shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Managers determine that such election is in the best interest of the Company. As determined by the Managers, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3    Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any

16

account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signatures of both Managers, unless the Members otherwise determine.

11.4     Tax Returns.  The Managers shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities.  Upon filing, a copy of each such tax return will be provided to all Members.  The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes.  The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5     Tax Matters Member.  The Members shall designate LSH to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.     Transfers of Interests of Members.

12.1     General.

(a)     Subject to Section 12.2 herein, no Transfer shall be permitted herein except in accordance with this Agreement or upon the written consent of all Members.  All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents, if any.  Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1.  In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer.  The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided, however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a).  Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)     If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

17

(i)     The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

(ii)    the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

(iii)   the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

(iv)    the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

(v)     if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

(vi)    the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

(vii)   the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

(c)     A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by

18

reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

    (d)  Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

    (e)  In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

    12.2  Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer

1.21.21 PM PRODUCTION00034

20-11612-mg    Doc 113    Filed 01/29/21    Entered 01/29/21 20:00:33    Main Document
Pg 140 of 218

their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member. Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

12.3    Death or Permanent Disability of a Member.

(a)    Death. Not later than ninety (90) days after the death of any Member with the exception of the DK Members (the "Deceased Member"), the executors or administrators of the estate of the Deceased Member and each transferee of the Deceased Member who owns Units by virtue of such death shall give written notice ("Deceased Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Deceased Member at the time of death. Not later than sixty (60) days after receipt of the Deceased Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty day period to the surviving Members ("Surviving Members"). The Surviving Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among the Surviving Member(s), the purchase by the Surviving Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of the Surviving Member elects not to purchase any Units subject to the Deceased Member's Notice, the remaining Surviving Member may purchase all of the Units subject to the Deceased Member's Notice, without the consent of any non purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Surviving Members, such Units may be retained by the estate of the Deceased Member or by such transferees and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Agreement, the death of Joel Schreiber shall be deemed to be the death of PM.

(b)    Permanent Disability. Not later than ninety (90) days after the determination that any Member (with the exception of any DK Member) has become Permanently Disabled (as hereinafter defined) ("Disabled Member"), the Disabled Member, his guardian or conservator and each transferee of the Disabled Member who owns Units by virtue of such Permanent Disability shall give written notice ("Disabled Member's Notice") thereof to the Company, offering to the Company or any assignee of the Company all of the Units owned by the Disabled Member at the time of such determination that he is Permanently Disabled. Not later than sixty (60) days after receipt of the Disabled Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the

20

Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members. Such other Member(s) may elect to purchase all or a portion of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Member(s), the purchase by such other Member(s) shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member(s) elects not to purchase any Units subject to the Disabled Member's Notice, the remaining Member(s) may purchase all of the Units subject to the Disabled Member's Notice, without the consent of any non-purchasing Members, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members, such Units may be retained by the Disabled Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. A Member shall be deemed "Permanently Disabled" if he has a mental or physical condition which has prevented or, in the opinion of a physician designated by the Managers and the Disabled Member (or, in the absence of agreement by the Managers and the Disabled Member as to the physician, by a physician mutually designated by two physicians respectively designated by the Disabled Member and the Managers) will prevent the Member for a period of more than ninety (90) consecutive days after its onset from performing his duties on a full time basis as an employee, officer or director of the Company. A Member will also be deemed "Permanently Disabled" if he has been so disabled for more than ninety (90) days of any one hundred and twenty (120) consecutive days. Each Member agrees to submit to an examination by such physician upon the request of the Managers. If one of the Managers is Permanently Disabled, the other Manager shall solely represent the interests of the Company. For purposes of this Agreement, the Permanent Disability of Joel Schreiber shall be deemed to be the Permanent Disability of PM.

(c)    Withdrawal/Termination of Member as Employee. In the event that any Member of the Company who serves as an employee of the Company shall no longer be employed by the Company, not later than ten (10) days after such cessation of employment, shall give written notice ("Unemployed Member's Notice") to the Company offering to the Company or any assignee of the Company all of the Units owned by the Unemployed Member at the time of cessation of employment. Not later than sixty (60) days after receipt of the Unemployed Member's Notice, the Company, or any such assignee, may elect to purchase all of the Units so offered at a purchase price per Unit determined in accordance with Section 12.6 hereof. If such Units are not purchased by the Company, they shall be offered in the same manner for an additional thirty (30) day period to the other Members of the Company. Such other Members may elect to purchase all of the Units so offered at a price per Unit determined in accordance with Section 12.6 hereof. Unless otherwise agreed between or among such other Members, the purchase by such other Member shall be pro rata to their then holdings of Units; provided, that if one or more of such other Member elects not to purchase any Units subject to the Unemployed Member's Notice, the remaining Members of the Company may purchase all of the Units subject to the Unemployed Member's Notice, without the consent of any non-purchasing Members of the Company, pro rata between or among them or in such other manner as they may agree. If any Units are not purchased by the Members of the Company, such Units may be retained by the Unemployed Member and shall lose all voting and consent rights, but shall retain their economic rights and shall be subject to all other provisions hereof. For purposes of this Section 12.3(c), PM shall never be considered an employee of the Company, regardless of whether or not he is on the Company's payroll.

21

1.21.21 PM PRODUCTION00036

12.4    Transfers by operation of Law. In the event that any Member, with the exception of any DK Member, (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, or (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to his Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date, or (iii) is subject to a transfer of his Units by operation of law, the Company or its assignee shall have the right to elect to purchase all of the Units which are then owned by the Member at a purchase price per Unit determined in accordance with Section 12.6 hereof. If the Company fails to purchase any or all of such Units, the other Member(s) may elect to purchase such remaining Units at a purchase price per Unit determined in accordance with Section 12.6 hereof; provided, however, that transfers occurring upon the death of the Member shall be governed by Section 12.3(a) hereof.

12.5    Prohibition on Encumbrances. The Member may not pledge, hypothecate or otherwise encumber his Units in any way.

12.6    Purchase Price.

(a)    Determination by Members. The purchase price of each Unit purchased hereunder shall be the fair market value per Unit last determined by agreement of the Members of the Company. The Members at the annual meeting of the Company's Members or at such other time or times as they deem proper, shall determine by agreement the value of the Units for purposes of the provisions of this Agreement, and the value so determined shall remain in effect until the next annual meeting of the Company's Members or the next determination, whichever is sooner to occur. The value so determined shall be equitably adjusted to reflect any subsequent Unit dividend, Unit split, reverse split, recapitalization or similar transaction of the Company.

(b)    Appraisal. If for any reason a determination of value as contemplated in Section 12.6(a) has not been made within the twelve-month period preceding any election to purchase Units pursuant to Section 12.3 or Section 12.4, the purchase price hereunder shall be the fair market value per Unit determined by appraisal as follows. Within thirty (30) days after the election to purchase pursuant to Section 12.3 or Section 12.4, the Company shall appoint an appraiser (the "Purchaser Appraiser") to be paid for by the entity purchasing the Units, and the Member whose Units are being valued pursuant to a sale to the Company shall have the option to appoint an appraiser (the "Member Appraiser"), at such Member's cost and expense. If a Member Appraiser has been appointed, the Member Appraiser and the Purchaser Appraiser shall appoint a third appraiser (the "Independent Appraiser"), the costs of which shall be borne equally by the entity purchasing the Units and such appointing Member. The appraiser(s) shall be a member or an associate of an independent investment banking firm, a public accounting firm, an appraisal firm, or another person experienced in valuing the securities of entities in businesses similar to the Company's. The Company shall promptly furnish to the appraiser(s) such information concerning its financial condition, earnings, capitalization, business prospects and sales of its capital securities as they may reasonably request. The appraiser(s) shall work together to determine the value of the Units of the Member as of a convenient date selected by the appraiser(s) and the Company. In the event

22

of any disagreement between the Purchaser Appraiser and the Member Appraiser during the appraisal process or regarding the appraisal, the Independent Appraiser shall make the final determination. The appraiser(s)'(s) determination of the fair market value of the Units shall be final and binding upon all interested persons. The appraiser shall promptly notify in writing the Company, the Member or his legally appointed representative(s), the other Members of the Company, and any other interested person known to the appraisers, of the appraiser(s)'(s) final determination of value.

        (c)    Manner of Payment.  The purchase price for Units valued under this Section 12.6 hereof shall be paid in the following manner:

        (i)    An amount equal to (i) twenty five (25%) percent of the total purchase price or (ii) the entire proceeds of any insurance owned by the Members or the Company on the life of the Member whose Units are being sold, whichever is greater ("Initial Payment"), within 30 days after the maturing of the obligation to purchase, and the balance in three (3) equal consecutive annual installments with interest on the unpaid balance from the due date of such Initial Payment at the rate of three percent (3%) per annum. The installments shall be payable on the anniversary of the date on which the Initial Payment was made or the next following business day. Any installment may be prepaid at any time without premium or penalty.

        (ii)    The obligation to pay the purchase price, as aforesaid, shall be evidenced by a promissory note (the "Note") executed and secured as follows:

        (iii)    in the event of a sale to one or more other Members, the Note or Notes shall be executed by the respective purchasing Member, with respect to the Units which he or she purchases;

        (iv)    the Notes shall be secured by a pledge of the Units sold, upon the following terms and conditions: After the Units sold are registered in the name of the buyer, the Units shall be certificated and the buyer shall deliver the Units to the seller endorsed in blank for transfer, and the seller shall retain and hold the Units as security for the Note. Upon the occurrence of any of the events referred to in subparagraph 12.6(c)(v) hereof, the seller shall, in addition to the exercise of any other available remedies, be entitled to offer the Units at public or private sale. The seller shall be entitled to bid for and purchase any or all of the Units at any such public sale, and if the seller is the successful bidder, the obligation of the buyer in default shall be deemed to be fully satisfied by the proceeds of the sale, even if insufficient to satisfy the obligations Notice of foreclosure and all other statutory requirements of such sale shall be deemed waived by the buyer, except that the buyer whose Units are to be offered for sale shall be given ten days' notice of the time and place of such sale. The proceeds of any such sale shall be including reasonable legal fees in connection therewith, then to pay any balance due the seller of such Units by the buyer thereof, with any surplus to be paid to the buyer in default. Upon payment in full by a buyer of the purchase price to a seller, the seller shall immediately return to the buyer the Units pledged with him. Further, during such pledge, but only so long as the buyer is not in default under his or her Units, the buyer shall exercise and enjoy all of the rights accruing from the ownership of said

23

Units. Notwithstanding the foregoing, under no circumstances can any Units be sold to a competitor of the Company, as reasonably determined by the Managers.

(v)     The Notes shall provide for acceleration of the entire unpaid balance and confession of judgment in the event of the following:

(1) failure to pay any installment payment within thirty days after written notice of failure to pay on its due date; and

(2) if the Company is the purchaser, levy or attachment upon any of the assets of the Company, which is not removed within 60 days from the making thereof, except that if the Company, in good faith, contests such levy or Attachment, no default shall exist or be declared as long as the Company proceeds diligently and continually with such contest, or until all rights and time to contest the same have expired; or

(3) the buyer is adjudicated a bankrupt, makes an assignment for the benefit of creditors, or a receiver is appointed for its assets and is not removed with 30 days.

13.     Withdrawal or Resignation. Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.     Admission of Additional Members. The Company may admit new Members, subject to Section 14.1.

14.1     Right of First Offer. Subject to the terms and conditions of this Subsection 14.1 and applicable securities laws, if the Managers propose to offer or sell any New Securities, the Company shall first offer such New Securities to each Member, who shall be entitled to purchase such Member's pro rata share of the issuance of such New Securities.

(a)     If all New Securities are not elected to be purchased or acquired as provided herein, the Company may offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons.

(b)     The right of first offer in this Subsection 14.1 shall not be applicable to (i) Exempted Securities; and (ii) securities issued in an IPO (as defined herein).

15.     Dissolution.

15.1     Dissolution. The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2     Liquidation.

24

1.21.21 PM PRODUCTION00039

(a)    Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company. The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)    Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Managers who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement. Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

(a)    General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Section 12.3 or Section 12.4 of this Agreement.

(b)    Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law, provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.    Participation in Sales.

16.1    Right of Co-Sale. Subject to Section 12.1, in the event that a Member ("Offeree") receives a bona fide offer from a third party or parties other than the Company or any other Member of the Company ("Purchaser") to purchase all or any part of the Units owned by the Offeree ("Co-Sale Units"), for a specified price payable in cash or otherwise

25

and on specified terms and conditions ("Offer"), and the Offeree proposes to sell or otherwise transfer the Co-Sale Units to the Purchaser pursuant to the Offer, each of the other Members shall have the right to sell to the Purchaser, at the same price per Unit and on the same terms and conditions as stated in the Offer, such number of Units equal to the Co-Sale Units multiplied by a fraction, the numerator of which is the aggregate number of Units owned by any particular Member of the Company desiring to sell Units and the denominator of which is the sum of all issued and outstanding Units.

