**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                        **FOR PUBLICATION**

          LIVE PRIMARY, LLC,                    Chapter 11

                                         Case No. 20-11612 (MG)

                        Debtor.
----------------------------------------------------------------x

**CORRECTED MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND**
**OVERRULING IN PART DEBTOR'S OBJECTION TO PROOF OF CLAIM # 8**
**FILED BY PRIMARY MEMBER LLC**

*A P P E A R A N C E S :*

ROSEN & ASSOCIATES, P.C.
*Attorneys for Live Primary, LLC*
747 Third Avenue
New York, NY 10017
By:    Sanford P. Rosen, Esq.
          Christine McCabe Dehney, Esq.

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
*Attorneys for Primary Member LLC*
1501 Broadway, 22nd Floor
New York, NY 10036
By:    Neal Rosenbloom, Esq.
          Kevin Nash, Esq.
          Daniel Goldenberg, Esq.

SCHAFER AND WEINER PLLC
*Attorneys for Noteholders*
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
By:    Daniel Weiner, Esq.
          Howard Borin, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Room 1006
New York, NY 10014
By:    Shannon Anne Scott, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The principal issue in this case is whether the purported $6+ million debt claim of Primary Member LLC ("PM") (filed as Proof of Claim No. 8 (the "Proof of Claim" or "POC")), which also holds a 48.5% membership interest in Live Primary, LLC's (the "Debtor" and together with PM, the "Parties"), should be disallowed as a unsecured claim and recharacterized as equity. Recharacterization of purported debt as equity is available relief that is not usually granted. But this is one of those unusal cases where, for the reasons explained below, following trial, the Court concludes that recharacterization is granted in substantial part.

"Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747–48 (6th Cir. 2001) ("*Autostyle*"). Courts in this Circuit have generally followed the 11-factor *Autostyle* analysis in deciding whether debt should be recharacterized as equity, and the Court will do so here. The "paradigmatic" recharacterization case involves a situation where "the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims." *See Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) ("*Adelphia*"). Following trial, the Court concludes that is precisely the situation here.

On January 3, 2021, the Debtor filed the Motion for Objection to Claim No. 8 of Primary Member LLC ("Objection," ECF Doc. # 93.) The Debtors' noteholders (the "Noteholders") filed the Response of Noteholders' Joining with Debtor's Objection to Claim No. 8 of Primary

Member, LLC, "join[ing] in and adopt[ing] as its own the Debtor's objection to the claim filed by Primary Member LLC." (ECF Doc. # 98 at 1.)

In support of the Objection, the Debtor filed the (1) Memorandum of Law of Debtor and Noteholders in Support of Objection to Claim No. 8 of Primary Member LLC ("Debtor MOL," ECF Doc. # 119); (2) Declaration, Amended and Restated, of Lisa Skye Hain, Managing Member and Chief Executive Officer of Live Primary, LLC in Support of Debtor's Objection to Claim No. 8 of Primary Member LLC ("Skye Hain Decl.," ECF Doc. # 110); (3) Debtor's and Noteholders' Exhibit List (ECF Doc. # 111); (4) Exhibit Nos. 1–52 ("Obj. Exs.," ECF Doc. # 111-1); (5) Exhibit 53 - Transcript of Deposition of Lisa Skye Hain ("Skye Hain Dep.," ECF Doc. # 112); (6) Exhibit 54 - Transcript of Deposition of Joel Schreiber ("Schreiber Dep.," ECF Doc. #113); and (7) Witness List of Debtor and Noteholders (ECF Doc. # 114).

In response to the Objection, PM filed the (1) Memorandum of Law for Trial ("PM MOL," ECF Doc. # 117); (2) Declaration of Joel Schreiber in Opposition ("Schreiber Decl.," ECF Doc. # 106); (3) Primary Member LLC Exhibit List (ECF Doc. # 116); (4) Exhibits 1–12 ("PM Exs.," ECF Doc. ## 116-1–116-12); and (5) Corrected Exhibit 10 ("PM Ex. 10," ECF Doc. # 118).

The Parties also entered into a Stipulation, approved by the Court, admitting in evidence the declarations of Lisa Skye Hain and Joel Schreiber, all deposition designations and exhibits, and agreeing that the February 10, 2021 trial (the "Hearing") would proceed solely with counsels' arguments. (ECF Doc. # 124.) Following the Hearing, the Court took the matter under advisement.

For the following reasons, the Court **GRANTS** the Debtor's requested relief in part, recharacterizing the "Purported Loan" (defined below), with a stated balance in the POC of $6,354,900, as equity.

The Court **DENIES** the Debtor's requested relief to recharacterize as equity the "Other Loans" (defined below), with a stated balance in the POC of $81,284. But, as explained below, Objection to Claim No. 8 includes separate grounds objecting to the claim for the Other Loans, namely that the Other Loans were not properly authorized and, in addition, the claim for the Other Loans should be disallowed under section 502(d) because PM received a transfer of an avoidable preference that it has not repaid. The objection that the Other Loans were not properly authorized is **OVERRULED**. The section 502(d) objection is **SUSTAINED** to the extent that PM received a transfer of $40,000 within 90 days of the Petition Date, which amount has not been repaid.[1]

## I.    FINDINGS OF FACT

The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),[2] which incorporates Rule 52 of the Federal Rules of Civil Procedure. Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.

---

[1]      Objection to Claim No. 8 argues that because PM is an insider, the look-back period for avoidable preferences is one year, during which period the Debtor transferred $88,000 to PM or its affiliate Waterbridge Capital. While the Debtor is presumed to be insolvent on or during the 90 days immediately preceding the petition date pursuant to section 547(f), transfers from the Debtor to PM or its affiliate made between 90 days and one year before the petition date have not been shown to be avoidable.

[2]      Bankruptcy Rule 9014(c) makes Bankruptcy Rule 7052 applicable to contested matters, and objections to a claim, such as the one at issue here, are contested matters. FED. R. BANKR. P. 3007.

### A.  Formation of the Debtor

Lisa Skye Hain ("Skye Hain") is the Debtor's Chief Executive Officer and managing member.  (Obj. Exs., Ex. 5 at 2.)  In 2010 and 2011, Skye Hain was a Founding Community Manager of WeWork, a shared office space company similar to the Debtor.  (Skye Hain Decl. ¶ 5.)  While at WeWork, Skye Hain met Joel Schreiber ("Schreiber").  (Schreiber Decl. ¶ 15.) Schreiber was one of the investors in WeWork.  (Skye Hain Decl. ¶ 7.)  Schreiber was also the founder and CEO of Waterbridge Capital ("Waterbridge"), a prominent real estate investment firm in New York City.  (Obj. Exs., Ex. 2.)  As described on the Waterbridge website, Schreiber and Waterbridge "were active in acquiring core plus, value-added and opportunistic assets in downtown Manhattan, with a focus on retail, office, and multifamily properties in Soho, Tribeca, the Meatpacking, Nolita, Chelsea, and the West Village."  (*Id.*)

After Skye Hain left WeWork, on several occasions over the next few years Schreiber contacted Skye Hain and indicated that if she ever wanted to start her own shared office space company, he would be an investor.  (Skye Hain Decl. ¶ 7.)  In 2015, Skye Hain decided to start her own shared office space company—Live Primary.  (*Id.* ¶ 8.)  She spoke to Schreiber, and they agreed that Schreiber would invest the $6,000,000 that Skye Hain budgeted for the start-up of the company, in exchange for a 40% membership interest in the company.  (*Id.* ¶ 10.)  Skye Hain and Daniel Orenstein ("Orenstein") would each receive a 30% membership interest in exchange for their full-time employment by the company.  Schreiber provided a draft operating agreement that called his investment a "loan" rather than a capital contribution.  (*Id.* ¶ 11.)  PM was formed as "the vehicle for the Live Primary project."  (Schreiber Decl. ¶ 16.)

Skye Hain received a salary from the Debtor.  Neither PM nor Schreiber received a salary or any other compensation.  (PM MOL at 6.)  PM had no involvement in day-to-day matters, and

5

retained certain consent rights relating to major decisions. (*Id.* at 6–7.) Schreiber later became a member of the Debtor's supervisory committee, which was formed after the Noteholders became involved with the Debtor in 2019. (*Id.* at 7.) Skye Hain and representatives of the Noteholders were also on the supervisory committee. (*Id.*)

## B. The Operating Agreements

On or about July 28, 2015, PM, Skye Hain and Orenstein, as members of Primary, LLC,[3] each executed a Limited Liability Company Agreement of Primary, LLC, as of July 28, 2015 (the "First Operating Agreement," Obj. Exs., Ex. 3.)

According to the First Operating Agreement, the aggregate capital contribution for this start up business was only $1,000. (*Id.* at Schedule 1.) PM's portion was $400. (*Id.*)

Section 9 of the First Operating Agreement is titled "Capital Contributions and Loans." Within that section, section 9.2 of the First Operating Agreement contemplated that PM would make a single "Loan" in multiple tranches totaling $6,000,000. Specifically, section 9.2 of the First Operating Agreement, titled "Loans by PM," provides:

> PM has agreed to lend the funds required by the Company in the form of a loan in the original principal amount of $6,000,000 (the "Loan") for the establishment and operation of two (2) shared office facilities (the "Initial Centers"), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate. The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM (the "Note" and together with the Loan Agreement, the "Loan Documents"). PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request (a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested by the Managers'

---

[3]    The First Operating Agreement refers to the Debtor as Primary LLC because that was the Debtor's intended name. However, that name was unavailable and so the Debtor was registered as Live Primary, LLC. (Skye Hain Decl. at 6 n.2.)

6

> to meet the startup costs and other obligations for the Initial Centers which shall include, but not be limited to, marketing, advertising, salaries, insurance, benefits, taxes, build-out costs, permits, licenses, professional fees, furniture, fixtures and equipment, utilities, technology and goods and services from vendors required by the Initial Centers. The Disbursements shall accrue interest at one (1.0%) percent per year, compounded annually and the Loan and accrued interest shall mature and be payable only upon a Liquidity Event (as defined herein) or the Company's first underwritten public offering (an "IPO") of its Common Stock under the Securities Act of 1933.[4]

(First Operating Agreement § 9.2.)

Thus, while section 9.2 provided that the Loan may be memorialized by a Loan Agreement, it mandated that each Disbursement under the Loan shall be evidenced by a promissory note made by the Debtor in favor of PM.  (*Id.*)

Section 9.3, titled "Disbursement Process," provides:

> The Managers shall deliver a written Disbursement Request to PM in accordance with and pursuant to the Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies. In the event a Disbursement request is not funded by PM within two (2) business days (the "Disbursement Date"), PM shall be in default hereunder (a "Disbursement Default"). PM shall have a period of sixty (60) days from the Disbursement Date to cure the Disbursement Default before the Disbursement Default penalty is triggered (the "Trigger Date").

> (a) Upon a Disbursement Default, PM shall deliver the Disbursement Amount to the Company plus an additional five (5%) percent (the "Default Fee"), prior to the Trigger Date which shall not be considered a part of the Loan and shall not be repaid by the Company.

> (b) Upon the Trigger Date, the Company shall automatically recover that portion of PM' Units applicable to the uncured Disbursement Default amount plus additional Units equal to fifty percent of such applicable number. By way of example, if PM shall fail to honor a Disbursement Request of $600,000 before the Trigger Date, the Company shall recover six (6) of PM' Units, which reflects the fact that (a) $600,000 is ten percent of the contemplated $6,000,000 Loan, (b) ten percent of PM' forty (40)

---

[4]    Section 9.2 remained unchanged in the amended versions.

Units is four (4) Units, (c) fifty percent of four (4) Units is two (2) Units, which would total to a six (6) Unit recovery by the Company.