16.2    Notices of Offer and Intent to Participate. The Offeree shall provide notice to the other Members of the Company stating the name of the Purchaser, the terms of the Offer and the period of time available to the other Members of the Company for notifying the Offeree of their intent to participate in the sale ("Notice Period"). The Offeree shall, if reasonably possible, provide such other Members with a Notice Period of not less than ten (10) days. Any Member of the Company wishing to participate in any sale pursuant to Section 16.1 shall notify the Offeree in writing of such intention as soon as practicable after such Member's receipt of the notice from the Offeree and in any event within the Notice Period. If the Offeree does not receive such notice from the other Member of the Company within the Notice Period, the Offeree shall be free to consummate the proposed transaction without any obligation to include the other Members' Units in such transaction.

16.3    Sale of Co-Sale Units. The Offeree and each participating Member shall sell to the Purchaser all, or at the option of the Purchaser, any part of the Units proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Purchaser than those stated in the Offer; provided, however, that any purchase of less than all of such Units by the Purchaser shall be made from the Offeree and each participating Member pro rata based upon the relative amount of the Units that the Offeree and each participating Member is otherwise entitled to sell pursuant to Section 16.1.

16.4    "Drag-Along" Obligation. In the event that any person or group (as such term is defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) desires to acquire all or substantially all of the securities of the Company, whether directly or indirectly, and such transaction is approved by a vote of the Members holding a majority of Class A Units, each Member hereby agrees to sell to such third party on the terms offered by such third party, a portion of the Units owned by the Member equal to the percentage of all the Units offered to be acquired by such third party, and to execute all documents reasonably necessary to effectuate such sale.

17.    Reserved.

18.    Guaranty of Real Estate Obligations. PM may, in his sole discretion, elect to provide such personal guaranty as landlords for the Initial Centers and Additional Centers may require in connection with the Company's leasing of real estate for the Initial Centers and Additional Centers' facilities.

**1.21.21 PM PRODUCTION00041**

19.    Miscellaneous.

19.1    Entire Agreement; Amendment. This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled. This Agreement may not be amended or modified orally, but only by an agreement in writing signed by all of the Class A Members; provided, that any amendment that adversely affects any Member(s) disproportionately as compared to any other Member(s) requires the written agreement of the adversely affected Member(s) and, provided, further, that the DK Representative must approve any amendment or modification whatsoever (except for any amendments required to admit new Members within the parameters of Section 7(a) and Schedule 1) until the Note Repayment.

19.2    Severability. If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

19.3    Preparation and Review of Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

19.4    Notices. Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing by notice similarly given to all parties in accordance with this Section 19.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or by any other authorized representative.

19.5    Governing Law; Venue.

(a)    This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

(b)    Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any

27

**1.21.21 PM PRODUCTION00042**

objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19.6    Counterparts; Signatures. This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document format (pdf) signature of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

19.7    No Third Party Beneficiaries. None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1.21.21 PM PRODUCTION00043

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER, LLC

By: Joel Schreiber
Title: Sole Member

Lisa Skye Hain

Daniel Orenstein

1.21.21 PM PRODUCTION00044

LAMPROS POLATIDIS TTEE, FIN TAP 401k

By: Lampros Polatidis
Title:  Trustee


BALKIN FAMILY LP, LLC

By:
Title:


A&J POPCORN HOLDINGS, LLC

By:
Title:


Ilene Hechtman


Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017


Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

By:
Title:

**1.21.21 PM PRODUCTION00045**

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

By: Michael S. Balkin
Title: Managing Member

A&J POPCORN HOLDINGS, LLC

_____

By:
Title:

_____

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

_____

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title: Trustee

BALKIN FAMILY LP, LLC

_____

By:
Title:

A&J POPCORN HOLDINGS, LLC

_____

By: ANDREW S. FRIEDMAN
Title: MANAGER

_____

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

_____

By:
Title:

**1.21.21 PM PRODUCTION00047**

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

_____

By:
Title:

A&J POPCORN HOLDINGS, LLC

_____

By:
Title:

_____
Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

_____

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

_____

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

_____

By:
Title:

A&J POPCORN HOLDINGS, LLC

_____

By:
Title:

_____

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

_____

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

_____

By:
Title:

LAMPROS POLATIDIS TTEE, FIN TAP 401k

By: Lampros Polatidis
Title:  Trustee

BALKIN FAMILY LP, LLC

By:
Title:

A&J POPCORN HOLDINGS, LLC

By:
Title:

Ilene Hechtman

Jeffrey Langenbach as Trustee of the Jeffrey
Langenbach Trust dated June 5, 2017

Jeffrey Langenbach, Trustee

MANDELL VENTURES LLC

By: Steven L. Mandell
Title: Managing Partner

**1.21.21 PM PRODUCTION00050**

FLF INVESTOR, LLC

By: Michael Nortman
Title: Manager

NORTMAN HOLDINGS LLC

By: MICHAEL NORTMAN
Title: MANAGER

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust

_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____
Jeffrey A. Wellek

1.21.21 PM PRODUCTION00051

FLF INVESTOR, LLC

By: _____
Title:

NORTMAN HOLDINGS LLC

By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_Marcy P. Kahan_, Trustee
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust

FLF INVESTOR, LLC

By: _____
Title:

NORTMAN HOLDINGS LLC

By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust

_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____
Jeffrey A. Wellek

FLF INVESTOR, LLC

By: _____
Title:

NORTMAN HOLDINGS LLC

By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neal Price, as Trustee of the Neal H. Price
Revocable Trust

_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____
Jeffrey A. Wellek

FLF INVESTOR, LLC

By: _____
Title:

NORTMAN HOLDINGS LLC

By: _____
Title:

Marcy P. Kahan, as Trustee of the Marcy P. Kahan
Living Trust dated May 29, 2000

_____
Marcy P. Kahan, Trustee

David L. Kirshenbaum, as Trustee of the David L.
Kirshenbaum Revocable Trust U/T/A 2/27/96

_____
David Kirshenbaum, Trustee

Neil Price, as Trustee of the Neal H. Price
Revocable Trust

_____
Neal Price, Trustee

Jeffrey A. Wellek, as Trustee of the Jeffrey A.
Wellek 1994 Trust

_____
Jeffrey A. Wellek

SUMMIT MONKEYS, LLC

By:    Paul Weinewuth
Title:  Manager

Schedule I

Members

| Member | Mailing Address | Capital Contribution | Class A Units | Class B Units |
|---|---|---|---|---|
| Primary Member, LLC | 115 West 18th Street 2nd Floor New York, NY 10011 | $400.00 | 4,365.00 | -- |
| Lisa Skye Hain | 70 Washington Street Apt. 2U Brooklyn, NY 11201 | $300.00 | 4,365.00 | -- |
| Daniel Orenstein | 110 Livingston Street Apt. 10J Brooklyn, NY 11201 | $300.00 | -- | 270.00 |
| Lampros Polatidis Ttee, Fin Tap 401k | 26 Broadway New York, NY 10014 | | | 73.80 |
| DK Members listed below | Addresses of Investors listed below | | | 369.25 total, allocated as set forth below |
| Company Equity Incentive Plan | | 0 | -- | 1,000.00 (reserved for future issuance) |
| Total: | | $1,040.00 | 8,730.00 | 1,713.05 |

**1.21.21 PM PRODUCTION00057**

## DK Members

| Name of DK Member | Number of Units |
|---|---|
| Balkin Family LP, LLC<br>1145 Green Bay Road<br>Glencoe, IL 60022 | 42.20 |
| A&J Popcorn Holdings, LLC<br>8135 Monticello Avenue<br>Skokie, IL 60076 | 21.10 |
| Ilene Hechtman<br>1018 Knoll Lane<br>Wilmette, IL 60091 | 21.10 |
| Jeffrey Langenbach as Trustee of the<br>Jeffrey Langenbach Trust dated June 5, 2017<br>1701 Kendale Drive<br>Glenview, IL 60025 | 21.10 |
| Mandell Ventures LLC<br>1146 Ashland Avenue<br>River Forest, IL 60305 | 21.10 |
| FLF Investor, LLC<br>Michael Nortman/Crossroads Partners<br>1300 E. Woodfield Road, Suite 150<br>Schaumburg, IL 60173 | 42.20 |
| Nortman Holdings LLC<br>Michael Nortman/Crossroads Partners<br>1300 E. Woodfield Road, Suite 150<br>Schaumburg, IL 60173 | 63.30 |
| Marcy P. Kahan, as Trustee of the<br>Marcy P. Kahan Living Trust dated May 29, 2000<br>1600 Provenance Way<br>Northbrook, IL 60062 | 10.55 |
| David L. Kirshenbaum, as Trustee of<br>the David L. Kirshenbaum Revocable Trust U/T/A<br>1318 Ridge Road<br>Northbrook, IL 60062 | 21.10 |

| | |
|---|---|
| Neal Price, as Trustee of the<br>Neal H. Price Revocable Trust<br>1324 Linden Avenue<br>Deerfield, IL  60015 | 10.55 |
| Jeffrey A. Wellek, as Trustee of the Jeffrey A. Wellek 1994 Trust<br>1414 Sheridan Road<br>Highland Park IL  60035 | 10.55 |
| Summit Monkeys LLC<br>1307 Kallien Court<br>Naperville, IL 60540 | 84.40 |

Schedule 2

Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall mean this First Amended and Restated Limited Liability Agreement of Live Primary, LLC, dated as of the date hereof, as it may be amended from time to time in accordance with its terms.

*"Approved Budget"* means a budget in the form of Schedule 3 to this Agreement, and signed by the Class A Members, together with such supporting materials as the Manager(s) deem appropriate in his/her/their sole discretion.

*"Approved Loan"* shall mean any loan made by the Company, which is secured by the Property or by any Interests of the Company and is approved by a vote of the Members holding a majority of Class A Units, in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with an Approved Budget and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

*"Business Day"* shall mean any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

*"Business Hours"* shall mean those hours in any day other than a Saturday, Sunday or any days on which national banks in the City of New York are not open for business.

*"Capital Account"* shall have the meaning set forth in Section 10.1(a).

*"Capital Contributions"* means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

*"Class A Interests"* means such Membership Interests in the Company evidenced by Class A Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class A Unit"* shall mean a Unit of Membership Interests designated as a Class A Unit and having the rights, preferences and privileges specified with respect to a Class A Unit in this Agreement.

*"Class B Interests"* means such Membership Interests in the Company evidenced by Class B Units issued to the Members as set forth on Schedule 1 to this Agreement and includes the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"Class B Unit"* shall mean a Unit of Membership Interests designated as a Class B Unit and having the rights, preferences and privileges specified with respect to a Class B Unit in this Agreement.

*"Code"* shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

*"Company"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Courts"* shall have the meaning set forth in Section 16.5.

*"Economic Risk of Loss"* shall have the meaning set forth in Section 10.4(c).

*"Effective Date"* shall have the meaning set forth in Section 10.4(a).

*"Fiscal Year"* or *"Fiscal Period"* means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2012, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

*"Gross Asset Value"* shall have the meaning set forth in Section 10.1(c).

*"Indemnitee"* shall have the meaning set forth in Section 8.5(b).

"*Liquidity Event*" Each of the following events shall be considered a "Liquidity Event" unless the Class A Members elect otherwise by written notice:

    (a)    a merger or consolidation in which

        (i)    the Company is a constituent party or

        (ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

    except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

    (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

*"Loan Documents"* shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

*"Member(s)"* shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

*"Member Nonrecourse Deductions"* shall have the meaning set forth in Section 10.4(c).

*"New Securities"* shall mean all Units issued by the Company after July 28, 2015, other than (1) the following Units and (2) Units deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

    (i)    Units, Options or Convertible Securities issued as a dividend or distribution;

(ii)    Units, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on Units;

(iii)    Units or Options issued to employees or directors of, or consultants or advisors to, the Company or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by a vote of the Members holding a majority of Class A Units;

(iv)    Units or Convertible Securities actually issued upon the exercise of Options or Units actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Units, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by a vote of the Members holding a majority of Class A Units;

(vi)    Units, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by a vote of the Members holding a majority of the Class A Units; or

(vii)    Units, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided that such issuances are approved by a vote of the Members holding a majority of Class A Units; or

(viii)    Units, Options or Convertible Securities issued in connection with strategic relationships approved by a vote of the Members holding a majority of Class A Units.