(c) Upon a Disbursement Default, the Company shall have the immediate right to obtain additional financing (the "Bridge") from third party lenders or equity investors. In such Event, the Disbursement Default shall not be cured until PM pays the interest (if any) and the reasonable costs and expenses (including attorney's fees) associated with the Bridge, up to an amount equal to fifteen percent (15%) of the Bridge.

(d) In the event the Bridge is a loan, the Company's obligations under the Loan Documents shall be subordinated to the Bridge, and PM hereby agrees to execute any documentation the lender of the Bridge shall require, and hereby grants each of the Managers an irrevocable limited power of attorney to execute any applicable subordination documentation required by the Bridge lender on PM' behalf.

(*Id.* § 9.3.)

Section 10.2(c) provides that the Loan was required to be repaid in full before any other distribution to its members.

After signing the First Operating Agreement, PM, Skye Hain and Orenstein found the space for the Debtor's first location at 26 Broadway, New York, New York ("26 Broadway"). (Skye Hain Decl. ¶ 17.)  PM provided $3.7 million for the development of the eighth floor at 26 Broadway.  (Schreiber Decl. ¶ 17.)  The balance of the loan commitment was extended to include the development of the eighth floor at 26 Broadway, along with the development of two floors at 251 West 30th Street, New York, New York.  (*Id.*)

With the opening of the 26 Broadway location, the need for developmental services was diminished.  (Skye Hain Decl. ¶ 17.)  Given the diminished need for developmental services, along with the partnership not working as anticipated, Orenstein sought to amicably reduce his membership share in the Debtor.  (*Id.*)

In December of 2017, Orenstein and the Debtor agreed that the Debtor would purchase Orenstein's membership interest in the Debtor and that Orenstein would no longer provide

8

significant services to the Debtor.  (*Id.*)  That agreement became effective on December 15,

2017, with the execution of the First Amendment to Limited Liability Company Agreement of

Live Primary, LLC (the "Second Operating Agreement").  (Obj. Exs., Ex. 4.)  Section 9.2

remained the same.  The preamble of section 9.3 was replaced by the following:

> The Manager(s) shall deliver a written Disbursement Request to PM in accordance with and pursuant to an Approved Budget, although the amount of capital requested in a Disbursement Request may be in excess of the applicable budgeted amount to allow the Company to maintain reasonable reserves for various contingencies.  In the event a Disbursement Request is not funded in full by PM within seventy-two (72) Business Hours after the Disbursement Request is sent by the Manager(s) (the time which is seventy-two (72) Business Hours after the Disbursement Request is sent being the "Disbursement Deadline"), PM shall be in default hereunder (a "Disbursement Default").  A Disbursement Default will automatically and immediately trigger the Default Fee, Bridge and all other rights and obligations set forth in Sections 9.3(a), 9.3(c) and 9.3(d).  PM shall cure the Disbursement Default within Ten (10) Business Days (the date falling ten (10) Business Days from the Disbursement Deadline being the "Trigger Date"), by funding in full the Disbursement Request.  A failure of PM to so cure on or before the Trigger Date will automatically and immediately trigger all of the rights and obligations set forth in Section 9.3(b).

(*Id*. § 9.3.)

In the Second Operating Agreement, section 8, titled "Management," was amended

substantially.  Section 8.1 provides:

> The business and affairs of the Company shall be managed solely and exclusively by, management of the Company shall be vested solely and exclusively in, and the sole authorized person(s) for all purposes of the Act is and shall be LSH as a member-manager, together with any such additional managers as might be added by later amendment of this Agreement (individually and collectively, the "Manager" or "Managers" of the Company).  DO has resigned as a Manager as of the date of the First Amendment to this Agreement.  The Manager(s) shall be the sole Person(s) with the Power to bind the Company, except and to the extent that such power is expressly delegated to any other Person by a unanimous vote of all of the Class A Members.  The Manager(s) shall have the right, power and authority, acting jointly in the management of the business and affairs of the Company, to execute all documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters

> necessary, desirable, convenient or incidental to the purpose of the
> Company. In the event that additional Manager(s) are appointed in the
> future, and a disagreement between them occurs, such disagreement shall
> be resolved by a vote of the holders of Class A Units (also referred to as the
> "Class A Members"). Pro rata, in proportion to their ownership of Class A
> Units.

(*Id.* § 8.1.) "LSH" refers to Skye Hain and "DO" refers to Orenstein. (*See id.*, Ex. 3 at

14.) PM, Skye Hain, and Orenstein are each individually a "Member" and collectively

"Members." (*Id.*) After Orenstein resigned, Skye Hain became the sole "Manager" of the

Debtor. (*Id.* Ex. 4 § 8.1.) The Second Operating Agreement created Class A Units and

Class B Units, providing Skye Hain and PM with 4,635 Class A units each and Orenstein

with 270 Class B Units. (*Id.* at Schedule 1; Skye Hain Decl. ¶ 17.) As such, Skye Hain

and PM were the only Class A Members. (*Id.*)

Section 8.2(b)(ix) of the Second Operating Agreement (the "Approval Requirement")

provides:

> (b) The following actions shall require the unanimous written approval of
> all Class A Members . . . .
>
> enter into or be a party to any transaction with any Member or executive
> officer level employee of the Company, except for transactions
> contemplated by this Agreement or transactions made in the ordinary course
> of business and pursuant to reasonable requirements of the Company's
> business and upon fair and reasonable terms that are approved by the
> Supervisory Committee[.]

(*Id.* Ex. 4 § 8.2(b)(ix).) In other words, the Manager, Skye Hain, acting on behalf of the Debtor,

was required to obtain the unanimous written approval of Class A Members Skye Hain and PM.

By the time the Second Operating Agreement was effective, $3,700,000 had been

invested in the Debtor. (Skye Hain Decl. ¶ 19.) After the Second Operating Agreement, no

funds were invested in the Debtor for roughly a year. (*Id.*) Toward the end of 2017, the Debtor

signed a lease for its second location and signed another lease for the expansion of its facility at

26 Broadway.  (*Id.*)  PM caused Waterbridge to contribute $800,000 of the $6,000,000

investment obligation to the Debtor, which was intended to be used as the security deposit for the

space that would become the Debtor's second location.  (*Id.*)  Another $1,500,000 (the remainder

of the $6,000,000 requirement) was forwarded to the Debtor, to be used for the improvement of

the second location's space and the improvement of the additional space at 26 Broadway.  (*Id.*)

Skye Hain met with David Kirshenbaum ("Kirshenbaum") at a Global Workspace

Association event in the fall of 2018.  (*Id.* ¶ 22.)  In the spring of 2019, Kirshenbaum contacted

Skye Hain and said he had an investor in Chicago who was interested in investing in the Debtor.

After reviewing the financial and legal structure of the Debtor, that investor (Mike Balkin) and

Kirshenbaum gathered a group of investors which loaned $2.65 million to the Debtor (the

"Additional Loan").  (*Id.*)

On January 14, 2019, when the Additional Loan was made by Kirshenbaum and his

group, a First Amended and Restated Limited Liability Company Agreement of Live Primary,

LLC (the "Third Operating Agreement" and together with the First Operating Agreement and the

Second Operating Agreement, the "Operating Agreements") was executed.  (*Id.* ¶ 23; Obj. Exs.,

Ex. 5 § 8.2(b)(ix).)

In the Third Operating Agreement, section 8.2(b)(ix) was modified to require the

Manager (Skye Hain) to obtain the unanimous written approval of Kirshenbaum and all Class A

Members in order to enter into any transaction with a Member or executive officer level

employee.  (Obj. Exs, Ex. 5 § 8.2(b)(ix).)

### C.  The Parties' Failure to Comply With the Terms of the Operating Agreements

Section 9.2 states that "PM shall advance funds from the Loan within seventy-two (72)

Business Hours after a request (a "Disbursement Request") from the Managers, depositing same

into the Company's bank account[.]" (Obj. Exs., Ex. 3 § 9.2.) Although section 9.2 of the Operating Agreements states that PM shall make advances to the Debtor, PM never did. PM does not and has never had a bank account. (Schreiber Dep. at 16:3–9.) Instead, all advances and repayments came from and were made by Waterbridge. (Skye Hain Decl. ¶¶ 26–29.) Waterbridge is another entity owned and controlled by Schreiber. (Schreiber Dep. at 28:5–22.) None of the operating agreements authorize Waterbridge to make any "loans" to the Debtor on behalf of PM under section 9.2 or otherwise, and no other documents authorize the Debtor to pay any amount owed to PM directly to Waterbridge. (Skye Hain Decl. ¶¶ 26–29.) In fact, Exhibit C to Schreiber's Declaration shows that PM's "loan" was reflected on its balance sheet as being owed to Waterbridge (Schreiber Decl. ¶ 11; Ex. C), and not to PM—the entity that examined and approved the filing of the Proof of Claim. However, according to Skye Hain's Declaration, "Schreiber caused Waterbridge to make PM's required investment in the Debtor by forwarding funds to the Debtor." (Skye Hain Decl. ¶ 16.)

PM contends that PM, Schreiber and Waterbridge were viewed to be interchangeable. PM also states that the Debtor's books and records reflected that the Loans were owed to either PM or Waterbridge without distinction. (Skye Hain Dep. at 80:18–19 ("Q. Waterbridge was Joel's funding company? A. Yes.").)

While the Debtor argues that Waterbridge's advancement of funds to the Debtor was not authorized under the agreement, the Debtor also inconsistently states that it was PM that provided the funds following a Disbursement Request by the Debtor, albeit late. (Debtor MOL at 4–5; Obj. Exs., Exs. 8–32.) Although PM missed the deadline to advance funds on multiple occasions, the penalties for PM missing the deadline to advance funding under section 9.3 were never enforced by the Debtor.

12

PM indirectly made over sixty Disbursements through Waterbridge, without issuance of a single promissory note.  (Schreiber Decl. ¶ 25.)  Schreiber concedes that "execution of a note was contemplated by the LLC Agreement, although not signed, without fault of either party." (*Id.*)

The Court finds by a preponderance of the evidence that the Parties always considered PM and Waterbridge to be interchangeable, with any funds provided by PM or Waterbridge, or transfers from the Debtor to Waterbridge, treated as being made or received by PM.  Therefore, the Court finds that for purposes of considering the obligee under the debts, or the holder of the membership equity interests, PM is the relevant party.  To the extent that any debt claim was properly asserted, PM is the relevant creditor whether transfers were made by PM or Waterbridge.[5]  PM's POC will not be disallowed because Waterbridge, rather than PM, is the proper creditor.

### D.  Communications Between Skye Hain and Schreiber Regarding the Other Loans

The duration of the Other Loans is a period of 2.1 years, spanning from June 1, 2018 until July 12, 2020.  (Obj. Exs., Ex. 1.)  The terms of the Other Loans were discussed orally.  The Debtor submitted into evidence several email chains documenting the terms of their oral agreements.  (Obj Exs. at 218–224.)

On June 8, 2018, Skye Hain sent Schreiber the following email with an attachment detailing various expenses:

> See below.
> We need $400,000 to keep the projection going over the next week.

(*Id.* at 181.)

---

[5]    The Court's finding that PM is the relevant creditor should not be construed as equitable relief.  Rather, this finding is simply a determination as to the intent of the Parties.

On June 19, 2018, Lisa sent the following email to Schreiber:

> Per our call, we agree to pay a $20k fee for a $485k loan with 30 days
> terms. Please confirm this can be transferred.
> Our banking details are as follows:
> Wire Transfer Information: Routing number: 021000021
> Swift code: CHASUS33
> Account number: 755697336
> Bank Address: 405 Lexington Ave New York NY 10174
> Bank Name—JPMorgan Chase Bank NA
> Business Legal Name: Live Primary LLC
> Address: 26 Broadway, 8th floor, NY NY 10004

(*Id.* at 182.)