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

*"Profits" or "Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.l (e) and (v) items of

income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Property"* shall have the meaning set forth in Section 2.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition, pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions. In the case of PM, the Transfer of any of the interests of PM to any Person other than Joel Schreiber, shall be deemed to be a Transfer of the applicable pro rata number of Interests hereunder.

*"Unit"* means one unit of the ownership interest of a Member in the Company consisting of (i) such Member's interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Units shall be considered personal property. The initial Units of each Member are set forth on Schedule 1 annexed hereto.

Schedule 3

Form Of Approved Budget

## APPROVED BUDGET

**Project Name:** _____

|   | Budget Item | Cost |
|---|---|---|
| 1 | Build Out | $ |
| 2 | Security Deposit | $ |
| 3 | Architect, Filing Fees, Engineering, Tools | $ |
| 4 | Primary Website & Design | $ |
| 5 | Sales & Marketing | $ |
| 6 | G & A | $ |
| 7 | COGS (e.g. Food & Beverage) | $ |
| 8 | Accounting Systems Setup | $ |
| 9 | Security Deposit | $ |
| 10 | Personnel Costs | $ |
| 11 | Legal Fees | $ |
| 12 | Fees for Professional Services | $ |
| 13 | Miscellaneous | $ |
|   | **Total Budget** | $ |

This Budget is hereby approved by the undersigned Class A Members or their undersigned approved representatives.

PRIMARY MEMBER, LLC

_____

By:  Joel Schreiber
Title:  Sole Member

_____

Lisa Skye Hain

1.21.21 PM PRODUCTION00065

Schedule 4

Fees, Expenses and Compensation

The Company shall continue to pay to LS on a monthly basis an amount equal to five thousand dollars ($5,000.00) (the "LS Salary"). The amount of the LS Salary may be changed with the consent of all Class A Members. All parties accept and confirm the prior payments made to LS for her efforts on behalf of the Company.

Upon commencement of operations of the Company's first shared office facility, PM shall be entitled to a monthly payment equal to the LS Salary (the "PM Payment"). PM Payments for the period prior to January 1, 2018 shall be payable at any time at the discretion of the Manager. PM may waive the Company's obligation to pay the PM Payment, in its sole discretion, provided, that the parties acknowledge that no such waiver had occurred as of the date of the First Amendment to the Agreement.

1.21.21 PM PRODUCTION00066

<u>LIMITED LIABILITY COMPANY AGREEMENT</u>

<u>OF</u>

<u>PRIMARY MEMBER LLC</u>

This Limited Liability Company Agreement (this "<u>Agreement</u>") of PRIMARY MEMBER LLC, a Delaware limited liability company (the "<u>Company</u>"), is entered into as of July 28, 2015 by the persons and/or entities listed on <u>Schedule 1</u> attached hereto, as members (individually, a "<u>Member</u>"; collectively, the "<u>Members</u>"). Capitalized terms used and not otherwise defined herein shall have the meanings set forth on <u>Schedule 2</u> attached hereto.

For the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, as set forth in Chapter 18 of Title 6 of the Delaware Code Annotated, as it may be amended from time to time (or any corresponding provisions of succeeding law) (the "<u>Act</u>"), the Members hereby agree as follows:

1.      <u>Formation</u>. Effective upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, the Members hereby form a Delaware limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.      <u>Name</u>. The name of the Company shall be "PRIMARY MEMBER LLC" and all business of the Company shall be conducted in such name. The Company shall hold its Investment in the name of the Company and not in the name of the Members.

3.      <u>Purpose</u>. The sole purpose of the Company is to acquire and maintain an investment in PRIMARY LLC , a company which was formed to develop, own, and operate shared office facilities, (the "Investment"), together with such other activities as may be necessary or advisable in connection with the ownership of the Investment. The Company shall not engage in any business, and it shall have no purpose, unrelated to the Investment and shall not acquire any real property or own assets other than those related to the Investment and/or otherwise in furtherance of the limited purposes of the Company.

4.      <u>Registered Agent; Registered Office</u>. The address of the registered office of the Company in the State of Delaware is 1013 Centre Road, Suite 403S, Wilmington, Delaware 19805. The Company's registered agent for service of process at that address is Registered Agents Legal Services, LLC.

5.      <u>Principal Office</u>. The Company's principal office shall be at such location as may be designated by the Members from time to time.

6.      <u>Term</u>. The term of the Company shall commence upon the effective date of formation of the Company as provided in the Act and shall continue until dissolved in accordance with the Act and this Agreement.

**1.21.21 PM PRODUCTION00115**

EXHIBIT

8

exhibitsticker.com

7.    Members.  The Company shall have initially one (1) Member.  The names, mailing addresses and percentage ownership Interest in the Company of the Members are as set forth on Schedule 1.

8.    Management.

8.1    The business and affairs of the Company shall be managed solely and exclusively by, and management of the Company shall be vested solely and exclusively in, and the sole authorized person for all purposes of the Act is and shall be the initial Member, as manager ("Manager") of the Company. The Manager shall be the sole Person with the power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by the Manager. The Manager shall have the right, power and authority, in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary, desirable, convenient or incidental to the purpose of the Company.

8.2    Binding Authority.  Unless authorized to do so by this Agreement, no Manager or Person shall have any power or authority to bind the Company and the signature of the Manager shall be required to bind the Company.

8.3    Liability for Certain Acts.  The Manager shall perform its duties in good faith, in a manner reasonably believed to be in the best interests of the Company and with such care, as an ordinarily prudent person in a similar position would use under similar circumstances. No Manager shall be liable to the Company or any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of the gross negligence or willful misconduct of such Manager.

8.4    No Exclusive Duty to Company.  Each Member recognizes that the other Member has or may have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that such other Member is entitled to carry on such other business interests, activities and investments.  No Member shall be obligated to devote all or any particular part of his time and effort to the Company and its affairs. Each Member may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without being limited to, owning, financing, acquiring, leasing, promoting, developing, improving, operating and/or managing real property on his own behalf or on behalf of other entities with which such Member is affiliated, and any Member may engage in any activities, whether or not competitive with the Company, without any obligation to offer any interest in such activities to the Company or to any Member.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

8.5    Indemnification.

(a)    The Company shall indemnify and hold harmless each Member and Manager from and against all obligations, losses, damages, fines, taxes and interest and penalties thereon, claims, demands, actions, suits, proceedings (whether civil, criminal,

**1.21.21 PM PRODUCTION00116**

-2-

administrative, investigative or otherwise), costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever which may be imposed on, incurred by or asserted at any time against the Member or Manager in any way related to or arising out of this Agreement, the Company, or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of the Member or Manager on behalf of the Company to the maximum extent permitted under the Act, including but not limited to the payment of the Member's or Manager's reasonable attorneys fees in connection with any action or proceeding brought against the Member or Manager except where the Member or Manager is found to be grossly negligent or has committed willful misconduct. All costs and expenses (including reasonable costs and expenses of investigation and reasonable attorneys' fees) incurred by the Member or Manager in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of a written undertaking by, or on behalf of, the Member or Manager to repay such amount if it shall ultimately be determined that the Member or Manager is not entitled to be indemnified by the Company as authorized by this Section 8.5(a).

(b)    In addition, if any Member or any Affiliate thereof (the "Indemnitee"), makes a loan to the Company, or personally guarantees the Company's credit or obligations, then the Company shall indemnify and hold harmless the Indemnitee from and against all claims and demands to the maximum extent permitted under the Act, including but not limited to the payment of the Indemnitee's reasonable attorneys fees in connection with any action or proceeding brought against the Indemnitee.

8.6    Expenses, Fees, and Compensation. Except as may be approved by the Members in writing, none of the Members or Manager nor any of their respective stockholders, partners, members, directors, officers, agents and/or Affiliates shall be entitled (a) to reimbursement for expenses incurred on behalf of the Company, or (b) to any fees, salaries or other compensation for any services rendered to, or on behalf of, the Company.

8.7    Officers. The Manager may designate one or more individuals as officers of the Company, who shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager. The Manager may remove any officer at any time, with or without cause. Each officer shall hold office until his or her successor is appointed and qualified. The same individual may hold any number of offices.

8.8    Affiliated Entities. The fact that a Member or any Affiliate thereof is directly or indirectly interested in, or connected with, any Person employed by the Company to render or perform any services, or to or from whom the Company may purchase, sell or lease any real or personal property, shall not prohibit such Member from employing such Person or from otherwise dealing with such Affiliate, and neither the Company, nor any of the Members, shall have any rights in, or any income or profits derived therefrom.

8.9    Meetings. All meetings of the Members or Manager shall be held at such time and place as shall be determined by the Manager for the purpose of the transaction of any business as may come before such meeting.

**1.21.21 PM PRODUCTION00117**

-3-

9.    Capital Contributions.

9.1    Initial Capital. As of the date hereof, each Member shall have made, or shall be deemed to have made, Capital Contributions to the Company in cash in the aggregate initial amount set forth opposite the Member's name on Schedule 1 attached hereto and in accordance with their Interest.

9.2    Additional Contributions. Each Member shall contribute to the capital of the Company, in cash, as and when determined by the Manager, such Member's pro rata share (based upon their respective Interest as set forth on Schedule 1) of all monies that the Manager deems necessary or appropriate (i) to cause the Property to be properly operated and maintained, (ii) to discharge all costs, expenses, obligations and liabilities of the Company to any Person, and (iii) to enter into any Approved Loan.

9.3    No Withdrawal of Capital Contributions. Except upon dissolution and liquidation of the Company, no Member shall have the right to withdraw, reduce or demand the return of its Capital Contribution, or any part thereof, or any distribution thereon, or to receive property other than cash in connection with a distribution herein, or to receive property other than cash in connection with a distribution or return of capital.

9.4    Return of Capital Contributions. Except upon dissolution and liquidation of the Company or as otherwise provided herein, there is no agreement, nor time set, for the return of any Capital Contribution of any Member.

9.5    No Priority. No Member shall have priority over any other Member as to return of Capital Contributions or allocations of income, gain, profits, losses, credits or deductions or as to distributions.

9.6    Liability of Members and Their Affiliates for Capital and Debts. Except as otherwise provided by applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company. Neither the Members nor any Person Affiliated with a Member shall be obligated personally for such debt, obligation or liability of the Company solely by reason of being a Member or being an Affiliate of a Member.

10.    Capital Accounts, Profits, Losses and Distributions.

10.1    Capital Accounts.

(a)    The Company shall maintain a separate capital account ("Capital Account") for each Member and its successors and permitted assigns.

(b)    The Capital Account of each Member shall initially be equal to the amount of the initial Capital Contribution as set forth on Schedule 1 and increased by (i) Capital Contributions made by such Member (net of liabilities in respect of contributions of property assumed by the Company or subject to which the Company takes such property); (ii) allocations of Profits to such Member pursuant to Section 10.4 hereof; and (iii) the amount of any Company liabilities assumed by such Member not otherwise taken into account in

**1.21.21 PM PRODUCTION00118**
-4-

determining Capital Accounts; and decreased by (A) allocations of Losses and other items of loss and deduction to such Member pursuant to Section 10.4 hereof; (B) by distributions and withdrawals of cash and property to such Member (to the extent of the fair market value thereof, net of liabilities securing such property assumed by the Member or subject to which the Member takes the property); and (C) the amount of any liabilities of such Member assumed by the Company not otherwise taken into account in determining Capital Accounts.

(c)   In the event the Gross Asset Value of an asset of the Company is adjusted pursuant to Section 10.1(d) hereof, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocation of gain or loss that would be recognized by the Company (as modified by Section 10.1 (e) hereof) if it disposed of such asset in an amount equal to the Gross Asset Value. For purposes of this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, as adjusted from time to time pursuant to Section 10.1(d).

(d)   In accordance with Regulation Section 1.704-1(b)(2)(iv)(f), the Gross Asset Value of all other Company's assets shall be adjusted to equal their respective gross fair market values, as of the following dates: (i) the issuance of Interests to any new or existing Member in exchange for a Capital Contribution (other than a *de minimis* contribution); (ii) the distribution by the Company to a Member of money or other property (other than a *de minimis* amount) as consideration for an Interest in the Company, unless all Members receive simultaneous distributions of undivided interests in the distributed assets in proportion to their Interests; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(e)   For purposes of computing the amount of any item of Profits and Losses to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)   any deductions for depreciation, amortization or similar expense attributable to property which has a Gross Asset Value different from its adjusted basis for federal income tax purposes, shall be based on the Gross Asset Value of such property as determined pursuant to Section 10.1(c).

(ii)   Profits or Losses resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(f)   In the event of a transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest. The cost of computing such adjustment shall be borne by the Member disposing of such Interest.