On April 18, 2019, Schreiber sent the following email to Skye Hain ("Schreiber's April

2019 Email"):

> Lisa,
> Per our conversation,
> Live Primary owes me an additional $35k to date (besides that $6mn)
> I am funding today an additional $165k as a loan.
> Waterbridge Capital will have a total Senior Secured loan to Live Primary
> in the amount of $200k.
> Please confirm,
> Respectfully,
> Joel Schreiber

(*Id.* at 224.)

That same day, Skye Hain responded ("Skye Hain's April 2019 Email"):

> Joel,
> Confirmed.
> Once Primary secures additional funding to consolidate hard money and
> operational costs, we will repay your loans as a priority.
> Thank you,
> Lisa

(*Id.* at 221.) [6]

---

[6] While the emails state that the Other Loans were apparently intended to be extended on a secured basis, no
security interest was perfected and, in fact, the POC identifies all loans as unsecured.

On September 19, 2019, Skye Hain replies again to Joel's April 2019 Email ("Skye

Hain's September 2019 Email"):

> Joel,
> This email confirmation should serve as confirmation Primary will repay
> the $200k loan from Waterbridge at 10% interest. Could Lisa please send
> us a document to use for our reconciliation?
> Thank you,
> Lisa

(*Id.* at 223.)

On June 28, 2019, Charles Valentino, Senior Vice President of Waterbridge (*see* Obj.

Exs., Ex. 2), stated via email (the "June 28 Email"):

> As per the email below, Waterbridge funded a senior secured note to Live
> Primary in the amount of $200,000.
> The current outstanding amount of this loan is $ 150,000.
>
> This loan is currently in default as it was not repaid from the recent
> financing proceeds received from the Chicago group of investors. Joel's
> consent to this financing was with the understanding that this loan would
> be paid off.
>
> Unless this loan is paid in full by the end of the day on July 1, 2019 Joel
> will inform the Chicago investors of this default and his intent to take
> legal action.
>
> Please advise your client accordingly.

(*Id.* at 220.)

On July 1, 2019, Skye Hain responds:

> Joel,
> These are the terms you agreed to on behalf of Waterbridge Capital if Live
> Primary LLC sends $150,000 to Waterbridge today:
> a. Primary sends $ 150,000 to Waterbridge in full payment of the remaining
> amount due on the loan Waterbridge made to Primary on April 18, 2019.
> b. Waterbridge agrees to loan the $150,000 back to Primary on or before
> July 16th, 2019 and [sic] will transmit $150,000 back to Primary by that
> date.
> c. If the $150,000 does not hit Primary's bank account by EOD July 16,
> 2019 it permanently nullifies Primary Member's rights under the equal pay

claus set forth in schedule 4 of the amended and restated operating agreement of Primary dated June 14, 2019, and Primary Member forfeits all of its rights to receive any payments under that clause.  All funds and amounts due to Primary Member under that clause are suspended unless and until the funds are timely received by Primary.

(*Id.* at 219.)

The fact that PM would be liable for nonpayment of funds shows the Parties' intent to keep PM as the creditor of the Other Loans.

### E.  Parties' Contentions

PM's POC alleges debt of $6,436,184 for "Loans extended to the Debtor as per operating agreement." (Obj. Exs., Ex. 1 at 8.)  That amount includes the Establishment and Operation Loan of $6,354,900 (the "Purported Loan") comprised of $6,131,148 in principal and $223,752 in accrued interest.  (*Id.*)  While PM was required to provide loans totaling $6,000,000, it alleges that it actually advanced $6,131,522.77 pursuant to section 9.2. (Schreiber Decl. ¶ 18.)   In addition to the Establishment and Operation Loan, the POC also seeks $81,284 for "Other Loans," comprised of $62,893 in principal and $18,391 in accrued interest.  (Obj. Exs., Ex. 1 at 7.)  The Other Loans accrue interest at ten percent per annum.  (Schreiber Decl. ¶ 10.)  PM claims to have made 14 of these Other Loans to the Debtor totaling $569,892.81 with a claimed balance due of $81,284.14 as of the Petition Date.  (Skye Hain Decl. ¶¶ 20–25.)  According to PM's summary of "Other Loans" in the POC (Obj. Exs., Ex. 1 at 7), PM received payments totaling $88,000 from the Debtor between July 13, 2019 and the July 12, 2020 Petition Date.  But PM received a $15,000 payment and $25,000 payement within 90 days of the Petition Date.

The Debtor contends that the POC was filed without the documentation required by the Bankruptcy Rules and related Official Bankruptcy Forms ("Official Forms") that govern procedure within bankruptcy cases.  FED. R. BANKR. P. 1001.  Section 9.2 specifically requires

16

that "each disbursement under the Loan shall be evidenced by a promissory note made by the Company in favor of PM."  (Obj. Exs., Ex. 3 § 9.2; Ex. 4 § 9.2; Ex. 5 § 9.2.)  According to the Debtor, the POC lacks *prima facie* validity and PM therefore has the burden of proof in this proceeding.

The Debtor argues that application of the *AutoStyle* Factors (defined below) to the facts of this chapter 11 case demonstrates that the Purported Loan is in fact equity.  The Debtor also argues that the "Other Loans" are unauthorized loans made by Waterbridge (an entity other than PM) that declined to file a proof of claim after its claim was disputed by the Debtor.

The Debtor also contends that the Court should find that PM is not a creditor of the estate because all payments by the Debtor were made to Waterbridge.  In particular, the only communications that exist related to the "Other Loans" state that Waterbridge was making those loans and that Waterbridge would be repaid.

Lastly, the Debtor argues that, even if PM has a claim for debt under the Purported Loan or the Other Loans, such claim must be disallowed under 11 U.S.C § 502(d) because PM is an insider of the Debtor under 11 U.S.C. § 101(31) and all transfers by the Debtor to PM or Waterbridge within one year before the Petition Date are avoidable preferences that have not been repaid.

PM argues that under the *AutoStyle* Factors and other "countervailing factors" all militate against recharacterization.  (PM MOL at 4–5.)  PM also argues that it is not clear whether federal law or state law provides the rule of decision for recharacterization.  PM explains that invoking state law, which PM argues would be Delaware law in this case, would be the "death knell" of the objection.  (*Id.* at 12.)

17

Finally, PM argues that an adversary proceeding is required to invoke the Court's equitable jurisdiction for recharacterization.

## II.    APPLICABLE LEGAL STANDARDS

### A.  Standing to File A Proof of Claim

"A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). "[The] Bankruptcy Code and Fed. R. Civ. P. 17 each have liberal standing provisions, designed to allow a party to appear as long as it has a direct stake in the litigation under the particular circumstances." *In re Conde-Dedonato*, 391 B.R. 247, 250 (Bankr. E.D.N.Y. 2008) (citation and internal quotation marks omitted).

To assert an allowed proof of claim, a claimant must show that it is the "creditor or the creditor's authorized agent." FED. R. BANKR. P. 3001(b); *In re Parrish*, 326 B.R. 708, 719 (Bankr. N.D. Ohio 2005). A "creditor" is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(A), (B). "State law usually determines whether a person has such a right," and "governs the substance of claims." *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1411 (2017); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007).

### B.  Burden of Proof

Bankruptcy Rule 3001(f) provides that "a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). Bankruptcy Rule 3001 and Official Form 410 govern the form,

content and required attachments for proofs of claim.  *See* FED. R. BANKR. P. 3001(a).

Bankruptcy Rule 3001(c) requires that "[w]hen a claim, or an interest in property of the debtor

securing the claim, is based on writing, the original or a duplicate shall be filed with the proof of

claim.  If the writing has been lost or destroyed, a statement of the circumstances of the loss or

destruction shall be filed with the claim."  FED. R. BANKR. P. 3001(c).

Official Form 410 sets forth the content and format for proofs of claim, and instructs

creditors as follows:

> Attach redacted copies of any documents that support the claim, such as
> promissory notes, purchase orders, invoices, itemized statements of running
> accounts, contracts, judgments, mortgages, and security agreements.

Official Form 410.  The creditor is required to explain any failure to attach documents based on a

lack of availability.  *Id.*  In addition, if the required documents are too voluminous, the creditor

may attach a summary.  *Id.*  Official Form 410 further requires the claimant to specify whether

the claim includes "any interest or other charges in addition to the principal amount of the

claim," and if so, to attach an "itemized statement of all interest or additional charges."  *Id.*

If the proof of claim complies with the requirements of Bankruptcy Rule 3001 and

Official Form 410, then it "shall constitute *prima facie* evidence of the validity and amount of

the claim."  FED. R. BANKR. P. 3001(f).  In other words, the party objecting to such a claim has

the initial burden of going forward with evidence to refute the claim even though the creditor

retains the ultimate burden of persuasion with regard to the validity of the claim.  *See Wright v.

Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991); *In re Armstrong*, 320 B.R. 97, 104

(Bankr. N.D. Tex. 2005).  *See also In re Sandifer*, 318 B.R. 609, 611 (Bankr. M.D. Fla. 2004)

(holding that a creditor who establishes the *prima facie* validity of the claim may refrain from

presenting additional documentation).  When, however, a proof of claim fails to comply with

Bankruptcy Rule 3001 and Official Form 410, the proof of claim loses its *prima facie* validity

and the claimant must come forward with sufficient evidence of the claim's validity and amount

in response to the objecting party. *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993); *Armstrong*,

320 B.R. at 104; *In re Minbatiwalla*, 424 B.R. 104, 119 (Bankr. S.D.N.Y. 2010) ("[I]n certain

circumstances claims can be disallowed for failure to support the claim with sufficient evidence,

even if this is not a specifically enumerated reason for disallowance under 11 U.S.C. § 502(b),

because absent adequate documentation, the proof of claim is not sufficient for the objector to

concede the validity of a claim."); *In re Lundberg*, 2008 WL 4829846, at *7–8 (Bankr. D. Conn.

Oct. 27, 2008) ("If . . . the claimant fails to allege facts in the proof of claim that are sufficient to

support the claim, e.g., by failing to attach sufficient documentation to comply with Fed. R.

Bankr. P. 3001(c), the claim is . . . deprived of any *prima facie* validity which it could otherwise

have obtained."); *In re Hight*, 393 B.R. 484, 493 n.7 (Bankr. S.D. Tex. 2008) ("[F]ailure to

comply with Bankruptcy Rule 3001(c) merely renders a claim to not constitute '*prima facie*

evidence of the validity and amount of the claim.'") (internal citation omitted).

The purpose behind Bankruptcy Rule 3001 and Official Form 410's documentary

requirements and the shifting burden of proof is two-fold. First, the attachments required by the

Bankruptcy Rule 3001 and Official Form 410 are intended to enable the debtor or trustee to

evaluate the claim's amount and validity and to challenge portions of the claim that may be

inaccurate. *Sandifer*, 318 B.R. at 611. Second, the rules governing claims are intended to

simplify the claims allowance process and provide a fair and inexpensive process for all parties.

*In re Shank*, 315 B.R. 799, 814 (Bankr. N.D. Ga. 2004).

The actual documentary evidence needed to establish and verify the proof of claim

cannot be reduced to a bright-line test; rather, it is decided on a case-by-case basis. *Sandifer*, 318

B.R. at 611.  Still, there are certain evidentiary guidelines that assist the court in making its

determination.  *In re Burkett*, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005).  In many cases, "a

claim verified by a debtor's schedules may require no documentation whatsoever."  *Id*.  "If a

proof of claim correlates to a debt listed by the debtor in its schedules, this may be sufficient, by

itself, to establish the *prima facie* validity of the proof of claim."  *Id*.; *In re Relford*, 323 B.R.