**1.21.21 PM PRODUCTION00119**

(g)    The foregoing provisions and other provisions of this
Agreement relating to the maintenance of Capital Accounts are intended to comply with
Treasury Regulations § 1.704-1(b)(2)(iv), and shall be interpreted consistently therewith.

10.2    Distributions of Available Cash.  The Company shall distribute all
Available Cash to the Members parri passu in accordance with their respective Interest.

10.3    Distributions in Kind.  In the event any proceeds available for
distribution consist of items other than cash (i.e., notes, mortgages, payments in kind), the
Members shall be entitled to their pro rata shares of each such asset, in accordance with the
aggregate amount of proceeds due them pursuant to this Section.

10.4    Profits and Losses.

(a)    Generally.

(i)    The Profits and Losses of the Company shall be determined
for each Fiscal Year in accordance with the accounting method followed by the Company
for federal income tax purposes.  Except as otherwise provided herein, whenever a
proportionate part of the Profit or Loss is credited or charged to a Member's Capital
Account, every item of income, gain, loss, deduction or credit entering into the
computation of such Profit or Loss shall be considered either credited or charged, as the
case may be, in the same proportion to such Member's Capital Account, and every item
of credit or tax preference related to such Profit or Loss, and applicable to the period
during which such Profit or Loss was realized shall be allocated to such Member in the
same proportion.

(ii)    In the event of the admission of a new member in the
Company or a valid transfer of all or part of a Member's Interest, the non-transferring
Member(s) shall determine the manner in which items of income, deduction, gain, loss
and/or credit of the Company shall be allocated among those Persons who were Members
in the Company prior to the date (the "Effective Date") on which there occurs the
admission of a new member in the Company or a valid transfer of all or a part of a
Member's Interest, and the Persons who were Members after the Effective Date.

(b)    Allocation of Profits and Losses.  Except as otherwise
provided in this Agreement, Profits and Losses (and, to the extent necessary, or as otherwise
provided in this Agreement, individual items of income, gain, loss, deduction or credit) for any
period shall be allocated among the Members in a manner that, after giving effect to the special
allocations set forth in Section 10.4(c), the Capital Account of each Member, immediately after
making such allocation, is, as nearly as possible, equal (proportionately) to the distributions
required to be made to such Member pursuant to Section 13.2.

(c)    Special Allocation Provisions.

(i)    Qualified Income Offset.  In the event any Member
unexpectedly receives an adjustment, allocation or distribution described in clauses (4),
(5) and (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having

**1.21.21 PM PRODUCTION00120**

a negative balance in its Capital Account in excess of the amount it is required to restore on a liquidation of the Company (or of the Member's Interest in the Company), then, after any allocations required by Section 10.4(c)(iii) hereof, such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 10.4(c)(i) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 10.4, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 10.4(c)(i) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 10.4(c)(i) if such unexpected adjustments, allocations or distributions had not occurred.

(ii)    Member Nonrecourse Deductions.  Any and all items of loss and deduction and any and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, "Member Nonrecourse Deductions") that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as the term "partner nonrecourse debt" is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the economic risk of loss pursuant to Sections 1.752-2(b)-(j) of the Regulations (the "Economic Risk of Loss") for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iii)    Minimum Gain Chargeback.

(A)    Company Minimum Gain.  Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as the term "partnership minimum gain" is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member, before any other allocation pursuant to Section 10.4 hereof is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company's Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(A) shall consist first of gains

**1.21.21 PM PRODUCTION00121**
-7-

recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a pro rata portion of the other items of Company income and gain for that year.

(B)     Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as the term "partner nonrecourse debt minimum gain" is defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation pursuant to Section 10.4 hereof (other than an allocation required pursuant to Section 10.4(c)(iii)(A)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 10.4(c)(iii)(B) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(iv)     Section 704(c) Allocation.

(A)     Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code and the Regulations promulgated thereunder so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(B)     In the event the Gross Asset Value of any Company asset is adjusted (pursuant to Section 10.1 hereof), subsequent allocations of income, gain, loss, deduction and credit with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations promulgated thereunder as in effect at the time such Gross Asset Value is adjusted.

1.21.21 PM PRODUCTION00122

(C)    Any elections or other decisions relating to allocations pursuant to this Section 10.4(c) shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(v)    <u>Members' Interest in Company Profits For Purposes of Section 752</u>. As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Interests.

(vi)    <u>Nonrecourse Deductions</u>. Nonrecourse Deductions shall be allocated to the Members pro rata in accordance with their Interests.

(vii)    <u>Regulatory Compliance</u>. The provisions of Sections 8.1 (Capital Accounts), 8.4(b) (Allocations of Profits and Losses), this Section 10.4(c)(vii) and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation. The Company may make appropriate amendments to the allocations of items pursuant to 8.4(b) (Allocations of Profits and Losses) if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement.

(viii)    <u>Curative Allocations</u>. The allocations set forth in Sections 8.4(c)(i) (Qualified Income Offset), 8.4(c)(ii) (Member Nonrecourse Deductions), 8.4(c)(iii) (Minimum Gain Chargeback), 8.4(c)(vi) (Nonrecourse Deductions) and 8.4(c)(ix) (Loss Allocation Limitation) of this Agreement (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of the Regulations. The Company may offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations of income, gain, loss or deductions pursuant to this Section 10.4(c)(viii) in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all items of income, gain, loss or deduction were allocated pursuant to Section 10.4(b) (Allocations of Profits and Losses). In exercising its discretion under this Section 10.4(c)(viii), the Company shall take into account future Regulatory Allocations under Section 10.4(c)(iii) (Minimum Gain Chargeback) that, although not yet made, are likely to offset other Regulatory Allocations made under Sections 8.4(c)(ii) (Member Nonrecourse Deductions) and 8.4(c)(vi) (Nonrecourse Deductions).

(ix)    <u>Loss Allocation Limitation</u>. Notwithstanding the foregoing provisions of Section 10.4(b) hereof, the Losses (or items of loss) allocated pursuant to Section 10.4(b) hereof shall not exceed the maximum amount of Losses (or items of loss) that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Period. In the event some but not all of the

**1.21.21 PM PRODUCTION00123**

Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses (or items of loss) pursuant to Section 10.4(b) hereof, the limitation set forth in this Section 10.4(c)(ix) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). All Losses (or items of loss) in excess of the limitation set forth in this Section 10.4(c)(ix) shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses (or items of loss) to each Member under Treasury Regulations Section 1.704-1(b)(2)(n)(d).

10.5   No Obligation to Restore Negative Balances in Capital Accounts. No Member shall have an obligation, at any time during the term of the Company or upon its liquidation, to pay to the Company or any other Member or third party an amount equal to the negative balance in such Member's Capital Account.

10.6   Tax Allocations. All items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items to the Members under the other provisions of this Article 10.

10.7   Withholding Taxes. If the Company is required to withhold any portion of distributions or allocations to a Member by applicable U.S. federal, state or local Tax laws, the Company may withhold such amounts and make such payments to Taxing authorities as are necessary to ensure compliance with such Tax laws. Any funds withheld by reason of this Section 10.7 shall nonetheless be deemed distributed or allocated (as the case may be) to the Member in question for all purposes under this Agreement. If the Company makes any payment to a taxing authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Company may, at its option, (i) require the Member to reimburse the Company for such withholding; or (ii) reduce any subsequent distributions to such Member by the amount of such withholding.

11.   Books and Records.

11.1   Books of Account. Complete original books of account and entry of the Company shall be kept by the Company at the principal office of the Company, and shall be made available for inspection and copying by any Member upon request.

11.2   Tax Elections. The Manager shall have the authority to cause the Company and to make any election required or permitted to be made for income tax purposes if the Manager determines that such election is in the best interest of the Company. As determined by the Manager, the Company may make, in accordance with Section 754 of the Code, a timely election to adjust the basis of the Company property as described in Sections 734 and 743 of the Code.

11.3   Bank Accounts. The Company may maintain one or more bank accounts for the funds of the Company (which accounts shall be separate and apart from any

account of any Member or any Affiliate of any Member), and withdrawals therefrom shall be made upon such signature of the Manager, unless the Manager otherwise determines.

11.4    Tax Returns. The Manager shall cause the Company to timely prepare all tax returns for the Company and shall further cause such tax returns to be timely filed with the appropriate authorities. Upon filing, a copy of each such tax return will be provided to all Members. The Members intend that the Company be classified as a "partnership" for federal, state and local income tax purposes. The Company and its Members will take such reasonable action as may be necessary or advisable, including the amendment of this Agreement, to cause or ensure that the Company shall be treated as a "partnership" for federal, state and local income tax purposes.

11.5    Tax Matters Member. The Members shall designate the Manager to act as the "tax matters partner" ("TMP") of the Company, as such term is defined in Section 6231(a)(7) of the Code, and shall have all the powers and duties assigned to the TMP under Sections 6221-6231 of the Code and the Regulations thereunder, provided that the TMP shall not take any action as TMP that would have a material adverse affect on another Member without the consent of such Member, which consent may be withheld in such Member's sole discretion.

12.    Transfers of Interests of Members.

12.1    General.

(a)    Subject to Section 12.2 herein, no Transfer shall be permitted herein except upon the written consent of all Members. All Transfers shall be subject to the terms, covenants and conditions of any Loan Documents. Each Member indemnifies the Company and each non-transferring Member against out-of-pocket expenses or other liability arising directly or indirectly as a result of any Transfer or purported Transfer by such Member in violation of this Section 12.1. In the event that any Transfer results in the assessment of any fees, charges or penalties against the Company, then each transferor whose Transfer is subject to the assessment of such fees, charges or penalties shall pay, promptly upon demand of the Company, the portion of such fees, charges or penalties allocable to its Transfer. The terms and provisions of this Section 12.1(a) shall survive the Transfer and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member; provided, however, that, if the Company is unable, within thirty (30) days, to collect such fees, charges or penalties from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such fees, charges or penalties in accordance with the provisions of this Section 12.1(a). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the non-transferring Member(s) to the extent of fees, charges or penalties due from such Member, as transferor, as set forth in this Section 12.1(a), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

(b)    If any Interest is permitted to be Transferred as provided in this Agreement, the non-transferring Member(s) may, in its/their discretion, require compliance with any or all of the following as the same may be applicable, as a condition thereto and with any other reasonable condition:

**1.21.21 PM PRODUCTION00125**
-11-

        (i)      The express assumption by the transferee of all of the obligations of the transferring Member relating to the transferred Interest;

        (ii)     the payment by the transferee of all filing, publication and recording fees, if any, and all reasonable expenses, including, without limitation, reasonable counsel fees and expenses incurred by the Company in connection with such transaction;

        (iii)    the delivery by the transferee of such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such Person as a Member, as applicable;

        (iv)    the delivery by the transferee of a statement that it is acquiring the Interest for its own account for investment and not with a view to the resale or distribution thereof and that it will only transfer the acquired Interest to a Person who so similarly represents and warrants and otherwise in accordance with this Agreement;

        (v)     if requested by the non-transferring Member(s), the delivery to the Company of an opinion of reputable counsel (who may be counsel for the Company), in form and substance satisfactory to the non-transferring Member(s), that such Transfer does not violate the Loan Documents, any federal or state securities laws, or any representation or warranty of such transferring Member given in connection with the acquisition of its Interest;

        (vi)    the delivery to the Company of an opinion from reputable counsel (who may be counsel to the Company) that such Transfer (A) will not result in a termination of the Company under Section 708 of the Code or, if such a termination were to result, it would not have a material adverse affect on the Members; (B) will not cause the Company to lose its status as a partnership for federal income tax purposes; and (C) will not cause the Company to become subject to the Investment Company Act of 1940; and

        (vii)   the delivery to the Company of a certification from an officer of the transferee, in form and substance satisfactory to the non-transferring Member(s), certifying that the transferee is an "accredited investor" within the meaning of Section 501 (a) of Regulation D under the Securities Act of 1933, as amended.

No Transfer, where permitted by the terms of this Agreement, shall be binding on the Company until all of the reasonable conditions to such Transfer established by the Company have been fulfilled. Upon the admission of a substitute or additional Member, the Company shall promptly cause any necessary documents or instruments to be filed, recorded or published, wherever required, if any, showing the substitution of the transferee as a substitute Member in place of the transferring Member or as an additional Member, as appropriate. All Transfers are subject to applicable provisions of the Securities Act of 1933, as amended, and all other federal and state securities laws.

        (c)     A transferee of an Interest shall be entitled to receive distributions of cash or other property from the Company attributable to the Interest acquired by

reason of such Transfer from and after the effective date of the Transfer of such Interest to it; provided, however, that anything herein to the contrary notwithstanding, the Company shall be entitled to treat the transferor of such Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of income, gain, losses, credits, deductions or distributions that are made in good faith to such transferor until such time as all of the conditions of such Transfer have been fulfilled, the written instrument of Transfer has been received by the Company and the effective date of Transfer has passed. Further, a transferee of an Interest under and pursuant to this Section 12.1 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act.