669, 676 (Bankr. S.D. Ind. 2005) (as amended following reconsideration); *In re Jorczak*, 314

B.R. 474, 481–82 (Bankr. D. Conn. 2004) (noting that the scheduling of a debt is a judicial

admission by the debtor); *In re Cluff*, 313 B.R. 323, 337 n.47 (Bankr. D. Utah 2004).  A debtor's

scheduling of a debt constitutes a sworn statement and admission against interest, which is

strongly probative of the claim's validity.  *In re Burkett*, 329 B.R. at 829.  On the contrary, "if a

proof of claim lacking proper attachments does not correlate to a debt scheduled by the debtor, or

aspects of the claim differ from the scheduled debt, this may give rise to a valid objection by the

debtor for lack of verification of ownership."  *Id*.

### C.  Bankruptcy Rule 7001

Under Bankruptcy Rule 7001, there are some matters that must go through the adversary

process.  Contested matters that are not denominated as adversary proceedings are governed by

other rules, including Bankruptcy Rule 9014, which provides that in contested matters not

otherwise governed by the Bankruptcy Rules, relief shall be requested by motion.  10 COLLIER

ON BANKRUPTCY ¶ 7001.01.  Bankruptcy Rule 9014 makes specific Part VII rules applicable to

motions, unless the court otherwise directs, and gives the court the power and discretion to

direct, at any stage, that one or more of the other rules in Part VII shall apply.  *Id.*  An objection

to a claim is a contested matter pursuant to Bankruptcy Rule 9014.  *In re Micro-Precision*

*Techs., Inc*., 303 B.R. 238, 243 (Bankr. D.N.H. 2003).  Thus, an objection to a claim is not

adversary proceeding in accordance with the provisions of Bankruptcy Rule 7001. *Id.*

Bankruptcy Rule 3007 provides that contested matters initiated by objection to a claim are

governed by Bankruptcy Rule 9014 which calls for contested matters to be disposed of by

motion, unless a counterclaim is asserted, in which event Bankruptcy Rule 7001 applies. *Id.*

(citing *In re Tesmetges*, 87 B.R. 263 (Bankr. E.D.N.Y. 1988), *aff'd*, 95 B.R. 19 (E.D.N.Y.

1988)).

Bankruptcy Rule 7001(7) provides that an adversary proceeding under Part VII is

necessary in order "to obtain an injunction or other equitable relief, except when a chapter 9, 11,

12, or 13 plan provides for the relief." 10 COLLIER ON BANKRUPTCY ¶ 7001.08. "Other

equitable relief" as used in Bankruptcy Rule 7001(7) should include relief other than injunctions

traditionally granted only by courts of equity. *Id.* A bankruptcy court has the "equitable power"

under section 105(a) to recharacterize filed claims as equity interests. *In re Protea Biosciences,*

*Inc.*, 2018 Bankr. LEXIS 3329, at *10 n.5 (Bankr. N.D.W. Va. Oct. 30, 2018). However, the

court's equitable power to recharacterize a proof of claim as an interest in the debtor "is not

based upon any inequitable conduct of a party that might be remedied by an injunction or some

type of specific performance as contemplated by Fed. R. Bankr. P. 7001(7)." *Id.*

Furthermore, recharacterization seeks a determination as to the claim's proper

classification in the Bankruptcy Code and does not seek the subordination of a valid claim based

on inequitable conduct. "Recharacterization cases turn on whether a debt actually exists, not on

whether the claim should be equitably subordinated." 4 COLLIER ON BANKRUPTCY ¶ 510.02[1]

(2018). *See also Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re*

*Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 232 (4th Cir. 2006) ("[A]lthough

recharacterization and equitable subordination lead to a similar result, they 'address distinct

concerns' and require a bankruptcy court to conduct different inquiries."); *Official Comm. of Unsecured Creditors of Russell Cave Co. v. Gen. Elec. Capital Corp. (In re Russell Cave. Co.)*, 107 F. App'x 449, 451 (6th Cir. 2004) (stating that a request for recharacterization is the same as objecting to the claim's allowance because it is "a request for the bankruptcy court to hold a debt, and hence any claim, is non-existent").

### D. Recharacterization

As already stated, "[r]echaracterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *AutoStyle*, 269 F.3d at 747–48. A claim to recharacterize debt as equity is different from a claim to equitably subordinate an allowed claim. *See, e.g.*, *Adelphia*, 365 B.R. at 74 (noting that "recharacterization analyses focus on the substance of the *transaction*, whereas equitable subordination analyses focus on the creditor's *behavior*"). In contrast to equitable subordination, "[r]echaracterization claims turn on whether a debt actually exists—not on whether the claim should be equitably subordinated or disallowed." *Id.* at 73. As stated earlier, the "paradigmatic" recharacterization case involves a situation where "the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims." *Id.* at 74. If bankruptcy courts were bound by a party's own characterization of its rights against a debtor, "controlling equity owners of a troubled corporation could jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights." *Sender v. The Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.)*, 380 F.3d 1292, 1298 (10th Cir. 2004) (citation omitted).

In determining whether an investment that purports to be debt should be recharacterized as equity, courts in this district balance the factors laid out by the Sixth Circuit in *AutoStyle*:

> (1) the names given to the instruments, if any, evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date and schedule of payments;
> (3) the presence or absence of a fixed rate of interest and interest payments;
> (4) the source of repayments;
> (5) the adequacy or inadequacy of capitalization;
> (6) the identity of interest between the creditor and the stockholder;
> (7) the security, if any, for the advances;
> (8) the corporation's ability to obtain financing from outside lending institutions;
> (9) the extent to which the advances were subordinated to the claims of outside creditors;
> (10) the extent to which the advances were used to acquire capital assets; and
> (11) the presence or absence of a sinking fund to provide repayments.

269 F.3d at 749–50.

The "ultimate exercise" in evaluating any recharacterization claim "is to ascertain the intent of the parties." *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 103 (Bankr. S.D.N.Y. 2016). While "no one factor is controlling or decisive . . . the court may dismiss a recharacterization claim if the plaintiff fails to plead facts that trigger the applicability of the *AutoStyle* factors, or a meaningful subset of them." *In re Official Committee of Unsecured Creditors v. Bay Harbour Master Ltd. (BH S & B Holdings LLC)*, 420 B.R. 112, 157–58 (Bankr. S.D.N.Y. 2009) (internal citations omitted).

Furthermore, "the claims of creditors who were corporate insiders and/or had conducted their transactions with the debtors in some inequitable manner are closely scrutinized [in recharacterization cases]." *See In re Micro-Precision Techs., Inc.*, 303 B.R. at 247 (emphasizing that the degree of affiliation between the creditor and the debtor will be positively correlated with the level of scrutiny to which the transactions are subjected in recharacterization requests).

24

### E.  Delaware Rules of Contract Construction

In analyzing disputes over the language of a contract, Delaware courts give priority to the

intention of the parties.  *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1114

(Del. 1985) (citing *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329 (Del.

1939)).  In discerning the intention of the parties, Delaware courts first look to the express

language within the four corners of the contract.  *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140,

145 (Del. 2009).  In the context of LLC Operating Agreements, the "policy" of the Delaware

Limited Liability Company Act is "to give the maximum effect to the principle of freedom of

contract."  6 *Del. C.* § 18-1101(b).

"Clear and unambiguous language . . . should be given its ordinary and usual meaning.

Absent some ambiguity, Delaware courts will not destroy or twist policy language under the

guise of construing it."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one

meaning."  *State Farm Mutual Auto. Ins. Co. v. Johnson*, 320 A.2d 345 (Del. 1974)).  "A

determination of whether a contract is ambiguous is a question for the court to resolve as a

matter of law" and, accordingly, "the court looks to the most objective indicia of that intent: the

words found in the written instrument."  *HIFN, Inc. v. Intel Corp.*, 2007 WL 2801393, at *9

(Del. Ch. May 2, 2007) (citing *Reardon v. Exch. Furniture Store, Inc.*, 188 A. 704, 707 (Del.

1936)); *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

Where the terms of a contract are ambiguous, Delaware courts may look outside the four

corners of the contract to the conduct of the parties to ascertain intent.  *Egan & Sons Air*

*Conditioning Co. v. Gen. Motors Corp.*, 1988 WL 47314, at *7 (Del. Super. Ct. Apr. 27, 1988).

"[T]he introduction of extrinsic, parol evidence does not alter or deviate from Delaware's

adherence to the objective theory of contracts." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (citation omitted). When reviewing extrinsic evidence, it should be reconciled, to the extent possible, with the text of the contract. *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *18 (Del. Ch. Mar. 30, 2017).

### F.   Section 502(d) of the Bankruptcy Code

Section 502(d) of the Bankruptcy Code provides in relevant part: "[T]he court shall disallow any claim of any entity from which . . . a transfer avoidable under section . . . 547, unless such entity or transferee has . . . turned over any such property, for which such entity . . . is liable. . . ." 11 U.S.C. § 502(d). The purpose of section 502(d) is to prevent entities that hold property subject to turnover or avoidance from receiving a distribution of estate assets until such property is first returned to the estate. *See In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986).

 A claim should not be disallowed pursuant to section 502(d) without the court initially determining whether the claimant is required to turn over property of the estate. *See Atl. Computer Sys.*, 173 B.R. at 862 (finding that section 502(d) requires "some sort of determination of the claimant's liability before its claims are disallowed, and in the event of an adverse determination, the provision of some opportunity to turn over the property"); *In re S. Air Transp., Inc.*, 294 B.R. 293, 297 (Bankr. S.D. Ohio 2003) ("When raising an objection to a claim based upon the ground that claimant has failed to surrender the alleged voidable transfer, the claim can neither be allowed nor disallowed until the preference matter is adjudicated." (citations and internal quotation marks omitted)); 4 COLLIER ON BANKRUPTCY ¶ 502.05[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014) ("[A] claim may be disallowed at least

temporarily and for certain purposes, subject to reconsideration, simply upon the allegation of an

avoidable transfer.").

### III.    ANALYSIS

Recharacterization only becomes relevant if a party has filed a proof of claim debt

obligations that would otherwise survive a debtor's other objections to allowance.  The Debtor in

this case has objected to PM's proof of claim on multiple grounds including that (i) PM lacks

standing as a creditor, and (ii) PM has not provided sufficient documentation to satisfy its *prima

facie* burden of proof.  And, with respect to the Other Loans, the Debtor argues that the proof of

claim for the Other Loans should be disallowed because the Other Loans were not properly

authorized, and should otherwise be disallowed under section 502(d) because PM received an

avoidable preference that has not been repaid.

PM argues that is has standing as a creditor and it has provided sufficient documentation.

PM also argues that the Debtor is required to commence an adversary proceeding (rather than a

claim objection) if it wants to recharacterize the debt claim as equity.

If the Court reaches the merits of recharacterization, the Parties dispute whether the 11-

Factor *Autostyle*  test requires recharacterization.  Yhe Court addresses each of tehse issues

below.

### A.  PM Has Standing as a Creditor to File a Proof of Claim

The Debtor first argues that PM is not a creditor of the estate because (1) it did not have a

bank account, (2) all advances to the Debtor were made by Waterbridge, (3) all payments by the

Debtor were made to Waterbridge, (4) the Debtor's books and records listed Waterbridge, rather

than PM, as creditor, and (5) Waterbridge, rather than PM, was listed on the Debtor's Amended

Schedules.  (ECF Doc. # 59 at 33.)  The Debtor does not dispute the enforceability of the

27

Operating Agreements, which were all signed by the Debtor and PM.  The Debtor does not cite any case law in support of its argument.

The first issue for this Court is whether PM had an enforceable right to payment against the Debtor.  The Court acknowledges that PM's evidence is not overwhelming and its inability to produce a loan agreement or a single promissory note outlining the exact contours of its relationship with Waterbridge is troubling.  The Operating Agreements do provide some evidence as to why PM should be entitled to recover, however, in that they provide evidence that PM has an interest in the property.