The effective date of a permitted Transfer of an Interest shall be no earlier than the last day of the calendar month following receipt of notice of assignment and such documentation as the Company determines is required. The transferring Member shall cease to be, and the transferee shall become, a substituted Member as to the Interest so transferred as of the effective date, and thereafter the transferring Member shall have no rights or obligations with respect to the Company insofar as the Interest transferred is concerned.

(d)    Notwithstanding anything to the contrary in this Agreement, any Transfer (i) in violation of the provisions of this Agreement, (ii) to a Person who, in accordance with applicable laws, lacks capacity by reason of minority, incompetence or otherwise, to hold such Interest, (iii) to a Person prohibited by law from holding such Interest, (iv) which would cause the termination of the Company within the meaning of Section 708 of the Code and, in addition, such termination would have a material adverse effect on the Members, or (v) which would cause any Member to cease to qualify as an "accredited investor" within the meaning of Section 501(a) of Regulation D under the Securities Act of 1933, as amended shall be void *ab initio* and shall not bind the Company.

(e)    In the event that any Transfers under this Agreement result in the assessment of any state or local real estate transfer taxes on such Transfer (and/or on any previous Transfers which are aggregated with the Transfer in question for purposes of the imposition of transfer tax), then each transferor (including such previous transferors) whose Transfer is subject to the assessment of such transfer taxes shall pay, promptly upon demand of the non-transferring Member(s), the portion of such transfer taxes allocable to its Transfer. The terms and provisions of this Section 12.1(e) shall survive the Transfers and shall be binding upon the transferor from and after the effective date of any Transfer, notwithstanding that the transferor may have withdrawn as a Member of the Company; provided, however, that, if non-transferring Member(s) is/are unable, within thirty (30) days, to collect such transfer taxes from such transferor, the transferee shall be obligated to pay the transferor's allocable portion of such transfer taxes in accordance with the provisions of this Section 12.1(e). Each Member undertaking a Transfer hereby indemnifies, defends and holds harmless the Company and the other Member to the extent of transfer taxes due from such Member, as transferor, as set forth in this Section 12.1(e), such indemnification to survive the termination of this Agreement and/or the withdrawal of such Member as a Member.

12.2    Certain Permitted Transfers. Notwithstanding anything to the contrary contained in Section 12.1 and subject to the terms, covenants and conditions of any Loan Documents, any Person that owns a direct or indirect interest in any Member may Transfer

**1.21.21 PM PRODUCTION00127**

their direct or indirect interest in such Member (a) to the parents, spouse, children, grandchildren, brothers or sisters, or children or grandchildren of brothers or sisters of the transferring party, or to one or more trusts for the benefit of the transferring party, or the spouse, children, grandchildren, children or grandchildren of brothers or sisters of the transferring party, (b) to any other Person solely for estate planning purposes, or (c) to another Member.  Notwithstanding anything to the contrary contained herein, no transferee of an Interest under and pursuant to clauses (a) and (b) of this Section 12.2 shall be entitled to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, it being understood and agreed that such transferee shall only have such economic rights, privileges and duties attributable to such Interest pursuant to this Agreement and any applicable law. Any Transfer permitted under Section 12.2 shall be otherwise subject to the provisions of Article 12 applicable thereto.

13.    Withdrawal or Resignation.  Except for Transfers permitted pursuant to Section 12, prior to the dissolution and winding up of the Company, no Member may withdraw from the Company.

14.    Admission of Additional Members.  The Company shall not admit any new Members (other than as provided in Article 12 hereof) without the written consent of all Members.

15.    Dissolution.

15.1    Dissolution.  The Company shall be dissolved or terminated upon the unanimous written consent of the Members or the entry of a decree of judicial dissolution with respect to the Company pursuant to the terms of the Act.

15.2    Liquidation.

(a)    Upon the dissolution of the Company, the Members shall proceed, within a reasonable time, to sell or otherwise liquidate the assets of the Company.  The assets of the Company (whether consisting of cash, assets or a combination thereof) shall be distributed in accordance with the provisions of Article 10.

(b)    Upon dissolution, the Members shall look solely to the assets of the Company for the return of their Capital Contributions. The winding up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Members who are hereby authorized to do any and all acts and things authorized by law for these purposes.

15.3    Termination.  The Company shall terminate when all property owned by the Company shall have been disposed of and the assets, after payment of, or due provision has been taken for, liabilities to Company creditors, shall have been distributed as provided in this Agreement.  Upon such termination, the Members shall execute and cause to be filed a certificate of cancellation of the Company and any and all other documents necessary in connection with the termination of the Company.

15.4    Effect of Certain Events on the Company's Existence.

**1.21.21 PM PRODUCTION00128**
-14-

(a)    General. The death or incapacity of any individual Member, the dissolution of any Member which is an entity and the withdrawal or Bankruptcy of any Member shall not dissolve or terminate the Company. Upon the occurrence of any such event, the Interest of such Member and all its rights or obligations under this Agreement shall devolve unto and vest in such Member's successors or legal representatives, except as otherwise provided for or restricted by Article 12 of this Agreement.

(b)    Bankruptcy. "Bankruptcy" as used in this Section 15.4 shall mean: (i) the filing by a Member of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Member's filing an answer consenting to or acquiescing in any such petition; (ii) the making by a Member of any assignment for the benefit of its creditors with respect to substantially all of the assets of such Member; or (iii) the earlier of (A) an entry of an order of relief which is not vacated or stayed within sixty (60) days or (B) the expiration of one hundred twenty (120) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for substantially all of the assets of a Member, or any involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law, provided that the same shall not have been dismissed, vacated, set aside, stayed or otherwise disposed of within such 120-day period. A "Bankrupt" Member shall mean a Member who has entered into Bankruptcy within the meaning of this Section 15.4(b).

16.    Miscellaneous.

16.1    Entire Agreement; Amendment. This Agreement contains the entire agreement of the parties concerning the subject matter hereof, and supersedes any and all prior agreements oral or written among the parties hereto concerning the subject matter hereof, which prior agreements are hereby canceled. This Agreement may not be changed, modified, amended, discharged, abandoned or terminated orally, but only by an agreement in writing, signed by all of the Members.

16.2    Severability. If any of the provisions of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof which can be given effect without the invalid provision, and to this end the provisions of this Agreement are intended to be and shall be deemed severable.

16.3    Preparation and Review of Agreement. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted. Each party acknowledges and agrees that this Agreement was subject to negotiation and that each party had an opportunity to seek to obtain, and did obtain, independent counsel prior to executing and delivering this Agreement.

16.4    Notices. Any and all notices, requests, demands or other communications hereunder shall be in writing and shall be given by personal delivery, by overnight delivery or courier or by certified or registered mail, postage prepaid, or by telecopy (confirmed by mail) to each of the Members at their respective addresses as set forth on Schedule 1 hereto or to such addresses as may from time to time be designated by any of them in writing

by notice similarly given to all parties in accordance with this Section 16.4. Notices shall be effective upon receipt or refusal. Any notice to be given hereunder can be given by counsel to such party or any other authorized representative.

      16.5   Governing Law; Venue.

      (a)   This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

      (b)   Each Member hereby irrevocably and unconditionally (i) submits itself and its property, solely for the purposes of any legal action or proceeding relating to this Agreement or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the Supreme Court of the State of New York located in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts thereof (collectively, the "Courts"), (ii) consents to the bringing of any such action or proceeding in the Courts and waives any objection that it may now or hereafter have to the venue or any such action or proceeding in any such court, including, without limitation, any objection that such action or proceeding was brought in an inconvenient court, and agrees not to plead or otherwise assert the same, (iii) agrees to service upon it or him of any and all process in any such action or proceeding at the address set forth on Schedule 1 attached hereto, (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

      16.6   Waiver of Trial by Jury. **EACH OF THE MEMBERS HEREBY WAIVES TRIAL BY JURY IN ANY ACTION ARISING OUT OF MATTERS RELATED TO THIS AGREEMENT, WHICH WAIVER IS INFORMED AND VOLUNTARY.**

      16.7   Counterparts; Signatures. This Agreement may be executed in any number of counterparts any one of which, or a copy of any one of which, shall be admissible into evidence, and all of which shall constitute one and the same agreement. The parties agree that they may rely on the facsimile signature or portable document signature (pdf) of any Member with respect to this Agreement or any waiver, amendment, supplement or consent relating thereto, with the same effect as if such signature was an original.

      16.8   No Third Party Beneficiaries. None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of the Company or any other Person not a party to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**1.21.21 PM PRODUCTION00130**

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date of this Agreement set forth above.

PRIMARY MEMBER LLC

By: _____

Joel Schreiber, Sole Member

Schedule I

Members

| Member | Mailing Address | Capital Contribution | Interest |
|---|---|---|---|
| Joel Schreiber | 7 Times Square<br>37th Floor<br>New York, NY 10036 | $_____ | 100.00% |
| Total: | | $_____ | 100.00% |

Schedule 2

Definitions

*"Act"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Additional Capital Contributions"* means contributions made to the Company pursuant to Section 9.3 by any Member (including any predecessor holder of the Interest of such Member).

*"Affiliate(s)"* shall mean with respect to any Person, any individual or entity directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with such Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or other entity with voting rights attributable to shares or other equity interests therein, the right to the exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares or other equity interests of the controlled corporation or other entity, or the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

*"Agreement"* shall have the meaning set forth in the introductory paragraphs hereto.

*"Approved Loan"* shall mean any loan made to the Company, which is secured by the Property or by any Interests of the Company and is approved by the Members in accordance with the terms of this Agreement.

*"Available Cash"* means for any period with respect to which a distribution is to be made pursuant to this Agreement, the positive difference, if any, between (i) the sum of (a) all cash received by the Company (including Capital Contributions and the proceeds of any loan or sale of assets) during such period and (b) any amounts drawn from the reserves of the Company during such period and (ii) the sum of (a) principal and interest payments due and payable on any indebtedness incurred by the Company pursuant to the terms of this Agreement during such period, (b) all other cash expenditures incurred by the Company in accordance with the terms of this Agreement during such period and (c) the amount of any additional reserves of the Company determined and set aside by the Company during such period in accordance with the approved annual budgets for the Property and such nominal additional amounts as shall be required to cover administrative expenses of the Company during such period.

*"Bankrupt"* shall have the meaning set forth in Section 15.4(b).

*"Bankruptcy"* shall have the meaning set forth in Section 15.4(b).

*"Business Day"* shall mean any day other than a Saturday, Sunday or any day on which national banks in the City of New York are not open for business.

*"Capital Account"* shall have the meaning set forth in Section 10.1(a).

 1.21.21 PM PRODUCTION00133

*"Capital Contributions"* means contributions made to the Company pursuant to Article 9 by any Member (including any predecessor holder of the Interest of such Member).

*"Code"* shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time.

*"Company"* shall have the meaning set forth in the introductory paragraphs hereto.

"*Courts*" shall have the meaning set forth in Section 16.5.

*"Economic Risk of Loss"* shall have the meaning set forth in Section 10.4(c).

*"Effective Date"* shall have the meaning set forth in Section 10.4(a).

*"Fiscal Year"* or *"Fiscal Period"* means, subject to the provisions of Section 706 of the Code, (i) the period commencing on the date of formation of the Company and ending on December 31, 2013, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on January 1 and ending on the date on which all assets of the Company are distributed to the Members pursuant to Article 15.

*"Gross Asset Value"* shall have the meaning set forth in Section 10.1(c).

*"Indemnitee"* shall have the meaning set forth in Section 8.5(b).

*"Interest"* means the ownership interest of a Member in the Company consisting of (i) such Member's percentage ownership interest in profits, losses, allocations and distributions, (ii) such Member's right to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such other rights and privileges, if any, provided for in this Agreement. All Interests shall be considered personal property. The initial Interest of each Member is set forth on Schedule 1 annexed hereto.

*"Loan Documents"* shall mean all documents, instruments and agreements entered into with respect to any Approved Loan.

"*Manager*" shall have the meaning set forth in Section 8.1.

*"Member(s)"* shall have the meaning set forth in the introductory paragraphs hereto and any Person hereafter substituted as a Member pursuant to Article 12 or hereafter admitted as a Member pursuant to Article 12.

*"Member Nonrecourse Deductions"* shall have the meaning set forth in Section 10.4(c).

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association or other entity whatsoever, any federal, state, county or municipal government, or any bureau or department or agency thereof, and any fiduciary acting in such capacity on behalf of any of the foregoing.