It is undisputed that the Proof of Claim is based on a writing: the Operating Agreements. Section 19.5, titled "Governing Law; Venue," of the Operating Agreements all provide that "[t]his Agreement and the rights of the parties hereunder shall be interpreted in accordance with the internal law of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflicts of laws."  (Obj. Exs., Ex. 3 § 19.5; Ex. 4 § 19.5; Ex. 5 § 19.5.)  Delaware law governs the Operating Agreements, and thus the enforceability and validity of the alleged right to payment is adjudged under Delaware law.  *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1049 (Del. Ch. 2006) ("When parties have chosen a state's contract law to govern their contract, it is illogical to assume that they wished to have the enforceability of that contract judged by another state's law.").  If PM does not have an enforceable right to payment under Delaware law, its claim would be disallowed for all purposes. *See In re Idicula*, 484 B.R. 284, 288 (Bankr. S.D.N.Y. 2013); *see also Bank of New York Mellon v. Lane (In re Lane)*, 589 B.R. 399, 407–08 (9th Cir. BAP 2018) ("In the context of a claim objection under § 502(b), the question of whether standing is a substantive or procedural objection has been addressed by only a few courts.  However, those courts are unanimous in

28

stating that it is a substantive objection under § 502(b)(1), which provides that a claim may be disallowed to the extent it is unenforceable against a debtor under any applicable law, including state law.").

Here, Schreiber signed the proof of claim form, naming the "Company" he was signing for as "Primary Member LLC c/o Waterbridge Capital." (PM Exs., Ex. 2 at 3.) A copy of section 9.2 of the Operating Agreements was also submitted with the proof of claim form. (*Id.* at 8.) Also attached is a list of all the alleged distributions made to the Debtor, with dates and amounts included. (*Id.* at 5.)

Section 9.2 of the Operating Agreements provides, in relevant part:

> The Loan may be memorialized by an agreement (the "Loan Agreement") and each tranche disbursement (a "Disbursement") under the Loan shall be evidenced by a promissory note made by the Company in favor of PM. PM shall advance funds from the Loan within seventy-two (72) Business Hours after a request ( a "Disbursement Request") from the Managers, depositing same into the Company's bank account, when such funds are requested by the Managers . . . ."

(*Id.* at 7.)

Under the plain language of section 9.2, PM possessed a conditional right to enforce the Loan. That right was conditional on PM making a disbursement to the Debtor. In *In Re Cluff*, the bankruptcy court aptly explained how conditional rights in an unsecured credit card agreement are triggered:

> Under the test this Court has articulated, these credit card debts are based on a writing. Every time a debtor uses a credit card it results in an electronic and/or written transmission. Contrary to some of the Debtors' arguments, it is not the unsecured underlying credit card agreement that creates the debt—for that only establishes a line of credit that defines the terms of the parties future transactions— it is the actual use of the line of credit that creates the obligation to repay. Each time a debtor uses a credit card, the debtor makes an implied representation of her intent to repay the debt.

313 B.R. at 334.

In substance, the Operating Agreements function similarly to the unsecured credit card agreement in *Cluff*, as the Operating Agreements also set out the terms for future transactions between the parties. *See id.* Indeed, Schreiber characterized PM as functioning as "the initial lending sponsor for the Debtor's start-up operations under credit line incentivized by an equity position." (Schreiber Decl. ¶ 7.) Similar to how a party may draw on a line of credit triggering the credit card company's duty to advance funds, the making of a Disbursement Request triggered PM's duty to advance funds to the Debtor's bank account. The disbursements by PM were made under the borrowing structure delineated in the Operating Agreements, in which the Debtor would provide PM with Disbursement Requests predicated upon a budget in accordance with the provisions of section 9.3. (*Id.* ¶ 18.) Critically, it is PM's making of a disbursement that creates the implied representation of an intent to be repaid under section 9.2 of the Operating Agreements.

Section 9.2 is silent as to how PM should disburse the funds to the Debtor. Contrary to the Debtor's assertions, it does not explicitly require PM to create a bank account to hold funds for making disbursements. The phrase "PM shall advance funds" also does not necessarily require direct payment from PM. For instance, Part 32 of Title 12 of the Code of Federal Regulations defines the phrase "contractual commitment to advance funds" to include a national bank's "obligation to making payment (directly or *indirectly*) to a third person . . . ." 12 C.F.R. § 32.2(g) (emphasis added).

Given this apparent ambiguity, the Court must examine extrinsic evidence to determine the existence of an implied representation of intent to repay the debt. *Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at \*5 (Del. Ch. Jan. 16, 1980) ("But where, as here, the meaning of the

contract cannot be determined from its terms, it is ambiguous and the intent of the parties must be determined from evidence extrinsic of the contract.").

There is no dispute that Skye Hain knew Waterbridge was Schreiber's funding company. (Skye Hain Dep. at 80:18–19.)  According to Skye Hain's Declaration, Schreiber caused Waterbridge to make PM's required investment in the Debtor by forwarding funds to the Debtor. (Skye Hain Decl. ¶ 16.)  Additionally, Exhibit 6 of PM's Exhibits for trial is a Balance Sheet (as of June 30, 2016) issued by Live Primary that notes current liabilities including a "2210 - Loans Payable – PM" for $3,652,235.83.  (PM Exs., Ex. 6.)  Once again, the Debtor failed to acknowledge any corporate separateness between PM and Waterbridge in the recently filed First Amended Disclosure Statement: "Primary Member LLC, filed a proof of claim for $6,436,184 [Claim No. 8].  The Claim of Primary Member LLC is listed on the Amended Schedules in the amount of $6,109,053.17, as shown by the Debtor's books and records."  (ECF Doc. # 77 at 15 n.3.)  The Amended Schedules show (1) the creditor of a claim for $6,109,053.17 is "Waterbridge Capital/ Joel Schreiber" (ECF Doc. # 59 at 33); (2) Waterbridge Capital is a "[c]orporation controlled by insider of the debtor" (*id.* at 41); and (3) Joel Schreiber "[c]ontrols Primary Member, LLC, which holds 50% of Class A units" (*id.* at 46).

PM is essentially a shell company formed on the same day as the Debtor was formed and has never had a bank account to forward funds.  (Obj. Exs., Exs. 4 & 6.)  There is also no dispute that the Debtor received over $6,000,000 from Waterbridge.  The conduct of the parties can be reconciled with text of the Operating Agreements: PM caused Waterbridge to advance the Purported Loan on its behalf.  The performance of PM's $6,000,000 obligation through Waterbridge triggered PM's right to payment under the Operating Agreements.

Even if the Operating Agreements were unambiguous and required PM to advance funds from its own bank account, that requirement was effectively waived by the course of conduct of the Parties. 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 39.27, at 621 (4th ed. 2000) ("[T]he well-known rule regarding waiver of contractual requirements [is that a] party to a contract may by express agreement or by his own course of conduct waive his legal right to insist on strict performance of the covenants of the contract." (internal quotation omitted)); *see also George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975) ("Intention forms the foundation of the doctrine of waiver, and it must clearly appear from the evidence."); *Klein v. Am. Luggage Works, Inc.*, 58 A.2d 814, 818 (Del. 1960) ("Waiver is the voluntary relinquishment of a known right or conduct such as to warrant an inference to that effect. It implies knowledge of all material facts and of one's rights, together with a willingness to refrain from enforcing those rights."). In fact, it is apparent that both parties failed to strictly comply with the respective requirements imposed on them by the agreement. The Debtor did not issue any promissory notes, which appears to be a covenant made in favor of PM that was subsequently waived by PM. The agreement is silent as to the timeline for creating the required promissory note and as to delivery of the promissory note to PM. It is undisputed that on multiple occasions PM failed to comply with the requirement to advance funds within the seventy-two business hours after a request. However, the Debtor continued to make requests and Waterbridge continued to fund these requests to the Debtor's account. The Debtor and PM each failed to enforce their respective rights under the Operating Agreements. Any requirement on PM to advance funds from its own bank account was thus effectively waived.

32

Applying Delaware law,[7] the Court also finds PM had a right to enforce the Other Loans. As stated above, PM was intended as the real party in interest as demonstrated by the Parties' course of conduct. Indeed, the Debtor threatened to impose penalties on PM pursuant to the Second Operating Agreement if Waterbridge did not make certain advancements of funds. (Obj. Exs., at 219.) The fact that PM would be liable for nonpayment of funds shows the Parties' intent to keep PM as the creditor of the Other Loans. The Debtor has failed to show otherwise.

Therefore, PM has standing as a creditor to assert the Proof of Claim.

**B. PM Has Provided Documentation Sufficient to Satisfy Its *Prima Facie* Burden of Proof**

As stated above, the First Amended Disclosure Statement identified "Claim of Primary Member LLC" as "listed on the Amended Schedules in the amount of $6,109,053.17, as shown by the Debtor's books and records." (ECF Doc. # 77.) The exhibits submitted with the Proof of Claim include section 9.2 of the Operating Agreements and a summary of all the advances made pursuant to the Purported Loan, with dates and amounts. (Obj. Exs., Ex. 1.) That summary also indicates the advances made pursuant to the Other Loans at the 10% interest rate. (*Id.*) In the description of payments made in the past year in the Debtor's Amended Schedules, the Other Loans are also indicated to be a "Long Term Loan Payable." (ECF Doc. # 59.) Overall, the First Amended Disclosure Statement, the Amended Schedules, the Debtor's books and records, and

---

[7]    The Court also notes that, unlike the Operating Agreements, there was no choice-of-law provision in the agreement reached for the Other Loans. The first step in the choice-of-law analysis is to determine whether federal or Delaware choice of law rules apply. "[F]ederal choice of law rules are a species of federal common law," and "[b]efore federal courts create federal common law, 'a significant conflict between some federal policy or interest and the use of state law must first be specifically shown.'" *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605–06 (2d Cir. 2001). As it has not been shown that a sufficiently significant federal policy is implicated in this action, Delaware choice of law rules should apply. Given that the Parties are both Delaware LLCs and the Parties have demonstrated an intent to be bound by Delaware law in previous agreements, Delaware law applies. *Dimeling, Schreiber & Park v. Packaging Indus. Grp.*, Inc., 1991 WL 260762, at *3 (Del. Ch. Nov. 15, 1991) ("Since most of the entities involved are or were Delaware corporations and, therefore, have a material connection with Delaware, Delaware law most likely would apply[.]").

the exhibits submitted with the Proof of Claim demonstrate that the Proof of Claim is entitled to *prima facie* validity.

While the Parties have demonstrated an intent to make a loan in the Operating Agreements, this factor is not dispositive of whether the Purported Loan should be recharacterized as equity.  PM has merely met its burden of making a prima facie claim.

### C.  An Adversary Proceeding Is Not Required Under Bankruptcy Rule 7001(7)

PM argues that under Bankruptcy Rule 7001(7), the Debtor is required to commence an adversary proceeding to obtain the relief of recharacterization.  PM further contends that the Debtor's choice to proceed by means of a claim objection relying on Bankruptcy Rule 3007 not only poses a procedural concern, but may compel the Court to apply state law.  This Court disagrees.

The dispute is whether PM's asserted claims, to the extent those claims exist, are actually capital contributions.  Although PM correctly notes that recharacterization claims usually are made in the context of a formal adversary proceeding, an adversary proceeding is not required because recharacterization of debt does not fall under one of the ten exclusive categories identified in Bankruptcy Rule 7001 that require an adversary proceeding.  *See Micro-Precision Techs.,* 303 B.R. at 243 (finding that a request to recharacterize a claim "is not a type of action listed in Rule 7001 that must be brought as an adversary proceeding"); *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 674 (Bankr. N.D. Ga. 2014) ("While the recharacterization of debt has typically been addressed in the Eleventh Circuit through an adversary proceeding, there is no rule requiring such."); *Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, 2007 WL 2509709, at *45 n.17 (Bankr. N.D.N.Y. Aug. 30,

34

2007) ("Plaintiffs' request for recharacterization of the Defendants' claims does not require the commencement of an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.").