 1:21:21 PM **PRODUCTION00134**

*"Profits" or "Losses"* for any Fiscal Year (or other period) shall mean an amount equal to the Company's taxable income or loss, respectively, for such taxable year determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss; (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as such pursuant to Regulations § 1.704-1(b)(2)(iv), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss; (iii) income, gain, loss and deduction of the Company shall be computed as if the Company had sold any property distributed to a Member on the date of such distribution at a price equal to its fair market value at the date; (iv) the adjustments set forth in Section 10.1 (e) and (v) items of income, gain deduction or loss specifically allocated pursuant to Section 10.4(c) in any year shall be excluded from the calculation of taxable income or loss for such year.

*"Investment"* shall have the meaning set forth in Section 3.

*"Regulations"* shall mean the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

*"Regulatory Allocations"* shall have the meaning set forth in Section 10.4(c).

*"Tax"* or *"Taxes"* means any federal, state, county, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, unemployment compensation, payroll and property taxes, import duties and other governmental charges and assessments), whether or not measured in whole or in part by net income, and including deficiencies, interest, additions to tax or interest, and penalties with respect thereto, and including expenses associated with contesting any proposed adjustments related to any of the foregoing.

*"TMP"* shall have the meaning set forth in Section 11.5.

*"Transfer"* means the transfer, sale, assignment, gift or other disposition pledge, hypothecation or collateral assignment of all or any portion of an Interest, whether direct or indirect, voluntary or involuntary, by operation of law or otherwise, and/or in one or more related or unrelated transactions.

1.21.21 PM PRODUCTION00136

**Joel Schreiber**

| | |
|---|---|
| om: | Lisa Skye Hain <lisa@liveprimary.com> |
| ent: | Friday, February 26, 2016 11:48 AM |
| To: | Nanci Hom |
| Cc: | Danny Orenstein; Joel Schreiber; Lisa Izkiayayeva |
| Subject: | Re: Live Primary LLC - AMEX Charges  = $25,005.21 |

Nanci,

Thanks so much.

Have a lovely weekend,
Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

Visit us at liveprimary.com for updates on our progress

On Feb 26, 2016, at 10:16 AM, Nanci Hom <nhom@waterbridge.com> wrote:

Good morning,
We know:

| DATE | NAME | AMOUNT | MEMO | FROM |
|---|---|---|---|---|
| 01/27/16 | Ylighting | 1,510.00 | | American Express Credit Card |
| 02/01/16 | Ferguson Enterprises | 7,449.77 | | American Express Credit Card |
| 02/01/16 | Ferguson Enterprises | 8,246.69 | | American Express Credit Card |
| 02/01/16 | Ylighting | 1,050.00 | | American Express Credit Card |
| 02/22/16 | Ylighting | 6,748.75 | | American Express Credit Card |
| | | | | |
| | | | | |
| | TOTAL | $ 25,005.21 | | |

**Waterbridge Capital / Nanci Hom**
**Operations Manager**
**Office (212) 696-2400**
**Waterbridge.com**

EXHIBIT

27

## Joel Schreiber

| | |
|---|---|
| From: | Lisa Skye Hain <lisa@liveprimary.com> |
| Sent: | Saturday, September 24, 2016 4:51 PM |
| To: | Joel Schreiber; Danny Orenstein |
| Subject: | loan doc ($100,000) |
| Attachments: | SKYE LOAN AGREEMENT NOTE ver4[1].doc |

Can you both please review the attached doc ASAP? I want to send it to her tomorrow.
Per my understanding of our OA, as Managing Members of the entity, Danny and I are ok to sign this alone. Correct me if I am mistaken please.

Thank you!
Lisa

Spam
Phish/Fraud
Not spam
Forget previous vote

Lisa Skye Hain
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

**EXHIBIT**

**53**

# LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE, is made this _____ day of September, 2016, by and among **LIVE PRIMARY LLC**, a Delaware Limited Liability Company (hereinafter known as "BORROWER") and **KELLY NOONAN**, an individual residing in the State of California (hereinafter known as "LENDER").

BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole. THIS LOAN AGREEMENT AND PROMISSARY NOTE DOES NOT CONSTITUTE EITHER AN OFFER TO SELL OR AN OFFER TO PURCHASE SECURITIES.

## PROMISSORY NOTE

FOR VALUE RECEIVED, BORROWER promises to pay to the order of LENDER, the sum of one hundred thousand dollars (**$100,000.00**) together with interest thereon at a rate of ten percent (10%) per annum on the unpaid balance (hereinafter, "the Loan Balance"). The entire outstanding Loan Balance (including principal and any accrued unpaid interest) shall, after one full calendar year, become fully due and payable by BORROWER. Should BORROWER fail to make payment in full to LENDER within (45) forty-five days of any actual demand, BORROWER shall be in default of the terms of this loan agreement. This agreement is subject to additional terms found below.

## ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legal bound as follows:

### A. <u>Loan Payment Terms</u>.
BORROWER to pay monthly installment interest payments of two thousand dollars ($2,000) to LENDER every month for the life of the loan, beginning January 1, 2017. The first payment shall be due on January 1, 2017 and continue each month on the 1st of the month until the Loan Balance, including principal and accrued unpaid interest, is paid in full or demand for payment in full is made by LENDER, in which case a prorated portion of interest shall be paid by BORROWER depending on when payment in full is made during the Post Demand Period.

### B. <u>Demand by Lender</u>.
This is a "demand" loan agreement and promissory note under which BORROWER is required to repay in full the entire outstanding Loan Balance within forty-five (45) days of receiving a written demand from LENDER for full repayment of the Loan Balance. Delivery of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. For mailing of said notice, LENDER shall use BORROWER'S address as stated below in the portion of this agreement pertaining to default.

### C. <u>Method of Loan Payment</u>.
The BORROWER shall make all payments called for under this loan agreement by providing a check or other negotiable instrument made payable to the following individual or entity at the address indicated:

**EXHIBIT**

54

exhibitsticker.com

**1.21.21 PM PRODUCTION00886**

Kelly Noonan
49 Beverly Park Circle
Beverly Hills, CA 90210

If Lender gives written notice to Borrower that a different address shall be used for making payments under this loan agreement, Borrower shall use the new address so given by Lender.

D. **Default**. The occurrence of any of the following events shall constitute a Default by the Borrower of the terms of this loan agreement and promissory note:

1. Borrower's failure to pay any amount due as principal or interest on the date required under this loan agreement, after a five (5) day grace period
2. Borrower seeks an order of relief under the Federal Bankruptcy laws
3. Borrower becomes insolvent
4. A federal tax lien is filed against the assets of Borrower

E. **Additional Provisions Regarding Default:**

1. **Addressee and Address** to which Lender is to give Borrower written notice of Default:

   Lisa Skye Hain
   c/o Primary
   26 Broadway, 8th floor
   New York, NY 10004

If Borrower gives written notice to Lender that a different address shall be used, Lender shall use that address for giving notice of default (or any other notice called for herein) to Borrower.

2. **Cure of Default.** Upon default, Lender shall give Borrower written notice of default. Mailing of written notice by Lender to Borrower via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. Borrower shall have 10 days after receipt of written notice of default from Lender to cure said default. In the case of default due solely to Borrower's failure to make timely payment as called for in this loan agreement, Borrower may cure the default by making full payment of any principal and accrued interest whose payment to Lender is overdue under the loan agreement and, also, the late payment penalty described below.

3. **Penalty for Late Payment.** For late payment of interest, there shall be imposed upon Borrower a one hundred fifty dollar ($150) penalty for any late payment of interest whose payment to Lender is more than five (5) days overdue under this loan agreement. For example, if the agreement calls for monthly payments of $2,000 upon the fifth day of each month and Borrower fails to make timely payment of said amount by the tenth day of the month, Borrower shall be liable to Lender for a penalty of one hundred and fifty dollars ($150) and, to become current, the Borrower must pay to Lender the overdue interest payment of $2,000 and a penalty of ($150.00), for a total of ($2150). For late payment of the Loan Balance after Lender's demand of payment, there shall be imposed upon Borrower a one tenth of one percent (.01%) per day penalty for the full amount due to Lender under this loan agreement and for which Lender has delivered a notice of default to Borrower. For example, if the Loan Balance is one hundred thousand dollars ($100,000) and the Post Demand Period expires upon the fifth day of the month, and Borrower makes payment of said amount on the 20th day of the month, the Loan Balance shall have accrued additional interest in the

2

amount of $1,500 as a penalty. Borrower (after receipt of a default notice from Lender), to cure the default, shall be liable to Lender for the penalty of $1,500, the overdue accrued interest of $500 accrued during the half-month after the expiration of the Post Demand Period and the Loan Balance, for a total of $102,000.

**4. Acceleration**. If the Borrower fails to cure any default on or before the expiration of the ten (10) day cure period that starts on the date Borrower receives written notice from Lender that an event of default has occurred under this loan agreement, the entire unpaid principal, accrued interest, and penalties under this loan agreement shall accelerate and become due and payable immediately.

**5. Security**. Borrower agrees that this note is secured by a two percent (2%) equity interest in the property and business more formally known as Live Primary LLC. Borrower warrants that at the time of this writing such percentage has a value equivalent to the amount being lent by Lender. Should Borrower default under any of the terms of this agreement Lender it its option may seek to claim a percentage interest equal to the total amount currently due to Lender. Lender agrees to allow an additional 60-day period to cure all defaults or to facilitate such transfer of ownership. To the extent that Lender can collateralize its interest in Live Primary LLC, such payments shall serve to offset any amounts still due and owing to Lender by Borrower. However, nothing herein shall serve as a waiver of any moneys due Lender.

**6. Indemnification of Attorneys Fees and out of pocket costs.** Should any party materially breach this agreement, the non breaching party shall be indemnified by the breaching party for its reasonable attorney's fees and out of pocket costs which in any way relate to, or were precipitated by, the breach of this agreement. The term "out of pocket costs", as used herein, shall not include lost profits. A default by Borrower which is not cured within 10 days after receiving a written notice of default from Lender constitutes a material breach of this agreement by Borrower.

**F. Parties that are not individuals**. If any Party to this agreement is other than an individual (i.e., a corporation, a Limited Liability Company, a Partnership, or a Trust), said Party, and the individual signing on behalf of said Party, hereby represents and warrants that all steps and actions have been taken under the entity's governing instruments to authorize the entry into this Loan Agreement. Breach of any representation contained in this paragraph is considered a material breach of the Loan Agreement.

**G. Integration**. This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated agreement.

**H. Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

**I. Waiver.** The failure by one party to require performance of any provision shall not affect that party's right to require performance at any time thereafter, nor shall a waiver of any breach or default of this Contract constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

**J. Modification**. Except as otherwise provided in this document, this agreement may be modified,

superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein. This agreement may be renewed for a period of one (1) additional year provided LENDER grants such consent to BORROWER and BORROWER requests in writing and executes an Extension/ Modification agreement no later than 30 days prior to the expiration of this Agreement. BORROWER agrees to pay for any and all reasonable legal expenses associated with the production of an appropriate Extension/ Modification agreement.

K. **Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in New York, NY for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts of New York, NY shall have exclusive jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sounds in contract, tort, or other areas of the law.

L. **State Law**. This Agreement shall be interpreted under, and governed by, the laws of the state of New York.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

**BORROWER:**

_____
**As a Managing Member of Live Primary LLC, Lisa Skye Hain**
Dated: September _____, 2016

_____
**As a Managing Member of Live Primary LLC, Daniel Orenstein**
Dated: September _____, 2016

**LENDER:**

_____
**Kelly Noonan**
Dated: September _____, 2016

**Joel Schreiber**

| | |
|---|---|
| From: | lisa@liveprimary.com |
| Sent: | Saturday, September 24, 2016 8:21 PM |
| To: | Danny Orenstein |
| Cc: | Joel Schreiber |
| Subject: | Re: loan doc ($100,000) |

I think we send it to her first (not notarized) for her review. Then she sends back or Ives approval - and then we can notarize. Can you both let me know what you think ASAP so I can send tomorrow for her review?

Thanks!

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

On Sep 24, 2016, at 5:22 PM, Danny Orenstein <danny@liveprimary.com> wrote:

Hi Lisa

We will need to get this notarized on Monday.
I'll review in the interim.
Thanks
Danny

On Sep 24, 2016, at 4:50 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:

> Can you both please review the attached doc ASAP? I want to send it to her tomorrow.
> Per my understanding of our OA, as Managing Members of the entity, Danny and I are ok to sign this alone. Correct me if I am mistaken please.
>
> Thank you!
> Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.