However, even if recharacterization did fall within one of the Bankruptcy Rule 7001 categories, exceptions are made when the issue is addressed through a plan. *See, e.g.*, FED. R. BANKR. P. 7001(7) and (8) ("a proceeding to obtain an injunction or other equitable relief, except when a . . . plan provides for the relief," and "a proceeding to subordinate any allowed claim or interest, except when a . . . chapter 11 . . . plan provides for subordination."). In determining whether a confirmed plan binds a particular party, courts generally evaluate whether that party received adequate notice that his rights would be modified by the plan. *In re Stansbury*, 403 B.R. 741, 746 (Bankr. M.D. Fla. 2009). PM is intimately familiar with the court proceedings and has received ample notice of the provisions seeking to recharacterize the Purported Loan in the Chapter 11 Plan of Reorganization (ECF Doc. # 71).

### D. Application of the *AutoStyle* Factors to the Purported Loan Weighs in Favor of Recharacterization

It is PM's position that the evidence and testimony overwhelmingly support the validity of the Claim as a debt obligation under federal or state law. PM explains that at issue is whether federal law or state law should be applied as the rule of decision. PM states that there is a circuit court-level division whether federal or state law should be applied as the rule of decision for purposes of recharacterization of debt in bankruptcy. PM further claims that the courts in this District have employed the same *AutoStyle* analysis, most often without questioning their jurisdiction under section 105(a).

On the contrary, a bankruptcy court's equitable powers include the ability to look beyond form to substance. *See Pepper v. Litton*, 308 U.S. 295, 305 (1939). The "exercise of this power to recharacterize is essential to the implementation of the Code's mandate that creditors have a

higher priority in bankruptcy than those with an equity interest." *See also In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("This Court is not required to accept the label of 'debt' or 'equity' placed by the debtor upon a particular transaction, but must inquire into the actual nature of a transaction to determine how best to characterize it.").

PM argues in a conclusory manner that Delaware law would be the "death knell" of the Objection.  Delaware law governs the parties' rights and relations under the section 19.5 of the Operating Agreement.  PM contends that Delaware law, as opposed to federal law, looks to the terms of the contract to ascertain intent.  (PM MOL at 12, citing *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) ("The question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract.").)  According to PM, the terms were clear and unambiguous that the funding provided by PM was treated and recognized as loans.

PM's contention is incorrect.  The court made clear in *Lyondell* that in applying the *AutoStyle* Factors, the "ultimate exercise" in evaluating any recharacterization claim "is to ascertain the intent of the parties."  *See In re Lyondell Chem.*, 544 B.R. at 102.  In fact, the *Lyondell* court specifically stated that it should look to other indicia of intent, in addition to the *AutoStyle* Factors.  *Id.* (citing *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006)).  Accordingly, PM has failed to show a meaningful difference between federal law and Delaware law and the Court may consider factors under *AutoStyle* and Delaware law.  *See SubMicron*, 432 F.3d at 456 n.8 (applying the following seven-factor test: "(1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of

36

payment in the event of the corporation's insolvency or liquidation").  While PM argues that this

Court should disregard the *AutoStyle* Factors entirely, PM has failed to cite to any Delaware

cases in support of its argument.  This Court will not divine the "intent of the parties" through

PM's proposed self-serving and haphazard methods.  Rather, it is the meticulous application of

the eleven *AutoStyle* Factors that reveals the actual intent of the Parties:

> Certain of the Ninth Circuit cases, . . . when read alone, might suggest that
> the most important of the eleven factors is the objective intent of the parties.
> That is what taxpayer would have us believe.  Ninth Circuit authority,
> however, considered as a whole, is to the contrary. . . .  This intent must be
> determined by looking at the various factors discussed above and weighing
> them to determine what was really in the minds of the parties making the
> advances.

*A. R. Lantz Co. v. U.S.*, 424 F.2d 1330, 1333–34 (9th Cir. 1970) (citations omitted).

Accordingly, this Court follows established precedent and looks to the following eleven

*AutoStyle* Factors to ascertain the intent of the Parties.

(1) <u>"the names given to the instruments, if any, evidencing the indebtedness"</u>

As to the first factor, "[t]he issuance of a stock certificate indicates an equity

contribution; the issuance of a bond, debenture, or note is indicative of a bona fide

indebtedness."  *S & B Holdings*, 420 B.R. at 158 (quoting *Stinnett's Pontiac Serv., Inc. v.

Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984)).  "The absence of notes or other instruments of

indebtedness is a strong indication that the advances were capital contributions and not loans."

*AutoStyle*, 269 F.3d at 750 (citing *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d

625, 631 (6th Cir. 1986)).

PM argues that the plain language of section 9.2 of the First Operating Agreement

labeled PM's investment as a loan.  This factor should not be dispositive; after all, as noted in *In

re Hedged-Investments Assocs. Inc.*, when a bankruptcy court recharacterizes a loan, it

"effectively ignore[s] the label attached to the transaction at issue and instead recognize[s] its true substance."  380 F.3d 1292, 1297 (10th Cir. 2004).  The effect is that "[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as a corporate debt, but are instead treated as a capital contribution."  *Id.*

Furthermore, under the plain language of section 9.2, each Disbursement under the Loan was required to be evidenced by a promissory note made by the Company in favor of PM.  In response to a discovery request to produce any promissory notes, PM responded "[t]he Debtor in violation of the Operating Agreement did not issue promissory notes."  A few days later, Schreiber's Declaration stated that no promissory notes were signed "without fault of either party."  (Schreiber Decl. ¶ 25.)  In any case, PM issued over sixty Disbursements without a single promissory note.  At the Hearing, PM argued that it was unfeasible to create promissory notes for all the distributions.  However, PM could not explain why a master promissory note was not used in that case.  It is undisputed that there were no instruments created or requested related to PM's investment in the Debtor.

At the Hearing, PM also argued that the Operating Agreements should be considered master loan agreements.  It is doubtful that over $6,000,000 in distributions were sufficiently governed by a single paragraph.  "The more specific and complete the parties are in identifying and codifying the terms of the alleged loan agreement, the more like a loan the transaction appears."  *In re Cold Harbor Assocs., L.P.*, 204 B.R. at 916.  "By contrast, if the terms of such an agreement are vague and nonspecific, such a transaction appears more like a shareholder contributing capital to keep his investment afloat."  *Id.*  In fact, basic provisions routinely seen in loan agreements were absent.  For instance, there was no provision discussing the delivery of the promissory note to PM.  Protections typically included in a commercial finance transaction of

38

this magnitude, such as an acceleration clause or a sinking fund, were also absent.  The mere fact

that the parties referred to PM's investment as a loan in the Operating Agreements and books and

records is not dispositive.  *See Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)*, 813 F.2d

266, 272 (9th Cir. 1987) (reversing bankruptcy court's finding that the transactions involved

sales—"[s]imply calling transactions 'sales' does not make them so.  Labels cannot change the

true nature of the underlying transactions"); *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631

(6th Cir. 1986) ("entry of the advances as loans on the accounting records of both entities

provides little if any support for a finding of bona fide debt").  PM's principal is a sophisticated

investor well-versed in the language of loan agreements and promissory notes.  PM does not

deny its role in drafting section 9.2 and also concedes that the failure to draft any promissory

note was not the fault of either party.  The clear lack of information speaks volumes about the

true relationship of the Parties.

This factor weighs in favors of recharacterizing the Purported Loan as equity.

(2) <u>"the presence or absence of a fixed maturity date and schedule of payments"</u>

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that

the advances were capital contributions and not loans . . . [and] the absence of a set schedule of

repayment of principal weighs in favor of equity, but is not dispositive."  *AutoStyle*, 269 F.3d at

750.

As argued by the Debtor, section 9.2 does not require any payments unless and until there

is an IPO or Liquidity Event.  Liquidity Event is defined as follows:

> Each of the following events shall be considered a "Liquidity Event" unless
> the Members elect otherwise by written notice: (A) a merger or
> consolidation in which
>
> (i)      the Company is a constituent party or

(ii)    a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation,

except any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation;

(b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

(Obj. Exs., Ex. 3 at Schedule 2; Ex. 4 at Schedule 2; Ex. 5 at Schedule 2.)

The Purported Loan has no fixed maturity date.  This indicates that the investment was not a loan, whereas no reasonable lender would make over $6,000,000 in unsecured advances to a startup business without a fixed maturity date.  *Curry v. U.S.*, 396 F.2d 630, 634 (5th Cir. 1968) ("[O]ne of the normal requisites of a true debt situation is that a sum certain will be paid on a particular day.").

Accordingly, this factor weighs in favor of recharacterizong the Purported Loan as equity.

(3) "the presence or absence of a fixed rate of interest and interest payments"

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans."  *AutoStyle*, 269 F.3d at 750.

The Debtor explains that section 9.2 provides for a nominal interest rate of 1% but does not require or allow for any interest payment.  PM explains that the "LLC Agreement provides

for a specific interest rate of one (1%) percent per annum on all advances, which was calculated by PM as part of the Claim. Indeed, Skye Hain testified that the Debtor maintained a separate ledger for the Loans and charted the various tranches. (Skye Hain Dep. at 73:16–74:2.)

Although there is a fixed rate of interest, it accrued at only one percent. In July 2015, when the First Operating Agreement was executed, the prime rate was 3.25%, for which the startup business would never qualify as a commercial borrower. This *de minimis* rate further indicates that the Purported Loan was equity.

This factor weighs in favors of recharacterizing the Purported Loan as equity.

(4) "the source of repayments"

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 631 (6th Cir. 1986)). "The question is whether the lender has any reasonable expectation of payment if the business fails." *Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 366 (Bankr. E.D. Okla. 2010). The relevant inquiry in deciding whether a claim should be recharacterized as an equity interest is not whether the alleged debt may be paid out of the debtor's revenues, but whether it is to be paid only out of the debtor's profits. *Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 739 (C.D. Cal. 2012).

The only source of repayment for the "loans" would be the proceeds of an IPO or a Liquidity Event if such an event were to occur. As such, this factor weighs in favors of recharacterizing the Purported Loan as equity.

(5) "the adequacy or inadequacy of capitalization"

"Thin or inadequate capitalization is strong evidence that the advances are capital

contributions rather than loans." *AutoStyle*, 269 F.3d at 751 (quoting *Roth Steel*, 800 F.2d at

630). Courts have cautioned against placing too much emphasis on this factor. *See S & B*

*Holdings*, 420 B.R. at 159 ("Courts should not put too much emphasis on this factor, in any

event, because all companies in bankruptcy are in some sense undercapitalized.").

The Debtor explains that Debtor's business plan was to "build out, renovate, decorate and

furnish Manhattan office space in two locations, pay for all startup expenses to get the business

off the ground and then lease areas of this newly improved space to multiple parties in a shared

office environment." (Skye Hain Decl. ¶ 35.) The First Operating Agreement's capital

contributions of $1,000, consisting of PM's $400, were massively inadequate, and it was obvious

from the First Operating Agreement that $6,000,000 was needed for this start up business to get

up and running.

PM contends:

> Like many start-ups, the LLC Agreement provides for modest capitalization
> by the members. This is consistent with the fact that until the Debtor's
> business got underway, it did not need much capital. However, after the 26
> Broadway location was procured, the Debtor, like many businesses,
> financed day-to-day operations through the Loans. That the Loans were
> funded over three (3) years clearly cuts against the Objection.

(PM MOL at 15.)

PM cites to *Matter of Yoga Smoga, Inc.*, 2016 WL 8943849, at *13 (Bankr. S.D.N.Y.

Dec. 20, 2016), for the proposition that this factor deserves little weight because all companies in

bankruptcy are in some sense undercapitalized. However, *Live Primary* is distinguishable. The

Debtor was inadequately capitalized at the time of the loan because it was a start-up in its early

42

stages of formation.  It is highly unlikely that a disinterested lender would have made unsecured

loans of over $6,000,000 to provide the Debtor with funds necessary to start its business.