EXHIBIT

55

**1.21.21 PM PRODUCTION00891**

1

# LOAN AGREEMENT AND PROMISSORY NOTE

THIS LOAN AGREEMENT AND PROMISSORY NOTE, is made this ____ day of December, 2016, by and among **LIVE PRIMARY LLC**, a Delaware Limited Liability Company (hereinafter known as "BORROWER") and **JENNIFER GLUCKOW,** an individual residing in the State of New Jersey (hereinafter known as "LENDER").

BORROWER and LENDER shall collectively be known herein as "the Parties". In determining the rights and duties of the Parties under this Loan Agreement, the entire document must be read as a whole. THIS LOAN AGREEMENT AND PROMISSARY NOTE DOES NOT CONSTITUTE EITHER AN OFFER TO SELL OR AN OFFER TO PURCHASE SECURITIES.

## PROMISSORY NOTE

FOR VALUE RECEIVED, BORROWER promises to pay to the order of LENDER, the sum of one hundred thousand dollars (**$40,000.00)** together with interest thereon at a rate of ten percent (10%) per annum on the unpaid balance (hereinafter, "the Loan Balance"). The entire outstanding Loan Balance (including principal and any accrued unpaid interest) shall, after one full calendar year, become fully due and payable by BORROWER. Should BORROWER fail to make payment in full to LENDER within (45) forty-five days of any actual demand, BORROWER shall be in default of the terms of this loan agreement.  This agreement is subject to additional terms found below.

## ADDITIONAL LOAN TERMS

The BORROWER and LENDER, hereby further set forth their rights and obligations to one another under this Loan Agreement and Promissory Note and agree to be legal bound as follows:

A. **Loan Payment Terms**.
BORROWER to pay monthly installment interest payments of two thousand dollars ($1,000) to LENDER every month for the life of the loan, beginning February 1, 2017. The first payment shall be due on February 1, 2017 and continue each month on the 1st of the month until the Loan Balance, including principal and accrued unpaid interest, is paid in full or demand for payment in full is made by LENDER, in which case a prorated portion of interest shall be paid by BORROWER depending on when payment in full is made during the Post Demand Period.

B. **Demand by Lender**. This is a "demand" loan agreement and promissory note under which BORROWER is required to repay in full the entire outstanding Loan Balance within forty-five (45) days of receiving a written demand from LENDER for full repayment of the Loan Balance. Delivery of written notice by LENDER to BORROWER via U.S. Postal Service Certified Mail shall constitute prima facie evidence of delivery. For mailing of said notice, LENDER shall use BORROWER'S address as stated below in the portion of this agreement pertaining to default.

C. **Method of Loan Payment**. The BORROWER shall make all payments called for under this loan agreement by providing a check or other negotiable instrument made payable to the following individual or entity at the address indicated:

**EXHIBIT**

**57**

exhibitsticker.com

Jennifer Gluckow
ABC Street
Charlotte, NC xxxxx

If Lender gives written notice to Borrower that a different address shall be used for making payments
under this loan agreement, Borrower shall use the new address so given by Lender.

D. **Default.** The occurrence of any of the following events shall constitute a Default by the Borrower of
the terms of this loan agreement and promissory note:

1. Borrower's failure to pay any amount due as principal or interest on the date required under this loan
agreement, after a five (5) day grace period
2. Borrower seeks an order of relief under the Federal Bankruptcy laws
3. Borrower becomes insolvent
4. A federal tax lien is filed against the assets of Borrower

E. **Additional Provisions Regarding Default:**

1. **Addressee and Address** to which Lender is to give Borrower written notice of Default:

> Lisa Skye Hain
> c/o Primary
> 26 Broadway, 8th floor
> New York, NY 10004

If Borrower gives written notice to Lender that a different address shall be used, Lender shall use
that address for giving notice of default (or any other notice called for herein) to Borrower.

2. **Cure of Default.** Upon default, Lender shall give Borrower written notice of default. Mailing of
written notice by Lender to Borrower via U.S. Postal Service Certified Mail shall constitute prima
facie evidence of delivery. Borrower shall have 10 days after receipt of written notice of default
from Lender to cure said default. In the case of default due solely to Borrower's failure to make
timely payment as called for in this loan agreement, Borrower may cure the default by making full
payment of any principal and accrued interest whose payment to Lender is overdue under the loan
agreement and, also, the late payment penalty described below.

3. **Penalty for Late Payment.** For late payment of interest, there shall be imposed upon Borrower
a one hundred fifty dollar ($150) penalty for any late payment of interest whose payment to Lender
is more than five (5) days overdue under this loan agreement. For example, if the agreement calls
for monthly payments of $1,000 upon the first day of each month and Borrower fails to make
timely payment of said amount by the tenth day of the month, Borrower shall be liable to Lender
for a penalty of one hundred and fifty dollars ($150) and, to become current, the Borrower must
pay to Lender the overdue interest payment of $1,000 and a penalty of ($150.00), for a total of
($1150).  For late payment of the Loan Balance after Lender's demand of payment, there shall be
imposed upon Borrower a one tenth of one percent (.001%) per day penalty for the full amount due
to Lender under this loan agreement and for which Lender has delivered a notice of default to
Borrower. For example, if the Loan Balance is forty thousand dollars ($40,000) and the Post
Demand Period expires upon the fifth day of the month, and Borrower makes payment of said
amount on the 20th day of the month, the Loan Balance shall have accrued additional interest in the

amount of $1,500 as a penalty. Borrower (after receipt of a default notice from Lender), to cure the default, shall be liable to Lender for the penalty of $1,500, the overdue accrued interest of $500 accrued during the half-month after the expiration of the Post Demand Period and the Loan Balance, for a total of $40,800.

4. **Acceleration**. If the Borrower fails to cure any default on or before the expiration of the ten (10) day cure period that starts on the date Borrower receives written notice from Lender that an event of default has occurred under this loan agreement, the entire unpaid principal, accrued interest, and penalties under this loan agreement shall accelerate and become due and payable immediately.

5. **Security**. Borrower agrees that this note is secured by a two percent (1%) equity interest in the property and business more formally known as Live Primary LLC. Borrower warrants that at the time of this writing such percentage has a value equivalent to the amount being lent by Lender. Should Borrower default under any of the terms of this agreement Lender it its option may seek to claim a percentage interest equal to the total amount currently due to Lender. Lender agrees to allow an additional 60-day period to cure all defaults or to facilitate such transfer of ownership. To the extent that Lender can collateralize its interest in Live Primary LLC, such payments shall serve to offset any amounts still due and owing to Lender by Borrower. However, nothing herein shall serve as a waiver of any moneys due Lender.

6. **Indemnification of Attorneys Fees and out of pocket costs.** Should any party materially breach this agreement, the non breaching party shall be indemnified by the breaching party for its reasonable attorney's fees and out of pocket costs which in any way relate to, or were precipitated by, the breach of this agreement. The term "out of pocket costs", as used herein, shall not include lost profits. A default by Borrower which is not cured within 10 days after receiving a written notice of default from Lender constitutes a material breach of this agreement by Borrower.

F. **Parties that are not individuals**. If any Party to this agreement is other than an individual (i.e., a corporation, a Limited Liability Company, a Partnership, or a Trust), said Party, and the individual signing on behalf of said Party, hereby represents and warrants that all steps and actions have been taken under the entity's governing instruments to authorize the entry into this Loan Agreement. Breach of any representation contained in this paragraph is considered a material breach of the Loan Agreement.

G. **Integration**. This Agreement sets forth the entire agreement between the Parties with regard to the subject matter hereof. All prior agreements, representations and warranties, express or implied, oral or written, with respect to the subject matter hereof, are hereby superseded by this agreement. This is an integrated agreement.

H. **Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

I. **Waiver.** The failure by one party to require performance of any provision shall not affect that party's right to require performance at any time thereafter, nor shall a waiver of any breach or default of this Contract constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

J. **Modification**. Except as otherwise provided in this document, this agreement may be modified,

superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein. This agreement may be renewed for a period of one (1) additional year provided LENDER grants such consent to BORROWER and BORROWER requests in writing and executes an Extension/ Modification agreement no later than 30 days prior to the expiration of this Agreement. BORROWER agrees to pay for any and all reasonable legal expenses associated with the production of an appropriate Extension/ Modification agreement.

K. **Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in New York, NY for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts of New York, NY shall have exclusive jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sounds in contract, tort, or other areas of the law.

L. **State Law**. This Agreement shall be interpreted under, and governed by, the laws of the state of New York.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, BORROWER and LENDER affix their signatures hereto.

**BORROWER:**

_____

**As a Managing Member of Live Primary LLC, Lisa Skye Hain**
Dated: December ____, 2016

_____

**As a Managing Member of Live Primary LLC, Daniel Orenstein**
Dated: December ____, 2016

**LENDER:**

_____

**Jennifer Gluckow**
Dated: December ____, 2016

STATE OF NEW YORK, COUNTY OF                    , ss.

        On the    day of September 2016, before me, the undersigned notary public, personally appeared **LISA SKYE HAIN**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                         _____

                                            Notary Public

                                   My commission expires on

STATE OF NEW YORK, COUNTY OF                    , ss.

        On the    day of September 2016, before me, the undersigned notary public, personally appeared **DANIEL ORENSTEIN**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                         _____

                                            Notary Public

                                   My commission expires on

STATE OF CALIFORNIA, COUNTY OF                    , ss.

        On the    day of September 2016, before me, the undersigned notary public, personally appeared **KELLY NOONAN**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                         _____

                                            Notary Public

                                   My commission expires on

5 1.21.21 PM PRODUCTION01079

## Joel Schreiber

**om:** Lisa Skye Hain <lisa@liveprimary.com>
**ent:** Monday, June 05, 2017 1:21 PM
**To:** Joel Schreiber
**Subject:** Re: Primary

$500 wires to us both were just made.
Should be completed in next hour.

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com

You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - Inc Magazine
*NYC's Coolest New Wellness-Focused Co-Working Space* - Harper's Bazaar
*Co-Working for Grownups* - Fortune Magazine

> On Jun 5, 2017, at 1:00 PM, Joel Schreiber <js@waterbridge.com> wrote:
>
> Lisa,
>
> As discussed please make a distribution today.
>
> Please confirm once done
>
> Thanks
>
> JS
>
> Sent from my iPad

**EXHIBIT**

**58**

exhibitsticker.com

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Wednesday, October 04, 2017 4:07 PM |
| **To:** | Joel Schreiber |
| **Cc:** | Rafay Khalid; Brian Hain |
| **Subject:** | Fwd: Primary Selected Financials as 9/30/2017 |
| **Attachments:** | Primary Select Financials 09302017.pdf |

Joel, see attached.

Please let us know if you agree/are ok with us sending these (to Peter Sabesan for the 30th Street deal) as the snapshot of current financials.

And/or let us know if you would make any changes.

Begin forwarded message:

**From:** Rafay Khalid <rafayzkhalid@gmail.com>
**Subject: Primary Selected Financials as 9/30/2017**
**Date:** October 4, 2017 at 12:36:05 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>, Brian Hain <brian@liveprimary.com>

Hi Lisa and Brian,

Attached is the selected financials for Primary 9/30/2017.