Quite frankly, any suggestion that initial capitalization of $1,000 was sufficient for a new

venture that projected that it needed more than $6 million to build out its facilities is frivolous.

This factor weighs in favor of recharacterizong the Purported Loan as equity.

### (6) "the identity of interest between the creditor and the stockholder"

"If stockholders make advances in proportion to their respective stock ownership, an

equity contribution is indicated," while "a sharply disproportionate ratio between a stockholder's

percentage interest in stock and debt is indicative of bona fide debt." *AutoStyle*, 269 F.3d at 751

(citing *Roth Steel*, 800 F.2d at 630).  It applies most obviously when several stockholders extend

the funds, and one can measure the proportion of the contribution of each against the stock

ownership of each. *AutoStyle*'s "identity of interest" factor is typically deployed to establish that

a stockholder making a loan to a corporation in proportion to its ownership interest indicates

such loan is equity. *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 567 (Bankr. S.D.N.Y. 2016).

PM is both a member of the Debtor and the purported creditor.  At the time of formation,

PM was a 40% owner and Skye Hain and Orenstein were each 30% owners.  PM contends that

"[t]he $6.0 million of Loans funded by PM is vastly and exponentially disproportionate to the

contributions of other members."  (PM MOL at 15.)  The Debtor concedes that the advances

were not made in proportion to ownership interests.  However, the Debtor argues that the reason

for the disproportion is that Skye Hain and Orenstein contributed sweat equity, while PM

contributed money.  PM did not have operational knowledge to contribute to the business.

The Debtor's argument is persuasive.  Contributions other than money may be considered in the analysis.  For instance, in *Lexington Oil & Gas*, the Bankruptcy Court for the Eastern District of Oklahoma reasoned:

> The Investment Package provided that Dow and Cox would each receive a 25% interest in International in exchange for cash contributions of $500,000. Other investors were to provide cash, property, and/or expertise. Under the concept outlined in the Investment Package, four investors were to provide roughly equal value (in the form of assets, cash, and/or expertise) in exchange for equal ownership interests in International. Such a structure is indicative of equity. In a manner roughly consistent with this structure, and thus consistent with an equity transaction, Dow and Cox provided their $500,000 and received their 25% ownership interest.

423 B.R. at 367 (Bankr. E.D. Okla. 2010).

The *Lexington* court went on to conclude that recharacterizing promissory notes given to purported lenders of the chapter 7 debtor and its former parent company as equity contributions was warranted where the underlying transaction, when viewed as a whole, was an attempt to provide purported lenders with benefits of equity ownership without any of attendant risks.  *Id*. at 371.

Similarly, here, the structure of contributions with money from PM and contributions of sweat equity from Orenstein and Skye Hain are indicative of equity.  The Purported Loan was indubitably tied to PM's membership interest.  Indeed, section 9.3 of the Operating Agreements provided that if PM did not make the Purported Loan, it would lose its membership interest in proportion to the amount of the Purported Loan it failed to fund.  (Obj. Exs., Ex. 3 § 9.3; Ex. 4 § 9.3; Ex. 5 § 9.3.)

This factor slightly weighs in favors of recharacterizing the Purported Loan as equity.

(7) "the security, if any, for the advances"

The *AutoStyle* court stated that "[t]he absence of a security for an advance is a strong

indication that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at

752 (citing *Roth Steel*, 850 F.2d at 631).  However, the court in *Lyondell* narrowed the weight of

this factor:

> [W]hen loans are made on an unsecured basis, they are much easier to recharacterize than secured loans, and deserve higher scrutiny; the additional formality associated with secured loans, and the need to perfect their security interests, tends to make secured loans particularly difficult to recharacterize. But bona fide loans have been made on an unsecured basis for decades, if not centuries (e.g., when insurance companies made private placement loans on an unsecured basis), and the fact that they were made without security cannot be regarded as a "strong indication" that loans documented as such were really "capital contributions rather than loans."

*In re Lyondell*, 544 B.R. at 98.

In the present case, it is undisputed that the Purported Loan were advanced on an

unsecured basis.  Accordingly, this factor slightly weighs in favors of recharacterizing the

Purported Loan as equity.

(8) "the corporation's ability to obtain financing from outside lending institutions"

"The fact that no reasonable creditor would have acted in the same manner is strong

evidence that the advances were capital contributions rather than loans." *S & B Holdings*, 420

B.R. at 158 (citing *AutoStyle*, 269 F.3d at 752).  This factor looks at "whether a reasonable

outside creditor would have made a loan to the debtor on similar terms."  *Lyondell*, 544 B.R. at

99; *In re AutoStyle Plastics, Inc.*, 238 B.R. 346, 350 (Bankr. W.D. Mich. 1999) (citing *Cold

Harbor*, 204 B.R. at 918); *see also Roth Steel*, 800 F.2d at 631; *S & B Holdings*, 420 B.R. at 158

(explaining that this factor looks at whether "a reasonable creditor would have acted in the same

manner" (citation omitted)).

20-11612-mg    Doc 134    Filed 03/02/21    Entered 03/02/21 16:42:35    Main Document
Pg 46 of 56

The Debtor explains that "[the Debtor] was a capital-intensive startup business in Manhattan's pricey real estate environment.  When PM advanced the first $50,000 three (3) weeks after the Operating Agreement was signed, [the Debtor] was nothing but a business plan without operational history or any real collateral." (Debtor MOL at 19.)  The Debtor contends "[t]raditional financing based upon strong collateral and/or creditworthy personal guarantors was either not available or not pursued."  (*Id.*)

PM contends "[t]he Debtor borrowed funds from multiple other sources on an equally unsecured basis, as noted throughout the deposition and reflected on the financial statements. The fact that other creditors also provided financing shows that PM was not alone in lending money to the Debtor."  (PM MOL at 16.)

The Debtor's argument that PM invested in the Debtor in the very early stages of the business without any security or personal guarantees is persuasive.  There is no evidence of outside lending institutions providing loans at the time the parties executed the operating agreement.  The mere fact that unsecured creditors existed does not hold much weight.  PM does not attempt to show that the unsecured lenders made investments at the same time or under the same terms of PM's Purported Loan.  The Debtor could not obtain loans at the time that were remotely similar to those extended by PM.  Given the inherent risk of any new venture, it is doubtful that a creditor as sophisticated as Schreiber would have agreed to extend a $6,000,000 loan through PM with no security, no loan agreement, no promissory note and no fixed maturity.

This factor weighs in favors of recharacterizing the Purported Loan as equity.

> (9) <u>"the extent to which the advances were subordinated to the claims of outside creditors"</u>

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *AutoStyle*, 269 F.3d at 752.  The Debtor contends

"[t]he Purported Loan was payable – if ever – only upon a Liquidity Event, (Exhibit 3, pp 5-6; Exhibit 52 ¶40), which subordinated the entire $6.4 Million to other creditors.  This meant that all of the real secured and unsecured creditors would continue to get paid along the way." (Debtor MOL at 15.)

PM contends "[a]t the time the Loans were funded, they were not subordinated to any other creditor or debt."  (PM MOL at 16.)  In *S & B Holdings*, the court evaluated an advance that ranked junior to one short-term loan but was senior to the claims of other creditors, and concluded that even though the advance was partially subordinated, that factor did not weigh in favor of recharacterization.  420 B.R. at 160.  Here, the Purported Loan was clearly unsecured and unlike the loans in *S & B Holdings*, the distributions were not senior to any other creditor claims.  The Purported Loan was payable only upon an IPO or a Liquidity Event.  The Purported Loan was effectively subordinated to other creditors unless and until either an IPO or Liquidity Event occurred.  In fact, the Operating Agreements did not in any way prevent subordination of the Purported Loan to other loans upon the occurrence of an IPO or Liquidity Event. Furthermore, if PM failed to provide timely funding, PM's interest would be subordinated to any Bridge lender pursuant to section 9.3(d).

Accordingly, this factor weighs in favors of recharacterizing the Purported Loan as equity.

          (10)        <u>"the extent to which the advances were used to acquire capital assets"</u>

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."  *AutoStyle*, 269 F.3d at 752. Courts have held that advances for operational expenses are indicative of debt even if a portion of the advance was used to fund capital expenditures.  *Am. Twine Ltd. P'ship v. Whitten*, 392 F.

Supp. 2d 13, 22 (D. Mass. 2005) (holding that recharacterization was inappropriate where "advances were used primarily for operational expenses, although some of the proceeds were used to acquire capital equipment").

PM contends the "Loans were mainly used for payment of operating expenses and salaries over a three (3) year period, and were not used to acquire capital assets." (PM MOL at 16.) Although the Debtor's use of the Purported Loan to acquire daily operating needs of the corporation may indicate it was an equity investment, this factor must still be viewed in context. *See Celotex Corp. v. Hillsborough Holdings Corp.* (*In re Hillsborough Holdings Corp.*), 176 B.R. 223, 250 (M.D. Fla. 1994); *Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1151 (10th Cir. 2015) (affirming the bankruptcy court's finding "that AFI's use of Mr. Jenkins' advances to fund operating expenses rather than to purchase capital assets—indicating debt—is irrelevant because AFI incurred no expenses other than the funding of reclamation operations" (citations omitted)).

Here, section 9.2 contemplates that the Loan was for "the establishment and operation of two (2) shared office facilities (the 'Initial Centers'), in addition to any necessary startup expenses (eg: website, marketing, branding) to be developed by the Company, provided however that the start-up expenses and costs for the first Initial Center shall not exceed $3,700,000 in the aggregate." (ECF Doc. # 106, Ex. B at 6.) The Debtor contends "[o]ne thousand dollars ($1,000) in capital contributions – $400 of which came from PM – doesn't acquire very much. The initial capital assets of the Debtors were acquired through the proceeds of the Purported Loan." (Debtor MOL at 16.)

The Debtor submits the Skye Hain Declaration in support of this argument. According to Skye Hain, all of the Debtor's assets were acquired with the proceeds of the "loan" made by PM.

48

(Skye Hain Decl. ¶ 40.)  PM also acknowledges that if the loans were not extended, the Debtor

would not be able to start operating and would not be able to pay the security deposit to the

landlord, build-out its facilities on the 3rd and 8th floors of 26 Broadway, build-out its facility on

West 30th Street or meet its payroll or other operating expenses.  (Schreiber Decl. ¶ 9.)

The Debtor testified that the proceeds of the Purported Loan were used to make capital

improvements to the Debtor's properties.  Both the Debtor and PM testified that the advances

were used to pay normal operating expenses.  The Parties disagreed whether the items described

in the Use of Funds Report (Obj. Exs., Ex. 12) should be classified as "Capital Assets."[8]

Given the funds were provided in the early stages of the Debtor and, as conceded by PM,

necessary to starting its business, the funds have the character of equity.  *Slappey Drive Indus.*

*Park v. U.S.*, 561 F.2d 572, 583 (5th Cir. 1977) ("[A]ppellants note, the corporations used the

contributions primarily for land, which constitutes the inventory of these real estate development

firms . . . .  Most of these advances, while perhaps not used for capital assets, nonetheless served

'to finance initial operations.'  Providing the bulk of the necessary first assets without which a

corporation could not begin functioning is as traditional a usage of capital contributions as is

purchasing 'capital assets.'"); *Texas Farm Bureau v. U.S.*, 725 F.2d 307, 314 (5th Cir. 1984)

("Purchase of such 'necessary first assets' points us away from a finding of debt"); *Fin Hay*

---

[8]     Bankruptcy courts have not adopted a particular definition for "capital asset," which is a broad term.  *In re Virginia Broadband, LLC*, 521 B.R. 539, 574 n.186 (Bankr. W.D. Va. 2014), *aff'd sub nom. Virginia Broadband, LLC v. Manuel*, 538 B.R. 253 (W.D. Va. 2015).  In the taxation context from which these *AutoStyle* Factors are derived,

> the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include [among other items] . . . property used in his trade or business, of a character which is subject to the allowance for depreciation provided in [26 U.S.C. §] 167, or real property used in his trade or business; . . . accounts or notes receivable acquired in the ordinary course of trade or business for services rendered . . . [and] supplies of a type regularly used or consumed by the taxpayer in the ordinary course of a trade or business of the taxpayer.