Thank you,

Rafay

**EXHIBIT**

**59**

*****************CONFIDENTIAL**********************************************

**Primary**
P&L for 26 Broadway
*as of September 2017*

| | Actual FY 2016 | Actual Jan-17 | Actual Feb-17 | Actual Mar-17 | Actual Apr-17 | Actual May-17 | Actual Jun-17 | Actual Jul-17 | Actual Aug-17 | Actual Sep-17 | Actual YTD 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 635,989 | $129,410 | $136,313 | $159,204 | $149,780 | $143,563 | $165,326 | $143,300 | $162,173 | $155,156 | $1,344,223 |
| Gross Profits | $ 614,034 | $124,194 | $131,045 | $152,324 | $143,037 | $136,080 | $159,326 | $137,240 | $156,052 | $148,974 | $1,288,272 |
| *gross margin* | 97% | 96% | 96% | 96% | 95% | 95% | 96% | 96% | 96% | 96% | 96% |
| **Expenses** | | | | | | | | | | | |
| Total Expenses | $1,260,531 | $161,756 | $126,727 | $159,727 | $160,927 | $151,226 | $153,227 | $156,677 | $118,343 | $148,573 | $1,337,185 |
| *SG&A margin* | 198% | 125% | 93% | 100% | 107% | 105% | 93% | 109% | 73% | 96% | 99% |
| Operating Income | $ (646,497) | $ (37,562) | $ 4,318 | $ (7,404) | $ (17,891) | $ (15,147) | $ 6,099 | $ (19,438) | $ 37,709 | $ 401 | $ (48,914) |
| *operating margin* | -102% | -29% | 3% | -5% | -12% | -11% | -4% | -14% | 23% | 0% | -4% |
| Net Income | $ (646,497) | $ (42,562) | $ (682) | $ (12,404) | $ (27,891) | $ (25,147) | $ (3,901) | $ (31,938) | $ 21,209 | $ (16,089) | $ (139,414) |
| *net margin* | -102% | -33% | -1% | -8% | -19% | -18% | -2% | -22% | 13% | -10% | -10% |

# Primary
## Balance Sheet
*as of September 2017*

| | Sep-17 |
|---|---|
| **ASSETS** | |
| CURRENT ASSETS | |
| Cash | $ 46,294 |
| Cash - Security Deposits Customers | $ 242,000 |
| Cash - Security Deposits Primary | $ 1,098,794 |
| **Total Current Assets** | $ 1,387,088 |
| | |
| **Net Fixed Assets** | $ 2,097,237 |
| | |
| **TOTAL ASSETS** | $ 3,484,325 |
| | |
| **LIABILITIES & EQUITY** | |
| LIABILITIES | |
| Accounts Payable | $ 76,000 |
| Security Deposits | $ 242,000 |
| Note / LOC | $ 280,000 |
| **Total Liabilities** | $ 598,000 |
| | |
| EQUITY | |
| Capital | $ 3,672,236 |
| Retained Earnings | $ (646,497) |
| Current Year Acc Income (Loss) | $ (139,414) |
| **Total Equity** | $ 2,886,325 |
| | |
| **TOTAL LIABILITIES & EQUITY** | $ 3,484,325 |

****************CONFIDENTIAL*******************************************************

## Joel Schreiber

| | |
|---|---|
| **From:** | Lisa Skye Hain <lisa@liveprimary.com> |
| **Sent:** | Thursday, April 12, 2018 4:06 PM |
| **To:** | Joel Schreiber; Nanci Hom |
| **Subject:** | Fwd: American Express Merchant Financing - Loan Application SE# 2310484019 |

Joel/Nanci,

Please see attached.

They need Waterbridge Capital to complete section B on this Docusign form. It's for the Amex merchant loan ($324,000).

Let me know if you have questions.

Many thanks,

Lisa

**Lisa Skye Hain**
Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



ou work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016 - Inc Magazine*
*NYC's Coolest New Wellness-Focused Co-Working Space - Harper's Bazaar*
*Co-Working for Grownups - Fortune Magazine*

---------- Forwarded message ----------
From: **Rafay Khalid** <rafay@liveprimary.com>
Date: Thu, Apr 12, 2018 at 2:32 PM
Subject: Fwd: American Express Merchant Financing - Loan Application SE# 2310484019
To: Lisa BNI Boom 68 Skye Hain <lisa@liveprimary.com>, brian@liveprimary.com

Hi Lisa,

Please ask Waterbridge Capital to complete section B on this Docusign form. It's for the Amex merchant loan.

Rafay

Begin forwarded message:

From: "Merchant Financing via DocuSign" <dse@docusign.net>
Date: April 12, 2018 at 2:30:23 PM EDT
To: "LISA SKYE HAIN" <rafay@liveprimary.com>

**EXHIBIT**

**61**

exhibitsticker.com

## Joel Schreiber

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Tuesday, June 05, 2018 9:23 AM
**To:** Joel Schreiber; Lisa Izkiayayeva
**Subject:** Fwd: Paying Brian and Lisa

Joel, see below
I need you to complete this form ASAP
It is to complete an application for a $250k Loan at 8-16%
Please confirm
Thank you

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - *Inc Magazine*
*NYC's Coolest New Wellness-Focused Co-Working Space* - *Harper's Bazaar*
*Co-Working for Grownups* - *Fortune Magazine*

Begin forwarded message:

**From:** Chad Gordon <chad@fundera.com>
**Date:** June 5, 2018 at 9:18:15 AM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Brian Hain <brian@liveprimary.com>
**Subject: Re: Paying Brian and Lisa**

Hi Lisa,


EXHIBIT
63

Thank you for your time on the phone, please have the Primary Member LLC complete the following form, he or she will
not receive a hard credit inquiry for signing the form it is just to ensure that their credit score is within the criteria for
the lender to underwrite the loan. Let me know if you have any questions.

• Fundera Credit Authorization

**1.21.21 PM PRODUCTION01257**

1

## Joel Schreiber

| | |
|---|---|
| ‛om: | Lisa Skye Hain <lisa@liveprimary.com> |
| ...ent: | Tuesday, June 19, 2018 10:36 AM |
| To: | Joel Schreiber |
| Cc: | Brian Hain |
| Subject: | $485k |

Per our call, we agree to pay a $20k fee for a $485k loan with 30 days terms. Please confirm this can be transferred today.

Our banking details are as follows:
Wire Transfer Information:
Routing number: 021000021
Swift code: CHASUS33
Account number: 755697336
Bank Address: 405 Lexington Ave New York NY 10174
Bank Name—JPMorgan Chase Bank NA
Business Legal Name: Live Primary LLC
Address: 26 Broadway, 8th floor, NY NY 10004

Best,
Lisa

**‛a Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - *Inc Magazine*
*NYC's Coolest New Wellness-Focused Co-Working Space* - *Harper's Bazaar*
*Co-Working for Grownups* - *Fortune Magazine*

**EXHIBIT**

**65**

## Joel Schreiber

**From:** Lisa Skye Hain <lisa@liveprimary.com>
**Sent:** Friday, June 22, 2018 5:27 PM
**To:** Joel Schreiber
**Cc:** Lisa Izkiayaveva; Charles Valentino
**Subject:** Fwd: Paying Brian and Lisa

Joel, we got approved for $100k. Need your personal returns for last two years ASAP. See below.

Please confirm you can send on Monday.
Thank you!

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

_Best New Co-Working Space 2016_ - Inc Magazine
_NYC's Coolest New Wellness-Focused Co-Working Space_ - Harper's Bazaar
_Co-Working for Grownups_ - Fortune Magazine

Begin forwarded message:

**From:** Chad Gordon <chad@fundera.com>
**Date:** June 22, 2018 at 4:47:36 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Brian Hain <brian@liveprimary.com>
**Subject: Re: Paying Brian and Lisa**

Hi Lisa,

Thanks for your time on the phone, as we discussed please find the pre-qualified offer from Credibility below along with the documentation needed to finalize the offer:

Maximum Loan Amount: $100,000
Term: 24 months
Interest Rate: 13.99%

> **EXHIBIT**
> **66**

**1.21.21 PM PRODUCTION01274**

1

Monthly Payments: $4,800.82
Total Payback: $114,930.84
Origination Fee: $5,000 (5%)

Closing Documents:
1. 2017 Business Tax extensions
2. 2017 and 2016 Personal Taxes for both owners (if they filed extensions we would need 2015 Personal taxes, extension forms, and W-2s for both owners)



On Mon, Jun 18, 2018 at 4:20 PM, Chad Gordon <chad@fundera.com> wrote:
  Hi Frankie,

Thank you for sending this over, confirming receipt. I'll have an update for you later this week. Thanks for sending everything over!

Best,

Chad



On Mon, Jun 18, 2018 at 4:02 PM, Frankie Morales <emorales@liveprimary.com> wrote:
  Hi Chad,

Hope you are having a good Monday thus far. Attached are bank statements for May and April 2018. Please let me know if there are any complications.

Thanks,
Frankie

On Mon, Jun 18, 2018 at 3:57 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:
  Hello Chad,
  Absolutely.
  Frankie, see below. Please forward these two statements from our Chase account to Chad.
  Thank you!
  Lisa


**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



**1.21.21 PM PRODUCTION01275**

**Joel Schreiber**

From:
Sent:                     Lisa Skye Hain <lisa@liveprimary.com>
To:                       Thursday, July 19, 2018 9:18 PM
Cc:                       Joel Schreiber
Subject:                  Brian Hain
                          Fwd: $800,000 FUNDING -- WE CAN FUND IN 24 HOURS

Read from bottom up

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - Inc Magazine
*NYC's Coolest New Wellness-Focused Co-Working Space* - Harper's Bazaar
*Co-Working for Grownups* - Fortune Magazine

Begin forwarded message:

**From:** James Scarlo <james@sapphirefundingsolutions.com>
**Date:** July 19, 2018 at 7:56:02 PM EDT
**To:** Lisa Skye Hain <lisa@liveprimary.com>
**Cc:** Brian Hain <brian@liveprimary.com>
**Subject: Re: $800,000 FUNDING -- WE CAN FUND IN 24 HOURS**

For Option #1 800k it would be a separate deal that i can fund in 1 hour, if you would like to payoff existing lines with
that you can do so, and once we have payment history on the 800k we can Refinance the deal. please let me know
whenever you are ready to make your decision and we can wrap this up , I have all documents already,
feel free to call/text me at any time with any questions or details,

On Thu, Jul 19, 2018 at 5:49 PM, Lisa Skye Hain <lisa@liveprimary.com> wrote:
James, you are rolling our current lines into the 800K?

**Lisa Skye Hain**

EXHIBIT

68

exhibitsticker.com

**1.21.21 PM PRODUCTION01294**

CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

*Best New Co-Working Space 2016* - Inc Magazine
*NYC's Coolest New Wellness-Focused Co-Working Space* - Harper's Bazaar
*Co-Working for Grownups* - Fortune Magazine

On Jul 19, 2018, at 2:04 PM, Brian Hain <brian@liveprimary.com> wrote:

Thank you for the clarification. For the $800, you are rolling our current lines into that?

**Brian Hain**
COO/Co-Founder
Primary
+1 (212) 495-9962
brian@liveprimary.com



You work best when you feel great
liveprimary.com

On Thu, Jul 19, 2018 at 1:44 PM James Scarlo <james@sapphirefundingsolutions.com> wrote:
So payment on option number 2 is 14k a month for the funding amount of 300k every 60 days until you hit the 1.2m ( full credit line)

payback will be 18% annually , however the first 300k will be 30% fixed factor rate which comes out to 3% a month cost per capital as that is the first influx of capital and it is a relationship starter on a unsecured credit line, we also use your payments as a credit builder so we can we can move The business to our SBA department after a few months of payments,

the deal was sent to SBA underwriting and it was declined however we work with our credit committee to monitor payments from our credit line programs and report them to our in house SBA underwriting so we can make you more bankable.

call/ text/email with any additional questions or information needed.

**1.21.21 PM PRODUCTION01295**

On Thu, Jul 19, 2018 at 12:22 PM, Brian Hain <brian@liveprimary.com> wrote:
Can you explain the 2nd offer a little more? The $14K per month until reaching the full line of credit? Amounting to $1.2M? Where/what is the interest?

**Brian Hain**
COO/Co-Founder
Primary
+1 (212) 495-9962
brian@liveprimary.com



You work best when you feel great
liveprimary.com

On Thu, Jul 19, 2018 at 1:17 PM Lisa Skye Hain <lisa@liveprimary.com> wrote:
Thanks.
Will review with my partner and revert back.
He is cc'd.

**Lisa Skye Hain**
CEO/Co-Founder
Primary
+1 (917) 796-6719
lisa@liveprimary.com



You work best when you feel great.
liveprimary.com

Best New Co-Working Space 2016 - Inc Magazine
NYC's Coolest New Wellness-Focused Co-Working Space - Harper's Bazaar
Co-Working for Grownups - Fortune Magazine

On Jul 19, 2018, at 1:15 PM, James Scarlo <james@sapphirefundingsolutions.com> wrote:

Please see offers below as per our discussion.

OFFER #1

**1.21.21 PM PRODUCTION01296**

3

Funded Amount $800,000
Payback $1,040,000
Daily payment $5,714

This deal is structured as a starter deal to establish payment history after 28 days (18 payments) we will Renew this deal on our monthly program and extend the term by additional 14 months as you will than be considered a platinum tiered client .

Please keep in mind you do not need to accept the full amount to establish payment history , you can accept how ever much you like and than wait the 28 day period to than accept the additional funds at our cheaper pricing

Offer #2
line of credit 1.2m
we release $300,000 every 60 days up until we reach the full credit line on a payment of $14,000 a month,

Pleas let me know if any of these options can work for the business .

ALSO KEEP IN MIND THAT WE CAN FUND THIS DEAL IN 24 HOURS WITH A SIGNED AGREEMENT, DRIVERS , LICENSE, VOID CHECK, AND PROOF OF OWNERSHIP.

feel free to call/text or email at any time.

--

Warm Regards,

**James Scarlo**

Funding Specialist

Office: 786-564-6466

Fax: 888-372-0132

Email: james@sapphirefundingsolutions.com

Visit us at: www.sapphirefundingsolutions.com

--

Warm Regards,

James Scarlo

**1.21.21 PM PRODUCTION01297**