26 U.S.C. § 1221(a).

*Realty Co. v. U.S.*, 398 F.2d 694, 698 (3d Cir. 1968) ("the corporation used the proceeds of the notes to purchase its original assets").

This factor, thus, also weighs in favors of recharacterizing the Purported Loan as equity.

        (11)        <u>"the presence or absence of a sinking fund to provide repayments"</u>

A sinking fund is "[a] fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt." BLACK'S LAW DICTIONARY (10th ed. 2014). The *AutoStyle* court recognized that where the loans were secured with liens, they obviated the need for a sinking fund, and thus concluded that "this factor only slightly weighs toward equity, if at all." 269 F.3d at 753. The loans are unsecured and there is no sinking fund to provide repayments. Accordingly, this factor weighs in favors of recharacterizing the Purported Loan as equity.

### E.  The Other Loans Are Not "Unauthorized"

There is no dispute that an agreement existed for Waterbridge to advance the Other Loans at a 10% interest rate.  (Schreiber Decl. ¶¶ 10, 21; Skye Hain Decl. ¶ 20.)  The Debtor does not analyze whether the Other Loans should be recharacterized as equity under the *Autostyle* Factors. Rather, the Debtor argues that the Other Loans should be disallowed because those loans "are unauthorized loans made by Waterbridge, an entity other than PM, that declined to file a proof of claim after its claim was disputed by the Debtor."  (Debtor MOL at 20.)  Specifically, the Debtor argues that the unanimous written approval requirements of the Second Operating Agreement and the Third Operating Agreement were not satisfied.  As already stated herein, this Court considers to the extent that any debt claim was properly asserted, PM is the relevant creditor, whether transfers were made by PM or Waterbridge.

The issue is whether the loans should be disallowed as "unauthorized loans." Waterbridge provided the Other Loans over a period starting January 1, 2018 and ending May 17, 2019. (Obj. Exs., 1 at 7.) At the time all the Other Loans were advanced by Waterbridge, the Second Operating Agreement was the operative agreement. According to Skye Hain, the only time Waterbridge transferred funds to the Debtor after the Third Operating Agreement was in effect was in relation to Waterbridge repaying back a $150,000 loan it had received from the Debtor. (Skye Hain Decl. ¶ 25.) After a thorough reading of the Second Operating Agreement, the Court concludes that the Debtor's interpretation of the Approval Requirement is incorrect. As explained below, that requirement has been satisfied and in any case has no bearing on PM's claim to the Other Loans. Alternatively, if the Approval Requirement was relevant to the enforceability of the Other Loans, any failure to satisfy that requirement was waived by the Parties.

As the sole Manager of the Debtor, Skye Hain was required to obtain "unanimous written approval" from all Class A Members in transacting with Members on behalf of the Debtor. *See* Obj. Exs., Ex, 4 § 8.2(b)(ix).) The only Class A Members at the time were Skye Hain and PM. The term "unanimous written approval" is not further defined. The Operating Agreements do not provide specific procedures or deadlines for obtaining written approval.

Given that the term "approval" is not defined in the Operating Agreements, the Court interprets the term according to its ordinary meaning. *See Alta Berkeley VIC. V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *see also Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018); *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *7 (Del. Super. Ct. Jan. 31, 2019). According to Black's Law Dictionary,[9]

---

[9]    *Cephas v. State*, 911 A.2d 799, 801 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined" within the statutes they

"approval" means "to give formal sanction to; to confirm authoritatively." *Approval, Black's Law Dictionary* (11th ed. 2019).  This definition contemplates "at least two parties working together and suggests that the approving party has a right that is akin to a veto right." *Am. Bottling Co. v. Repole*, 2020 WL 7787043, at *9 (Del. Super. Ct. Dec. 30, 2020) (denying a motion to dismiss a promissory estoppel claim where text messages endorsing a transaction were alleged to demonstrate an unambigious promise to approve the transaction pursuant to the parties' distribution agreement).

Here, there is no dispute that Skye Hain was acting on behalf of the Debtor in seeking funds from Schreiber, a Class A Member.  Thus, Approval Requirement was implicated. Schreiber's April 2019 lays out several relevant terms of an agreement pursuant to a previous conversation: (1) the Debtor owed $35,000 as of April 18, 2019, (2) Schreiber will fund an additional $165k as a loan, and (3) Waterbridge will have a total loan to Live Primary in the amount of $200,000.  (Obj. Exs. at 182.)  In response, Skye Hain's April 2019 Email states "[c]onfirmed" and agrees to repay the loans as a priority once the Debtor has secured additional funding to consolidate hard money and operation costs.  In Skye Hain's September 2019 Email, sent as another response to Schreiber's April 2019 Email, she states "this email confirmation should serve as confirmation Primary will repay the $200k loan from Waterbridge at 10% interest."  (*Id.* at 223.)  The June 28 Email documents that the $200,000 loan was funded to the Debtor and that the outstanding amount of that loan as $150,000.  (*Id.* at 220.)  Collectively, the documentation of the emails is sufficient to constitute unanimous written approval from both

---

appear.); *Andrews v. State*, 34 A.3d 1061, 1063 (Del. 2011) (Because a key word was not otherwise specifically defined in the subject statute, it "must be given its common, or dictionary, definition."); *Freeman v. X-Ray Associates, P.A.*, 3 A.3d 224, 227–28 (Del. 2010) ("Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for assistance in determining the plain meaning of undefined terms.").

Schreiber and Skye Hain.  Schreiber's April 2019 Email clearly confirms the terms of his oral

agreement with Skye Hain.  Schreiber's April 2019 Email, together with the June 28 Email,

demonstrate that written approval was obtained.  There is also no question that Skye Hain

approved the loans; indeed, she specifically requested the loans and stated she was confirming

the Debtor would repay the loans at 10%.  Accordingly, the Approval Requirement was satisfied.

However, even if the Approval Requirement were not satisfied, it does not follow that the

Other Loans would be unenforceable by PM.  That requirement is clearly a covenant imposed on

managing member Skye Hain for the benefit of Class A Members Skye Hain and PM.  Generally

speaking, LLC members have some power to define or limit the managers' duties in the

operating agreement or by consent at the time of the transaction, including limiting the manager

from engaging in self-dealing transactions with members.  2 RIBSTEIN AND KEATINGE ON LTD.

LIAB. COS. § 12:4.  The Debtor essentially argues that the Approval Requirement is a condition

precedent to the validity of the Other Loans, despite the delivery and acceptance of the Other

Loans by the Debtor.  The Complex Commercial Litigation Division of the Delaware Superior

Court rejected a similar argument by the defendant in *B&C Holdings, Inc. v. Temperatsure

Holdings, LLC*, 2020 WL 1972855 (Del. Super. Ct. Apr. 22, 2020), *aff'd*,  2021 WL 554198

(Del. Feb. 15, 2021).  There, the defendant sought to escape its obligation to make $6,000,000 in

payments to the plaintiff under a promissory note when it finally realized—almost three years

after signing the note—that it had miscalculated the principal amount and overvalued the

company it purchased by over $5,900,000.  *Id.* at *5.  Almost three years after signing the note

and making payments in the amount of $200,000, the defendant argued that its own failure to

calculate the principal amount pursuant to the procedures laid out in the note should excuse its

performance under the note.  *Id*. at *6.  The court explained the critical distinction between a

covenant and a condition precedent:

> The distinction between a covenant and a condition precedent is that non-occurrence of a covenant, unlike a condition precedent, does not release [the defendant] from its obligation to perform under the Note.  Generally, a condition precedent is a term rendering performance by one party contingent upon a condition or performance of another.  This condition "must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies."  Necessarily, whether a condition is one precedent to performance by the other party is divined from the parties' intent.  Courts look to an agreement's terms as evidence of that intent . . . .

*Id.* at *10 (citations omitted).  After examining the plain language of the Note, the court

determined that the procedures for calculating the principal amount were covenants imposed for

the benefit of the plaintiff.  *Id*.  The court concluded that the defendant's breach of that covenant

could not allow the defendant to further excuse its own performance under the obligations of the

note.  *Id.*

Similarly, here, the plain language of the Second Operating Agreement restricts the

ability of the Manager to enter into transactions with members on behalf of the Debtor without

approval by Class A Members.  This is a typical terms imposed for the benefit of members in

LLC operating agreements.  There is also no language in the Second Operating Agreement

suggesting that Debtor's obligation to perform was conditional on the Manager satisfying the

requirement.  Alternatively, even if the Approval Requirement was a condition precedent, both

parties have effectively waived this condition through their performance.  "A condition

precedent may be waived by the party for whose benefit the contingency clause was inserted in

the contract" and "by conduct that demonstrates such an intention."  *Id.*  The Parties have each

demonstrated such an intention here.

54

Accordingly, this Court finds that Debtor has failed to demonstrate that the Other Loans should be disallowed on the basis that they are unauthorized. However, the Other Loans can be disallowed under section 502(d).

### F.   The Claim for Other Loans is Disallowed Under Section 502(d)

The Debtor argues that if the Other Loans are considered to be debt by this Court, section 502(d) should apply. Section 502(d) states that "the court shall disallow any claim of an entity . . . that is a transferee of a transfer avoidable under section 547." Section 547 states that "the trustee may avoid any transfer . . . made on or within 90 days before the date of the filing of the petition." 11 U.S.C. § 547(b)(4)(A). "Thus, a Court is to bar the claim of any transferee of a transfer made on or within 90 days before the filing of the bankruptcy petition." *In re McLean Indus., Inc.*, 196 B.R. 670, 676 (Bankr. S.D.N.Y. 1996).

The 90-day-look-back period runs from April 13, 2020. According to the Proof of Claim, the Debtor repaid a total of $40,000 to PM within that period.[10] The transfer in this case clearly meets the requirements of an avoidable transfer under section 547. Accordingly, the Other Loans must be disallowed in their entirety pursuant to section 502(d).

### IV.    <u>CONCLUSION</u>

As noted in *Lyondell*, "in most cases where courts have recharacterized a loan as equity, the purported loan documentation did not comport with the formalities typical of debt instruments, the lender did not take any action to enforce his rights as a lender, or both." 544 B.R. at 104. Conclusory assertions that the Parties intended to make a loan at the time the First

---

[10]    In the Debtor's first statement of financial affairs filed on August 12, 2020 (ECF Doc. # 41), the Debtor indicated that the payments made in the 90-day-look-back period totaled $43,750.00, with payments made on April 22, 2020 and June 8, 2020.

Operating Agreement was signed cannot be substituted for some concrete demonstration of formal loan documentation and enforcement of rights as a lender. The analysis of the objective *AutoStyle* Factors is relevant to whether the relationship between the Parties was one of a debtor and creditor. The failure to issue any promissory notes, the absence of fixed, realistic dates for repayment, the *de minimis* interest rate, the subordination of the Purported Loan to other debt, the lack of any security or sinking fund, and the use of advances for initial operating expenses rate all reveal the economic reality that the Purported Loan functioned as equity. Accordingly, this Court **GRANTS** the requested relief of recharacterization of the Purported Loan as equity.

Additionally, the Court **SUSTAINS** the Debtor's objection and disallows the POC with respect to the Other Loans because PM received a $40,000 avoidable transfer within 90 days of the Petition Date, which PM has not repaid.

**IT IS SO ORDERED.**

Dated:   March 2, 2021
           New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge